**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| O&G LEASING, LLC, *et al.* | ) | Case No. 10-01851 EE |
| | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DISCLOSURE STATEMENT FOR DEBTORS'**
**PLAN OF REORGANIZATION**

O&G Leasing, LLC ("**O&G**") and Performance Drilling Company, LLC ("**Performance**"), the above-captioned debtors and debtors-in-possession (each generally a "**Debtor**" and, collectively, the "**Debtors**" or the "**Company**"), submit this *Disclosure Statement* for solicitation of votes on the accompanying *Plan of Reorganization* [Dkt #407] (the "**Plan**"). Capitalized terms used and not otherwise specifically defined herein shall have the meaning ascribed to them in the Plan.

## I.    INTRODUCTION

The purpose of a Disclosure Statement is to set forth information (1) regarding the history of the Debtors, their businesses and these jointly administered Chapter 11 Cases; (2) concerning the Plan; (3) advising the Holders of Claims and Interests of their rights under the Plan; (4) assisting the Holders of Claims and Interests in making an informed judgment regarding whether they should vote to accept or reject the Plan; and (5) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of Chapter 11 of the Bankruptcy Code and should be confirmed. Only the representations to be made concerning the Debtors or the Plan that are set forth in this Disclosure Statement are those authorized by the Court to be made. Any representations or inducements made to secure your acceptance of the Plan that are other than as set forth in this Disclosure Statement are not authorized and should not be relied upon by you in arriving at your decision.

Accompanying this Disclosure Statement are copies of the following (collectively, with the Disclosure Statement, the "**Solicitation Package**"):

- the Plan, attached hereto as Exhibit 1;

- the Disclosure Order, attached hereto as Exhibit 2;

- the *Motion to Approve Employment of Voting Agent and Solicitation Procedures* [Dkt # __] and *Order Approving Employment of Voting Agent and Solicitation Procedures* [Dkt # __], collectively attached hereto as Exhibit 6; and

- one or more Ballots to those members of the voting classes.

Article 1 of the Plan contains definitions of certain terms. Where those capitalized terms are used in this Disclosure Statement, they have the meaning set forth in Article 1 of the Plan. Those defined terms are very important to fully understand this Disclosure Statement.

**THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST. THE DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN IS A SUMMARY ONLY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.**

### A.    Disclosure Order

By order dated _____, 2011 (the "**Disclosure Order**") a copy of which is annexed hereto as Exhibit 2, the Bankruptcy Court approved this Disclosure Statement, in accordance with § 1125 of the Bankruptcy Code, as containing "adequate information" to enable a hypothetical, reasonable investor typical of Holders of Claims against, or Interests in, the Debtors, to make an informed judgment as to whether to accept or reject the Plan, and authorized its use in connection with the solicitation of votes on the Plan. The Disclosure Order also establishes the following dates and deadlines:

- the deadline for filing objections to confirmation of the Plan;

- the date for determining that Holders of Claims may vote on the Plan;

- the record date for determining the Holders of 2009 Debentures entitled to receive Solicitation Packages and to vote on the Plan;

- the deadline for voting on the Plan; and

- the date on which a final hearing on confirmation of the Plan will be held.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement and § 1125 of the Bankruptcy Code. In voting on the Plan, Holders of Claims and Interests should not rely on any information relating to the Debtors and their businesses, other than that contained in this Disclosure Statement, the Plan and all exhibits to either.

### B.    Voting on the Plan

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are (i) "impaired" by a plan of reorganization, and (ii) entitled to receive a distribution under such a plan, are entitled to vote on the plan. If you are entitled to vote to accept or reject the Plan (see Article V.B of this Disclosure Statement), accompanying this Disclosure Statement should be the Ballot for casting your vote(s) on the Plan and a pre-addressed envelope for the return of the Ballot. BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN THE VOTING CLASSES BECAUSE THEY ARE THE ONLY HOLDERS OF CLAIMS THAT MAY VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS RECOMMEND THAT THE HOLDERS OF CLAIMS IN ALL SOLICITED CLASSES VOTE TO ACCEPT THE PLAN. The Debtors believe that the prompt confirmation and implementation of the Plan is in the best interests of the Debtors, all Holders of Claims and Interests, the Debtors' Chapter 11 estates and all persons who may be affected by the confirmation or denial of the confirmation of the Plan.

After carefully reviewing this Disclosure Statement and the exhibits attached hereto, please indicate your vote with respect to the Plan on the enclosed Ballot and return it in the envelope provided. Voting procedures and requirements are explained in greater detail elsewhere in Article VIII of this Disclosure Statement and in Exhibit 6 hereto. If you are entitled to vote and you did not receive a ballot, received a damaged ballot or lost your ballot, please call the Debtors' solicitation and voting agent, BMC Group, Inc., at 1-888-909-0100. Votes cannot be transmitted via email, orally or by facsimile, except in the case of a master ballot submitted by a Master Ballot Agent. Accordingly, you are urged to return your signed and completed ballot, by hand delivery, overnight delivery or regular U.S. mail, promptly, so that it is received by the Debtors' solicitation agent on or before the Voting Deadline at the applicable following address:

| **BY UNITED STATES MAIL:** | **BY OVERNIGHT COURIER OR PERSONAL DELIVERY:** |
|---|---|
| O&G Leasing LLC Voting Agent | O&G Leasing LLC Voting Agent |
| BMC Group, Inc. | BMC Group, Inc. |
| P.O. Box 3020 | 18750 Lake Drive East |
| Chanhassen, MN 55317 | Chanhassen, MN 55317 |

**IN ORDER TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED BY 5:00 P.M. (CENTRAL TIME) ON _____, 2011 (THE "VOTING DEADLINE"). ANY EXECUTED BALLOTS WHICH ARE TIMELY RECEIVED BUT WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE A VOTE TO ACCEPT THE PLAN.**

As established in the Disclosure Order, the date for determining the record holders of Claims or Interests that may vote on the Plan is _____, 2011 (the "**Record Date**").

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS. HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ IT CAREFULLY AND IN ITS ENTIRETY, AND WHERE POSSIBLE, CONSULT WITH COUNSEL OR OTHER ADVISORS PRIOR TO VOTING ON THE PLAN.**

**THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, WHICH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS AND PROVISIONS OF THE PLAN AND THIS DISCLOSURE STATEMENT, THEN THE TERMS AND PROVISIONS OF THE PLAN SHALL CONTROL. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE FORWARD LOOKING AND MAY CONTAIN PROJECTIONS AND FORECASTS THAT ARE BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH**

**STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.[1] ALL HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD CAREFULLY READ AND CONSIDER FULLY THE ENTIRE DISCLOSURE STATEMENT AND PLAN BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

Most of the historic and current financial and other information contained in this Disclosure Statement has been derived from the Debtors, the Debtors' records or the Claims Registers maintained by the Clerk of the Bankruptcy Court in these Cases. The Debtors believe the information to be correct; however, it has not been independently verified in every instance, nor has it been subjected to a certified audit. The projections attached to the Disclosure Statement have been prepared with assistance of Summit Group Partners/Kevin Lombardo, the Debtors' financial advisor in these cases. The valuation information along with other information and market-related data was obtained through Hadco International, the Debtors' expert engaged to appraise and provide valuation opinions and testimony regarding the Debtors' drilling equipment and industry information relevant to the Plan. The Debtors believe the projections and valuation opinions to be sound, but they have not been independently assessed.

## II.     OVERVIEW OF PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full Plan. For a more detailed description of the terms and provisions of the Plan, see Article V below entitled "Summary of the Plan."

### A.     Plan Explanation

The Plan contemplates the substantive consolidation of the Debtors but solely for the purposes of implementation of and performance under the Plan. The estates of the Debtors will be deemed combined so that all assets, liabilities, Claims and Interests are merged into and treated as one consolidated estate. There will be combined classification of Claims and Interests, voting, and treatment of and distributions to Holders of Claims. As a result of substantive consolidation, joint obligations of the Debtors shall be treated as a single obligation of the consolidated estate. By way of example, the WSB Secured Claim is presently asserted against the estates of both O&G and Performance; upon the substantive consolidation, the WSB Secured Claim will be comprised of one Claim asserted against the consolidated estate. Substantive consolidation for purposes related to the Plan will not affect the corporate separateness of the Debtors nor their status as independent, separately existing entities going forward or for any purpose other than the Plan.

### B.     Overview of Plan Performance

The Plan provides in Section 11.2 that it will become effective on the Effective Date, which at this time has not been determined or estimated by the Debtors. While there are other actions contemplated by the Plan, and described in more detail below, the Debtors propose to restructure and exit bankruptcy as reorganized companies that will continue to operate their respective businesses. The corporate and financial restructuring transactions that are proposed in the Plan are designed to, and the Debtors believe that they will, provide them with a stable and flexible debt structure under which to execute the Plan,

---

[1]     This Disclosure Statement may not be relied upon by any person for any purpose other than by holders of Claims or Interests entitled to vote and for the purpose of determining whether to vote to accept or reject the Plan. Nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtors or any other party, or be deemed conclusive evidence of the tax or other legal effects of the reorganization on the Debtors or the holders of Claims or Interests.

operate the Company with appropriate safeguards against the turbulence of the oil and gas industry, and successfully reorganize their businesses for long-term success.

### C.    Overview of Classification and Treatment of Claims and Interests

The Plan provides for payment in full of all Administrative Claims, Tax Claims and Priority Claims, and for payment of Secured and Unsecured Claims from Cash on hand and revenues generated from operations from and after the Effective Date. The Interest in O&G will be cancelled, and the Holder of such Interest will not receive a distribution under the Plan. The following chart[2] summarizes distributions to Holders of Allowed Claims and Interests under the Plan:

| Class | Claim/Interest | Treatment of Claim/Interest on later of Effective Date or Date on which Claim or Interest is Allowed | Estimated Recovery Under Plan |
|---|---|---|---|
|  | Unclassified Claims | Paid in full |  |
| 1 | WSB Secured Claim | New 5 year secured term loan | $4,504,177 |
| 2 | Senior Debentures Secured Claim | If Allowed, will be issued New Debentures in face amount of $25,955,000 | $0 - $25,955,000 |
| 3 | Other Secured Claims | Paid in full, arrearage paid in extended installment payments | $59,440 |
| 4 | General Unsecured Claims | Repaid in full over 24 months | $1,016,497 |
| 5 | Unsecured Debenture Claims | Alternate treatment | $7,610,000 – 33,565,000 |
| 6 | Octane Claims | Receive new membership Interests in O&G | $0 (negative equity value) |
| 7 | Unsecured Deficiency Claims | If Class 2 Claims are allowed, Class 7 Claims will be discharged | $0 |
| 8 | Interests | Cancelled and extinguished | $0 |

THE TREATMENT AND DISTRIBUTIONS PROVIDED TO HOLDERS OF ALLOWED CLAIMS AND INTERESTS PURSUANT TO THE PLAN ARE IN FULL AND COMPLETE SATISFACTION OF THE ALLOWED CLAIMS AND INTERESTS ON ACCOUNT OF WHICH SUCH TREATMENT IS GIVEN AND DISTRIBUTIONS ARE MADE. REFERENCE SHOULD BE MADE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.

### III.    HISTORY OF THE DEBTORS

### A.    Company Formation

O&G was formed in 2006 to acquire and construct land drilling rigs that it would lease to its wholly-owned subsidiary, Performance. Performance was formed to provide contract drilling services for ArkLaTex (Arkansas, Louisiana and Eastern Texas) region, as well as Alabama, Florida, Mississippi and Oklahoma. Management's goal was to establish Performance as a mid-sized oil field service company,

---

[2]        This chart is only a summary of the classification and treatment of Claims and Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

meaningfully differentiated from its competitors, and recognized as performing in the top percentages of the marketed fleet when measured by age and capability of the rigs, quality of crew, safety record, and drilling efficiency. With nearly 200 years of collective management experience in the oil and gas drilling industry, Performance believed it could well position itself in its desired market and compete on a long-term basis.

1.      *Rig Construction and Deployment*

Starting in 2006 and continuing through 2007, the Company built three 1000 horsepower ("HP") rigs.  The first of which (currently known as Rig 22) was completed and started drilling in the fourth quarter of 2006, and the next two rigs (currently known as Rig 48 & Rig 3) were completed and began drilling in 2007. All three rigs were completed on schedule and on budget, despite a shortage of quality rig parts and components, long lead times for delivery and a shortage of skilled labor available to a start-up company.

A description of each of the five rigs constructed/acquired is as follows:

| Rig # | 22 | 48 | 3 | 14 | 28 |
|---|---|---|---|---|---|
| Description | HRI 800 Heartland | HRI 800 Heartland | HRI 800 Heartland | Oil Rig 1000 Full Circle | Gardner-Denver 1100 Full Circle |
| Horsepower | 1,000 | 1,000 | 1,000 | 1,200 | 1,500 |
| Depth-TMD (Feet) | 12,500 | 12,500 | 12,500 | 15,000 | 18-20,000 |
| Drill Pipe | 4 ½" | 4 ½" | 4 ½" | 4 ½" | 5" |
| Type | Mechanical | Mechanical | Mechanical | Mechanical | Electrical |
| First Mobilized | November 2006 | March 2007 | September 2007 | June 2008 | December 2008 |

The total cost of the rigs constructed is as follows:

Rig 22:        $ 7,267,000, first deployed in November 2006

Rig 48:        $ 7,162,000, first deployed in March 2007

Rig 3:         $ 8,171,000, first deployed September 2007

Rig 14:        $ 7,846,000, first deployed in June 2008

Rig 28:        $12,527,000, first deployed in December 2008

At the time the Company was formed and during the periods that each of these rigs were commissioned and financed, market conditions were at historical highs that were supported by an extended, sustained need for additional rig capacity.

2.      *Construction/Acquisition Funding of Rigs*

Construction of each of the rigs was funded through a series of debenture offerings, private debt and equity. As each rig was acquired and constructed, new bonds were issued to fund the cost of the rig. The bonds were placed by Crews and Associates, Inc. ("**Crews**") of Little Rock, Arkansas. First Security

Bank ("**First Security**"), Crews' sister corporation also of Little Rock, Arkansas, served as indenture trustee. The structure for the first three (3) rigs (*see* chronology below) was that Sajac, owner of the Interest in O&G, would contribute 10% cash equity and Crews would arrange and place the balance of the construction costs through the sale of senior debentures for 80% of the remaining amount and junior debentures for 20% of the remaining amount. However, the bond financings did not cover all construction costs so the Company financed shortfalls, working capital and operational expenses through loans from affiliates.

The following summarizes the construction and financing of the Company's first three rigs, which were all built and financed under the same structure:

Rig 22. The debenture issuance for Rig 22 (previously known as Rig 1 and then Rig 8) was dated September 15, 2006, consisting of a senior component of $5,100,000 at 9.25% interest and a subordinated component of $1,860,000 at 17.6% interest, with interest on both payable quarterly, and a maturity date of September 15, 2011. Sajac paid $700,000 of equity towards construction of the rig. The net cash available for the project after costs was $6,921,964, which left a shortfall of $345,036 which was funded through related party loans. Prior to the refinancing of Rig 22 in 2008, *see* below, a total of $2,300,000 in principal and $1,283,812 in interest was paid to the debenture Holders.

Rig 48. The original debenture issuance for Rig 48 (previously known as Rig 2) was dated December 13, 2006, consisting of a senior component of $5,800,000 at 9.25% interest and a subordinated component of $1,510,000 at 15% interest, with interest on both payable quarterly and a maturity date of January 15, 2012. The Cash equity component provided by Sajac was $735,000. The net cash available for the project after costs was $7,260,185. Prior to the retirement of these debentures in 2008, a total of $2,050,000 in principal and $1,362,072 in interest was paid to the debenture Holders.

Rig 3. The debenture issuance for Rig 3 was dated April 10, 2007, with a senior component of $5,800,000 at 9.25% interest and a subordinated component of $1,515,000 at 15% interest, with interest on both payable quarterly and a maturity date of May 15, 2012. The Cash equity component provided by Sajac was $735,000. The net cash available for the project after costs was $7,259,251 which left a shortfall of $911,749 which was funded through loans from related parties. Prior to the exchange in 2009, a total of $1,350,000 in principal and $1,641,784 in interest was paid to the debenture Holders.

a.        Initial Budgeted Operating Costs

The trust indentures under which the above debentures were issued provided for an allowance of $7,000 per day from revenue to be provided to the Company for its operational costs on a per rig basis. This allowance (which was disclosed in the offering documents for each debenture) has resulted in ongoing confusion with regard to what the Company's operational costs actually are. This number was developed by Superior Well Drilling, LLC ("**Superior Well**"), and its principals, with whom the Company had negotiated a turnkey agreement under which Superior Well would manage the construction of the Company's rigs, its drilling operations and business. Superior Well represented its capabilities and intention to be responsible for handling all aspects associated with the construction, ownership and operation of the rigs, from overseeing construction, to finding work and negotiating contracts, to drilling wells for $7,000 per day, and to run the Company "in an efficient and profitable manner." Superior Well further represented that it would be able to secure work and generate enough profit to be able to pay off all acquisition and financing costs associated with each rig within 24 months of the rig being placed in service. Based on these representations, the Company believed and conveyed to Crews that $7,000 per day was an appropriate operating expense for budgeting purposes. Consequently, this number was used in and relied upon in the financing projections of the first 3 rigs (Rig 22, Rig 3, and Rig 48). Superior Well was unable to live up to its representations and its relationship with the Company ended. As a result of

this failed relationship, the Company was forced to then assume complete control of its business in a manner that was not originally contemplated and form and employ its own sales and management team and thus incurring higher operating costs than contemplated.

Soon after the Company took over the day-to-day management and operations of its business that Superior Well was to handle, it was obvious that operational costs far exceeded $7,000 per rig, per day. This number was based on representations and assumptions that did not materialize and does not represent the actual cost of operations. This problem, compounded by the restrictive cash requirements contained in the original debenture financings (discussed below), led to significant cash flow problems. The result was that the Company was forced to obtain loans to cover these shortfalls even though the Company as a whole was generating significant excess revenues which were being swept by First Security to make accelerated principal payments on certain debentures, all as discussed in more detail in Subsection B.4, below.

b.   Restrictions on Revenues

Another significant structural problem with the first three debenture financings was that each issuance constituted a separate financing unto itself and under which the Company was required to segregate all operating revenues. As stated above, the Company was permitted to retain only $7,000 per day and all remaining revenues were placed into a revenue account for use solely to pay interest and (if excess funds existed, as they quite often did) principal to retire the debentures issued in connection with that particular rig. So, for example, if Rig 22 was working, the revenue generated by its use was not available to the Company for use in paying any other obligation. If Rig 3 was not working, the Company was unable to make its interest payments as and when due. This resulted in the obvious problem of having significant cash in the revenue account of a working rig that would repay interest and significant accelerated principal payments while at the same time causing the Company to incur significant additional debt to be able to service debenture obligations for a rig that was not working.

Rig 28.   Consistent with its strategic plans, in early 2008 the Company was doing well operationally and as a whole and opportunities arose that justified the acquisition of another rig. The Company used this opportunity to request that Crews and First Security modify the debenture structure to alleviate the problems noted above. Crews agreed and committed to place new debentures that would be used to finance the construction costs of Rig 28, to refinance the outstanding amounts owed on Rig 22 and to repay the loans that the Company had to secure from affiliates to fund the operating shortfalls that had accumulated due to the structural problems stated above.

On June 19, 2008, the Company issued senior debentures in the amount of $17,600,000 at 10% interest and subordinate debentures in the amount of $4,400,000 at 15% interest, with interest on both to be paid quarterly and a maturity date of June 15, 2013. These debentures were issued pursuant to a new indenture that eliminated both the $7,000 per day budget requirement and the restriction on use of revenue generated by these rigs, giving the Company partial relief from the structural problems it was experiencing. The net proceeds available after deposits and issuance costs were $19,926,660, which was used to cover the cost of the construction of Rig 28 ($12,527,000), to retire the remaining $3,490,000 of senior debt related to rig 22 and $1,170,000 of subordinate debt related to Rig 22, and to repay bridge financing in the amount of $2,739,660.

c.   Funding Shortfalls; Rig 14

Also in 2008, the Company agreed to purchase Rig 14 after being presented with the opportunity by Tom Taylor, a consultant hired by Crews in connection with the financing of the Company's rigs. Crews committed to provide the financing for the purchase of Rig 14. Given these assurances for

financing, the Company made several non-refundable deposits in excess of $1 million and continued to expend several million dollars on upgrades and improvements to complete the rig. Only after these multi-million dollar investments had been made by the Company, Crews informed the Company that it was unable to raise sufficient funding to close on the scheduled closing date and that an alternative lender would have to be brought in to assist.

Crews first suggested that an alternate lender simply finance the acquisition of Rig 14 and that Crews would place subordinate debt if there was any shortfall. It was then suggested that the Company use the alternate lender to refinance the debentures issued on Rig 48 so that the Holders of the Rig 48 debentures could roll their investment into the debentures to be issued for the Rig 14 financing to allow for a completed financing. This funding structure was more complex and increased significantly the cost of financing, but the Company had already invested millions of dollars into Rig 14 and had no other realistic alternative. WSB was identified by Crews as an appropriate lender and the parties ultimately agreed that Rig 48 would be refinanced through a new loan from WSB in the amount of $5,250,000, and the acquisition of Rig 14 would be financed through placement by Crews of new senior debentures in the amount of $8,170,000 and new subordinate debentures placed on Rig 48 for $3,000,000 for a total debenture capital raise of $11,170,000. The debenture transaction was to be consummated within a week or two after the close of the WSB financing to allow enough time to effect retirement of the Rig 48 debentures before issuance of the debentures on Rig 14 and the subordinate debentures on Rig 48.

Ultimately, the debenture issuance for Rig 14 was dated October 31, 2008 with a senior component of $5,670,000, of which only $3,500,000 was funded, at 10.5% interest and a subordinate component of $2,500,000, of which only $2,100,000 was funded, at 16% interest, with interest payable quarterly and a maturity date of November 15, 2013. Of the $11,170,000 in new debenture funding committed, only $4,750,000 of actual funding was placed after accounting for substantial placement fees, legal fees and related costs. This left a permanent funding shortfall of $6,300,000 related to these transactions. Octane Funding, LLC provided the additional funding that enabled the acquisition of Rig 14 and expected to be repaid from the completion of the financing as proposed by Crews, which did not materialize.

Provisions for a second lien on Rig 48 were given in favor of the indenture trustee only because of the commitment from Crews to place the subordinate debenture on the rig, but the funding which served as the consideration for this lien did not materialize.

### 3.    *Management/Key Employees and Relationships with Affiliates*

The following are the management and senior-level employees of the Company:

Ben O. Turnage is the Manager and Chief Executive Officer of both O&G and Performance, holding ultimate responsibility for oversight of all managerial, financial and executive business activities. He has more than 25 years of investment, operating, turnaround and restructuring experience as an executive of mid-sized, privately owned companies across a broad spectrum of industries, including energy, energy-related and construction. Mr. Turnage has made and managed investments in oil and gas over the last 15 years throughout the southeastern United States, including the direct purchase of mineral rights, leases, overriding royalty, working interest and strategic investments in operating companies.

David G. ("Grumpy") Farmer is the President and Chief Operating Officer of Performance and is directly responsible for all operations and staffing. He managed construction of all five of the Company's rigs, with completion of each on-time and within-budget. Mr. Farmer has over 25 continuous years of industry experience in drilling oil and gas wells throughout the ArkLaTex, Black Warrior and Gulf Coast Regions. Mr. Farmer started with Hughes Tool Company in 1981, later joining Smith International as a

Regional Sales Manager in 1990. In 1999, Mr. Farmer formed DGFI, described more fully below, to further expand his services to Smith and its subsidiaries, along with his advisory work to major oil and gas operators, including BP/Amoco and Shell. He left Smith International in 2006 to join Performance. Mr. Farmer is highly regarded by and has many valuable relationships with operators and producers throughout the United States.

Jeff H. Goodwin, CPA, is the Treasurer and Chief Financial Officer of O&G and Performance and supervises the all aspects of the Company's financial unit and is the chief financial spokesperson for the organization. Mr. Goodwin directly assists and advises management on all strategic and tactical matters as they relate to budget management, cost benefit analysis and forecasting needs. He is a graduate of Mississippi College and has been a practicing Certified Public Accountant for over 20 years.

Tom Ferguson is Senior Vice President-Marketing and Contracts-Southern Area and is responsible for marketing, customer relations and contract procurement for Performance. He joined Performance in early 2007, after having held similar positions for years with Patterson Drilling Company and with Grey Wolf Drilling Company, where under Mr. Ferguson's direction expanded its operations from 18 rigs to 120 and expanding its territory from the Gulf Coast Region and South Texas to one include West Texas, Rocky Mountains, Mid Continent and the ArkLaTex, Mississippi and Alabama.

Don White is Senior Vice President-Marketing and Contracts-Northern Area and, like Mr. Ferguson, holds similar responsibilities for Performance. He joined Performance in March 2009 from Pioneer Drilling where he was Manager of Contracts/Marketing and responsible for marketing of drilling rigs in ArkLaTex, Mississippi and the Gulf Coast regions from 2007 to 2009. From 2004 to 2007, he was Manager of Contracts/Marketing for Patterson Drilling Company.

Billy W. Bunch, Jr. Vice President of Operations - Mr. Bunch joined Performance in November, 2007 and has responsibility for all drilling operations. He has over 28 continuous years of experience in drilling, work over and completion of oil and gas wells in the ArkLaTex, Gulf Coast, and Rocky Mountain Regions

Dell Group Holdings, LLC, is a holding company managed by Mr. Turnage and through which managerial/executive oversight and backbone operational support is provided to the Company. From the Company's inception, Dell Group Holdings, LLC, has provided two main support services: a) the executive management services of Mr. Turnage, and b) a substantial amount of administrative, accounting and IT support, including the accurate and timely production of all payroll, tax preparation, reporting for all employees, financial statements, sales use and income tax and senior-level accounting functions, all of which are managed by employees of Dell Group Holdings, LLC.

The Octane entities are entities related to the Debtors and managed by Mr. Turnage. Octane has provided bridge loan financing to the Company at various times to, among other things, fund construction costs of the rigs pending closing of the debenture financings (which was understood and agreed to among all parties, including First Security and Crews), fund construction shortfalls, and fund working capital due to the Company's revenue restriction problems under the early debentures.

David Grumpy Farmer, Inc. ("**DGFI**") was formed in 1999 by Mr. Farmer well prior to his full-time involvement in the Company. When Mr. Farmer agreed to work for Performance, he requested that his employment be through DGFI as an independent contractor, making administrative matters for Mr. Farmer easier to manage and providing tax benefits to Performance. Additionally, when the Company was formed its lack of credit history was problematic, so DGFI agreed, as an accommodation to the Company, to purchase vehicles and other equipment needed and lease them to the Company on essentially a pass-through basis. Mr. Farmer personally guaranteed substantial amounts of debt for these

- 10 -

transactions and never once asked about his liability or requested compensation for doing so. After vehicles and equipment financed by DGFI have been paid off, DGFI has permitted the Company to continue using them at no cost. DGFI also had in place certain infrastructure (including a yard, shop and field office facility complete with utilities, etc.) that it allowed the Company to use and pay for as a direct pass through expense at very advantageous pricing. DGFI, also as an accommodation to Performance, provides equipment for use by the Company, if requested or needed by its customers, which are handled simply as pass through costs that are neither net expenses to the Company nor profit centers for DGFI. The Company's need for access to vehicles and other equipment provided by DGFI has been an absolute requirement in order to operate on a daily basis.

**B.      Events Leading to Need for Restructuring**

1.      *Market Dynamics Affecting the Drilling Industry*

The period from 2004 through 2008 represented a boom era for drilling contractors. During this time, land rig counts continued to rise rapidly to the peak in August of 2008, while utilization rates across the industry increased to the low to mid 70% range. This increase in rig counts was driven by a significant increase in the prices of crude oil and natural gas and significant investments in large gas shale plays.

The following chart depicts the movement of rig counts, natural gas prices and utilization rates during the period in which the Company entered the market. These market conditions were conducive to additional capacity to be placed into the market. Demand was high which pushed day rates to an average over $17,000 per day. The second chart below tracks crude oil prices from 2000 through 2010. It is clear from the chart that the Company entered the market as the growth curve in oil prices was accelerating to an all-time high in 2007 with natural gas prices skyrocketing right behind.

# U.S. Land Rig Count vs. Natural Gas Prices





Crude oil, avg, spot price chart

2. *Drastic Changes in Market*

The above chart also illustrates the drastic change in the market beginning in late 2008. This dramatic drop in oil and gas prices coincided with the global financial crisis that was occurring and caused a virtual stoppage in the drilling industry. The exploration and production of oil and gas, and the drilling that goes along with it, dramatically contracted as companies lost the ability to obtain the capital required to finance their ventures. Rigs were pulled out of the market and most contractors not under contract were released by operators. Demand plummeted as did utilization and rig counts. Utilization fell from over 70% nationally to 41% for 2009. Rig counts suffered a decline of 57% within one year as contractors took rigs off the market and out of service. As companies swiftly reduced drilling budgets, long-term contracts were replaced with short-term well-to-well engagements. Day rates fell as low as $9,500 to 10,000, which are rates similar to those the Company was able to secure at that time (when it was able to secure work) for its 1000HP rigs. The Company suffered the same plight as the rest of the industry.

3. *Effect on Company Operations*

Although Performance has traditionally outperformed the market,[3] the significant decline in utilization and day rates in 2009 impacted all drilling contractors and resulted in a reduction in cash flow available to fund operations and service debt. Prior to this market collapse, the Company believed, as did just about everyone else in the industry, that day rates and utilization would remain at pre-crisis levels for years to come. It was commonly heard that we would never see $100 per barrel oil again. Looking back,

---

[3]      When utilization rates were peaking in the low-mid 70% range during 2008, Performance's utilization was at 90%. When in 2009 the utilization rates fell to 41%, Performance's utilization was 52%. This is even more evident now, as overall market utilization is around 53%, Performance has remained at virtually 100% utilization since late 2010.

however, the Company's utilization rate fell to 52% in 2009, which was higher than the national average of 40% but obviously a big problem. The Company's reputation for safe and highly efficient drilling services helped it secure this better than average work, but it was not enough. Two of the three rigs that the Company was able to find work for were at $11,000 per day, in contrast to the first quarter 2009 rates of $17,000–$18,000 per day. If it were not for the Company's largest rig, Rig 28, which was fortunately under a term contract (through April of 2011) at a day rate of $25,000, the Company may not have been able to successfully reorganize like it has. By the mid-first quarter of 2010, Performance had two rigs working with one on a short-term contract rate of $10,300 per day. These worsening conditions made supporting the Company's debt structure impossible.

### 4.    *Problems Exacerbated by Debenture Structure*

As described above, the structure of the initial debentures caused the Company to incur additional debt to fund operations while at the same time significant (but restricted) revenues were being generated by the Company as a whole. The Company suffered operating shortfalls in excess of $5 million, all while repaying high rates of interest and, due to the restrictions on use of excess revenues, accelerated principal payments that were swept and remitted to the Holders of certain debentures. Instead of having the flexibility and capability to use the Company's net revenues to satisfy all of its debenture obligations, the structural requirements instead resulted in payments of principal (not accounting for amounts repaid through refinancing) of approximately $5,700,000 while the Company had to secure loans to finance operations.

### 5.    *2009 Debentures*

In early 2009 when the global economic meltdown was in full swing and the market challenges began to impact all drilling contractors. It became clear that servicing the debenture indebtedness was going to be a challenge for the Company. This simply aggravated the significant strain on Company finances already caused by the existing debenture structure. Management approached Crews to discuss the problems and market issues and requested a one-year deferment of interest and principal under each of the outstanding debentures to permit the market to settle and provide all parties with an opportunity to revisit the obligations under more stable and improved market conditions. Instead, Crews proposed an exchange under which all of the previously issued debentures would be terminated and exchanged for a new, consolidated debenture issuance. This debenture structure would also remove the problems discussed above that existed with the prior debentures but did not defer any interest payments as requested. It was agreed that the proposed exchange would be consummated in the Spring 2009, but it was ultimately delayed until September 15, 2009. The Company was required during this delay to make regular payments as an inducement to the completion of the exchange and therefore required further borrowings from Octane in order to do so. The Company was advised that this exchange was duly voted upon and agreed to by the Holders of the previously issued series. The new principal balances became $25,955,000 for the Senior Debentures and $7,610,000 for the Subordinate Debentures at an overall higher interest rate to the Company. It was optimistically anticipated that (a) the market would have recovered in time for the Company to return to financial stability, (b) the newly consolidated debt structure would provide the Company with the much needed flexibility to assist in servicing the obligations, and (c) day rates would recover to levels existing before the steep market decline. Unfortunately, the market downturn continued (ultimately into mid to late 2010), resulting in rigs remaining stacked and day rates depressed. In early 2010, it became evident that the Company was not going to be able to make the first interest payment due March 15, 2010, and management notified First Security and representatives at Crews of the Company's inability to make the payment.

### C.      Attempt to Negotiate an Agreed Restructuring of 2009 Debentures

In early 2010, the Company notified Crews and First Security that the March 15, 2010, interest payment could not be made, and began to explore alternatives for restructuring the debenture indebtedness. The Company first attempted to engage with First Security in hopes of being able to negotiate an agreed, out-of-court restructuring of the 2009 Debentures. The Company desperately wanted to avoid bankruptcy and communicated this to First Security. The Company had already engaged a financial advisor for the primary purpose of assisting the Company with restructuring the debenture indebtedness and avoiding a bankruptcy filing.

Documents were provided to First Security, and presentations were made by the Debtors with initial proposals for the terms of a restructuring. First Security had already threatened litigation to enforce its asserted rights in Company assets, including the appointment of a receiver for purposes of liquidating the Company's assets. As part of the negotiation, the Company informed First Security of its belief that problems with the loan and security documents raised serious concerns about the validity of the asserted liens and security interests it was threatening to enforce. *See* Section IV.D, below. The Company offered to waive and forego contesting the Liens if there was agreement to avoid judicial proceedings (whether that be litigation or bankruptcy proceedings) and to a mutual restructuring of the debenture indebtedness. Forbearance was requested in order to give the parties reasonable time and appropriate conditions to negotiate toward such an agreement. First Security denied the request and it soon became clear to the Company that First Security either did not have the ability or authority to negotiate a restructuring, or it that had no intention of truly engaging in such a negotiation. The Company's initial proposals were never met with counter-proposals or meaningful discussion, other than derogatory comments. So, the Company quickly and reluctantly determined that further dealings with First Security would not be productive.

This led the Company to make several requests to First Security to provide a list of the Holders of the 2009 Debentures. The Company intended to communicate directly with the Holders to facilitate a restructuring that would provide a much higher recovery than they would have gotten through First Security's foreclosure. These requests were refused on the assertion that First Security did not know who held the debentures and was therefore unable to comply with the request. The Company did its best to identify some of the Holders of larger amounts of the 2009 Debentures and reached out to those Holders to open the discussion regarding available options to restructure the debt. The Company was attempting to establish open lines of communication so that the Holders would be able to receive timely and accurate information and have dialogue with the Company about the current financial issues and potential for addressing them. This was also done by requesting that First Security pass along information developed by the Company to the debenture Holders. The Company came to see, based on the limited feedback and clear lack of understanding of important and basic facts, that information flow to the Holders was, at best, slow and in many instances nonexistent. With First Security threatening judicial action, time was of the essence with regard to any agreed solution to the Company's financial distress, and it was becoming evident that there would be no avenue available to the Company to achieve one.

This became a reality when First Security filed a civil action for appointment of a receiver and for judicial foreclosure and liquidation of the Company's assets. Based on the Company's information at the time, which has since been substantiated by industry and market data, the Company was in the midst of the low point of the market downturn. Forced liquidation at that time (even assuming valid liens and security interests) would have yielded the lowest possible return to the Holders of debentures. The Company then filed voluntary petitions for relief with the Bankruptcy Court on May 21, 2010, for both O&G and Performance to prevent a forced liquidation at the bottom of the market and to preserve the enterprise value of the Company. Market data and the benefit of hindsight, along with the Company's operational success in these proceedings, has proven that the Company's judgment and actions in

thwarting First Security's threatened foreclosure was critically important and beneficial, even though the Debtors sought all along to avoid bankruptcy.

## IV.    SIGNIFICANT EVENTS IN THE BANKRUPTCY CASES

On May 21, 2010, the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Since filing the petitions, the Debtors' Cases have been jointly administered under the above-captioned Case number. The Debtors have remained in possession of their property and operated their businesses as debtors-in-possession. The Debtors have continued to operate their drilling rigs and otherwise conduct operations in the ordinary course of business. Immediately after filing the petitions, the Debtors obtained permission to pay all pre-petition wage and benefit payments due to employees. As a result, substantially all, if not all, valid employee Priority Claims have already been paid in full. The Debtors also obtained the approval of the Bankruptcy Court to pay pending *ad valorem* taxes and insurance premiums due and payable as of the Petition Date. Finally, due to the Company's outstanding reputation and success as an efficient drilling contractor, it has achieved essentially 100% utilization.

### A.    Use of Cash Collateral

Since the Petition Date, the Debtors have funded their on-going operations and administrative expenses pursuant to the Debentures Cash Collateral Order under which the Debtors were authorized to use cash collateral, subject to a budget, in which First Security asserts Liens but which the Debtors have contested on the bases asserted in the Lien Adversary. *See* Section IV.D. below. This order provided for the continuation of the pre-petition Liens on the Senior Debentures Collateral post-petition as adequate protection for any decline in the value of their collateral that may result from the Debtors' use. These protections were conditional given that the Lien position of First Security was disputed and ultimately are dependent upon the outcome of the Lien Adversary to determine whether these protections become non-conditional, if First Security prevails, or become a nullity, if the Debtors prevail. Since July 2010 as agreed to in the Debentures Cash Collateral Order, the Debtors have placed in a "Debt Reserve Escrow" monthly payments of $65,000 with the right of disbursement also contingent upon the outcome of the Lien Adversary. Since the Petition Date, the Debtors have exceeded the budget, stabilized their business and significantly increased accumulated Cash from operations and accounts receivable. *See* Section IV.J.4., below.

### B.    Retention of Professionals

The Debtors retained McCraney, Montagnet & Quin, PLLC as their bankruptcy counsel [Dkt #36] and YoungWilliams, P.A. as corporate counsel [Dkt #35]. The Debtors retained General Capital Partners as financial and restructuring advisor [Dkt #100] and Lefoldt & Co. as accountants [Dkt #99]. Hadco International was engaged by the Debtors to provide full and complete appraisals of the Debtors' five (5) drilling rigs and related drilling equipment, expert testimony and consultation regarding valuation of said equipment for purposes of the Plan and related industry expertise regarding the Debtors' operations and business affairs, where applicable.

### C.    Proof of Claim Bar Dates

Pursuant to the notice issued by the Clerk of the Bankruptcy court in the above-captioned Case on May 28, 2010, the last day on which Proofs of Claim were permitted to be filed was September 20, 2010, except that governmental entities were permitted until November 17, 2010 to file Proofs of Claim. Consistent with its practice in jointly administered cases, the Clerk of the Bankruptcy Court has maintained separate Claims Dockets for each of the Cases. In accordance with § 1111(a) of the Bankruptcy Code, a creditor whose Claim is listed on the Debtors' Schedules of Liabilities filed in these

Cases as undisputed, liquidated and not contingent is deemed to have filed a Proof of Claim for that amount. Conversely, all Claims for which an objection to a Proof of Claim has been filed, will be filed or which are listed on the Debtors' Schedules of Liabilities as disputed, contingent or unliquidated have not yet been "Allowed" and are subject to the provisions of Article 8 of the Plan for the resolution of Disputed Claims and objections to Proofs of Claim.

Throughout the last several months, the Debtors have reviewed and attempted to reconcile the filed Proofs of Claim with the Debtors' books and records. The Debtors will file prior to confirmation their first omnibus objections to several categories of filed Proofs of Claim. Unless otherwise provided in the Plan or the Confirmation Order, the Debtors (before the Effective Date) and Reorganized Debtors (after the Effective Date) shall have the sole right to object to and contest the allowance of any Proofs of Claim filed in the Cases. The Debtors shall file such objections according to the process contained in Article 8 of the Plan.

### D.    Lien Adversary

As discussed in Section III. C, above, First Security instituted its civil action styled *First Security Bank, as Trustee v. O&G Leasing, LLC, Performance Drilling Company, LLC, et al.* in the United States District Court for the Southern District of Mississippi, in which it sought appointment of a receiver for the Debtors, judicial foreclosure of the Debtors' assets, among other remedies. The filing of this action pushed the Debtors into bankruptcy, which in turn stayed the action due to the imposition of the automatic stay of § 362.

Shortly after filing their petitions for relief in the Bankruptcy Court, the Debtors instituted an adversary proceeding styled *O&G Leasing, LLC and Performance Drilling Company, LLC v. First Security Bank, as Trustee, and John Does 1-1000*, Adversary Proceeding 10-00054. The Debtors assert numerous claims challenging First Security's loan and security documents, including a request for a determination as to the nature, extent and validity of its asserted Liens, avoidance of preferential transfers stemming from the March 2010 filing of the UCC-1 financing statement that was to have been filed in connection with the September 2009 closing of the 2009 Debentures exchange, and an objection to First Security's asserted secured claims.

Upon the Debtors' filing of their adversary proceeding, the parties agreed to the referral of First Security's civil action to the Bankruptcy Court, where it became Adversary Proceeding No. 10-00070, and then to the consolidation of the two adversary proceedings, which the Bankruptcy Court approved. The consolidated cases essentially assert the same claims and defenses between and among the parties, and the cases have proceeded under Case No. 10-00054 since that time. Discovery is still ongoing, with in excess of 10,000 documents having been produced collectively by the parties. Pending at present is a motion for summary judgment filed by First Security that the Debtors have opposed.

### E.    Rule 2019 Litigation

The Debtors filed their *Motion for an Order (A) Compelling First Security Bank's Compliance with Federal Rule of Bankruptcy Procedure 2019; (B) Prohibiting Further Participation in the Case by First Security Bank Pending Compliance with Federal Rule of Bankruptcy Procedure 2019* [Dkt #133] seeking to have the Court compel First Security to comply with the disclosure requirements of Rule 2019, based primarily on (a) the plain language of Rule 2019, which requires that indenture trustees make the disclosures called for thereunder, and (b) knowledge and belief that First Security had the ability to obtain and/or was in possession of the requested information, notwithstanding its representations to the contrary. Document production in the Lien Adversary proved this to be the case, where numerous documents produced by First Security (albeit improperly redacting the names of the Holders) show that the trustee

was party to correspondence with Crews and had direct correspondence with brokers regarding the tally of votes of the Holders on the exchange offer for the 2009 Debentures and received documents reflecting the Holders voting in favor of the exchange and the amounts in face value of the previous debentures held by the Holders.

First Security vigorously opposed the motion, denying that it was obligated to comply, denying that it had any ability to identify the Holders of the 2009 Debentures and belatedly requesting that it should be excused from having to comply with the mandates of the rule. The Bankruptcy Court initially granted the Debtors' motion on the basis that the language of Rule 2019 is clear and that First Security ought to comply by providing at least a limited amount of information regarding the Holders of the debentures. First Security filed its *Motion to Reconsider and/or Alter or Amend* the Court's order granting the Debtors' motion, which the Court granted. No further proceedings have been held on the issue, and the matter has effectively been held in abeyance by the Court. This has perpetuated the Company's inability to find a way to negotiate a solution with any of the 2009 Debenture constituency.

### F.    Rule 2004 Discovery

First Security filed their *Motion for 2004 Examination of Debtor, O&G Leasing, LLC* [Dkt. #62], *Motion for 2004 Examination of Performance Drilling Company, LLC* [Dkt. #63], *Motion for 2004 Examination of Dell Group Holdings, LLC* [Dkt. #64], *Motion for 2004 Examination of David Grumpy Farmer, Inc.* [Dkt. #65], *Motion for 2004 Examination of Octane Funding, LLC* [Dkt. #66], *Motion for 2004 Examination of Octane Funding II, LLC* [Dkt. #67] and *Motion for 2004 Examination of SAJAC O&G Investors, LLC* [Dkt. #68] seeking to examine the entities with respect to the acts, conduct or property or the liabilities and financial conditions of the Debtors or any other matter that would affect the administration of these bankruptcy cases as well as requesting that they produce documentary evidence to First Security for inspection. First Security conducted each of these examinations and received all documents and information requested. The Debtors have pending a scheduled Rule 2004 examination of First Security.

### G.    First Security's Motion for Appointment of Chapter 11 Trustee

First Security filed its *Motion to Appoint Trustee or Examiner for Debtors O&G Leasing, LLC and Performance Drilling Company, LLC* [Dkt #331] on January 19, 2011. The basis for the request is steeped in allegations of wrongdoing that First Security has made for months prior to its filing of the motion, all of which the Debtors strongly contest and believe have no merit whatsoever. The Debtors and all other parties subjected to First Security's extensive Rule 2004 examinations provided all requested documents and provided explanation through testimony of the very matters First Security states in the motion require further investigation and warrant appointment of a trustee or examiner. Furthermore, at the time the motion was filed, the Company had — for the first time in its existence — recently achieved 100% utilization to solidify a hugely successful operational recovery as debtors-in-possession. On these significant bases, the Debtors believe that the motion is far from well founded. The motion was held in abeyance pursuant to the Mediation Order (*see* Section IV.H below) prior to the deadline for filing a response and has remained that way due to the anticipated filing and prosecution of competing plans of reorganization.

### H.    Mediation

By virtue of the consensual and mutual desire to attempt to negotiate and resolve on a final basis a restructuring plan for the Debtors that resolved globally all matters in dispute in this case, including plan treatment for the 2009 Debentures, settlement of the Lien Adversary and plan treatment for WSB, the Bankruptcy Court entered its *Order Referring Case and Adversary Proceeding to Mediation, Appointing*

*Mediator and Establishing Mediation Procedures* [Dkt #346] (the "**Mediation Order**"). The agreement to mediate arose from discussions between counsel for First Security and the Debtors wherein the willingness and desire to mediate, in lieu of litigating the numerous and significant disputes that were fast approaching. In fact, this constituted the first opportunity the Debtors had been given since March 2010 to have meaningful discussions with First Security, and the Debtors were genuinely optimistic at what they believed to be an apparent and significant change for the better in the tenor of these proceedings. So, along with agreement from WSB to participate and forego litigation of its pending request for adequate protection or, alternatively, relief from the automatic stay, the parties were able to secure agreement of the Bankruptcy Court and submit the aforementioned order.

As the Debtors prepared for the mediation in earnest, with all professionals working diligently to prepare and handle their respective responsibilities for presentation and discussion, First Security engaged additional "special" counsel and a financial advisor, R.M. Duncan Advisors (which, upon information and belief, is or is an affiliate of either a Holder of 2009 Debentures or a broker who controls certain accounts of Holders of 2009 Debentures), for purposes of proposing an undefined and undisclosed "alternate transaction" or competing plan of reorganization. This information (and nothing more) was provided to the Debtors only days before the mediation. At the mediation, which occurred on March 23, 2011, instead of negotiation of terms and engagement in open discussions regarding the issues and how to resolve them, First Security presented its summary terms of its "alternate transaction" and advised the Debtors that they could either match or accept them, with oversight and presumably some transfer of control to a then and still unidentified "steering committee" consisting of one or more representatives of the 2009 Debentures, or there was nothing to negotiate. The terms of the proposed transaction as explained to the Debtors by the mediator were infeasible, so after discussion with and agreement by the mediator that there was no way to respond to such an ultimatum, the mediation ended with no progress and no discussion between the parties having occurred and, obviously, no progress toward resolution of any issues having been made. Post-mediation requests by the Debtors to have further discussions regarding the terms and bases for the proposal made by First Security at the mediation were refused.

## I. Exclusivity

The Debtors obtained authorized extensions of their rights of exclusivity under § 1121 of the Bankruptcy Code, giving them the right to be the only party authorized to file a plan of reorganization and to solicit acceptances of their plan, first to December 21, 2010, then again to March 1, 2011, pursuant to orders entered granting the Debtors' two motions requesting both such extensions [Dkt #236 and #344]. Upon entry of the Mediation Order, the March 1, 2011 deadline was suspended pending completion of the mediation. Thereafter, the Bankruptcy Court entered an order setting aside the Mediation Order [Dkt #373] thereby effecting termination of the Debtors' exclusivity after the Bankruptcy Court stated its intention to terminate exclusivity at the request of First Security.

## J. Post-Petition Operations

### 1. *Market Conditions Since Petition Date*

As previously mentioned, the collapse of the oil and gas markets along with the rest of the economy caused utilization and day rates to plummet. The market "bottomed" in the second quarter of 2010 and the latter months of 2010 brought the start of a slow but steady rebound of sorts for the drilling industry as oil and gas prices increased. Per the National Oil Well Varco Annual Rig Census, total land rig utilization in the United States increased from 39% to 65% during 2010.[4] It is important to note,

---

[4] The Company's rig fleet is primarily comprised of 1000 HP, mechanical rigs that have depth capacity to 12,500 feet. The reported utilization for rigs of this class was 44% for 2010, up from 35% in 2009.

however, that the primary driver of this increase was demand for larger rigs, those capable of drilling from 16,000 to over 20,000 feet.[5] A large part of this demand was and continues to be related to activity in the Eagle Ford Shale play in South Texas and in the Granite Wash play in Western Oklahoma, areas in which the Company does not operate.

Increased utilization means that more rigs, especially those between 1000HP and 1500HP, are being put back into service and marketed, and new and more technologically advanced rigs are being built. The trend seems to be that operators are requesting newer, faster and more mobile electric rigs equipped with top drives and draw works capacities preferably up to 1500 HP. The Company has only one rig, Rig 28, in this class, and it has continued to work almost continuously since it was constructed in 2008.

All in all, day rates paid to drilling contractors have increased but the increases have been modest due to the increased competition. The introduction of newly-constructed and more flexible non-mechanical rigs to the ArkLaTex region has also presented a challenge for contractors with less sophisticated mechanical rigs to command prime day rates.

2.    *Reasons for Company Success*

Even in light of the challenges presented by the market collapse and changes in desirability of rigs, the Company has done remarkably well over the last several quarters. Management made several key strategic decisions that enabled the Company to be successful when it was able to stabilize its business through this reorganization and as the market rebounded. First Security and certain Holders of 2009 Debentures were very critical of the Company's decisions, complaining that these actions were too expensive. However, the Company has always been aware of the fact that operators seeking to hire drilling contractors are primarily concerned with ensuring that the rig is proven and well maintained, the crew is experienced, and the drilling contractor has a sound safety record. As discussed below, these decisions have been proven correct and are what led to an unquestionably successful turnaround.

a.    <u>Availability of Skilled Labor</u>

One of the major factors impacting the drilling market today is crew availability. When the market plummeted in 2009, many people were laid off and left the industry and geographical areas to seek employment elsewhere and in other industries that were not impacted quite as hard. This shortage of trained labor has severely impacted drillers, large and small, that may be able to secure work but do not have the work force required to perform. This prevented many drilling contractors, both large and small, from re-entering the market when the opportunities for work finally arose.

Performance has assembled and maintained a highly skilled and experienced drilling crew. As with any successful company, a drilling contractor is only as strong and successful as its people. Iron is secondary. When the Company began suffering from the downturn and rigs were being released by operators forced to scale back or cease drilling, Company management made the decision to retain its skilled-position employees when possible — tool pushers, drillers, and derrick men — all of whom had years of knowledge and experience on the Company's rigs. This was an added cost burden to the Company during a very difficult period, but this decision ensured that (1) the rigs would be properly maintained and cared for while stacked, (2) the Company would be ready on a moment's notice to put any of its rigs back to work and (3) customers could expect safety and efficiency due to continuity of the drilling crews. Contractors unable to withstand the downturn and forced to stack their rigs and terminate

---

[5]    It has been reported that 2010 utilization for larger rigs increased to over 80% from around 55% in 2009.

their employees were placed at a severe competitive disadvantage and were unable to timely mobilize when the time came to re-enter the marketplace. Without key people and proven equipment, it is very difficult to solicit work from operators; further, even if you can get work, without capable employees and fully functioning equipment, a contractor cannot perform. Performance avoided this dilemma, and this is one of the key reasons that the Company has all five rigs working today.

b.  Safety Policies and Record

Work in the drilling industry is extremely dangerous. Personnel on the Company's rigs work around the clock, 24 hours a day, seven days a week, while drilling wells for customers. Safety is therefore critical to running an efficient operation and to maintain a sound reputation as a respected drilling contractor. Performance established and maintains thorough and strict safety policies that have resulted in a safety record that rivals any company in the industry. The continuity of skilled employees who have worked together on the same rig for a period of time contributes greatly to a safe work environment. Performance employs a Manager of Safety and Training who oversees two field safety engineers and a training instructor who, collectively, develop, maintain, implement and educate employees on its safety policies and procedures.

c.  Efficient and Reliable Operating Record

One of the qualities most sought after by operators is that its drilling contractors are reliable and efficient, and a satisfactory review of a company's downtime record (interruption in operations due to equipment failure or other problems), by rig and by fleet, is a prerequisite of any operator hiring a drilling contractor. Because a working rig operates 24 hours a day, seven days a week, it is required that all equipment be maintained and kept in full working order. Performance's downtime is less than 2%, which is excellent by industry standards and well below the standard contractual allowance of 5%. Performance's ability to achieve such success is attributable in large part to its having built and maintained a shop fully equipped with replacement parts overseen by a full-time mechanic, electrician and other skilled personnel who are all familiar with the rigs and ready to respond to the emergency maintenance calls that regularly arise. The Company's decision to accept smaller jobs during the downturn (well-to-well jobs for small operators) also enhanced its Company's performance record as they enabled the Company's rigs to remain in good working order and to continue running, as opposed to simply being stacked and deteriorating. Because of this decision, all of the Company's rigs were in good working order when the market presented better opportunities, which in turn showed customers current and reliable operating history.

3.  *Expansion to West Texas Market*

As of the Petition Date, the Company had three of its five rigs working: two were under term contracts, the third rig was on a well-to-well contract that ended shortly after the Petition Date. Day rates for work available to the Company at the time remained fairly consistent with market rates (well below average). New long-term contracts from operators were virtually nonexistent, and well-to-well agreements were realizing rates no better than $10,000 to $11,000 per day. The Company was aware that multiple areas throughout the country had increasing needs for drilling contractors, so management began strategically investigating new markets that could hold opportunities for Performance. Some of those areas included Pennsylvania, the Rocky Mountain Region and West Texas, all of which were outside of the region in which the Company had market recognition and presence. The Rocky Mountain Region and Pennsylvania were areas that the Company determined would not be prudent business opportunities to pursue.

- 20 -

The Company determined, however, that West Texas held fewer obstacles to entry and sent sales and management representatives to the area to evaluate the opportunity. They determined that the West Texas region would be a viable region for the near term and that Performance had a very good chance of securing work for a minimum of one year, which was management's overriding criteria for entering any new market. Performance made contacts with key potential customers whose primary concerns were our ability to provide qualified rig crews due to the widespread shortage of qualified labor. As discussed above, because Performance retained most of its key skilled employees, it was able to bring capable rig crews to the market along with its rigs. In October of 2010, the Company landed its first work in West Texas, a three well agreement priced on a footage basis.[6] The wells were successfully drilled by Rig 22, and the Company was thereafter able to secure a one year contract for this rig. Performance's successful showing led it to relocate two additional rigs, Rig 48 and Rig 3, to West Texas where it has secured additional long-term work. Performance has opened a shop in Big Springs, Texas, to support its local maintenance in the area.

4.    *Post-Petition Financial Performance*

The Company has benefited from positive movement in the industry, which due to sound management and effective implementation of strategic decisions, has resulted in a tremendously successful operational turnaround. These results are evidenced by reviewing the Company's increase in liquid working capital: at the Petition Date, the Company had Cash on deposit of approximately $700,000, and accounts receivable of $3,500,000; and as of May 31, 2011, the Company had Cash in the amount of $3,415,125, which includes $715,322, in the "Debt Service Reserve" account created and funded pursuant to the Debentures Cash Collateral Order, and accounts receivable of $6,336,875.

The Company incurred approximately $450,000 in costs for mobilizing equipment to pursue work in West Texas, along with $715,000 in unbudgeted costs associated with work done on a footage basis. Despite over $1 million in additional and unforeseen costs, as of May 31, 2011 the Company has spent on a cumulative basis 1% less than its total budgeted costs. During this same 53 week period, the Company's actual weekly revenues met or exceeded budgeted amounts 31 of those weeks, and weekly costs were less than the budgeted amounts for 28 of those weeks. Notwithstanding the higher costs associated with work in the West Texas market, which also include increased labor costs, the Company has realized the benefit of these investments by establishing Performance as a reliable and quality drilling contractor in the West Texas market and thereby securing long-term contracts at higher day rates in that market.

5.    *Drilling Contracts*

As evidence of Performance's successful reorganization strategies, Performance today has all five rigs in operation and under contracts of varying lengths. Rig 28 is currently under a six month day work contract at $19,000 per day in South Louisiana, but the Company has received requests from its customer who previously had Rig 28 under contract to discuss redeploying Rig 28 when its current six month contract expires. Rig 48 and Rig 3 are under one year day work contracts at $14,500 per day in West Texas. Rig 22 is under a one year footage contract at $33 per foot. Rig 14 continues to operate under an

---

[6]    Footage contracts pay the drilling contractor on a per foot basis and carry risks that day rate contracts do not, which is a variation on the Company's standard of working under day rate contracts. The contractor on a footage contract bears responsibility for additional costs of direct supplies that typical day rate contracts do not carry, such as the costs of mobilization, fuel, casing, drill bits and other input costs. The development of the quote and negotiation of the contract price are more involved, and the drilling contractor has to have a good handle on how many days it will take to complete to realize an acceptable profit margin. If the drilling takes more time than budgeted, profit will fall significantly. If the contractor completes the well in less time than budgeted, opportunities for profit increase significantly.

agreement with its customer on a day work basis and expects to continue working under this agreement through December 2011.

6.     *Operational Success*

The Company has continued its exemplary performance for its customers despite the challenges and obstacles it has faced in the marketplace as a debtor-in-possession. Highlights of the last 12 months alone show that the management of the Company is well focused and able to execute its business plans and operations.

Company Highlights:

- Operated over 1500 accident free drilling days.
- Successfully entered the West Texas market and quickly built a reputation for efficient and professional execution.
- Deployed all five (5) Drilling Rigs with term contracts, achieving a current 100% utilization.
- Retained all of its senior management who continue on a daily basis to perform with utmost effectiveness for the Company.
- Performance's sales and senior executive staff continues to field solicitations for work from and to negotiate with major, large and small independent operators concerning long-term contracts for its rig fleet.
- Despite having been declined certain contracts because of this pending bankruptcy, it believes that upon its exit of bankruptcy it will be allowed to garner significant longer term contracts for its rigs.

Certain Highlights of each Drilling Rig:

Rig 28:

- While working under a term contract for a large independent, Rig 28 drilled the longest horizontal lateral well bore in the Haynesville Shale Formation in northwest Louisiana and in record time.
- While working for the same independent, Rig 28 was graded and ranked in the top percentile of safety, efficiency and success within a 19 rig fleet drilling for this independent.
- Achieved safety and success bonuses for the rig crew on 6 wells for this customer.
- Successfully drilled over 200,000 ft. of well bore over the last twenty-four (24) months for this customer.
- Under a term contract with a new customer and on the very first well, successfully drilled the fastest vertical hole to the Wilcox horizon (12,200' in 7 days), showing that the Company's performance rivals that of other much larger drillers employed by the same operator (Precision Drilling and Rowan Drilling Company).

Rig 48:

- Shortly after being deployed in West Texas, Rig 48 successfully drilled the fastest well drilled for its customer – a super independent with over 20 rigs drilling in the Permian Basin – within this horizon. Performance reached total depth in 9.8 days, compared to the previous record of 13 days.

Rig 3:

- Rig 3 continues to work for the same super independent as Rig 48. Its performance is similarly equal to that of Rig 48, and in the last seven (7) months working for this operator has drilled over 100,000 ft. of well bore.

Rig 14:

- This rig continues to operate for a large private exploration and production company for which Performance has worked for over 2 years. Rig 14 has successfully drilled a number of vertical and horizontal wells for this client and recently had its contract extended and day rate increased.
- Of the last 12 months, the Rig 14 crew has received safety and efficiency bonuses from this operator on a number of wells. Safety and efficiency bonuses are not widely distributed by operators and in each case reflect recognition by the customer of exemplary work performed by the crew.

Rig 22:

- Deployed recently in West Texas and successfully drilling footage contracts for a large independent operator.
- In some cases Rig 22's mobilization time from one well site to another has been less than 30 hours – a phenomenal mobilization time as compared to historic times and those of competitors.
- Rig 22's comparable drilling time on footage wells are equal to or better than the historical norm of drilling footage wells in West Texas.
- Since its seven (7) month deployment in West Texas, Rig 22 has drilled over 98,000 feet of well bore.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

## V.    SUMMARY OF THE PLAN

The following summary and the other descriptions of the Plan in this Disclosure Statement are qualified in their entirety by reference to the provisions of the Plan and its exhibits, a copy of which is attached hereto as Exhibit 1. It is urged that each Holder of a Claim or Interest carefully review the terms of the Plan. In the event of any inconsistency between the provisions of the Plan and the summary contained in this Disclosure Statement, the terms of the Plan shall control.

In general, a Chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to confirm the plan. Under the Bankruptcy Code, "claims" and "equity interests" are classified, rather than classification as "creditors" and "shareholders," because such entities may hold claims or equity interests in more than one class.

A Chapter 11 plan may specify that certain classes of claims or equity interests are either to be paid in full when the plan becomes effective or are to remain unchanged by the treatment prescribed in the plan. Such classes are referred to as "unimpaired," and because of such favorable treatment, the Holders in such classes are deemed to accept the plan and are not entitled to vote. Accordingly, it is not necessary to solicit votes from the Holders of claims or equity interests in such classes. A Chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any claim against the debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan.

### A.    Debtors' Assets

As of May 31, 2011, the Debtors' assets primarily currently consist of (i) the five (5) Drilling Rigs and related drilling equipment, including all Company Property; (ii) Cash and current accounts receivable; (iii) current drilling contracts; and (iv) rolling stock and equipment. The Debtors hold various Causes of Action, identified on their Schedules and other choses of action that they believe hold value, including the following: receivable from Zenergy (in litigation pending in U.S. District Court for Southern District of Mississippi), and an arbitration award against Odyssey Petroleum Corp. (US) (now an allowed unsecured claim due to its bankruptcy filing). All of these assets shall vest in and be retained by the Debtors on and after the Effective Date for continued use in their ongoing business operations and for performance of their obligations in accordance with the Plan.

The Schedules filed by the Debtors identify the tangible assets that existed on the Petition Date and their respective values based on management's best information and opinions at the time. The obvious bulk of the Debtors' asset value is concentrated in the Drilling Rigs. The Debtors engaged Hadco International to provide valuation advices and opinions on the values of the rigs and drilling equipment for purposes of determining Plan treatment. All of the rigs and equipment appraised were determined as of the Petition Date to be in "Good" condition, and as of May 31, 2011, the following are believed by the Debtors to be the approximate aggregate values of the rig fleet and equipment,[7] all of which the Debtors believe to still be in "Good" condition:

---

[7]    These values are believed to accurately reflect the increases in value due to improved market conditions since the Petition Date and the effective date of the Debtors' most current appraisal. The Debtors believe these values are subject to the same variances applicable to those in their most current appraisal.

| Fair Market Value | Orderly Liquidation Value | Forced Liquidation Value |
|---|---|---|
| $28,329,000 | $21,192,000 | $16,520,000 |

Hadco International defines "Fair Market Value" as the price, in cash or equivalent, that a buyer could reasonably be expected to pay and a seller could reasonably be expected to accept, if the property were exposed for sale on the open market for a reasonable period of time (at least one year), both buyer and seller being in possession of the pertinent facts and neither being under any compulsion to buy or sell. "Orderly Liquidation Value" is the estimated proceeds that would result from sale of an asset, or group of assets, if sold individually and not as part of the enterprise of which they were originally a part, through an orderly sale process involving the owner preparing the asset and promoting and advertising the sale over a reasonable period of time (six months to one year) with the owner not being under the pressure of a deadline to sell. "Forced Liquidation Value" is the estimated proceeds that would result from sale of an asset, or group of assets, if sold individually and not as part of the enterprise of which they were originally a part, typically at auction sales, sold "as is, where is" and without warranties of any kind, under compulsion to sell/time pressures (less than six months), and net of sale commissions, advertising, mobilization/assembly and preparation costs.

Under the Bankruptcy Code, for purposes of determining the appropriate value of an asset, the United States Supreme Court has declared that the appropriate determination is the "replacement value" as of the effective date of the plan – that is, the hypothetical cost or amount that a debtor would incur to replace the asset. The Debtors, based on extensive consultation with Hadco International and the realities of the drilling rig market, believe that the "replacement value" should be determined based on the following factors and reasons.

Because of the unique nature of a drilling rig and the open market and what affects a rig's condition and value, it would be difficult to acquire a perfectly conditioned, operative drilling rig of any class. That is because completely operative rigs (those not stacked and in no need of capital improvement or significant maintenance) are not for sale — they are working and generating revenue. This is a significant consideration because whether a rig is working or not dramatically affects its value — a non-working/stacked rig is merely iron and component parts, whereas a working is a revenue generating asset. Further, a drilling rig without work and a skilled and competent rig crew is significantly devalued in the marketplace. As current utilization rates across the industry are barely above 50%, even for some of the industry giants who have dozens, if not hundreds, of available and functional drilling rigs, rigs that are not being worked by experienced contractors with experience crews (and are therefore available to be purchased to "replace" the Company's rigs) can be acquired at very depressed prices as compared to historical prices. Rigs under construction (particularly new drilling rigs), even assuming that they were comparable for purposes of replacement value, are too expensive and are also not typically available because the orders with manufacturers are backlogged and have all been placed by the largest drilling companies that dominate the market. This was the very reason the Company was required to construct its own rigs beginning in 2006 — there were no rigs available on the market because they were all already either working or under contract for purchase.

The most viable and cost-effective manner today of acquiring ("replacing") a rig is to purchase one of the many stacked rigs either at auction (Forced Liquidation Value) or at steeply discounted prices from operators no longer in business or no longer intending to use them. Obviously, additional capital expenditures would be required to make the rig operable and able to be placed back into working condition, but given the plentiful availability of stacked rigs of the class and type of the majority of the Debtors' rig fleet (mechanical 1000HP rigs) this is the most likely alternative for replacing the Company's rigs. Acquiring and improving a stacked rig is not only the most practical and available option

but also the most economically advantageous manner for "replacing" these rigs. It is Hadco International's opinion that, factoring these market dynamics and overlaying them with the traditional valuation metrics above, the "replacement value" would therefore equate to something between the Orderly Liquidation Value of $21,192,000 and the Forced Liquidation Value of $16,520,000.

**B.    Classification of Claims and Interests**

The Plan divides the Claims against, and the Interests in, the Debtors into the following classes:

| Class | Debtors Claims/Interests | Status | Voting Rights |
|---|---|---|---|
| Unclassified | Administrative, Tax and Priority Claims | Unimpaired | Not entitled to vote |
| 1 | WSB Secured Claim | Impaired | Entitled to vote |
| 2 | Senior Debentures Secured Claims | Impaired | Entitled to vote |
| 3 | Other Secured Claims | Impaired | Entitled to vote |
| 4 | General Unsecured Claims | Impaired | Entitled to vote |
| 5 | Unsecured Debenture Claims | Impaired | Entitled to vote |
| 6 | Octane Claims | Impaired | Entitled to vote |
| 7 | Unsecured Deficiency Claims | Impaired | Deemed to reject |
| 8 | Interests | Impaired | Deemed to reject |

**C.    Treatment of Unclassified Claims and Interests**

1.    *Administrative Claims*

a.    Post-Petition Trade Debt.

All allowed Administrative Claims that are incurred by the Debtors in the ordinary course of business shall be paid on the later of (i) the Effective Date, (ii) when due or (iii) the date on which there exists a Final Order requiring payment. As of May 31, 2011, the Debtors have accrued and unpaid post-petition liabilities totaling $1,867,371, which includes unpaid Professional fees.

b.    United States Trustee Fees.

Quarterly fees owed to the United States Trustee will be paid when due. The Debtors shall continue to make post-confirmation quarterly fee payments to the United States Trustee, based upon disbursements by the Debtors until the Effective Date, and by the Liquidation Agent thereafter, until entry of a final decree pursuant to § 350 of the Bankruptcy Code.

c.    Professional Fees.

The Debtors have Administrative Claims for accrued but unpaid Professional fees and expenses, which Claim amounts will increase for all fees and expenses incurred through the Effective Date. Professionals in the case have been paid *interim* compensation and reimbursement of expenses pursuant to the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Dkt #129] throughout the Cases, therefore any Administrative Claims will be comprised largely of fees and expenses that are incurred in the immediate

All requests for the payment of previously unpaid Professional fees and expenses, and the final applications for payment shall be filed with the Bankruptcy Court on or before the Administrative Bar

Date, which is no later than thirty (30) days after the Effective Date. Professionals shall not be required to seek or obtain any approval of fees or expenses incurred from and after the Effective Date.

d.    Other Administrative Claims.

Under the Plan, any creditor or party-in-interest asserting that it is still owed an Administrative Claim must file a request for payment of the Administrative Claim on or before the Administrative Bar Date, which is no later than 30 days after the Effective Date. Any creditor or party-in-interest that fails to file a request for payment by this date shall be forever barred from asserting any such right to payment and any such right shall be waived and forever released.

2.    *Tax Claims*

According to the Debtors' Schedules, various Tax Claims exist. The Claims Docket that the Clerk of the Bankruptcy Court maintains for these Cases showed filed Tax Claims in the amount of $24,615 that as of May 31, 2011, remain unpaid. The Debtors will pay all Allowed Tax Claims in full on the Effective Date. The Debtors obtained approval to pay the Tax Claims of certain Louisiana parish taxing authorities for 2009 *ad valorem* tax assessments on rigs on location in Louisiana and have satisfied in full all Allowed Tax Claims of these parish taxing authorities. The Debtors paid, as and when due, their 2010 post-petition *ad valorem* taxes.

In May 2011, the Company was notified by the Mississippi State Tax Commission of its intent to perform a sales tax audit, which was performed and concluded on or about June 3, 2011. The Company was advised that Performance would be assessed unpaid sales taxes from years 2008 through the Petition Date of May 21, 2010, of $211,344, plus $46,056 in penalties and interest and an aggregate use tax liability of $1,212. The Company has not yet concluded its analysis of this assessment by the Mississippi State Tax Commission. Each of the Debtor's scheduled Claims for amounts owed to the Mississippi State Tax Commission, but it has filed no proofs of Claim in these Cases asserting or otherwise disputing such Scheduled Claims despite being properly noticed of the petition filing and all Bar Dates, so any Claims asserted, whether based upon this audit or otherwise, will be Disputed as untimely. Additionally, most of Performance's drilling contracts contain provisions imposing liability for such taxes on its customer, so Performance may be able to pass these taxes through to or otherwise recover some or all of these amounts from its customers whose projects generated the asserted tax liabilities.

3.    *Priority Claims*

Other than Tax Claims, the Debtors are unaware of any Priority Claims.

**D.    Treatment of Classified Claims and Interests**

1.    *Class 1: WSB Secured Claim*

The WSB Secured Claim has been determined by the Debtors to be an Allowed Secured Claim pursuant to § 506(b) of the Bankruptcy Code in the amount of $4,504,177, which is the full principal amount of its Secured Claim. The Allowed amount of the WSB Secured Claim is derived from the aggregate valuation of the WSB Collateral, which consists of (a) Rig 48 and its related drilling equipment; (b) Cash attributable to revenues from Rig 48; and (c) accounts receivable, drilling contracts and other intangible collateral relating to Rig 48, including that certain civil action styled *Zenergy, Inc. v. Performance Drilling Company, LLC*, Case Number 3:10-cv-00483-HTW–LRA in the United States District Court for the Southern District of Mississippi, in which Performance seeks payment of in excess

- 27 -

of $500,000 for non-payment of services under a contract with Zenergy, Inc., which contract also provides for payment of interest on all unpaid amounts and for reimbursement of attorneys' fees

On the Effective Date, WSB's Class 1 Claim will be restructured. The Debtors and WSB will enter into new loan documents similar in all material respects to the pre-petition loan and documents upon which its Class 1 Claim is based, except for modification as provided in the Plan. Under the Plan, the newly restructured loan will be a five (5) year interest-only term loan that will bear interest at prime + 2%, but subject to a floor of 5% and a ceiling of 8%. Interest will be paid quarterly, with a balloon payment at maturity. WSB will receive payments of interest paid from Free Cash deposited into the Interest Reserve Account, *see* Section VI.C.3, below. Also, the Debtors will deposit with WSB in a restricted reserve account $125,000 which shall serve as collateral security and be used by WSB to pay the quarterly interest payments on the loan only in the event that the Debtors become unable to do so at any time after the Effective Date. WSB will also receive on a quarterly basis its allocated share of the Free Cash on deposit in the Debt Service Account at the end of each quarter as accelerated principal payments.

The Debtors will execute on or before the Effective Date all loan and security documents necessary to implement and close the restructured loan transaction and to grant to WSB continuing first priority Liens in the WSB Collateral. The new loan and security documents will contain terms and conditions substantially similar to those in effect prior to the Petition Date, except to the extent those terms are modified by the Plan treatment described herein. Furthermore, provision will be made for a process for agreed disposition of the WSB Collateral upon default, either (i) in a controlled and orderly liquidation process by engaging a mutually acceptable broker to sell, within on hundred twenty (120) days, some or all of the WSB Collateral, or (ii) by transferring some or all of the WSB Collateral to WSB in partial or full satisfaction of indebtedness, with the value of the WSB Collateral transferred either agreed upon or determined by the Bankruptcy Court prior to such transfer.

Class 1 is Impaired and entitled to vote to accept or reject the Plan.

2.    *Class 2: Senior Debentures Secured Claims*

The Class 2 Claims consist of the asserted Secured Claims of the Holders of the Senior Debentures. These Claims are Disputed, and the Dispute is embodied in and will be resolved through litigation of the Lien Adversary. Consequently, it will not be known until a Final Order is entered resolving the Lien Adversary whether the Claims in Class 2 are Allowed. However, the Debtors have provided in their Plan alternative treatment for the Claims of Holders of both the Senior and Subordinated Debentures depending upon the outcome. In either event, the 2009 Indenture and 2009 Debentures will be cancelled on the Effective Date.

If all Class 2 Claims are determined to be Allowed Secured Claims, then the Reorganized Debtors will issue the 2011 Senior Debentures pursuant to a New Indenture to be executed, along with all accompanying security documents and related agreements, within sixty (60) days from the date the Lien Adversary is resolved. The Debtors will select the New Trustee to serve as indenture trustee. The Debtors believe that the replacement value of all of the property and assets alleged by the Holders of Class 2 Claims to constitute the Senior Debentures Collateral will in no event exceed $25,955,000, *see* Section V.A, above, therefore the face amount of the 2011 Senior Debentures will be $25,955,000 (based on the assumption for these purposes that Class 2 Claims are Secured by all of the Secured Debentures Collateral), or such lesser amount if the Bankruptcy Court determines that less than all of such property and assets constitutes Senior Debentures Collateral. Such amount is the original face amount of the Senior Debentures, which amount was within the approximated amount the Debtors believe to constitute the replacement value of the Senior Debentures Collateral. The 2011 Senior Debentures shall bear interest at

five percent (5%), payable quarterly, and mature ten (10) years from the date of issuance. Interest will be paid quarterly, with a balloon payment at maturity.

Holders of 2011 Senior Debentures will receive payments of quarterly interest from Free Cash deposited into the Interest Reserve Account, *see* Section VI.C.3, below. Holders will have the ability to tender 2011 Senior Debentures for early and priority retirement by the Company pursuant to the "Debenture Retirement Program" outlined in Exhibit "A" to the Plan and discussed below. Holders will not receive payments on account of their Class 2 Claim unless and until the Lien Adversary is resolved by Final Order deeming the Class 2 Claims as Allowed Secured Claims.

If all Class 2 claims are determined to be allowed claims, the Debtors will execute all loan and security documents necessary to close the New Indenture, issue the 2011 Senior Debentures and grant to the New Trustee first priority Liens in the Senior Debentures Collateral, all on terms substantially similar to those contained in the 2009 Indenture, except to the extent those terms are modified by the Plan treatment described herein. Furthermore, provision will be made for a process for agreed disposition of the Senior Debentures Collateral upon default, either (i) in a controlled and orderly liquidation process by engaging a mutually acceptable broker to sell, within on hundred twenty (120) days, some or all of the Senior Debentures Collateral, or (ii) by transferring some or all of the Senior Debentures Collateral to the New Trustee in partial or full satisfaction of indebtedness, with the value of the Senior Debentures Collateral transferred either agreed upon or determined by the Bankruptcy Court prior to such transfer.

All Class 2 Claims are Disputed. However, for purposes of the Plan, the Debtors will deem the Holders of Class 2 Claims to hold temporarily Allowed Claims pursuant to Bankruptcy Rule 3018(a), and solely for purposes of voting on the Plan, in the amount of $25,955,000. Class 2 is Impaired and entitled to vote to accept or reject the Plan.

   3.  *Class 3: Other Secured Claims*

The Debtors believe that the only Class 3 Secured Claim is that of Ally Financial (f/k/a G.M.A.C.) with regard to two (2) vehicles purchased by Performance and financed through Ally Financial. Pursuant to an *Agreed Order Providing for Adequate Protection to G.M.A.C.* [Dkt #177], the Debtors agreed to modify the pre-petition terms of the subject financing agreements to extend the contract term by the necessary number of additional monthly installment payments necessary to pay in full the delinquent balances due and owing thereunder. Accordingly, the terms of the aforementioned agreed order are incorporated herein, and the Debtors shall continue to make those payments, subject to the modified terms, until Ally Financial' s Allowed Class 3 Claim is paid in full.

Class 3 is Impaired and entitled to vote to accept or reject the Plan.

   4.  *Class 4: General Unsecured Claims*

Class 4 consists of Allowed General Unsecured Claims. The total Allowed amount of General Unsecured Claims is believed to be $1,016,497. Each Holder of an Allowed Class 4 Claim shall be paid the Allowed amount of its Class 4 Claim in eight (8) quarterly installments of Cash. Payments to Holders of Class 4 Claims will be made quarterly commencing with the first calendar quarter after the Effective Date. If a Class 4 Claim does not become an Allowed Claim until after the Effective Date, such Holder shall receive the first of its eight (8) payments in the first calendar quarter after the date upon which such Claim becomes an Allowed Claim. Class 4 is Impaired and entitled to vote to accept or reject the Plan.

Class 4 is Impaired and entitled to vote to accept or reject the Plan.

5.    *Class 5: Unsecured Debenture Claims*

Membership in Class 5 will be comprised of some or all of the Holders of 2009 Debentures. As with Class 2, the treatment of Holders of Class 5 Claims will be determined by the outcome of the Lien Adversary, so the Debtors have provided in their Plan alternative treatment for the Claims of such Holders, depending upon the outcome. Due to the inability to determine what Holders are entitled to what distributions, Holders will not receive payments on account of their Class 5 Claim under Section 5.5. of the Plan until the Lien Adversary is resolved by Final Order.

If Class 2 Claims are Allowed Secured Claims, then Class 5 shall consist of the Holders of Subordinate Debentures in the Allowed amount of $7,610,000, which is the original face amount of the Subordinate Debentures. Class 5 Claims shall receive their *pro rata* share of the 2011 Subordinate Debentures, which provide for quarterly payments over a five (5) year period after all Class 2 Claims have been paid, beginning in the eleventh (11th) year from the date of issuance of the New Debentures and ending in the fifteenth (15th) year after such date of issuance; provided, however, that such Holders may receive earlier or different payments in accordance with Section 7.3.c of the Plan upon repayment of the Class 1 Secured Claim and/or the Class 2 Secured Claims or as otherwise provided for in the Debenture Retirement Program. Payments to Holders of Class 5 Claims will be made from Free Cash deposited into the Debt Service Account and paid as discussed in Section VI.C.3, below.

If Class 2 Claims are Disallowed, then the Holders of Class 2 Claims shall become Holders of Class 5 Claims, and Class 5 shall consist of all Holders of 2009 Debentures in the Allowed Amount of $33,565,000, the original amount of issuance of both Senior and Subordinate Debentures. Holders of Class 5 Claims will receive their *pro rata* share of the 2011 Subordinate Debentures with a face amount of $33,565,000, payable pursuant to Section 7.4 of the Plan and as generally discussed in Section VI.C.3, below. Payments to such Holders will commence on the last day of the calendar quarter that is sixty (60) days after the Lien Adversary is resolved.

Class 5 is Impaired and entitled to vote to accept or reject the Plan.

6.    *Class 6: Octane Claims*

The Octane Claims constitute the Unsecured Claims of Octane Funding, LLC, and Octane Funding II, LLC, both of which are affiliates of the Debtors, in the amounts of $1,828,380 and $2,279,721, respectively. The Octane Claims were identified on the Debtors' Schedules as Secured Claims but which were both Disputed. Both Octane Secured Claims were based upon UCC-1 financing statements that were filed within the ninety (90) day period provided in § 547 of the Bankruptcy Code, and in the Debtors' opinion, avoidable. As also evidenced in the Debtors' Statement of Financial Affairs filed in these Cases and consistent with customary practices with the Debtors described herein, Octane Funding, LLC, provided bridge financing to the Debtors, and Octane Funding II, LLC, made loans and received repayments from the Debtors within the one (1) year period provided in § 547 of the Bankruptcy Code for affiliated parties. As provided in Section 7.8.3 of the Plan, the Claims of Octane Funding, LLC, and Octane Funding II, LLC, are subject of a compromise and settlement of these issues with the Debtors avoiding any litigation of potential claims for preferences or fraudulent conveyances, with Octane waiving and foregoing any right to payment of Cash, treating such contribution as new capital to O&G and accepting the newly issued Interest in O&G (projected to have a negative value on and for at least several years after the Effective Date).

Class 6 is Impaired and entitled to vote on the Plan.

7.    *Class 7: Unsecured Deficiency Claims*

Class 7 will exist only in the event that the Class 2 Claims are deemed Allowed Secured Claims and the treatment of Class 5 under Section 5.5.a. of the Plan is invoked. In such event, all amounts asserted by the Holders of the 2009 Debentures in excess of the Allowed amounts to be paid by the Debtors under the Plan, shall be Class 7 Claims and shall receive no distribution or payment under the Plan. These amounts will constitute the aggregate amount of the difference between the face amount of the Senior Debentures and the Subordinate Debentures and the amounts stated in the respective Proofs of Claim filed by First Security on behalf of the Holders. The Senior Debentures Claim is asserted to be $29,001,217.17, and the Subordinate Debentures Claim is asserted to be $8,933,008.33.

Class 7 is Impaired, shall receive nothing under the Plan and is therefore conclusively deemed to reject the Plan.

8.    *Class 8: Interests*

Class 8 consists of the limited liability company membership Interest in O&G owned by Sajac. The limited liability company membership Interest in Performance is owned by O&G. Sajac's Interest shall be cancelled on the Effective Date. Performance shall remain a wholly owned subsidiary limited liability company of O&G.

Class 8 is Impaired, shall receive nothing under the Plan and is therefore conclusively deemed to reject the Plan.

**E.    Claims Objections and Administration**

1.    *Objections to Claims*

No later than ninety (90) days after the Effective Date, the Reorganized Debtors shall file with the Bankruptcy Court any objections to Claims. The Bankruptcy Court shall determine the amount of any Disputed Claim, unless the Debtors stipulate as to its amount, or compromise, settle or dismiss the objection to the Disputed Claim prior to the determination of the Bankruptcy Court.

2.    *Pending Litigation*

The Company has pending litigation that result from Claims asserted against these estates and which are being contested by the Company. These Claims were included in the Company's Schedules and are Disputed.

a.    EEOC Claim

One such Claim is an action filed and prosecuted by the United States Equal Employment Opportunity Commission ("**EEOC**") asserting a racially-based Title VII wrongful discharge claim on behalf of an African-American who, along with the entire crew (all remaining members of which are Caucasian), was terminated for cause, later rehired, and then voluntarily quit. The EEOC also filed a proof of Claim on behalf of the former employee. The Claim amount asserted is $300,000, although no justification for this amount has been provided. The Company is defending the litigation, which is presently in discovery, and considers the likelihood of a finding of liability to be unlikely.

b.    GCI Claim

In 2008, Performance contacted GCI to arrange for the fabrication, delivery and commissioning of certain drilling rig control-assembly structures ("**SCR Houses**") for its then to-be-constructed Rigs 28, 16 and 9. These houses integrate and house the equipment that provides the electrical power for drilling equipment at well sites and act as the control or power center for a drilling rig. GCI proposed to build an SCR house for Rig 28 for $605,000, along with two additional houses for the same price for each. Performance paid for the first SCR house in installments with the final payment made in December, 2008. Performance also made a down payment for a house for Rig 16 in the amount of $201,833.

GCI delivered the SCR house for Rig 28 in November, 2008. However, the SCR house was not fully functional and had not been completed in accordance with the agreement with Performance. GCI refused to perform the warranty work necessary to get the SCR house fully operational and attempted to charge Performance for repair and service work which should have been covered by warranty. GCI filed an oil well lien on property in Louisiana where Performance was performing drilling services with Rig 28, and Performance was required to post a cash bond for $121,096.76 to get the lien released for its customer. When the problems with the SCR house for Rig 28 became apparent, Performance cancelled its order for houses for Rigs 16 and 9 (which were never built) and demanded a refund of its deposit.

Performance has claims against GCI breach of contract, breach of warranty, negligent and fraudulent misrepresentation, unjust enrichment and wrongful interference with Performance's business relationship with a project owner as a result of the wrongful filing of an oil well lien by GCI. GCI has filed a proof of Claim against Performance [Claim No. 13-1] in the amount of $1,211,000 which purportedly represents the amounts it asserts in counterclaims and is Disputed. Performance intends to pursue this claim in the near future.

3.    *Disallowed Claims*

In the event the Debtors have or have asserted a Cause of Action under Chapter 5 of the Bankruptcy Code against the Holder of a Claim, then such Claim shall be deemed Disallowed pursuant to Section 502(d) of the Bankruptcy Code. Consequently, the Holders of such Claims may not vote to accept or reject the Plan until the Cause of Action against such Claimant has been settled or adjudicated by the Bankruptcy Court and any amounts due the Debtors have been received.

4.    *No Interest*

Except as expressly stated in the Plan or otherwise allowed by Final Order of the Bankruptcy Court, no Holder of an Allowed Claim will be entitled to the accrual of interest from and after the Petition Date or the payment of interest, penalties, or late charges on account of such Claim for any purpose.

5.    *Security Deposits*

To the extent the Debtors have posted security deposits (with landlords, utilities or otherwise) prior to the Petition Date, those amounts may be set off against Allowed Claims only upon the written consent of the Debtors or upon entry of a Final Order authorizing such offset. To the extent the Debtors have posted security deposits (with landlords, utilities or otherwise) after the Petition Date, those amounts shall be remitted to the Debtors promptly after the Effective Date and shall not be offset against any Claim.

## VI.    SUMMARY OF PLAN IMPLEMENTATION

### A.    Substantive Consolidation

The Debtors believe that the substantive consolidation of the Debtors is in the best interest of the estates and their creditors, but solely for the purposes of implementing and carrying out the Plan. The law generally provides that substantive consolidation is appropriate when there is a substantial identity among the estates to be consolidated and consolidation is necessary to realize some benefit. In the proposed substantive consolidation of these Cases, such circumstances indeed exist.

On the Effective Date, the estates of the Debtors will be substantively consolidated for the purposes of solicitation, voting, confirmation, implementation and execution of the Plan. Also, on the Effective Date, all assets and liabilities of the Debtors shall be treated as merged. All Claims filed against either O&G or Performance shall be deemed filed against the Debtors' consolidated estate for all purposes relating to the Plan. The Debtors believe that substantive consolidation aids in the efficiency of administration, maximizes the recovery to creditors and is in the best interest of the estates and all interested parties.

The Debtors' most significant liabilities are those owed to WSB and Holders of 2009 Debentures. Both O&G and Performance are obligors, whether as primary obligors or as secondary obligors by virtue of alleged pledges of property as collateral (the validity and extent of which is the subject of the Lien Adversary). O&G's sole source of revenue is derived from its leasing of drilling equipment to Performance, which is the operating company producing substantially all of the combined company's revenue from drilling oil and gas wells for its customers. The Debtors are insured under a common insurance policy and share common senior management. The ability to consolidate the collective claims of the Debtors' largest creditors for the purposes of voting and distribution maximizes the return to creditors holding the most significant Claims (in dollar amount), provides no prejudice or adverse treatment to Holders of any other Claims and eases the administrative burdens of the solicitation and voting process.

### B.    Vesting of Assets

On the Effective Date, except as provided in the Plan, all assets and property of the Debtors shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, Interests or encumbrances. This includes all known assets identified in each respective Debtors' Schedules and Statements of Financial Affairs, as amended.

### C.    Consummation of Plan Transactions

#### 1.    *Corporate Restructuring Transactions*

Upon the Effective Date, the Reorganized Debtors will exist and be governed under the same corporate structure as the Debtors did prior to the Effective Date. O&G and Performance will both remain manager-managed Mississippi limited liability companies existing under their respective certificates of formation in existence on the Petition Date, and all authority for making corporate decisions will be vested in the manager. New limited liability company operating agreements will be executed, substantially similar in form and substance to those contained in the Plan Supplement for each Debtor. Each operating agreement will contain, to the extent required by § 1123(a), prohibitions against issuance of non-voting equity securities. The Plan provides in Sections 6.2 and 6.3 that confirmation of the Plan will be deemed to constitute the express authorization for all corporate action necessary to be taken to implement all actions necessary to consummate the Plan.

The officers, managers, management and senior-level employees for O&G and Performance will remain unchanged. *See* Section III.A.3., above. Ben Turnage, through Dell Group Holdings, LLC, an affiliate of the Debtors, will continue to serve as manager of both O&G and Performance and will continue providing management-level and administrative services to the Debtors. Mr. Turnage will continue being compensated through Dell Group Holdings, LLC. Grumpy Farmer will remain President and chief operating officer of Performance and shall receive compensation through DGFI. Compensation for all management and senior-level employees will remain unchanged.

On the Effective Date, the existing Interest in O&G held by Sajac will be cancelled as provided in the treatment of Sajac's Class 8 Claim. The newly issued Interests in O&G will be delivered to Octane, *pro rata*, as the sole Holders of such newly issued Interests. Performance will initially remain a wholly-owned subsidiary of O&G on the Effective Date. As provided in Section 6.4.3. of the Plan, no post-Effective Date corporate or other transaction relieves the Reorganized Debtors from its obligations under the Plan.

2.    *Financial Restructuring Transactions*

The WSB Class 1 Claim will be satisfied by the Reorganized Debtors entering into the new and restructured secured loan described in Section 5.1 of the Plan. WSB shall retain a Secured Claim on the WSB Collateral, but the Allowed amount of its indebtedness, $4,504,177, will be restructured pursuant to a new five (5) year term loan as described in Section 5.1 of the Plan pursuant to loan and security documents substantially similar to the original loan and security documents and agreements existing between the Debtors and WSB as of the Petition Date.

On or as of the Effective Date, the 2009 Indenture and 2009 Debentures, including all documents, instruments and agreements accompanying or existing on account of the 2009 Indenture or 2009 Debentures, will be cancelled, terminated and of no further force or effect. The Plan provides for specific instructions, and the Confirmation Order shall constitute an order of direction from the Bankruptcy Court, directing closure of all transfer registers or ledgers and the surrender of all Debentures, including those issued by the Depository Trust Company in the name of Cede & Company, any broker, dealer or other representative or entity.

If the Bankruptcy Court determines that the Senior Debentures hold Allowed Secured Claims, then within sixty (60) days after entry of the Final Order so holding, the Reorganized Debtors will issue to Holders of Class 2 Claims the 2011 Senior Debentures pursuant to the New Indenture. The Reorganized Debtors will select a New Trustee to serve as indenture trustee, and the New Trustee shall keep and maintain books for the registration and for the transfer of the 2011 Senior Debentures pursuant to the terms of and in accordance with the New Indenture and applicable law.

Also within sixty (60) days after entry of a Final Order resolving the Lien Adversary, the Reorganized Debtors will issue the 2011 Subordinate Debentures pursuant to Section 5.5 of the Plan, the face amount of which will either be $7,610,000 or $33,565,000 depending upon the outcome of the Lien Adversary. The Reorganized Debtors shall keep and maintain books for the registration and for the transfer of the 2011 Subordinate Debentures as provided in the Plan. The Holder in whose name any 2011 Subordinate Debenture shall be registered shall be deemed and regarded as the absolute owner thereof for all purposes and payment on any such debenture shall be made only to or upon the order of the registered owner thereof, or the registered owner's legal representative, and the Reorganized Debtors shall not be affected by any notice to the contrary, but such registration may be changed as herein provided. All such payments shall be valid and effectual to satisfy and discharge the liability upon such Subordinate Debenture to the extent of the sum or sums so paid.

2011 Subordinate Debentures may be transferred on the books of registration kept by the Reorganized Debtors by the registered owner in person or by the owner's duly authorized attorney, upon surrender thereof, together with a written instrument of transfer duly executed by the registered owner or the owner's duly authorized attorney in form and substance acceptable to the Reorganized Debtors, and subject to the Reorganized Debtors' receipt of any additional information or documents that the Reorganized Debtors may reasonably require, including, but not limited to, the assignee's taxpayer identification number and/or an opinion of counsel to the transferor or assignee, which opinion and counsel shall be satisfactory to the Reorganized Debtors, to the effect that such transfer is exempt from all applicable registration requirements and that such transfer will not violate any applicable law regulating the transfer, sale or other disposition of securities. Upon surrender for transfer of any Subordinate Debenture at the principal office of the Reorganized Debtors and satisfaction of the terms of the Plan, the Reorganized Debtors shall execute and deliver in the name of the transferee or transferees a new Subordinate Debenture(s) in the same aggregate principal amount and of any authorized denomination or denominations.

On the Effective Date, Performance will close the transaction described in Section 6.9 of the Plan with DGFI to acquire several trucks and trailers that are used solely by the Company but have been purchased, financed and/or leased by DGFI. This arrangement was initiated since the Company's inception due to the Company's lack of a credit history and the ability to finance its own vehicles. DGFI used its credit to acquire and finance the trucks, trailers and related equipment that the Company needed to operate and then leased them to the Company on virtually a pass-through basis. First Security has questioned this financing structure, so the Debtors will enter into this Transaction to eliminate DGFI from its role as lender and/or lessor. DGFI will sell to Performance 16 trucks and trailers, all further identified in the Plan Supplement, in exchange for Performance's assumption of the outstanding indebtedness on the rolling stock ($142,391.64 as of May 31) and set off a Company deposit of $75,000. The "blue book" trade-in value of the rolling stock being acquired is approximately $380,000, providing a non-Cash acquisition of assets having equity in excess of $160,000.

3.      *Establishment of Interest Reserve Account and Debt Service Account*

Sections 7.2 through 7.4 of the Plan set forth a mechanism pursuant to which all of the Debtors and Reorganized Debtors will administer their Cash from operations on and after the Effective Date. This mechanism addresses the following primary objectives: (i) first, ensuring that the Reorganized Debtors at all times maintain adequate funds to first meet all obligations necessary to sustain operations within the confines of the Budget; (ii) second, ensuring that the Reorganized Debtors maintained adequate funds to meet all payments of quarterly interest to Holders of Claims in Class 1 and, if applicable, Class 2; (iii) third, that all excess revenues would be allocated to retirement of the long-term debt obligations under Classes 1, 2 and 5, as applicable, as quickly as possible. This system of Cash management and allocation provides that all of the Company's excess revenue — defined in the Plan as Free Cash — will be devoted to repayment of term debt in a manner designed to retire it as quickly as possible. It also provides for the flexibility necessary to navigate the market volatility inherent in the oil and gas industry and protect against future downturns that led to the unfortunate consequences that the Company experienced in 2008–2010.

On the Effective Date, the Debtors will retain, consistent with the Budget, an amount necessary to ensure that operations will continue and be sustained. This will include a reserve of up to $2 million to be established and maintained for operating capital, capital improvement and debt service reserves. Allowed Claims in Classes 3 and 4 will be paid from the Reorganized Debtors' operating Cash consistent with the Budget. Cash on hand at the Effective Date, and all Cash collected and generated thereafter, will first be used, on a monthly basis, to fund these expenses and fully fund this operating capital reserve account. All funds that exist after such amounts are funded constitute Free Cash.

With Free Cash, the Debtors and Reorganized Debtors will then fund, on a monthly basis, the Interest Reserve Account. All Free Cash shall be allocated to first funding the next upcoming quarterly payments due. WSB and, if applicable, the Holders of 2011 Senior Debentures will receive their respective quarterly interest payments from the Interest Reserve Account as provided in Sections 7.2.f. and 7.3.a, respectively.

After the upcoming quarterly interest payment obligation has been funded in the Interest Reserve Account, the Reorganized Debtors will then on a monthly basis deposit all Free Cash into the Debt Service Account. These funds shall be allocated between WSB and the Holders of 2009 Debentures in Classes 2 and/or 5, and are defined in Section 7.2.d. as the "WSB Funds" and the "Debenture Funds." WSB is entitled to an allocation of twenty percent (20%) of the funds in the debt Service Account because of its proportionate interest in the Drilling Rigs — WSB Collateral is comprised of one of the five Drilling Rigs and related equipment, or twenty percent (20%). Likewise, the remaining eighty percent (80%) is allocated for payment to the Holders of 2009 Debentures. When and on what terms these payments will be made to Holders of 2009 Debentures depends on the outcome of the Lien Adversary, but all funds deposited into the Debt Service Account will be used solely for retirement of Claims of WSB and the Holders of 2009 Debentures.

Under the "Secured" alternative, the quarterly interest payments will be made as discussed above and as provided in Section 7.3 of the Plan. Under the "Unsecured" alternative, the allocated Debenture Funds shall be used to make the quarterly payments due to the Holders of Class 5 Claims.

Under either model, as provided in Section 7.3.c. and 7.4.b., upon satisfaction in full of WSB's Class 1 Claim, the WSB Funds shall then be allocated to the Holders of Class 5 Claims for payments consistent with the Plan. In addition, Holders of New Debentures will be entitled to tender their New Debentures to the Reorganized Debtors pursuant to the Debenture Retirement Program discussed below to provide for accelerated principal retirement, if such Holders desire to do so.

4.    *Debenture Retirement Program*

Attached to the Plan as Exhibit "A" is the Debenture Retirement Program. This program provides for Holders of New Debentures to tender them to the Company for early and priority retirement. If both 2011 Senior Debentures and 2011 Subordinate Debentures are issued pursuant to the Plan, Holders of 2011 Subordinate Debentures will not be permitted to participate in the Debenture Retirement Program until after all 2011 Senior Debentures have been retired and satisfied, except with respect to any WSB Funds available for distribution to the Holders of 2011 Subordinate Debentures pursuant to Section 7.3.c of the Plan after all obligations owed to WSB have been satisfied in full.

If at least $100,000 exists in the Debt Reserve Account after each calendar quarter, then the Company will provide notice to eligible Holders of such amount available to offer for early retirement of New Debentures and the instructions for making such offers. Offers that are accepted shall receive payment on a *pro rata* basis among those offers that are accepted at the same price. The Reorganized Debtors will have the sole discretion to determine whether to accept any tender offers made during the applicable period of program eligibility, but when making such determination will do so in a manner so as to retire the greatest possible principal amount of New Debentures.

D.    **Executory Contracts and Leases**

Pursuant to the Plan, any Executory Contract or Lease not previously assumed or rejected by an Order of the Bankruptcy Court during the pendency of these Cases, or otherwise expressly rejected in the Plan, shall be assumed upon entry of the Confirmation Order. The assumption of Executory Contracts and

Leases shall be accomplished through the Plan, and shall not require the filing of any additional motion by the Debtors. If the Debtors elect prior to the Effective Date not to take assignment of any Executory Contract or Lease, neither shall have any liability for the payment or satisfaction of any other Claim arising prior to the Effective Date under such Lease or Executory Contract. Any Rejection Claim arising as a result of rejection of an Executory Contract or Lease by virtue of the entry of the Confirmation Order shall be filed on or before thirty (30) days from the Effective Date. If an Executory Contract or Lease was rejected by the Debtors during the pendency of the Cases, then the Rejection Claim for rejection damages arising from such rejection should have been filed by the date set by the Court in the order approving such rejection. Any Rejection Claim not timely filed shall be deemed waived without further action by the Committee or the Debtors. If any Rejection Claim becomes an Allowed Claim, it shall be treated as a General Unsecured Claim under Class 4.

### E.    Post-Effective Date Actions

#### 1.    *Generally*

Depending upon the timing of final resolution of the Lien Adversary and the treatment of Claims that will be dictated by the result, the various actions necessary to consummation of the Plan may take place after the Effective Date and will take place at such times and upon the occurrence of the events specified in the Plan. All matters pertaining to the Debtors' corporate authority and existence are likewise provided in Sections 6.2, 6.3 and 6.4 of the Plan, and the Confirmation Order shall constitute the express corporate authority for all such corporate actions to take place on or after the Effective Date.

#### 2.    *Claims Administration*

As provided in Section 7.7 and Article 8 of the Plan, and discussed in Section V.E., above, the Reorganized Debtors will retain authority for handling of review and, if necessary, objection and resolution of Claims that are or are determined to be Disputed.

#### 3.    *Causes of Action*

The Debtors retain and reserve all Causes of Action for post-confirmation pursuit on behalf of the Debtors' estates and shall have broad discretion to institute, prosecute, compromise or abandon any Cause of Action. After the Effective Date, the Reorganized Debtors shall have the exclusive right, authority and discretion to institute, prosecute, abandon, settle or compromise any and all Causes of Action subject to the provisions of Section 7.8.2 of the Plan. The expenses of pursuit of any Causes of Action, including fees of counsel, shall be paid from Cash generated from operations.

Neither a vote to accept the Plan nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against any Holder of a Claim unless such Holder is otherwise expressly released in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court. The Debtors identified in their Schedules those Causes of Action it is aware at this time, in addition to potential avoidance actions relating to preferential transfers and possible fraudulent transfers under various provisions of the Bankruptcy Code, which the Debtors have not yet investigated but will do so after the Effective Date.

#### 4.    *Retention of Jurisdiction*

The Bankruptcy Court will maintain jurisdiction to the fullest extent allowed under applicable law over all matters set forth in the Plan, including authority to adjudicate the matters specifically reserved for determination by the Bankruptcy Court.

5.    *Final Accounting and Case Closing*

The Debtors shall, as and when appropriate, prepare and file any required motion and the final accounting necessary to close the Cases. These Cases may be closed notwithstanding the pendency of any Claims objections, contested motions, adversary proceedings or Causes of Action, over which the Court shall retain jurisdiction.

## VII.    FINANCIAL PROJECTIONS AND ASSUMPTIONS

### A.    Preparation

The Debtors' management and advisors have, through the development of financial projections (the "**Projections**"), analyzed the ability of the Company to meet its obligations under the Plan while maintaining sufficient liquidity and capital resources to conduct its business. The Projections were also prepared to assist each Holder of an Allowed Claim or Interest in voting Classes in determining whether to accept the Plan. The Company has prepared two (2) alternate series of Projections as a result of the unresolved Lien Adversary, one being a "secured model" and the other an "unsecured model" reflecting the projected recovery to Holders of Claims under each outcome.

The Projections are collectively found in <u>Exhibit 3</u> and should be read in conjunction with the assumptions, qualifications and/or footnotes thereto. The Projections were prepared in good faith based upon assumptions believed to be reasonable and applied in a manner consistent with past practices. Most of the assumptions about the operations of the business after the assumed Effective Date that are utilized in the Projections were based, in part, on economic, competitive, and general business conditions prevailing at the time. While as of the date of the Disclosure Statement such conditions have not materially changed, any future changes in these conditions may materially impact the ability of the Company to achieve the Projections.

The Projections, along with the accompanying assumptions and the Company's discussions below regarding its operations on and after the Effective Date, are "forward-looking statements." Generally, these statements relate to business plans, anticipated strategies, and anticipated capital financing needed and estimated costs and expenses required to perform the Plan. Forward-looking statements are subject to risks, uncertainties, and assumptions about the Company, including, but not limited to all of the risks discussed below. Actual results may differ materially from those in the Projections as a result of these risks and uncertainties. These forward-looking statements are made only as of the date hereof, and the Company undertakes no obligation to update or revise the forward-looking statements, whether as a result of new information, future events or otherwise.

Although the Company believes that the expectations reflected in the forward-looking statements are reasonable, there can be no assurances that such expectations will materialize or prove to be accurate. The Company's operations and the industry and market conditions in which it operates are subject to a number of uncertainties, risks and other influences, many of which are outside the control of the Company and cannot be predicted with any degree of accuracy. In light of the significant uncertainties inherent in the forward-looking statements made in the Projections, the inclusion of such statements should not be regarded as a representation by the Company or any other person that the results reflected in the Projections will be achieved.

### B.    Future Operations

As explained in more detail below, the primary source of future funds for distribution by the Reorganized Debtors is the future Free Cash from operations. Company management and their advisors

- 38 -

have analyzed the Company's ability to meet its obligations while maintaining sufficient liquidity and capital resources to conduct its business and to withstand inevitable adverse market conditions inherent in the oil and gas industry. The Debtors and their advisors prepared the alternate *pro forma* financial statements for the Reorganized Debtors for a ten (10) year period. *See* Exhibit 3. The Projections show the estimated consolidated financial position, results of operations and cash flows at and following June 1, 2011. The financial and operational assumptions (the "**Assumptions**") used and relied upon by the Debtors in connection with the formulation and preparation of the Projections are attached to this Disclosure Statement as Exhibit 4.

Based upon existing contracts and expected business going forward, management anticipates 95% utilization in Year 1. The Company currently enjoys 100% utilization and term contracts that provide it with reasonable certainty for the near term and for most of the first year of the Plan. While the Company cannot be certain of its ability to secure new or extended contracts, it believes that it will be able maintain average utilization of 75% in Years 2 thru 10. While management believes this is a reasonable estimate due to Performance's consistent outperformance of the industry, utilization is extremely difficult to predict especially considering the fact that the market has never maintained industry utilization above 80% for prolonged periods of time and the uncertainty created by increased instability in the Middle East and the otherwise volatile domestic oil and gas market.

The Company has projected day rates to remain constant for all but one of the Company's rigs. The market has seen a rebound in day rates, but the rebound has been slow and the unpredictability in demand supports utilizing rates at conservative levels. Operating expenses for the Projections are based upon the known current cost structure of the business plus costs associated with the expansion into West Texas. Operating expenses include, but are not limited to direct labor costs to run the rigs, indirect labor, shop expense, repairs and maintenance, operating supplies, rig insurance and property taxes. The margins that the company generates on both a percentage basis and per day basis are nevertheless in line with the industry averages and better than most public companies with less than 100 rigs in operation.

Sales, general and administrative costs represent the costs associated with the running of the Company and securing business, including safety and training, sales and marketing, strategic planning and direction, management of litigation, securing and managing capital and working capital needs, along with administrative support for accounting, payroll, tax review and filing and information technology. Sales costs are primarily costs associated with the Company's three (3) full-time sales representatives. Based on the Company's best information and belief, its costs of sales, general and administrative costs (after adjusting for excess restructuring costs) compare favorably to (and in some cases are much lower than) those of similarly situated drilling contractors whose information is publicly or otherwise available for comparison, both on a per-day basis and as a percentage of revenues. The Company's administrative expense under its current structure will remain the same whether it has 3, 5 or possibly more rigs in service.

The Company's rigs were placed into service between 2006 and 2008. Because they have been well maintained and serviced properly at all times, the Company has incurred limited capital expenditure due to age and continued use. However, because the Company's rigs have been in operation for much of the past five (5) years and are currently 100% utilized, it is estimated that between $1,250,000 and $1,500,000 in capital investment will be required in each of the next five (5) years. This amount is below what the Company believes is the industry average for such expenses. Significant expenditures included in these estimated amounts are for anticipated purchases of drill pipe, engines and mud pumps which range in price from $150,000 to over $600,000 or more each. Replacement through capital investment of such items is not only necessary to ensure uninterrupted operations but is ordinary and customarily expected in the industry. The Company has provided for retention of capital reserves in the Projections to be able to meet those needs when they arise.

C.    **Risks**

The Projections provided in this Disclosure Statement have been prepared by management and reviewed by the Debtors' advisors. These Projections, while presented with numerical specificity and based upon the historical operations of the Debtors, are necessarily based on a variety of estimates and assumptions which, though considered reasonable by the Debtors and their Professionals, may not be realized, and are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the Debtors' control. For example, the Debtors' Projections may be adversely affected by a myriad of factors that impact drilling contractors and the oil and gas industry as a whole, including among other things (i) the demand for drilling based upon prices for oil and natural gas (steep price declines contributing to the significant downturn in the drilling industry in 2008); (ii) demand for the type of Drilling Rigs that the Debtors operate; (iii) changes in prevailing day rates in the drilling market; (iv) continued unrest and instability in the Middle East; (v) adverse changes to the drilling industry and/or financial markets; and (vi) changes resulting from government regulation or legislation.

For these reasons, the Debtors caution that no representations can be made as to the accuracy of the Projections, or to the Company's ability to achieve the projected results. Some assumptions may not materialize. Further, events and circumstances occurring subsequent to the date on which the Projections were prepared may be different than those assumed, or, alternatively, may have been unanticipated. The occurrence of these events may affect financial results in a material and possibly adverse manner. The Projections, therefore, shall not be deemed or relied upon as a guaranty or other assurance of the actual results that will occur. The Debtors' independent accountants have neither compiled nor examined the accompanying prospective financial information to determine the reasonableness thereof and, accordingly, have not expressed an opinion or any other form of assurance with respect thereto.

The Debtors do not, as a matter of course, publish projections of their anticipated financial position, results of operations or cash flows. Accordingly, the Debtors do not intend to, and disclaim any obligation to, furnish updated projections to Holders of claims prior to the Effective Date or otherwise make such updated information publicly available.

D.    **Tax Consequences**

The following discussion summarizes certain United States federal tax consequences of the implementation of the Plan to the Debtor and to certain Holders of Claims. The following summary is based on Title 26 of the United States Code ("**Tax Code**"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the United States federal tax consequences described below.

The United States federal tax consequences of the Plan are complex and are subject to significant uncertainties because of (i) the complexity of the transactions contemplated by the Plan; (ii) the uncertainty as to the tax consequences of events in prior years; (iii) the differences in the nature of the types of Claims and the taxpayer status, residence and methods of accounting of Holders of Claims; (iv) prior actions taken by Holders with respect to their Claims; and (v) the possibility that events or legislation subsequent to the date hereof could change the federal tax consequences of the transactions. There may also be state, local or foreign tax issues that may affect particular Holders. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the United States federal income tax consequences of the Plan to special classes of taxpayers (such as foreign

taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations (including, without limitation, certain pension funds), persons holding a Claim as part of a constructive sale, straddle or other integrated transaction, and investors in pass-through entities). If a partnership (or other entity taxed as a partnership) holds a Claim, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership.

Holders of Claims and Interests are urged to consult their tax advisors respecting the individual tax consequences of the transactions contemplated under or in connection with the Plan. **Accordingly, the following summary of certain United States federal tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim.**

**IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, Holders of Claims are hereby notified that: (a) any discussion of United States federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by Holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the solicitation of votes on the Plan by the Debtor; and (c) Holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.**

1.    *Material Tax Consequences to Holders of Claims and Interests*

The tax consequences of the implementation of the Plan to Holders of Claims and Interests will depend in part on (i) whether the Holder's Claim constitutes a security for federal income tax purposes, (ii) whether the Holder reports income on the accrual or cash basis, (iii) whether the Holder receives consideration in more than one (1) tax year, (iv) whether the Holder is a resident of the United States, (v) whether the Holder is a corporation, partnership, or an individual, (vi) whether all the consideration received by the Holder is deemed to be received by that Holder as part of an integrated transaction or a step transaction, or (vii) whether the Holder is a Holder of some interest in the Debtor.

In general, if the Holder of a Claim receives interest on account of its Claim, such interest will constitute income under the Tax Code. In general, if an Interest Holder receives funds on account of such Interest, these funds will constitute a recovery of the Interest Holder's investment and any excess funds above the Holder's basis in the Interest will be a capital gain. Conversely, if the Holder does not recover the full amount of the basis in the Interest, such deficiency will be a capital loss.

2.    *Material Tax Consequences to the Debtor*

There are no known material tax consequences of the Plan to the Debtor.

**E.    Liquidation Analysis**

The Debtors, together with their advisors, have prepared a liquidation analysis that is contained in Exhibit 5 hereto (the "**Liquidation Analysis**"). This Liquidation Analysis outlines potential recoveries to creditors in the event the Company was liquidated in a hypothetical Chapter 7 case and demonstrates that the Plan satisfies the "best interests" test of Section 1129(a)(7)(A)(ii). *See* Section VIII.G.6., below. Proceeds distributed in the Liquidation Analysis are presumed to be distributed in accordance with § 726 of the Bankruptcy Code in the following priority: (i) claims of secured creditors to the extent of the value of their collateral; (ii) costs, fees and expenses of liquidation, as well as any other administrative expenses; (iii) claims arising prior to commencement of the hypothetical Chapter 7 case, but which have

priority status under the Bankruptcy Code; and (iv) general unsecured claims. The Liquidation Analysis does not constitute a certified valuation of assets and is not necessarily indicative of recoverable proceeds in an actual liquidation.

This analysis is based on a number of assumptions, which are contained as a part of and are outlined in Exhibit 5. The assumptions used in the Liquidation Analysis are based on management's knowledge of operations and the industry in general and input from Hadco International, the Debtors' appraisal and valuation expert. These assumptions are subject to significant uncertainties as a result of, among other factors, general market conditions.

## VIII.   CONFIRMATION OF PLAN

The Plan cannot be consummated unless it is confirmed by the Bankruptcy Court. Confirmation of the Plan requires that, among other things, either (i) each class of Claims or Interests that is Impaired by the Plan has voted to accept the Plan by the requisite majority, or (ii) the Plan is determined by the Bankruptcy Court to be fair and equitable, as defined by the Bankruptcy Code, with respect to classes of Claims or Interests that have rejected the Plan. The Bankruptcy Code also requires that the Confirmation of the Plan be in the "best interests" of all Holders of Claims and Interests. The Debtors believe that the Plan meets the Confirmation requirements of the Bankruptcy Code.

### A.   **Manner of Voting**

IT IS IMPORTANT THAT HOLDERS OF CLAIMS AND INTERESTS EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN. All known Holders of Claims and Interests entitled to vote on the Plan have been sent a Ballot contained in the Solicitation Package. Such Holders should read the Ballot carefully and follow the instructions contained therein. In voting for or against the Plan, please use only the Ballot (or Ballots) sent to you with this Disclosure Statement. If a creditor has an Allowed Claim or Interest in more than one class, such creditor may vote multiple Ballots.

FOR YOUR BALLOT TO COUNT, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY BMC GROUP, THE DEBTORS' SOLICITATION AND VOTING AGENT (IDENTIFIED BELOW), NO LATER THAN 5:00 P.M. CENTRAL TIME ON _____, _____, 2011 (the "**Voting Deadline**"). IF YOU MUST RETURN YOUR BALLOT TO YOUR BROKER, ATTORNEY OR ANYONE ELSE WHO WILL BE VOTING FOR YOU, YOU MUST RETURN YOUR BALLOT TO THEM IN SUFFICIENT TIME FOR THEM TO PROCESS IT AND RETURN IT TO DEBTORS' SOLICITATION AND VOTING AGENT BY THE VOTING DEADLINE, AT THE APPLICABLE FOLLOWING ADDRESS:

| **BY UNITED STATES MAIL:** | **BY OVERNIGHT COURIER OR PERSONAL DELIVERY:** |
|---|---|
| O&G Leasing LLC Voting Agent | O&G Leasing LLC Voting Agent |
| BMC Group, Inc. | BMC Group, Inc. |
| P.O. Box 3020 | 18750 Lake Drive East |
| Chanhassen, MN  55317 | Chanhassen, MN  55317 |

ANY BALLOT WHICH IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED A VOTE TO ACCEPT THE PLAN. IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES OR IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE DEBTORS'

SOLICITATION AND VOTING AGENT AT THE ADDRESSES ABOVE OR BY TELEPHONE AT 1-888-909-0100.

Additional copies of the Plan, the Disclosure Statement, or any exhibits to such documents may be obtained by requesting copies thereof from (i) BMC Group, at the addresses and/or telephone numbers above, or (ii) by requesting copies thereof from Debtors' counsel at the telephone numbers or e-mail addresses set forth below.

**B.      Creditors Eligible to Vote**

Subject to the provisions of the Disclosure Order and express provisions of the Plan providing otherwise, any Holder of a Claim against or Interest in any Debtor as of the Petition Date, which Claim or Interest has not been disallowed by order of the Bankruptcy Court and is not otherwise a Disputed Claim or Disputed Interest, is entitled to vote to accept or reject the Plan if (i) such Claim or Interest is Impaired under the Plan and is not of a Class that is deemed to have accepted or rejected the Plan pursuant to §§ 1126(f) and 1126(g) of the Bankruptcy Code and (ii) either (a) such Holder's Claim or Interest has been scheduled by the Debtors (and such Claim or Interest is not scheduled as disputed, contingent or unliquidated), or (b) such Holder has filed a Proof of Claim on or before the applicable Bar Dates. Unless otherwise permitted in the Plan, the Holder of any Disputed Claim or Disputed Interest is not entitled to vote with respect to such Disputed Claim or Disputed Interest, unless the Bankruptcy Court, upon application made by such Holder pursuant to Bankruptcy Rule 3018(a) and in accordance with the provisions set forth in Exhibit 6 hereto, temporarily allows such Disputed Claim or Disputed Interest for the limited purpose of voting to accept or reject the Plan. Any such application must be heard and determined by the Bankruptcy Court on or before ten (10) days prior to the Voting Deadline. A vote on the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

For Holders of any Disputed Claim or Disputed Interest, the Debtors will cause to be distributed by United States mail, first-class postage prepaid, personal service or overnight delivery a Solicitation Package, which contains a Ballot, and such person or entity will be provided with notice that its entire Claim has been allowed temporarily for voting purposes only and not for purposes of allowance or distribution, at $1.00.

**C.      Acceptance Necessary to Confirm the Plan**

For the Plan to be accepted and thereafter confirmed, it must be accepted by at least one (1) class of Claims that is Impaired by the Plan. Under § 1126 of the Bankruptcy Code, the Impaired class is deemed to have accepted the Plan if: (i) with respect to a class of Claims, votes representing at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Allowed Claims that have voted in that class have accepted the Plan, and (ii) with respect to a class of Interests, votes representing at least two-thirds (2/3) in amount of those Allowed Interests that have voted have accepted the Plan; provided, however, that the vote of any Holder of an Allowed Claim or Allowed Interest whose acceptance or rejection of the Plan was not made in good faith, as determined by the Court, will not be counted.

If a class of Claims has been Impaired by the Plan, the Impaired class must accept the Plan. Otherwise, the Bankruptcy Court, in order to confirm the Plan, must independently determine that the Plan provides to each Holder of a Claim or Interest, as the case may be, of such class a recovery which has a value, as of the Effective Date, at least equal to the value of the distribution which such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

CREDITORS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE DISCLOSURE ORDER FOR A FULL UNDERSTANDING OF VOTING REQUIREMENTS, INCLUDING, WITHOUT LIMITATION, USE OF BALLOTING FORMS.

### D.    General Procedures for Solicitation and Voting

Pursuant to Bankruptcy Rule 3017(d) and as directed in the Disclosure Order, on or before _____, 2011 (the "**Solicitation Mailing Date**"), BMC Group, the Debtors' solicitation and voting agent, will transmit Solicitation Packages to all parties entitled to receive them pursuant to and in accordance with the Solicitation Procedures described in Exhibit 6.

1.    *Record Date for Determining Holders Entitled to Vote*

Pursuant to Bankruptcy Rule 3017(d) and in the Disclosure Order, the Court has established _____, 2011, as the record date as of which it is shall be determined the Holders of 2009 Debentures entitled to vote on the Plan (the "**Record Date**").

2.    *Procedures for Holders of 2009 Debentures*

Set forth with particularity in Exhibit 6 hereto are the Debentures Solicitation Procedures, which are special provisions established for the solicitation of votes from Holders of 2009 Debentures. Reference should be made to Exhibit 6 and, particularly, Exhibit "D" found therein.

3.    *Procedures for Holders of Contingent, Unliquidated and Disputed Claims*

Pursuant to Bankruptcy Rule 3003(c)(2), unless otherwise provided in the Plan, the Debtors will not mail or distribute any documents or notices to any Holders of Claims or Interests (a) whose Claim or Interest is not scheduled or is scheduled at zero, in an unknown amount or as disputed, contingent, or unliquidated and (b) who failed to timely file a Proof of Claim. Moreover, such Holders shall not be treated as a Holder of a Claim or Interest with respect thereto for the purposes of voting and distribution.

4.    *Procedures for Vote Tabulation*

a.    Voting Deadline

Pursuant to Bankruptcy Rule 3017(c), the Court has established _____, 2011, as the Voting Deadline, which is the last date and time by which ballots for accepting or rejecting the Plan must be received by BMC Group, the Debtors' solicitation and voting, agent in order to be counted. Except to the extent otherwise determined by the Debtors, in their sole discretion and after consultation with BMC Group, the Debtors will not accept or count any Ballots received after the Voting Deadline.

b.    Tabulation Procedures

The Tabulation Procedures applicable to the receipt and tabulation of votes on the Plan shall be those defined and set forth more particularly in Exhibit 6, and all creditors entitled to vote on the Plan are directed to Exhibit 6 for careful review.

### E.    Distributions Under the Plan

1.    *Timing of Distributions*

The Reorganized Debtors shall make distributions as and when called for under this Plan.

2.      *Distributions to Holders of Debentures*

As provided in Sections 6.8 and 7.5 of the Plan, as a condition to Holders of 2009 Debentures receiving distributions under the Plan, (a) the 2009 Debentures must first be surrendered to the Debtors for cancellation (or, as applicable, to BMC Group as the Debtors' solicitation and voting agent) or (b) the Debtors shall have received satisfactory evidence of the ownership and cancellation of the 2009 Debentures. With respect to any 2009 Debentures held in book-entry form by The Depository Trust Company ("**DTC**"), then the DTC shall surrender such securities to First Security, which shall in turn surrender same to the Debtors or otherwise provide written certification of such cancellation in form and substance satisfactory to the Debtors. In connection with such cancellation, Holders will be provided with a letter of transmittal from the Debtors (or, as applicable, to BMC Group as the Debtors' solicitation and voting agent) to be completed by such Holder and to provide the proper mailing address for remitting distributions under the Plan.

3.      *Nominal Distributions*

With respect to any distribution prior to the final distribution, if the Holder of an Allowed Claim would receive less than $100, the Debtors may choose not to distribute such lesser amount to such Holder, but may instead defer the distribution thereof until the cumulative amount to be distributed to such Holder and any subsequent distribution is $100 or more. No interest on any deferred amount shall be paid to such Holder. If the final distribution to the Holder of an Allowed Claim would be less than $100, the Debtors are not required to make such distribution, and such distribution is deemed waived.

4.      *Unclaimed Distributions*

If a check or other distribution notice transmitted the Holder of an Allowed Claim or Interest hereunder is returned or otherwise not timely negotiated, then the Reorganized Debtors will make no further distribution to such Holder unless and until they are provided in writing with the Holder's proper address. If a proper address is provided, the Debtors shall remit to such Holder as soon as practicable any previously undelivered distributions, without interest. If one or more distributions are unclaimed or undeliverable for one (1) year after the Effective Date, such Holder shall be deemed to have waived and forfeited its Claim, such Claim will no longer be deemed to be an Allowed Claim in any respect, such Holder will not participate in any further distributions under the Plan. All unclaimed or undelivered property existing on the date that is one (1) year after the Effective Date shall be deemed unclaimed property under § 347(b) of the Bankruptcy Code. The Debtors shall have no affirmative obligation to identify or locate any Holders of Claims or Interests entitled to distributions under the Plan.

**F.      Hearing on Confirmation of the Plan**

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing on confirmation of a plan. Pursuant to the Disclosure Order entered by the Bankruptcy Court, a preliminary hearing on confirmation of the Plan will be held on Tuesday, _____, **2011, at [____], Central Time**, before the Honorable Edward Ellington in Courtroom 4D of the United States Courthouse for the Southern District of Mississippi in Jackson, Mississippi (the "**Confirmation Hearing**"). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be made in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, set forth the name of the objector, the nature and amount of the Claim or Interest held or asserted by the objector against the

- 45 -

Debtors' estates or property, the basis for the objection and the specific grounds therefor. **Any objection, together with proof of service thereof, must be filed with the Clerk of Court by 5:00 p.m. Central Time on _____, _____, 2011, ("Plan Objection Deadline") and served on all counsel for the Debtors by such Plan Objection Deadline.**

Objections to confirmation of the Plan are governed by Federal Rule of Bankruptcy Procedure 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### G.    Requirements for Confirmation of the Plan

####    1.    *Acceptance*

Holders of Claims in Classes 1, 2, 3, 4, 5 and 6 (the "**Voting Classes**") are Impaired under, and the Holders of such Claims are entitled to vote on, the Plan and, therefore, must accept the Plan in order for it to be confirmed without application of the "fair and equitable test", described below, to such Class. As stated above, a Class of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds (⅔) in dollar amount and a majority in number of the Claims of such Class (other than any Claims of creditors designated under § 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The Holders of Claims in Class 7 and Interests in Class 8 are not entitled to vote on the Plan; such Holders will receive no distribution under the Plan and are conclusively deemed to reject the Plan.

####    2.    *Fair and Equitable Test*

The Debtors may seek to confirm the Plan notwithstanding the nonacceptance of the Plan by any impaired class of Claims under the requirements of § 1129(b) of the Bankruptcy Code. To obtain such confirmation, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired Class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class receives more than it is entitled to for its claims or interests. The Debtors believe that the Plan satisfies this requirement and that in all cases, distributions under the Plan satisfy the application of the fair and equitable rule.

Section 1129(b) of the Bankruptcy Code establishes different "fair and equitable" tests for secured claims, unsecured claims and interests, as follows:

(a)    Secured Claims. The plan must provide either (i) that the Holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and each Holder of a claim receives deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such Holder's interest in the estate's interest in such property; (ii) for the sale of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or (iii) for the realization by such Holders of the indubitable equivalent of such claims.

(b)    Unsecured Claims. Either (i) the plan provides that each Holder of an impaired unsecured claim receives or retains under the plan property of a value, as of the effective date of the plan, equal to

- 46 -

the amount of its allowed claim or (ii) the Holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

   (c)  Interests. Either (i) each interest Holder will receive or retain under the plan property of a value, as of the effective date of the plan, equal to the greater of (y) the fixed liquidation preference or redemption price, if any, of such interest or (z) the value of the interest, or (ii) the Holders of interests that are junior to the interests in such class will not receive or retain any property under the plan.

   3.  *Confirmation without Unanimous Acceptance; Cram Down*

   Section 1129(b) of the Bankruptcy Code provides that the Plan may be confirmed by the Court despite not being accepted by every Impaired class if (i) at least one Impaired class of Claims, excluding the claims of insiders, has accepted the Plan; and (ii) the Court finds that the Plan does not discriminate unfairly and is fair and equitable to the rejected classes. Among other things, such a finding would require a determination by the Court that the Plan provides that no Holder of an Allowed Claim or Interest junior to the rejecting class will receive or retain property or payment under the Plan until or unless such rejecting class is paid in full.

   The Debtors reserve the right pursuant to Bankruptcy Code § 1129(b) to request that the Court confirm the Plan if all of the applicable requirements of Bankruptcy Code § 1129(a) have been met. THE DEBTORS BELIEVE THAT THE PLAN MAY BE CONFIRMED ON A NONCONSENSUAL BASIS (PROVIDED AT LEAST ONE IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN). ACCORDINGLY, THE DEBTORS EXPECT TO DEMONSTRATE AT THE CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF § 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS. In addition, the Debtors reserve the right pursuant to Bankruptcy Code § 1126(e) to request that the Court designate and strike any Ballot rejecting the Plan cast by any Holder of a Claim which was not cast in good faith.

   4.  *Absolute Priority Rule*

   The absolute priority rule provides that the Plan is fair and equitable with respect to a rejecting class if the rejecting class receives payment in full over time with interest or as long as no class junior to it receives a distribution under the Plan. The Debtors believe that the Plan represents the best option available to maximize the return to all creditors. Furthermore, under the Plan, no inferior class of creditors or Interest Holders will receive or retain anything unless the Allowed Claims of all superior classes are paid in full.

   5.  *Feasibility*

   The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor or its successor other than as provided in the Plan. The Debtors believe that the Plan provides the means by which the Reorganized Debtors will be able to make all payments and perform all obligations as required by the provisions of the Plan and that there is no reasonable basis for believing that confirmation of the Plan is likely to be followed by the liquidation or the need for further financial reorganization which is not provided for in the Plan. *See* Article VII hereof and the Exhibits relating thereto for the financial Projections upon which the Debtors' opinions regarding feasibility of the Plan are based.

6.      *"Best Interests" Test/Liquidation Analysis*

To obtain confirmation of the Plan, the Debtors must show that each Holder of an Impaired Claim or Interest has accepted the Plan, or that each Holder will receive or retain under the Plan on account of the Holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors' assets were liquidated under Chapter 7 of the Bankruptcy Code on said date.

The information set forth in Exhibit 5 provides a summary of the liquidation values of the Debtors' assets assuming a Chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court or some other third party (including a secured party) would liquidate the assets of the Debtors' estates or some other forced sale procedure were followed. Reference should be made to Exhibit 5 and to the discussion thereof in Section VII, and comparison should be made to the information regarding the estimated return to Holders of Allowed Claims under the Article 5 of the Plan and Exhibit 5 hereto. Plainly, the Debtors believe that continuation of operations maximizes the values of these assets.

Underlying the Debtors' Liquidation Analysis are estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors and management. The liquidation value is also based upon assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected may not be realized if the Debtors were, in fact, to undergo such a liquidation. The liquidation period is assumed to be for a period ranging from six (6) to eighteen (18) months following the discontinuance of operations. This period would allow for the collection of receivables, selling of assets and the winding down of operations. It has been assumed that creditor recoveries would not be affected by proceeds of Causes of Action, if any, including avoidance actions or any other litigation that any of the Debtors are or may be able to assert or the expenses necessary to litigate such claims.

Furthermore, after consideration of the effects that a forced liquidation would have on the ultimate proceeds available for distribution to creditors in this Chapter 11 Case, including: (a) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee or other liquidating agent; (b) the substantial erosion in a Chapter 7 case of the value of the Drilling Rigs and related assets, in the context of the expeditious liquidation required under Chapter 7 or a similar "forced sale" atmosphere that would prevail, (c) the complete loss of any going concern value of the Company; (d) the adverse effects on the salability due to the immediate departure of management and key skilled employees and the loss of customers and suppliers; (e) the potential increases in Claims required to be satisfied on a priority basis or on parity with creditors in these Cases, the Debtors believe that confirmation of the Plan will provide each Holder of an Allowed Claim with significantly more than the amount it would receive pursuant to liquidation of any of the Debtors under Chapter 7 of the Bankruptcy Code.

The Debtors also believe that the value of any distributions from the liquidation proceeds to each class of Allowed Claims in a Chapter 7 case or other forced liquidation scenario would be less than the value of distributions under the Plan because such distributions in a Chapter 7 case would not occur for a substantial period of time. It is likely that distribution of the proceeds of the liquidation could be delayed for at least a year or more after the completion of such liquidation in order to resolve claims and prepare for distributions. In the likely event litigation was necessary to resolve claims asserted in the Chapter 7 cases (*e.g.* the Lien Adversary), the delay could be prolonged and the recovery diminished further.

### H.    Effect of Confirmation

Confirmation of the Plan will bind the Debtors and all Holders of Claims or Interests, whether or not they accept the Plan. The distributions provided for in the Plan will be in exchange for and in complete settlement, satisfaction and discharge of all Claims and Interests, including any claim for interest after the Petition Date. All Holders of Claims shall be precluded from asserting any claim against the Debtors or their property based upon any transaction or other activity of any kind that occurred prior to the Effective Date.

#### 1.    *Title to Assets*

Except as otherwise provided by the Plan, on the Effective Date, title to all assets and properties encompassed by the Plan shall vest in the Reorganized Debtors in accordance with § 1141 of the Bankruptcy Code.

#### 2.    *General Injunction*

The Plan provides in Section 13.6 for a permanent injunction against parties holding Claims against any of the Debtors, which states as follows:

**Except as otherwise expressly provided in the Plan or the Confirmation Order, all Holders of Claims, Interests or Causes of Action against or in any of the Debtors are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action, process or other proceeding against any of the Debtors or their property or assets on account of such Claim, Interest or Cause of Action, (b) seeking enforcement, attachment, collection or recovery on account of such Claim, Interest or Cause of Action against any of the Debtors by any manner or means not expressly provided for in this Plan, (c) creating, perfecting, or enforcing any Lien or other encumbrance against any of the Debtors or interests in their property or assets, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Debtors or their property or assets, (e) commencing or continuing any action or other proceeding of any kind with respect to any Claims or Causes of Action which are extinguished or released pursuant to the Plan, and (f) taking any actions to interfere with the implementation or consummation of the Plan, other than any rights of appeal of the Confirmation Order as may exist.**

#### 3.    *Release and Exculpation of Covered Parties*

The Plan provides in Section 13.8 for a release of claims and causes of action against and exculpation of liability in favor of the Covered Parties, which state as follows:

**Confirmation of this Plan constitutes a waiver by the Debtors and their estates of any and all Causes of Action against the Debtors and all Covered Parties, and shall constitute a release by the Debtors and the estates of all Covered Parties from all Causes of Action, including but not limited to all Causes of Action arising in connection with or related to any act or omission in connection with, relating to, or arising out of, the Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan or any of the transactions contemplated by the Plan, to the fullest extent permissible under applicable law, except as to obligations of the Debtors expressly provided in or reserved by this Plan or the Confirmation Order. On the Effective Date, any and all Causes of Action by or derivatively through any Debtor against any of the Covered Parties shall automatically and immediately be fully and finally waived, released and discharged for all purposes.**

**Neither the Debtors nor their estates existing before or after the Effective Date nor any of the Covered Parties, shall have or incur any liability to, or be subject to any right of action by, any of the Debtors or any Holder of a Claim or Interest or any other party in interest in the Cases, or any of their respective owners, members, officers, directors, managers, employees, agents, representatives, attorneys, advisors or other Professionals, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (i) the Cases, (ii) any act taken or omitted to be taken on or after the Petition Date in connection with the Cases, or (iii) the Disclosure Statement, the Plan or the documents and actions necessary to perform the Plan, except for obligations of the Debtors or any of the Covered Parties expressly arising under or in accordance with the Plan and Confirmation Order, and except for their willful misconduct or gross negligence; and each of the Debtors and the Covered Parties shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan and Confirmation Order.**

4.    *Discharge of Claims*

Except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order will operate as a discharge, pursuant to Bankruptcy Code § 1141(d), to the fullest extent permitted by applicable law, as of the Effective Date, of any and all debts of, and claims of any nature whatsoever against the Debtors that arose at any time prior to the Effective Date, including any and all claims for principal and interest, whether accrued before, on or after the Petition Date. Without limiting the generality of the foregoing, on the Effective Date, the Debtors will be discharged from any claim or debt that arose prior to the Confirmation Date and from any and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h), or 502(i), regardless of whether (a) a Proof of Claim based on such debt was filed pursuant to the Bankruptcy Code § 501, (b) a Claim based on such debt is an Allowed Claim pursuant to Bankruptcy Code § 502, or (c) the Holder of a Claim based on such debt has voted to accept the Plan.

5.    *Exemption from Securities Laws*

a.    Initial Issuance

Section 1145(a)(1) of the Bankruptcy Code generally exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state securities laws if three principal requirements are satisfied: (i) the securities are offered and sold under a plan of reorganization and are securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold a claim against, or an interest in, the debtor or such affiliate; and (iii) the securities are issued entirely in exchange for the recipient's claims against or interests in the debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property. The Debtors believe that the issuance and distributions of the New Debentures and the new membership interests in O&G under the Plan will satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

b.    Subsequent Transfers

To the extent not otherwise prohibited, and subject to the terms of the Plan, New Debentures and the New Indenture, all New Debentures issued under the Plan and covered by § 1145(a)(1) of the Bankruptcy Code may be resold by the Holders thereof without registration unless, as more fully described below, the Holder is an "underwriter" with respect to such securities, as such term is defined in § 1145(b)(1) of the Bankruptcy Code. Generally, § 1145(b)(1) of the Bankruptcy Code defines an

"underwriter" as any person who: (i) purchases a claim against, an interest in or a claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (ii) offers to sell securities offered under a plan for the Holders of such securities; (iii) offers to buy such securities from the Holders of such securities, if the offer to buy is: (A) with a view to distributing such securities; and (B) under an agreement made in connection with the plan, the consummation of the plan or with the offer or sale of securities under the plan; or (iv) is an "issuer" with respect to the securities, as the term "issuer" is used in section 2(a)(11) of the Securities Act. Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer or any person under direct or indirect common control of the issuer. Such a person is an "affiliate" of the issuer. "Control" (as such item is defined in rule 405 promulgated under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting of securities, by contract or otherwise.

To the extent that Persons who receive New Debentures pursuant to the Plan are deemed to be "underwriters" as defined in § 1145(b) of the Bankruptcy Code, including as an "affiliate" of the issuer, resales by such Persons would not be exempted by § 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Consequently, an "underwriter" or "affiliate" may not resell New Debentures except in compliance with the registration requirements of the Securities Act (which is an undertaking the Debtors and Reorganized Debtors or an exemption therefrom, including Rule 144. In addition, any person who is an "underwriter" but not an "issuer," including an "affiliate," with respect to an offer and sale of securities is entitled to engage in exempt "ordinary trading transactions" within the meaning of § 1145(b) of the Bankruptcy Code.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Debentures to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, we express no view as to whether any particular Person receiving New Debentures under the Plan would be an "underwriter" with respect to such Subscription Rights or New Debentures.

GIVEN THE COMPLEX AND SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN "UNDERWRITER," THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE NEW DEBENTURES. POTENTIAL RECIPIENTS OF THE NEW DEBENTURES ARE ADVISED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY TRADE THE NEW DEBENTURES WITHOUT TAKING ADDITIONAL ACTION TO ENSURE COMPLIANCE WITH THE SECURITIES ACT, THE EXCHANGE ACT, OR SIMILAR STATE AND FEDERAL LAWS.

c.     Subsequent Transfers Under State Laws

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the New Debentures.

THE DEBTORS MAKE NO REPRESENTATION TO ANY OFFEREE OF ANY SECURITIES ISSUED UNDER THE PLAN REGARDING THE LEGALITY OF ANY INVESTMENT THEREIN BY SUCH OFFEREE UNDER APPROPRIATE LEGAL INVESTMENT OR SIMILAR LAWS OR REGULATIONS.

6. *Exemption from Transfer Taxes*

In accordance with § 1146(c) of the Bankruptcy Code, no stamp tax or similar tax shall be imposed in connection with the issuance, transfer or exchange of a security or the making or delivery of an instrument of transfer pursuant to the Plan.

**I.      Confirmation Order and Plan Control**

To the extent the Confirmation Order and/or the Plan is inconsistent with the Disclosure Statement, or any other agreement entered into between or among the Debtors and any third party, the Plan controls the Disclosure Statement and the Confirmation Order shall control the Plan.

**IX.      CONCLUSION AND RECOMMENDATION**

The Debtors believe that the Plan is in the best interests of all Holders of Claims and Interests and of all other persons who will be affected by the confirmation of the Plan. The Debtors urge the Holders of Impaired Claims in the Voting Classes (Classes 1, 2, 3, 4, 5 and 6) to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be actually received by the Debtors' solicitation and voting agent by the Voting Deadline.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

DATED:  July 1, 2011

Respectfully submitted,

**O&G LEASING, LLC,** *et al.*


By: /s/ *Jeff H. Goodwin*

JEFF H. GOODWIN
Chief Financial Officer


OF COUNSEL:

Douglas C. Noble
**McCraney, Montagnet & Quin PLLC**
602 Steed Road • Suite 200
Ridgeland, Mississippi 39157
Telephone:  (601) 707-5725
Email:  dnoble@mmqlaw.com
Web: www.mmqlaw.com

Robert L. Holladay, Jr.
**YoungWilliams, P.A.**
Post Office Box 23059
Jackson, Mississippi 39225-3059
Telephone:  (601) 948-6100
Email: rob.holladay@youngwilliams.com
Web:  www.youngwilliams.com

*Counsel to Debtors O&G Leasing, et al.*