**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

| | |
|---|---|
| **In re:** | ) |
| | ) |
| **O&G LEASING, LLC,** | ) **Case No. 10-01851 EE** |
| **PERFORMANCE DRILLING** | ) **Case No. 10-01852 EE** |
| **COMPANY, LLC,** | ) **Chapter 11** |
| | ) **Jointly Administered** |
| **Debtors.** | ) |

**DISCLOSURE STATEMENT TO THE INDENTURE TRUSTEE'S CHAPTER 11 PLAN**
**FOR O&G LEASING, LLC AND PERFORMANCE DRILLING COMPANY, LLC**

**PAUL H. STEPHENSON, III (MSB# 7864)**
**JIM F. SPENCER, JR. (MSB# 7736)**
**C. JOYCE HALL (MSB# 2123)**
**WATKINS & EAGER** PLLC
**Post Office Box 650**
**Jackson, Mississippi 39205**
**The Emporium Building**
**400 East Capitol Street**
**Jackson, Mississippi 39201**
**Telephone: (601) 965-1900**
**Facsimile: (601) 965-1901**
*pstephenson@watkinseager.com*
*jspencer@watkinseager.com*
*jhall@watkinseager.com*

**STEPHEN W. ROSENBLATT (MSB# 5676)**
**CHRISTOPHER R. MADDUX (MSB#100501)**
**BUTLER, SNOW, O'MARA, STEVENS &**
    **CANNADA** PLLC
**Post Office Box 6010**
**Ridgeland, Mississippi 39158**
**Suite 1400**
**1020 Highland Colony Parkway**
**Ridgeland, Mississippi 39157**
**Telephone: (601) 985-4502**
**Facsimile: (601) 985-4500**
*steve.rosenblatt@butlersnow.com*
*chris.maddux@butlersnow.com*

**STEVE JAKUBOWSKI (ADM.** *PRO HAC VICE)*
**THE COLEMAN LAW FIRM**
**77 West Wacker Drive, Suite 4800**
**Chicago, Illinois 60601**
**Telephone: (312) 606-8641**
**Facsimile: (312) 444-1028**
*sjakubowski@colemanlawfirm.com*

**Dated: July 26, 2011**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................. 1

II. OVERVIEW OF TRUSTEE PLAN ....................................................... 5

    A.  The 363 Sale, Bidding Procedures, and the Stalking Horse Bid .................... 5
    B.  Overview of Classification and Treatment of Claims and Equity Interests .. 6
    C.  Chart of Classification and Treatment of Claims and Equity Interests ...... 10
    D.  The Post-Confirmation Liquidating Trust .................................... 16
    E.  Substantive Consolidation ................................................................. 16

III. COMPARISON OF THE TRUSTEE PLAN TO THE DEBTORS' PLAN ........... 17

IV. VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS .............. 27

    A.  The Disclosure Statement Order ....................................................... 27
    B.  Manner of Voting ............................................................................ 27
    C.  Creditors Entitled to Vote on the Trustee Plan ............................... 28
    D.  General Procedures for Solicitation and Voting ............................. 29

        1.  Ballot Tabulation Procedures .................................................. 30
        2.  Execution of Ballots by Representatives ................................. 31
        3.  Waivers of Defects and Other Irregularities Regarding Ballots .......... 31
        4.  Withdrawal of Ballots and Revocation ................................... 31

    E.  Confirmation of the Trustee Plan ..................................................... 32

        1.  The Confirmation Hearing ....................................................... 32
        2.  Requirements for Confirmation of the Plan ........................... 33
        3.  Acceptances Necessary to Confirm the Plan ......................... 35
        4.  Cramdown ................................................................................ 36
        5.  Feasibility ............................................................................... 37
        6.  "Best Interests" Test ............................................................... 38

V.  HISTORY OF THE DEBTORS; SIGNIFICANT EVENTS IN THE CASES ....... 39

VI. SUMMARY OF THE TRUSTEE PLAN ............................................... 40

    A.  The Debtors' Assets ........................................................................ 41
    B.  Classification of Claims and Equity Interests ............................... 43
    C.  Treatment of Unclassified Claims ................................................... 43

        1.  Administrative Claims .............................................................. 43
        2.  United States Trustee Fees ...................................................... 44
        3.  Professional Fees ..................................................................... 44
        4.  Allowed Unsecured and Priority Unsecured Tax Claims ...... 45

i

       5.   *Allowed Priority Unsecured Non-Tax Claims* ....................................... 45

  D.    **Treatment of Classified Claims and Equity Interests** .................... 45

       1.   *Class 2A – Allowed Claims of Holders of Senior Series 2009A Debentures* .................................................................... 45

          (a) *Plan Alternative 2A – (A)* ................................................ 46
          (b) *Plan Alternative 2A – (B)* ................................................ 47
          (c) *Disposition of Post-Petition Escrow Account* ..................... 47

       2.   *Class 2B – Allowed Claims of Holder Series 2009B Debentures* ......... 48
       3.   *Class 2C – Allowed Secured Claims and Certain Allowed Unsecured Claims of Washington State Bank* ..................................... 48
       4.   *Class 2D – Allowed Claims of Octane Funding* ................................... 50

          (a) *Plan Alternative 2D-(A)* .................................................. 50
          (b) *Plan Alternative 2D-(B)* .................................................. 50

       5.   *Class 2E – Other Secured Claims* ........................................................ 51
       6.   *Class 3 – General Unsecured Claims* ................................................. 51

          (a) *Plan Alternative 3(A)* ..................................................... 52
          (b) *Plan Alternative 3(B)* ..................................................... 52

       7.   *Class 4 – Intercompany Claims* .......................................................... 53
       8.   *Class 5 – Subordinated Claims* ........................................................... 53
       9.   *Class 6 – Equity Interests* ................................................................... 53

**VII.**   **SALES PROCEDURES GOVERNING THE AUCTION AND 363 SALE** ............ 53

  A.    **The Staking Horse Bid** .................................................................... 54
  B.    **The Break-Up Fee** ........................................................................... 54
  C.    **Important Dates for Potential Competing Bidders** .......................... 54
  D.    **Assets to be Sold** .............................................................................. 55
  E.    **The Bidding Process** ......................................................................... 55
  F.    **Participation Requirements** ............................................................. 56
  G.    **Due Diligence** ................................................................................... 56
  H.    **Bid Deadline and Bid Requirements** ................................................ 57
  I.    **Determination of Lead Bid** .............................................................. 58
  J.    **The Potential Auction** ...................................................................... 59
  K.    **The Successful Bid** ........................................................................... 59
  L.    **The Sale Hearing** ............................................................................. 60
  M.    **The Backup Bid** ............................................................................... 60
  N.    **"As Is, Where Is"** ............................................................................ 60
  O.    **Return of Good Faith Deposit** ......................................................... 61

**VIII.**  **MEANS OF IMPLEMENTATION OF THE TRUSTEE PLAN** ............................ 61

  A.    **The 363 Sale** ..................................................................................... 61
  B.    **Corporate Action** ............................................................................. 62
  C.    **Preservation of Avoidance Actions and Causes of Action** .............. 62

D.    Sources of Payments ............................................................. 62
E.    Substantive Consolidation of the Debtors.............................. 62
F.    Negative Covenant Regarding Distributions........................... 63

IX.    THE LIQUIDATING TRUST ............................................................ 63

A.    Formation of Liquidating Trust ............................................ 63
B.    The Liquidating Trustee ........................................................ 64
        1.    Appointment of the Liquidating Trustee and LTOC ........... 64
        2.    Powers of the Liquidating Trustee .................................. 64
        3.    Authorization.................................................................. 64
        4.    Appointment as Disbursing Agent................................... 65
        5.    Liquidation of Assets ...................................................... 65
        6.    Compensation of the Liquidating Trustee and Professionals ............. 66
        7.    Maintenance of Reserves ................................................ 66
        8.    Execution of Documents .................................................. 66
        9.    Replacement of Liquidating Trustee ................................ 66
C.    Distributions on Account of Allowed Claims ........................ 66
D.    Disposition of Certain Guaranteed Payments Received from Purchaser
        in Advance of Entry of a Final Order in the Lien Adversary...... 67
E.    No Interest ............................................................................. 67
F.    Delivery of Distributions ....................................................... 67
G.    Nominal Distributions ........................................................... 68
H.    Unclaimed Distributions ....................................................... 68

X.    PROCEDURES FOR TREATING DISPUTED CLAIMS UNDER PLAN ............ 68

A.    Objections to Claims ............................................................. 68
B.    Disallowed Claims ................................................................. 69
C.    No Distribution Pending Allowance ...................................... 69
D.    Estimation of Claims.............................................................. 69

XI.    TREATMENT OF EXECUTORY CONTRACTS AND
        UNEXPIRED LEASES ................................................................... 70

A.    Assumption or Rejection of Executory Contracts ................. 70
B.    Assumption and Assignment to Purchaser............................. 70
C.    Payment of Cure Costs Related to Assumption of Executory Contracts
        and Unexpired Leases............................................................. 70
D.    Assumed Executory Contracts and Unexpired Leases.............. 71
E.    Claim Based on Rejection of Executory Contracts and
        Unexpired Leases .................................................................. 71
F.    Reservation of Rights.............................................................. 71

XII.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ................................. 72

    A.    Condition Precedent to Effectiveness ................................................. 72
    B.    Waiver of Condition Precedent .......................................................... 72
    C.    Satisfaction of Condition Precedent .................................................. 72

XIII.    EFFECT OF CONFIRMATION .......................................................................... 72

    A.    Vesting of Assets ................................................................................. 72
    B.    Binding Effect ..................................................................................... 72
    C.    Discharge of Claims ........................................................................... 73
    D.    Exculpation ......................................................................................... 73
    E.    Injunction or Stay ............................................................................... 73
    F.    Exemption from Certain Transfer Taxes ............................................ 73
    G.    Cancellation of Equity Interests/Dissolution of the Debtors ............. 74
    H.    Removal of Officers, Directors, and Managers .................................. 74
    I.    Authority of liquidating Trustee to Wind Up Affairs of the Debtors ......... 74
    J.    Tax Reporting Requirements .............................................................. 74
    K.    Expedited Tax Determination ............................................................. 75
    L.    Substantial Consummation ................................................................. 75
    M.    Interpretations of Orders .................................................................... 75
    N.    Modification of the Plan ..................................................................... 75
    O.    Revocation or Withdrawal of the Plan ............................................... 75
    P.    Substantial Consummation of the Plan ............................................... 76
    Q.    Severability of Plan Provisions .......................................................... 76
    R.    Post-Confirmation Jurisdiction .......................................................... 76

XIV.    EXEMPTION FROM SECURITIES LAWS ...................................................... 76

    A.    Applicability of Bankruptcy Code Sections 1125 and 1145 to
        Certain New Securities to Be Issued Under the Plan ........................ 76
    B.    Initial Issuance ................................................................................... 77
    C.    Subsequent Transfers ......................................................................... 77
    D.    Subsequent Transfers Under State Laws ............................................ 78

XV.    CERTAIN TAX CONSEQUENCES OF THE TRUSTEE PLAN ...................... 78

    A.    Generally ............................................................................................. 78
    B.    Material Tax Consequences to Holders of Claims and
        Equity Interests ................................................................................... 79
    C.    Material Tax Consequences to the Debtor .......................................... 80

XVI.    CONCLUSION AND RECOMMENDATION ................................................... 80

### EXHIBITS

1. **Trustee Plan of Reorganization, dated July 22, 2011**

2. **Disclosure Statement Order, dated _____, 2011**

3. **Sales Procedures Order, dated _____, 2011**

4. **Solsten Projections**

5. **Background Materials on SolstenXP, Inc.**

6. **Indenture Trustee's Motion to Appoint a Trustee or Examiner, dated January 19, 2011**

7. **Debtors' April 2010 "Offer to Bondholders" PowerPoint Presentation**

8. **Bidding / Sales Procedures**

First Security Bank, as Indenture Trustee (the "**Indenture Trustee**"), submits this Disclosure Statement (the "**Trustee Disclosure Statement**") for solicitation of votes on its Plan of Reorganization (the "**Trustee Plan**" or "**Plan**") for O&G Leasing, LLC ("**O&G**") and Performance Drilling Company, LLC ("**PDC,**" and together with O&G, the "**Debtors**" or the "**Company**").[1]  A copy of the Trustee Plan is attached hereto as **Exhibit 1**.  The Trustee Plan is a competing plan of reorganization to the plan of reorganization submitted by the Debtors (the "**Debtors' Plan**," and together with the "**Trustee Plan**," the "**Competing Plans**").  The Trustee Disclosure Statement was approved for solicitation by Order of the Bankruptcy Court dated _____, 2011, a copy of which is attached hereto as **Exhibit 2**.

Accompanying the Trustee Disclosure Statement are copies of the following (collectively, with the Trustee Disclosure Statement, the "**Solicitation Package**"):

- the Trustee Plan, attached hereto as **Exhibit 1**;

- the Disclosure Statement Order, attached hereto as **Exhibit 2**;

- the Sales Procedures Order, attached hereto as **Exhibit 3**; and

- Ballots to Holders of Claims entitled to vote on the Trustee Plan.

Article I of the Trustee Plan and Schedule 1.1(a) to the Asset Purchase Agreement contains definitions of certain terms.  Where those capitalized terms are used in the Trustee Disclosure Statement, they have the meaning set forth therein.  Those defined terms are very important to fully understand the Trustee Disclosure Statement.

## I.  INTRODUCTION

The purpose of the Trustee Disclosure Statement is to set forth information regarding the following:

(1)  the Trustee Plan, and the rights of Holders of Claims and Equity Interests thereunder;

(2)  the Auction process, contemplated by the Trustee Plan, for the sale of substantially all of the Debtors' assets pursuant to a sale under section 363 of the Bankruptcy Code (a "**363 Sale**") that is to be conducted in advance of the Confirmation Hearing in accordance with Bidding Procedures pre-approved by the Bankruptcy Court in the Sales Procedures Order;

(3)  the initial Stalking Horse Bid submitted by wholly-owned subsidiaries of SolstenXP, Inc., a full service upstream oil and gas services company headquartered in Anchorage, Alaska, that is the basis of the Trustee Plan (together with the proposed Sales Procedures), which provides, among other things, guaranteed payments to Creditors of $1,008,448 each quarter for

---

[1]    All capitalized terms shall have the meanings ascribed to them in the Trustee Plan or the Asset Purchase Agreement set forth at Exhibit 1.9 to the Trustee Plan, or if not defined therein, the Bankruptcy Code, except that capitalized terms that are not bolded and are contained in quotation marks generally shall have the meaning set forth in Article 1 of the Debtors' Plan (unless the context suggests otherwise, such as the quotation from the Debtors' Disclosure Statement at p. 8, n.10 hereof).

the first 7 years following the Plan Effective Date and $818,292 each quarter for the next 3 years (for total aggregate guaranteed payments $38,056,048 over 10 years);

(4)  the proposed Sales Procedures by which the assets and business of the Debtors are exposed to the marketplace through a formal, structured, Court-approved and Court-supervised sales process to determine whether the Stalking Horse Bid or some other Bid (perhaps even an all-Cash Bid) will produce a greater recovery for all non-Insider Creditors of the Debtors and would be more acceptable to such Creditors;

(5) the significant deficiencies in the Debtors' Plan, including:

- the Debtors' valuing the Debtors' assets for distribution purposes at unconscionably low values that ignore and are divorced from present market realities;

- treating Creditors of equal priority vastly differently, for example by paying nominal Unsecured Creditors in full over 24 months and certain Insider Claims in full while (A) Holders of Series 2009B Debentures (who are either Secured Creditors or Unsecured Creditors, depending on the outcome of the Lien Adversary) receive—at best—a small fraction of the principal amount of their Allowed Claims and (B) Washington State Bank ("**WSB**") and Holders of all Series 2009 Debentures receive nothing on account of their Claims for more than $4.5 million in accrued and unpaid interest;

- giving an Insider, Octane Funding, all membership interests in the Reorganized Debtors (which the Stalking Horse Bid alone would have a value of as much as $15 million on the "Effective Date" of the Debtors' Plan) in exchange for nothing more than a waiver and release of Octane Funding's Unsecured Claims totaling approximately $4.1 million;

- failing adequately to protect through escrow payments and otherwise the Secured Claims and Cash Collateral rights of the Holders of Series 2009 Debentures before the Lien Adversary has been resolved;

- making payments to WSB and Holders of Series 2009 Debentures dependent upon "Free Cash" availability instead of providing them with guaranteed fixed payments, which if not paid results in default by the Reorganized Debtors;

- failing to establish the extent to which the Debtors will generate "Free Cash" based on their proposed formula and their recent historical and projected operating profitability;

- stripping Secured Creditors of their existing contractual rights to foreclose on their Collateral upon the occurrence of an event of default;

- denying Holders of Series 2009 Debentures the right to select an Indenture Trustee of their own choosing and instead retaining the right to select one of the Reorganized Debtors' own liking;

- failing to satisfy the "best interests" test, as demonstrated by the existence of the Stalking Horse Bid alone;

- unfairly denying Creditors holding Undersecured Deficiency Claims their voting and distribution rights while preferring other Unsecured Claims of equal priority;

- providing insufficient interest rate risk premiums to Secured Creditors in a cram down scenario while denying them the "indubitable equivalent" of their Secured Claims; and

- providing overreaching and improper releases of Insiders from potential Causes of Action by the Estate and third parties.

The information contained in the Trustee Disclosure Statement will assist the Holders of Claims in making an informed judgment regarding whether they should vote to accept or reject either of the Competing Plans. Under 11 U.S.C. § 1125(b), an acceptance or rejection of a plan may not be solicited unless, at the time of or before such solicitation, there is transmitted to such holder the plan (or a summary of the plan), and a written disclosure statement approved by the Bankruptcy Court as containing "adequate information" (within the meaning of 11 U.S.C. § 1125(a). Any representations or inducements made to secure your acceptance of the Trustee Plan that are not consistent with those made in this approved Disclosure Statement should not be relied upon by you in arriving at your decision.

THE TRUSTEE'S DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE TRUSTEE PLAN BY EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE TRUSTEE PLAN. THE TRUSTEE'S DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTIONS OF THE TRUSTEE PLAN HEREIN ARE SUMMARIES ONLY AND YOU ARE CAUTIONED TO REVIEW THE TRUSTEE PLAN, THE PLAN SUPPLEMENT, AND ANY RELATED EXHIBITS, SCHEDULES, OR ATTACHMENTS FOR A FULL UNDERSTANDING OF THE TRUSTEE PLAN'S PROVISIONS. THE TRUSTEE DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE TRUSTEE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS AND PROVISIONS OF THE TRUSTEE PLAN AND THE TRUSTEE DISCLOSURE STATEMENT, THEN THE TERMS AND PROVISIONS OF THE TRUSTEE PLAN SHALL CONTROL.

THE STATEMENTS CONTAINED IN THE TRUSTEE DISCLOSURE STATEMENT ARE MADE BY THE INDENTURE TRUSTEE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED HEREIN, AND THE DELIVERY OF THE TRUSTEE DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAVE BEEN NO CHANGES IN THE INFORMATION SET FORTH HEREIN SINCE SUCH DATE. THE TRUSTEE DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE INDENTURE TRUSTEE WITH THE ASSISTANCE OF ITS ADVISORS. HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ IT CAREFULLY AND IN ITS ENTIRETY, AND WHERE POSSIBLE, CONSULT WITH COUNSEL OR OTHER ADVISORS PRIOR TO VOTING ON THE TRUSTEE PLAN.

THE TRUSTEE DISCLOSURE STATEMENT MAY NOT BE RELIED UPON BY ANY PERSON FOR ANY PURPOSE OTHER THAN BY HOLDERS OF CLAIMS ENTITLED TO VOTE AND FOR THE PURPOSE OF DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE TRUSTEE PLAN. NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE INDENTURE TRUSTEE OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON THE DEBTORS, THE PURCHASER, THE INDENTURE TRUSTEE, OR THE HOLDERS OF CLAIMS OR EQUITY INTERESTS.

ANY HISTORIC FINANCIAL INFORMATION CONTAINED IN THE TRUSTEE DISCLOSURE STATEMENT HAS BEEN TAKEN FROM THE DISCLOSURE STATEMENT TO THE DEBTORS' PLAN OR FROM OTHER FILINGS OR SUBMISSIONS BY THE DEBTORS, NONE OF WHICH HAS BEEN SUBJECT TO INDEPENDENT ANALYSIS BY THE INDENTURE TRUSTEE TO DETERMINE ITS ACCURACY. IN THE DEBTORS' DISCLOSURE STATEMENT, THE DEBTORS ADVISE THAT THEY BELIEVE THE INFORMATION TO BE CORRECT BUT HAVE NOT INDEPENDENTLY VERIFIED THAT INFORMATION IN EVERY INSTANCE NOR HAVE THEY SUBJECTED THE INFORMATION TO A CERTIFIED AUDIT.

THE PROJECTIONS ATTACHED AS **EXHIBIT 4** TO THE TRUSTEE DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE PROPOSED PURCHASER, WHO HAS PROVIDED THE STALKING HORSE BID UNDER THE TRUSTEE PLAN FOR THE PURCHASE OF THE DEBTORS' ASSETS, SUBJECT TO RECEIPT OF HIGHER AND BETTER OFFERS FROM QUALIFIED BIDDERS PURSUANT TO THE APPROVED BIDDING PROCEDURES. THE PROPOSED PURCHASER HAS PREPARED THE PROJECTIONS BASED UPON THE INFORMATION MADE AVAILABLE TO IT AND THE PROPOSED PURCHASER TAKES NO RESPONSIBILITY AND MAKES NO REPRESENTATIONS CONCERNING THE INFORMATION PROVIDED TO IT USED IN THE PREPARATION OF THE PROJECTIONS. THE INDENTURE TRUSTEE BELIEVES THE PROJECTIONS OF SOLSTEN DRILLING TO BE SOUND, BUT THEY HAVE NOT BEEN INDEPENDENTLY ASSESSED BY THE INDENTURE TRUSTEE OTHER THAN THROUGH ITS FINANCIAL ADVISOR.

CERTAIN OF THE STATEMENTS CONTAINED IN THE TRUSTEE DISCLOSURE STATEMENT ARE FORWARD LOOKING AND MAY CONTAIN PROJECTIONS AND FORECASTS THAT ARE BASED UPON CERTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD CAREFULLY READ AND CONSIDER FULLY THE ENTIRE DISCLOSURE STATEMENT AND TRUSTEE PLAN BEFORE VOTING TO ACCEPT OR REJECT THE TRUSTEE PLAN.

THE INDENTURE TRUSTEE BELIEVES THAT THE STALKING HORSE BID PROVIDES AN INITIAL PURCHASE PRICE FOR THE DEBTORS' ASSETS IN EXCESS OF THE $28,329,000 VALUATION THAT THE DEBTORS' EXPERT, HADCO INTERNATIONAL ("HADCO"), OPINED IS THE "FAIR MARKET VALUE" OF THE DEBTORS' ASSETS. IN THE VIEW OF THE INDENTURE TRUSTEE, THE STALKING HORSE BID—IN CONJUNCTION WITH THE GUARANTEED PAYMENTS AND THE DISTRIBUTIONS TO CREDITORS UNDER THE TRUSTEE PLAN—ALSO PROVIDES VASTLY SUPERIOR AND MORE CERTAIN RECOVERIES TO CREDITORS. THESE RECOVERIES PROPOSED UNDER THE TRUSTEE PLAN MAXIMIZE THE VALUE OF THE DEBTORS' ASSETS IN TODAY'S FAVORABLE MARKET CONDITIONS FOR THE DEBTORS' RIGS AND STANDS IN STARK CONTRAST TO THE RECOVERIES PROPOSED IN THE DEBTORS' PLAN, UNDER WHICH RECOVERIES TO

CREDITORS ARE LIMITED BY THE SO-CALLED "REPLACEMENT VALUE" OF THE DEBTORS' ASSETS AT A VALUE BETWEEN A "FORCED LIQUIDATION VALUE" AND AN "ORDERLY LIQUIDATION VALUE," WHICH HADCO PLACED IN THE RANGE OF APPROXIMATELY $16 MILLION AND $21 MILLION FOR ALL FIVE OF THE DEBTORS' RIGS.

## II.  OVERVIEW OF TRUSTEE PLAN

The Trustee Plan represents the culmination of the Trustee's increasing frustration with the persistent attempts by the Debtors, through their Insiders, to leverage first, the temporary distressed market conditions of early 2010, and now, the chapter 11 bankruptcy process, for their own benefit instead of for the benefit of Creditors generally.

The following is a brief overview of the material provisions of the Trustee Plan and is qualified in its entirety by reference to the actual Trustee Plan attached hereto as **Exhibit 1**.  For a more detailed description of the terms and provisions of the Trustee Plan, see Section VI below entitled "Summary of the Trustee Plan."

## A.    The 363 Sale, Bidding Procedures, and the Stalking Horse Bid

The lynchpin of the Trustee Plan is the proposed 363 Sale of the Debtors' assets and business through an Auction to the highest and best Qualified Bidder, all in accordance with the Bidding Procedures approved by the Bankruptcy Court in the Sales Procedures Order attached hereto as **Exhibit 3**.  To that end, the Indenture Trustee has entered into an Asset Purchase Agreement with wholly-owned subsidiaries of SolstenXP, Inc. ("**SolstenXP**"), an experienced and successful full service upstream oil and gas services company headquartered in Anchorage, Alaska and founded in 1993, to provide the Stalking Horse Bid for the purchase of substantially all the Debtors' assets, subject to higher and better offers from Qualified Bidders pursuant to the Bidding Procedures set forth in the Sales Procedures Order.

Additional background materials on SolstenXP can be found at **Exhibit 5**, including SolstenXP's "Statement of Qualifications" and biographical sketches of SolstenXP's senior management, and at SolstenXP's website, http://www.solstenxp.com.  The manifest experience and qualifications of SolstenXP and its senior management to operate the Debtors' Business and honor its commitments under the Asset Purchase Agreement starkly contrasts with the Indenture Trustee's experience in the past two years with Debtors' management, who not only have abjectly failed to honor their contractual commitments to their Creditors, but also—as detailed in the Indenture Trustee's Motion to Appoint a Trustee or Examiner (filed January 19, 2011 and attached as **Exhibit 6**)—have mismanaged the Debtors with their free-spending practices, grossly overcompensated themselves and their wholly-owned Affiliates, repaid themselves millions within one year of the Petition Date, attempted to obtain a priority to the Debtors' assets within 3 months of the Petition Date by filing UCC-1 financing statements against these assets, and perpetuated bitterly hostile and acrimonious relations with their main Creditor constituents.

The Asset Purchase Agreement underlying the Stalking Horse Bid has been executed by two wholly-owned subsidiaries of SolstenXP:  SolstenXP Drilling, LLC ("**Solsten Drilling**") and SolstenXP Venture Funding, LLC ("**Solsten Funding**").  The Asset Purchase Agreement calls for Solsten Drilling to purchase substantially all the assets of the Debtors, pay $190,156 quarterly

over 7 years to WSB on account of its Class 2C Claim in the principal amount of $4,504,177, and pay $818,292 quarterly over 10 years for the benefit of other Creditors according to their priorities (as ultimately determined by the outcome of the Lien Adversary and the Octane Adversary).  The Asset Purchase Agreement also provides that, regardless of the outcome of the Lien Adversary, Solsten Drilling will issue 3% Preferred Interests in Solsten Drilling on the Effective Date to Holders of Series 2009B Debentures (*i.e.,* Allowed Class 2B Claims) in the amount of one 3% Preferred Interest for each $1.00 of principal amount of Allowed Class 2B Claim.

As provided in the Sales Procedures Order, the Asset Purchase Agreement is expressly subject to higher and better offers by Qualified Bidders.  If Solsten Drilling is outbid, or if the Debtors' Plan is confirmed, then, under the proposed Sales Procedures that are subject to approval by the Bankruptcy Court, its $250,000 earnest money deposit will be returned and it will receive a $500,000 break-up fee (the "**Break-Up Fee**").

Capitalization of the Business going forward Post-Confirmation is also important, and here—unlike the Debtors' Plan that provides no capital infusion into the Debtors in exchange for the issuance of all membership interests in the Reorganized Debtors to an Insider, Octane Funding—the Asset Purchase Agreement calls for the parties to the Asset Purchase Agreement to be capitalized with $4.5 million, $3 million of which will be advanced in the form of a capital contribution from SolstenXP to Solsten Funding (which is a guarantor of payments to Creditors under the Trustee Plan).  Solsten Funding will then itself contribute $1 million to its wholly-owned subsidiary, Solsten Drilling, the operating entity that is buying the Debtors' assets in the Asset Purchase Agreement.  The remaining $1.5 million in capitalization to support operations of Solsten Drilling will come from SolstenXP through a working capital credit facility (the "**Solsten Post-Confirmation Loan Agreement**").[2]

The sales process, using the Stalking Horse Bid as a base, is designed to expose the Debtors' assets to the marketplace to determine their true value, something the Debtors have failed and refused to do.  Moreover, the Sales Procedures also may produce a buyer willing and able to make a Cash Bid for the Debtors' assets at a price acceptable to the Creditors, an option the Indenture Trustee believes should be explored.

**B.**      **Overview of Classification and Treatment of Claims and Equity Interests**

The following table designates the classes of Claims against and Equity Interests in the Debtors under the Trustee Plan and specifies which of those Classes are Impaired or Unimpaired by the Plan and entitled to vote to accept or reject the Plan in accordance with Section 1126 of the Bankruptcy Code or deemed to accept or reject the Plan.

---

[2]      The Solsten Post-Confirmation Loan Agreement either will be attached as an exhibit to the Asset Purchase Agreement or included in the Plan Supplement to be filed with the Bankruptcy Court no later than fifteen (15) days prior to the Voting Deadline or on such other date as the Bankruptcy Court establishes.

**S**UMMARY OF **C**LASSIFIED **C**LAIMS AND **E**QUITY **I**NTERESTS

| Class | Nature of Claims Within Class | Impairment | Entitled to Vote |
|-------|-------------------------------|------------|------------------|
| 1 | **Priority Unsecured Non-Tax Claims (both Debtors)** | **Unimpaired** | **No (deemed to accept)** |
| 2 | **Secured Claims (Consisting of Five Subclasses: 2A, 2B, 2C, 2D, 2E)** | **Impaired** | **Yes (Each Subclass)** |
| 3 | **General Unsecured Claims (both Debtors)** | **Impaired** | **Yes** |
| 4 | **Intercompany Unsecured Claims (both Debtors)** | **Impaired** | **No (deemed to reject)** |
| 5 | **Subordinated Claims (both Debtors)** | **Impaired** | **No (deemed to reject)** |
| 6 | **Equity Interests (both Debtors)** | **Impaired** | **No (deemed to reject)** |

As noted above, the outcome of the Lien Adversary (which is expected to be adjudicated before Confirmation) and the Octane Adversary (which is contemplated to be initiated Post-Confirmation) will determine which Creditors receive the $818,292 in quarterly payments to be paid over 10 years by Solsten Drilling, the Proposed Purchaser under the Asset Purchase Agreement. The Trustee Plan describes the resultant outcomes based on the Holders of Series 2009 Debentures (Class 2A Claims) winning or losing the Lien Adversary as "**Plan Alternative A**"[3] and "**Plan Alternative B**,"[4] respectively.

Under <u>Plan Alternative A</u>, the Holders of Series 2009A Debentures (Class 2A) will have been successful in the Lien Adversary and they alone will share Pro Rata in the $818,292 in quarterly payments to be paid over 10 years by Solsten Drilling. In addition, Holders of Allowed Class 2A Claims and Allowed Class 2C Claims (WSB) under Plan Alternative A will not only receive their respective quarterly Guaranteed Payments of $818,292 and $190,156 (or $1,008,448 in the aggregate), but they also will have the right to participate in a so-called "**Dutch Auction**" to be conducted no less than once in each calendar year following the Effective Date.[5] Through this Dutch Auction, Solsten Funding (using the "**Solsten Funding**

---

[3] "**Plan Alternative A**" is defined in the Trustee Plan as the treatment proposed for Classes 2A (Series 2009A Debentures), 2D (Octane Funding Claims), and 3 (General Unsecured Claims) in the event that, subject to Section 6.4 of the Plan, a Final Order is entered in favor of the Indenture Trustee in the Lien Adversary which results in the Allowed Class 2A Claims of the Holders of Senior Series 2009A Debentures being treated as Secured Claims. The treatment of the remaining Classes 1 (Priority Unsecured Non-Tax Claims), 2B (Series 2009B Debentures), 2C (WSB), 2E (Other Secured Claims), 4 (Intercompany Claims), 5 (Subordinated Claims), and 6 (Equity Interests) does not change under either Plan Alternative A or Plan Alternative B.

[4] "**Plan Alternative B**" is defined in the Trustee Plan as the treatment proposed for Classes 2A (Series 2009A Debentures), 2D (Octane Funding Claims), and 3 (General Unsecured Claims) in the event that a Final Order is entered against the Indenture Trustee in the Lien Adversary, resulting in the Allowed Class 2A Claims of the Holders of Senior Series 2009A Debentures being treated as Class 3 Unsecured Claims (under Plan Alternative 3B). As noted above, the treatment of the remaining Classes 1 (Priority Unsecured Non-Tax Claims), 2B (Series 2009B Debentures), 2C (WSB), 2E (Other Secured Claims), 4 (Intercompany Claims), 5 (Subordinated Claims), and 6 (Equity Interests) does not change under either Plan Alternative A or Plan Alternative B.

[5] The "**Dutch Auction**" is defined in the Trustee Plan as the mechanism under Plan Alternative A, conducted no less than once in each calendar year following the Effective Date, by which Solsten Funding (using the Solsten Funding Contribution, the Solsten Funding Claims Purchase Recoveries, and Excess Cash (all defined terms

Contribution,"[6] the "**Solsten Funding Claims Purchase Recoveries**,"[7] and the "**Excess Cash**"[8] dividended in that year to Solsten Funding) shall offer to purchase Allowed Class 2A and Class 2C Claims at an initial starting price, and thereafter incrementally increasing such price to induce these Holders to sell their Allowed Claims to it.  Unlike the Debtors' "Debenture Retirement Program," which is wholly voluntary on the part of the Reorganized Debtors, Solsten Funding shall be required to use all Excess Cash dividended in that year by Solsten Drilling to purchase Allowed Claims in Classes 2A and 2C up to 80% of the face amount of those Claims.

Under <u>Plan Alternative B</u>, where the Holders of Series 2009A Debentures lose the Lien Adversary, there are two potential outcomes depending on whether Octane Funding wins or loses

---

under the Trustee Plan) dividended in that year to Solsten Funding) shall offer to purchase Allowed Class 2A and Class 2C Claims entitled to the aggregate $1,008,448 in Guaranteed Payments at an initial starting price, and thereafter incrementally increasing such price for purposes of inducing such Holders to agree to sell their Allowed Claims to Solsten Funding; *provided however*, that (A) while Solsten Funding shall be required to use all Excess Cash dividended in that year to purchase such Allowed Claims, in no event shall Solsten Funding be required to purchase such Allowed Claims at an amount greater than 80% of their Face Amount, (B) Holders of Series 2009B Debentures, Allowed Class 2D Claims, and Allowed Class 3 Claims shall not be entitled to participate in any Dutch Auction, (C) Excess Cash not used to purchase Allowed Claims in any Dutch Auction may be used thereafter by Solsten Funding in its sole discretion for capital expenditures or capital investments, for transfer to Solsten Drilling as a capital contribution, or for exercise of Solsten Drilling's 3% Preferred Interests Buyback Rights, and (D) in the event there shall be a greater amount of Allowed Class 2A and/or Class 2C Claims tendered in the Dutch Auction than there are funds available to purchase such Claims, then payments shall be allocated Pro Rata based on the principal amount of aggregate Claims tendered.

[6]    The "**Solsten Funding Contribution**" represents the $3 million Cash contribution to be advanced by SolstenXP to Solsten Funding on the Effective Date to support Solsten Funding's $1,000,000 contribution to Solsten Drilling in advance of the Effective Date (the "**Solsten Drilling Contribution**"), purchases of Allowed Claims in the first Dutch Auction, and the Solsten Funding Guaranty.   Technically, the "**Solsten Drilling Contribution**" is the $1 million aggregate Cash contribution to be advanced by Solsten Funding to Solsten Drilling on the Effective Date for purposes of (i) funding payments required under the Plan on account of Allowed Administrative Expenses, Professional Fees, Cure Costs, and other Allowed Claims payable in full in Cash on the Effective Date, but only up to $500,000 in the aggregate and only to the extent the Operating Accounts Balances are insufficient to pay such amounts and (ii) providing working capital to Solsten Drilling of not less than $500,000 as of the Effective Date.

[7]    The "**Solsten Funding Claims Purchase Recoveries**" represents any Cash received by Solsten Funding or its Affiliates from Solsten Drilling on account of payments made under the Plan to Holders of Allowed Class 2A under Plan Alternative A (Senior Series 2009A Debenture) or Class 2C (WSB) Claims under either Plan Alternative A or Plan Alternative B.

[8]    "**Excess Cash**" means, as applied to the income statement of Solsten Drilling under GAAP for each full calendar year following the Effective Date, the Cash amount dividended to Solsten Funding within 120 days following the close of that calendar year, as determined by following formula (with all figures representing full calendar year amounts):  90% of the sum of pre-tax net income, (+) depreciation, (–) principal portion of Guaranteed Payments, (–) Dividend payments on 3% Preferred Interests, (–) capital expenditures or capital investment financed from internally generated Cash flows, (–) Federal Income Tax Liability Dividend to SolstenXP equal to 35% of Solsten Drilling's pre-tax net income , (–) all principal paid under the SolstenXP Post-Confirmation Loan Agreement, (–) subtotal of the foregoing x 10% as dividend to SolstenXP; *provided, however,* that if the period between the Effective Date and the calendar year-end cutoff date shall be less than a full calendar year, then the first determination of Excess Cash shall be calculated based on the Cash amount derived from the foregoing formula commencing as of the Effective Date and concluding through the end of the first full calendar year thereafter.

the Octane Adversary to be commenced Post-Confirmation by the Liquidating Trustee. Under either outcome, the Holders of Series 2009A Debentures are treated as Class 3 General Unsecured Claims, and the $818,292 in quarterly Guaranteed Payments over 10 years from Solsten Drilling that were to be distributed exclusively to Holders of Series 2009A Debentures under Plan Alternative A will instead be shared by Allowed Class 3 General Unsecured Claims (which now would include the $25,955,000 in Class 2A Series 2009A Debentures) and Octane Funding.

The way these quarterly Guaranteed Payments are allocated under Plan Alternative B further depends on whether the Liquidating Trustee will be successful in the Octane Adversary.[9] If the Liquidating Trustee is successful (as is likely in the opinion of the Indenture Trustee and the Debtors),[10] then the Allowed Class 2D Claim of Octane Funding (to the extent it is not a Subordinated Claim) and all Class 3 Unsecured Claims (which under Plan Alternative B includes an additional $25,955,000 in Claims under the Senior 2009A Debentures) will share Pro Rata in each $818,292 quarterly Guaranteed Payment over 10 years from Solsten Drilling (but with no rights to participate in any Dutch Auctions). Conversely, if Octane Funding wins the Octane Adversary (and its Claim is not otherwise Disallowed or Subordinated), then Octane Funding will be paid 1/40th of its Allowed Claim quarterly plus interest at the non-default contract rate (or approximately $130,000 per quarter based on a mortgage amortization schedule) and the Holders of Allowed Class 3 Claims under Plan Alternative B (including the Senior 2009A Debentures) will share in the remainder of that quarterly Guaranteed Payment (or approximately $688,292 per quarter).

The Trustee Plan also provides that Cash reflected in the Debtors' Operating Accounts Balances on the Effective Date, plus the Arbitration Receivable (anticipated to yield in excess of $1 million in Cash for the Estate), plus Causes of Action not purchased by Solsten Drilling under the Asset Purchase Agreement will be available to pay Allowed Administrative Claims, Professional Fees, Cure Costs, and other Allowed Claims payable in full in Cash on the Effective Date, with any excess paid over Pro Rata to Holders of Allowed Class 3 General Unsecured Claims (under either Plan Alternative A or Plan Alternative B). The Asset Purchase Agreement provides that to the extent the Operating Accounts Balances and Arbitration Receivable are insufficient to pay amounts due as of the Effective Date, then the Purchaser will contribute up to $500,000 in the aggregate to cover any shortfalls. To the extent the Operating Accounts Balances and Arbitration Receivable are sufficient to pay such amounts, then any remainder in respect of those assets shall be distributed as follows: (i) to the limited extent that they represent

---

[9]    In the Octane Adversary, the Liquidating Trustee will seek (among other possible counts), to (i) avoid as a preferential transfer the security obtained by Octane Funding within three months of the Petition Date and (ii) have Octane Funding's Class 2D Claim treated as a Class 5 Subordinated Claim that is not entitled to any distributions under the Plan.

[10]   Because Octane Funding had no preexisting perfected lien and filed a UCC-1 financing statement to perfect a lien on the Debtors' assets within 90 days of the Petition Date, the Trustee believes that the Liquidating Trustee will successfully avoid any security interests claimed by Octane Funding in respect of its Class 2D Claim. Notably, the Debtors acknowledge in Section V.D.6 (p. 30) of their disclosure statement (the "**Debtors' Disclosure Statement**") that Octane Funding's alleged Secured Claims are "disputed" and, "in [their] opinion, avoidable." Until actually avoided, however, the Trustee Plan must deal with the possibility—however remote—that Octane Funding will succeed in the Octane Adversary.

the Cash Collateral of Holders of Series 2009A Debentures, they shall be distributed Pro Rata under Plan Alternative A to Holders of Senior Series 2009A Debentures and Series 2009B Debentures on account of their Allowed Claims for accrued and unpaid interest (which total more than $4.3 million); and (ii) to the extent these assets do not represent the Cash Collateral of the Holders of Series 2009A Debentures, they will be distributed Pro Rata to all Holders of Allowed Class 3 General Unsecured Creditors under Plan Alternative B.

**C.      Chart of Classification and Treatment of Claims and Equity Interests**

The Trustee Plan provides for payment in full of all Administrative Claims, Professional Fees, Cure Costs, and Priority Unsecured Non-Tax Claims on the "**Effective Date**"[11] of the Trustee Plan.  Payments to be made pursuant to the Trustee Plan and the Asset Purchase Agreement by Solsten Drilling will be guaranteed by Solsten Funding.  Holders of Intercompany Claims, Subordinated Claims, and Equity Interests in the Debtors will receive no distributions under the Trustee Plan.  The following chart details the distributions to Holders of Allowed Claims and Equity Interests under the Trustee Plan:[12]

| Class | Claim/Interest | Treatment of Claim/Interest on Later of Effective Date or Date on which Claim is Allowed | Estimated Recovery Under Trustee Plan |
|---|---|---|---|
| N/A | Unclassified Claims (Admin. Claims, Cure Costs, Prof. Fees, Secured & Priority Unsecured Taxes)<br><br>Est. Amt.:<br><br>Admin./Prof: $1,000,000<br><br>Tax: $300,000 | 1.      Admin. Claims, Prof. Fees (Incl. fees of Indenture Trustee's Professionals), and Cure Costs paid in full from Operating Accounts Balances and the Arbitration Receivable, supported to the extent necessary by up to $500,000 from Solsten Drilling.<br><br>2.      Tax Claims paid in equal quarterly installments within 5 years of Petition Date, plus 4% interest, from remaining Operating Accounts Balances, the Arbitration Receivable, and other assets of the Liquidating Trust. | 100% of Allowed Claim amount. |
| 1 | Priority Unsecured Non-Tax Claims | Unimpaired and (to the extent such Claims exist) paid on the Effective Date. | 100% of Allowed Claim amount. |

---

[11]     The "**Effective Date**" of the Trustee Plan is defined as the Business Day selected by the Liquidating Trustee and the Indenture Trustee on or after the Confirmation Date, but not later than sixty (60) days after the entry of the Confirmation Order, on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of the Plan shall have been satisfied or waived.

[12]     This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Trustee Plan.  Reference should be made to the entire Disclosure Statement and the Trustee Plan for a complete description of the classification and treatment of Claims and Equity Interests.

| | | | |
|---|---|---|---|
| | Est. Amt.: $0.00 | | |
| 2A | Senior Series 2009A Debentures<br><br>(***Plan Alternative A** –* Indenture Trustee Wins Lien Adversary; Secured Claims Allowed)<br><br>Est. Amt.:<br><br>$25,955,000 (Class 2A – Principal)<br><br>$3,046,217 (Class 3 – Accrued Interest) | 1.    In accordance with the terms of the New Indenture, and as part of the purchase price, Solsten Drilling shall pay to the Indenture Trustee for benefit of the Holders of Allowed Class 2A Claims an amount equal to $25,955,000 (plus Accrued Interest Thereon at 5% Per Annum) Over 10 Years in Quarterly Installments of $818,292.00.<br><br>2.    Holders of Allowed Class 2A Claims shall be given a lien on the Purchased Assets to secure the $25,955,000 in principal amount according to the same priorities and to the same extent as existed as of the Effective Date.<br><br>3.    Following the Effective Date, interest shall accrue on the unpaid balance of the New Indenture to Class 2A Claims at a rate of 5% per annum.<br><br>4.    Payment of the Class 2A Alternative A Guaranteed Payment shall be further guaranteed by Solsten Funding.<br><br>6.    The amounts of the Allowed Claims of Holders of Senior Series 2009A Debentures (*e.g.,* accrued interest and other permitted charges) in excess of the principal amount of their Claims shall be treated as Unsecured Claims under Class 3 of the Plan and be paid under Plan Alternative 3(A).<br><br>7.    Excess Cash, Solsten Funding Claims Purchase Recoveries and, in the first such Dutch Auction, $2 Million of the Solsten Funding Contribution will be used for purchases of Class 2A Claims (under Plan Alternative A only) and Class 2C Claims in annual Dutch Auctions (up to 80% of the Claim's face amount). | 100% on principal amount of Claim<br><br>Recoveries on Allowed Class 3 General Unsecured Claim expected at not less than 10%, dependent in large part upon whether Arbitration Receivable and remaining cash in Operating Accounts Balances, if any, are Cash Collateral. |
| 2A | Senior Series 2009A Debentures<br><br>(***Plan Alternative B** –* Indenture Trustee Loses Lien Adversary by Final Order; Secured Claims Disallowed) | 1.    Lien rights extinguished.  No New Indenture issued.<br><br>2.    Entire Claim treated as Allowed Class 3 Claim and Holders receive their Pro Rata share of the distributions provided to Holders of Allowed Class 3 Claims under Plan Alternative 3(B). | Recoveries projected at not less than 85% of the Allowed Amount of the Claim (not discounted to present value), but possibly higher if Octane Funding loses the Octane |

11

| | | | |
|---|---|---|---|
| | Est. Amt.:<br><br>$25,955,000 (Class 2A – Principal)<br><br>$3,046,217 (Class 3 – Accrued Interest) | | Adversary. |
| 2B | Series 2009B Debentures Secured Claims<br><br>(Treatment Unaffected by Results of Lien Adversary)<br><br>Est. Amt.:<br><br>$7,610,000 (Class 2B – Principal)<br><br>$1,323,008 (Class 3 – Accrued Interest) | 1.    The Purchaser shall issue to Holders of Allowed Class 2B Claims under the Series 2009B Debentures one (1) 3% Preferred Interest for each one dollar ($1.00) of principal amount of Allowed Class 2B Claims, all subject to the "**3% Preferred Buyback Right**."[13]<br><br>2.    The Rights of Holders of Allowed Class 2B Claims under the Trust Indenture Shall Be Entirely Extinguished.<br><br>3.    Accrued Interest & Other Permitted Charges under the Indenture on Account of Class 2B Claims Treated as Class 3 General Unsecured Claims Under Either Plan Alternative A or Plan Alternative B.<br><br>4.    $0.03 Annual Cumulative Dividend Owed on 3% Preferred Interests, Payable in Arrears, to the Extent Permitted Under Applicable Law to Holders of Record of Each 3% Preferred Interest on Each Anniversary Following the Effective Date.<br><br>5.    Solsten Drilling retains a right of first refusal in connection with any proposed transfer, assignment, or sale of beneficial ownership of the 3% Preferred Interests after the Effective Date to a Person that is not an Insider of such beneficial holder. | 40% estimated recovery of principal amount as of Effective Date based on projected value of 3% Preferred Buyback Right after first year of projected earnings.<br><br>Recoveries on Allowed Class 3 General Unsecured Claim expected at not less than 10%, dependent in large part upon whether the Indenture Trustee wins the Lien Adversary and, if so, whether the Arbitration Receivable and remaining cash in Operating Accounts Balances, if any, are Cash Collateral. |

---

[13]    "**3% Preferred Interests Buyback Rights**" means the right, but not the obligation, of Solsten Drilling or Solsten Funding, to the extent permitted by applicable law, within 30 business days following the close of an annual Dutch Auction , to apply Excess Cash unused in the preceding Dutch Auction to redeem or purchase pursuant to the following formula the 3% Preferred Interests from any holder thereof who voluntarily offers to have a stated amount of its 3% Preferred Interests redeemed or purchased:  Purchase/Redemption Amount Paid = Solsten Drilling's Previous Fiscal Year EBITDA  (x)  4  (x)  0.15   (x)   (# of 3% Preferred Interests Offered / 7,610,000).  By way of example, assuming an Effective Date of  12/31/2011, if (A) Solsten Drilling's EBITDA in its fiscal year ending 12/31/2012 is $5,000,000 and (B) Solsten Drilling or Solsten Funding accepts in its sole discretion the offer of such holder to have 1,000,000 in principal amount of its 3% Preferred Interests (plus accrued and unpaid dividends earned thereon) redeemed or purchased, then such holder shall receive $394,218.13 in Cash (plus Cash at the stated formula rate for accrued and unpaid dividends earned thereon) in exchange for those 1,000,000 3% Preferred Interests (plus accrued and unpaid dividends earned thereon).

| | | | |
|---|---|---|---|
| | | 6.    The amounts of the Allowed Claims of Holders of Series 2009B Debentures (*e.g.,* accrued interest and other permitted charges) in excess of the principal amount of their Claims shall be treated as Unsecured Claims under Class 3 of the Plan and (A) if the Indenture Trustee wins the Lien Adversary, be paid under Plan Alternative 3(A) or (B) if the Indenture Trustee loses the Lien Adversary, be paid under Plan Alternative 3(B). | |
| 2C | Washington State Bank Secured Claims<br><br>Est. Amt.:<br><br>$4,504,177 | 1.    In accordance with the terms of the New WSB Note, Solsten Drilling shall pay Holders of Allowed Class 2C Claims an amount equal to $4,504,177 (plus Accrued Interest Thereon at 5% Per Annum) Over 7 Years in Quarterly Installments of $190,156.00.<br><br>2.    The Allowed Class 2C Claims shall be given a lien on the Purchased Assets according to the same priorities as existed as of the Effective Date to secure the New WSB Note in the principal amount of $4,504,177.<br><br>3.    Excess Cash, Solsten Funding Claims Purchase Recoveries and, in the first such Dutch Auction, $2 Million of the Solsten Funding Contribution will be used for purchases of Class 2A Claims (under Plan Alternative A only) and Class 2C Claims in annual Dutch Auctions (up to 80% of the Claim's face amount).<br><br>4.    Accrued Interest & Other Permitted Charges owed to Holders of Class 2C Claims Treated as Class 3 General Unsecured Claims under either Plan Alternative A or Plan Alternative B.<br><br>5.    Payment of the Class 2A Alternative A Guaranteed Payment shall be further guaranteed by Solsten Funding. | 100% on principal amount of Claim.<br><br>Recoveries on Allowed Class 3 General Unsecured Claim expected at not less than 10%, dependent in large part upon whether the Indenture Trustee wins the Lien Adversary and, if so, whether the Arbitration Receivable and remaining cash in Operating Accounts Balances, if any, are Cash Collateral. |
| 2D | Octane Funding Claims<br><br>(***Plan Alternative A*** – Indenture Trustee Wins Lien Adversary; Class 2D Claim Disallowed as Secured Claim) | Allowed Class 2D Claim shall be treated either as an Allowed Class 3 Claim or an Allowed Class 5 Claim and Holders of such Allowed Class 2D Claims shall receive their Pro Rata share of the distributions provided in the Plan to Holders of Allowed Class 3 Claims under Plan Alternative 3(A) or no distributions as provided in the Plan to Holders of Allowed Class 5 Subordinated Claims. | Recoveries on Allowed Class 3 General Unsecured Claim expected at not less than 10%, but dependent in large part upon whether the Arbitration Receivable and remaining cash in |

| | | | |
|---|---|---|---|
| | Est. Amt.:<br><br>$4,108,000 | | Operating Accounts Balances, if any, are Cash Collateral. |
| 2D | Octane Funding Claims<br><br>(*Plan Alternative B –* Indenture Trustee loses Lien Adversary; Octane Funding Either Wins or Loses Octane Adversary)<br><br>Est. Amt.:<br><br>$4,108,000 | 1.    The Purchaser shall pay the entire amount of the Allowed Class 2D Claim, plus interest accruing thereon, by paying Holders of Allowed Class 2D Claims their Pro Rata share of such amount as represents 1/40th of the amount of their Allowed Class 2D plus accrued interest thereon (the "**Class 2D Contingent Guaranteed Payment**") on or about the last Business Day of each of 40 successive full calendar quarters following the date such Class 2D Claims are Allowed (plus accrued interest thereon at the non-default rate).  The Liens securing the Allowed Class 2D Claims shall remain in full force and effect following the Effective Date according to the same priorities as existed as of the Effective Date and according to the same terms and provisions of the existing loan documentation in respect of the enforcement of such Liens.<br><br>2.    If Octane Funding loses the Octane Adversary Proceeding (but Claims are not Subordinated Claims), lien rights are extinguished and Claims treated as Allowed Class 3 Claims with Holders receiving their Pro Rata Share of the distributions Provided in the Plan to Holders of allowed Class 3 Claims under Plan Alternative 3(B).<br><br>3.    If treated as Subordinated Claims, no distributions will be made. | 100% on principal amount of Claim plus accrued interest at the non-default contract rate if Octane Funding wins Octane Adversary.<br><br>Recoveries projected at not less than 85% of Allowed Amount of Claim (not discounted to present value) even if Octane Funding loses Octane Adversary (and not treated as Subordinated Claim).<br><br>0% Recovery if treated as Subordinated Claim. |
| 2E | Other Secured Claims<br><br>Est. Amt.:<br><br>$40,000 | Holder shall receive on the Effective Date either: (i) the return of its Collateral in full satisfaction of its claim or (ii) such other treatment as may be agreed to in writing by such Holder and the Purchaser. | 100% recovery on entire Secured Claim through return of Collateral securing Claim on the Effective Date, or as soon as practicable thereafter. |

14

| 3 | General Unsecured Claims<br><br>(***Plan Alternative 3(A)***) – Indenture Trustee Wins Lien Adversary; Octane Funding Either Wins or Loses Octane Adversary))<br><br>Est. Amt.<br><br>$1,016,000 (Trade)<br><br>$3,046,217 (Interest-Class 2A)<br><br>$1,323,008 (Interest-Class 2B) | 1.    Holders of Class 3 Claims represented by the accrued and unpaid interest on account of the Senior Series 2009A Debentures and the Series 2009B Debentures shall share Pro Rata in all Cash and other assets held by the Liquidating Trustee (after payment of Allowed Administrative Claims, Professional Fees, Cure Costs, and other Allowed Claims payable in full in Cash on the Effective Date) that represent Cash Collateral as of the Effective Date, including without limitation, Cash Collateral represented by (i) the Operating Accounts Balances; (ii) the Arbitration Receivable; (iii) the Liquidating Trust Contribution; and (iv) Causes of Action (including proceeds of Avoidance Actions).<br><br>2.    The remaining Cash and other assets held by the Liquidating Trustee that do not represent Cash Collateral as of the Effective Date shall be distributed Pro Rata among all Holders of Allowed Class 3 Claims. | Recoveries on Allowed Class 3 General Unsecured Claim expected at not less than 10%, but dependent in large part upon whether the Arbitration Receivable and remaining cash in Operating Accounts Balances, if any, are Cash Collateral. |
| 3 | (***Plan Alternative 3(B)***) – Indenture Trustee Loses Lien Adversary)<br><br>Est. Amt.<br><br>$1,016,000 (Trade)<br><br>$3,046,217 (Interest-Class 2A)<br><br>$1,323,008 (Interest-Class 2B) | 1.    Holders of Class 3 Claims shall share Pro Rata in the following assets:  (i) the Operating Accounts Balances; (ii) the Arbitration Receivable; (iii) the Liquidating Trust Contribution; (iv) Causes of Action (including Avoidance Actions); and (v) $818,292.00 paid by Solsten Drilling to the Liquidating Trustee on or about the last Business Day of each of 40 successive calendar quarters (less any amounts required to be paid separately to Holders of Allowed Class 2D Claims if (A) a Final Order is entered against the Holders of Class 2A and Class 2B Claims in the Lien Adversary and (B) a Final Order is entered in favor of the Holders of Allowed Class 2D Claims in the Octane Adversary) (the "**Class 3 Alternative B Guaranteed Payment**"), with the first such payment commencing on the last day of the first full calendar quarter following the Effective Date.<br><br>To the extent that the Class 3 Alternative B Guaranteed Payments plus all other distributions to be made under Plan Alternative 3(B) exceed the Allowed Amount of such Class 3 Claims, then | Recoveries projected at not less than 85% of Allowed Amount of Claim (not discounted to present value) even if Octane Funding wins Octane Adversary. |

---

[14]    This provision for treatment of Allowed Class 3 Claims under Plan Alternative 3(B) was inadvertently omitted from the Trustee Plan filed with the Bankruptcy Court on July 22, 2011.  The first set of amendments to the Trustee Plan will include this provision.

| | | further distributions shall be made on account of such Allowed Class 3 Claims as represents the payment of accrued interest on each Holder's full Allowed Class 3 Claim at 5% per annum commencing on the Petition Date through the date of the last distribution made by the Liquidating Trustee on the Allowed amount of such Holder's Class 3 Claim.[14]<br><br>Payment of the Class 3 Alternative B Guaranteed Payment shall be further guaranteed by Solsten Funding. | |
|---|---|---|---|
| 4 | Intercompany Unsecured Claims | Holders of Allowed Class 4 Intercompany Claims will not receive any distributions under the Plan. | None |
| 5 | Subordinated Claims | Holders of Allowed Class 5 Subordinated Claims will not receive any distributions under the Plan. | None |
| 6 | Equity Interests | Holders of Allowed Class 6 Equity Interests will not receive any distributions under the Plan. | None |

## D. The Post-Confirmation Liquidating Trust

To administer the Plan distributions, prosecute Causes of Action, and administer the Post-Confirmation Estates of the Debtors, a Liquidating Trust shall be established on the Effective Date. A Liquidating Trustee, guided by the Liquidating Trust Oversight Committee (the "**LTOC**") (both of whom will be selected by the Indenture Trustee, subject to Bankruptcy Court approval at the Confirmation Hearing), will administer the Liquidating Trust, collect and liquidate the Debtors' remaining assets, object to Disputed Claims, prosecute any retained Causes of Action (including Avoidance Actions), make required distributions under the Plan, file requisite tax returns, employ professionals, and take all other actions required under the Plan to complete the liquidation, dissolution and wind-up of the Debtors in accordance with applicable non-bankruptcy law and the Plan.

## E. Substantive Consolidation

The Plan shall serve as a motion by the Indenture Trustee seeking entry of an Order of the Bankruptcy Court substantively consolidating all of the Estates into a single consolidated Estate for all purposes associated with Confirmation and Consummation. If substantive consolidation of all of the Estates is ordered, then on and after the Effective Date, all remaining assets and liabilities not addressed in Asset Purchase Agreement and Transfer Order shall be treated as though they were merged into the Estate of O&G for all purposes associated with Confirmation and Consummation, and all guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor shall be treated as one collective obligation of the Debtors.

### III.   COMPARISON OF THE TRUSTEE PLAN TO THE DEBTORS' PLAN

The table below compares the proposed treatment of Impaired Creditors and Equity Interests under the Trustee Plan and the Debtors' Plan and vividly illustrates why the Trustee Plan is vastly superior to the Debtors' Plan:

| Claim/Interest | Treatment Under Trustee Plan | Treatment Under Debtors' Plan[15] |
|---|---|---|
| Senior Series 2009A Debentures<br><br>(*Plan Alternative A* –Indenture Trustee Wins Lien Adversary; Secured Claims Allowed)<br><br>Est. Amt.:<br><br>$25,955,000 (Class 2A – Principal)<br><br>$3,046,217 (Class 3 – Accrued Interest) | 1.    In accordance with the terms of the New Indenture, and as part of the purchase price, Solsten Drilling shall pay to the Indenture Trustee for benefit of the Holders of Allowed Class 2A Claims an amount equal to $25,955,000 (plus Accrued Interest Thereon at 5% Per Annum) Over 10 Years in Quarterly Installments of $818,292.00.<br><br>2.    Holders of Allowed Class 2A Claims shall be given a lien on the Purchased Assets to secure the $25,955,000 in principal amount according to the same priorities and to the same extent as existed as of the Effective Date.<br><br>3.    Following the Effective Date, interest shall accrue on the unpaid balance of the New Indenture to Class 2A Claims at a rate of 5% per annum.<br><br>4.    Payment of the Class 2A Alternative A Guaranteed Payment shall be further guaranteed by Solsten Funding.<br><br>6.    The amounts of the Allowed Claims of Holders of Senior Series 2009A Debentures (*e.g.,* accrued interest and other permitted charges) in excess of the principal amount of their Claims shall be treated as Unsecured Claims under Class 3 of the Plan and be paid under Plan Alternative 3(A).<br><br>7.    Excess Cash, Solsten Funding Claims Purchase Recoveries and, in the first such Dutch Auction, $2 Million of the Solsten Funding Contribution will be used for purchases of Class 2A Claims (under Plan Alternative A only) and Class 2C Claims in | 1.    Principal amount of Claim adjusted to "replacement value" as of Confirmation, but not to exceed $25,955,000, with interest paid at 5% per annum and principal maturing as a balloon payment in 10 years.<br><br>2.    Replacement value for all 5 rigs estimated "between the orderly liquidation value of $21,192,000 and the forced liquidation value of $16,520,000." Because WSB's Claim is Allowed in full at $4,504,177, the resultant projected value for the 4 Rigs securing the Senior Series 2009A Debentures would be between approx. $12 million and $16.6 million, which parenthetically is only marginally better than the value the Debtors premised their abject April 2010 offer despite 100% rig utilization now. *Compare* April 2010 Bondholder Proposal attached as **Exhibit 7** hereto.<br><br>3.    Interest is payable quarterly only from "Free Cash" (*i.e.,* net operating income less legal fees in prosecuting adversaries, taxes, payments due under the Plan to trade Creditors and for the benefit of certain Insiders, and a $2 million slush fund "set aside for reserves").<br><br>4.    Payments don't commence until 60 days after conclusion of the Lien Adversary, with no escrowing of or accounting for the use of such funds in the interim.<br><br>5.    Once payments commence, Free Cash in the "Debt Reserve Account" will be split 80/20, respectively, between the Holders of Senior Series 2009A Debentures and WSB for reduction of principal, except that when |

---

[15]    Capitalized that are not bolded and are contained within quotation marks shall have the meanings set forth in Article 1 of the Debtors' Plan.

| | |
|---|---|
| annual Dutch Auctions (up to 80% of the Claim's face amount). | that account exceeds $100,000, funds can be diverted to retire debt through the "Debenture Retirement Program," though the Reorganized Debtors will have no obligation to actually retire any of the "2011 Senior Debentures" to be issued under the Debtors' Plans to Holders of Senior Series 2009A Debentures.<br><br>6.    Lien rights are preserved, in theory, but the "2011 Senior Debentures" to be issued to Holders of Senior Series 2009A Debentures will purportedly cause the rights of such Holders to be modified so that in the event of a default thereunder and provide for an ill-defined and—in the view of the Indenture Trustee—wholly impermissible "process for agreed disposition of collateral" by "engaging a mutually acceptable broker to sell collateral within 120 days or transferring collateral at value to be determined by Bankruptcy Court."  (Debtors' Disclosure Statement at p. 29).<br><br>7.    No distributions are made on account of Undersecured Deficiency Claims, including the difference between the Debtors' "replacement value" and the principal amount of Senior Series 2009A Debentures or on account of accrued interest earned thereon through the Petition Date. |

| Senior Series 2009A Debentures<br><br>(*Plan Alternative B* – Indenture Trustee Loses Lien Adversary by Final Order; Secured Claims Disallowed)<br><br>Est. Amt.:<br><br>$25,955,000 (Class 2A – Principal)<br><br>$3,046,217 (Class 3 – Accrued Interest) | 1. Lien rights extinguished. No New Indenture issued.<br><br>2. Entire Claim treated as Allowed Class 3 Claim and Holders receive their Pro Rata share of the distributions provided to Holders of Allowed Class 3 Claims under Plan Alternative 3(B). | 1. Lien rights are extinguished and new 2011 Senior Indentures are issued.<br><br>2. Claims treated as Allowed Unsecured Claims equal to the $25,955,000 principal amount and such Claims will share Pro Rata with the $7,610,000 in principal amount of Series 2009B Debenture Holders in 80% of available Free Cash, unless those funds are instead diverted for use in the "Debt Retirement Program," though (as noted above) the Reorganized Debtors will have no obligation to actually retire any of the "2011 Senior Debentures" to be issued under the Debtors' Plan.<br><br>3. No mandatory quarterly pay downs of principal.<br><br>5. Payments commence no earlier than 60 days after entry of a Final Order concluding Lien Adversary with no escrow o r accounting for these funds to be distributed until the Lien Adversary is resolved by Final Order. |
|---|---|---|
| Series 2009B Debentures Secured Claims<br><br>Est. Amt.:<br><br>$7,610,000 (Class 2B – Principal)<br><br>$1,323,008 (Class 3 – Accrued Interest) | 1. The Purchaser shall issue to Holders of Allowed Class 2B Claims under the Series 2009B Debentures one (1) 3% Preferred Interest for each one dollar ($1.00) of principal amount of Allowed Class 2B Claims, all subject to the "**3% Preferred Buyback Right**."<br><br>2. The Rights of Holders of Allowed Class 2B Claims under the Trust Indenture Shall Be Entirely Extinguished.<br><br>3. Accrued Interest & Other Permitted Charges under the Indenture on Account of Class 2B Claims Treated as Class 3 General Unsecured Claims Under Either Plan Alternative A or Plan Alternative B.<br><br>4. $0.03 Annual Cumulative Dividend Owed on 3% Preferred Interests, Payable in Arrears, to the Extent Permitted Under Applicable Law to Holders of Record of Each 3% Preferred Interest on Each Anniversary Following the Effective Date. | 1. Treated as Unsecured Claims regardless of results of Lien Adversary.<br><br>2. New "2011 Subordinate Debentures" are issued by the Reorganized Debtors and provides for quarterly payments over 5 years after the Senior Series 2009 Debenture Holders are paid in full, with the first such payment commencing in the 11th year after resolution of the Lien Adversary by Final Order.<br><br>2. Quarterly payments allotted for principal and interest, with payments coming only from available "Free Cash."<br><br>3. Pay down of principal through discretionary "Debenture Retirement Program."<br><br>4. If Indenture Trustee loses Lien Adversary then the principal amount of Claims of Holders of Senior Series 2009 Debentures will share Pro Rata the Holders of Series 2009B Debentures in 80% of |

| | | |
|---|---|---|
| | 5.    Solsten Drilling retains a right of first refusal in connection with any proposed transfer, assignment, or sale of beneficial ownership of the 3% Preferred Interests after the Effective Date to a Person that is not an Insider of such beneficial holder.<br><br>6.    The amounts of the Allowed Claims of Holders of Series 2009B Debentures (*e.g.,* accrued interest and other permitted charges) in excess of the principal amount of their Claims shall be treated as Unsecured Claims under Class 3 of the Plan and (A) if the Indenture Trustee wins the Lien Adversary, be paid under Plan Alternative 3(A) or (B) if the Indenture Trustee loses the Lien Adversary, be paid under Plan Alternative 3(B). | available "Free Cash," unless those funds are instead diverted for use in the "Debt Retirement Program." |
| Washington State Bank ("WSB") Secured Claims<br><br>Est. Amt.:<br><br>$4,504,177 | 1.    In accordance with the terms of the New WSB Note, Solsten Drilling shall pay Holders of Allowed Class 2C Claims an amount equal to $4,504,177 (plus Accrued Interest Thereon at 5% Per Annum) Over 7 Years in Quarterly Installments of $190,156.00.<br><br>2.    The Allowed Class 2C Claims shall be given a lien on the Purchased Assets according to the same priorities as existed as of the Effective Date to secure the New WSB Note in the principal amount of $4,504,177.<br><br>3.    Excess Cash, Solsten Funding Claims Purchase Recoveries and, in the first such Dutch Auction, $2 Million of the Solsten Funding Contribution will be used for purchases of Class 2A Claims (under Plan Alternative A only) and Class 2C Claims in annual Dutch Auctions (up to 80% of the Claim's face amount).<br><br>4.    Accrued Interest & Other Permitted Charges owed to Holders of Class 2C Claims Treated as Class 3 General Unsecured Claims under either Plan Alternative A or Plan Alternative B.<br><br>5.    Payment of the Class 2A Alternative A Guaranteed Payment shall be further | 1.    Allowed Secured Claim fixed at $4,504,177.  No Undersecured Deficiency Claim for accrued interest or other permitted charges through the Petition Date.<br><br>2.    Paid interest-only quarterly for the first 5 years at prime + 2%, with a floor of 5% and ceiling of 8%, and payments made only from available "Free Cash," if any. Principal balloons and is payable at maturity.<br><br>3.    $125,000 shall be deposited with WSB as security for any missed quarterly interest payment.<br><br>4.    WSB's allocable share of "Free Cash" shall be 20% and paid quarterly as a "mandatory" pay down of principal, except that when account exceeds $100K, money can be diverted to retire debt through "Debenture Retirement Program."<br><br>5.    Lien rights are preserved, in theory, but the restructured loan agreement to be delivered to WSB will purportedly cause the rights of WSB to be modified so that in the event of a default under the restructured loan agreement, an ill-defined and—in the view of the Indenture Trustee—wholly impermissible "process for agreed disposition of collateral" shall be established by "engaging a mutually acceptable broker |

| | | |
|---|---|---|
| | guaranteed by Solsten Funding. | to sell collateral within 120 days or transferring collateral at value to be determined by Bankruptcy Court." (Debtors' Disclosure Statement at p. 28).<br><br>6.  No distributions are made on account of Undersecured Deficiency Claims, including on account of accrued interest earned through the Petition Date. |
| Octane Funding Claims<br><br>(*Plan Alternative A* – Indenture Trustee Wins Lien Adversary; Class 2D Claim Disallowed as Secured Claim)<br><br>Est. Amt.:<br><br>$4,108,000 | Allowed Class 2D Claim shall be treated either as an Allowed Class 3 Claim or an Allowed Class 5 Claim and Holders of such Allowed Class 2D Claims shall receive their Pro Rata share of the distributions provided in the Plan to Holders of Allowed Class 3 Claims under Plan Alternative 3(A) or no distributions as provided in the Plan to Holders of Allowed Class 5 Subordinated Claims. | Octane Funding receives all membership interests in O&G in exchange for its waiver and release of its prepetition Claims against the Debtors, with O&G "treating such contribution as new value to O&G" in exchange for such membership interests. |
| Octane Funding Claims<br><br>(*Plan Alternative B* –Indenture Trustee loses Lien Adversary; Octane Funding Either Wins or Loses Octane Adversary)<br><br>Est. Amt.:<br><br>$4,108,000 | 1.  The Purchaser shall pay the entire amount of the Allowed Class 2D Claim, plus interest accruing thereon, by paying Holders of Allowed Class 2D Claims their Pro Rata share of such amount as represents 1/40th of the amount of their Allowed Class 2D plus accrued interest thereon (the "**Class 2D Contingent Guaranteed Payment**") on or about the last Business Day of each of 40 successive full calendar quarters following the date such Class 2D Claims are Allowed (plus accrued interest thereon at the non-default rate).  The Liens securing the Allowed Class 2D Claims shall remain in full force and effect following the Effective Date according to the same priorities as existed as of the Effective Date and according to the same terms and provisions of the existing loan documentation in respect of the enforcement of such Liens.<br><br>2.  If Octane Funding loses the Octane Adversary Proceeding (but Claims are not Subordinated Claims), lien rights are extinguished and Claims treated as Allowed Class 3 Claims with Holders receiving their | Octane Funding receives all membership interests in O&G in exchange for its waiver and release of its prepetition Claims against the Debtors, with O&G "treating such contribution as new value to O&G" in exchange for such membership interests. |

| | | |
|---|---|---|
| | Pro Rata Share of the distributions Provided in the Plan to Holders of allowed Class 3 Claims under Plan Alternative 3(B).<br><br>3.    If treated as Subordinated Claims, no distributions will be made. | |
| Other Secured Claims<br><br>Est. Amt.:<br><br>$40,000 | Holder shall receive on the Effective Date either: (i) the return of its Collateral in full satisfaction of its claim or (ii) such other treatment as may be agreed to in writing by such Holder and the Purchaser. | 100% recovery through assumption of liabilities associated with vehicle contracts for the benefit of Insiders. |
| General Unsecured Claims<br><br>(*Plan Alternative 3(A)*) – Indenture Trustee Wins Lien Adversary; Octane Funding Either Wins or Loses Octane Adversary))<br><br>Est. Amt.<br><br>$1,016,000 (Trade)<br><br>$3,046,217 (Interest-Class 2A)<br><br>$1,323,008 (Interest-Class 2B) | 1.    Holders of Class 3 Claims represented by the accrued and unpaid interest on account of the Senior Series 2009A Debentures and the Series 2009B Debentures shall share Pro Rata in all Cash and other assets held by the Liquidating Trustee (after payment of Allowed Administrative Claims, Professional Fees, Cure Costs, and other Allowed Claims payable in full in Cash on the Effective Date) that represent Cash Collateral as of the Effective Date, including without limitation, Cash Collateral represented by (i) the Operating Accounts Balances; (ii) the Arbitration Receivable; (iii) the Liquidating Trust Contribution; and (iv) Causes of Action (including proceeds of Avoidance Actions).<br><br>2.    The remaining Cash and other assets held by the Liquidating Trustee that do not represent Cash Collateral as of the Effective Date shall be distributed Pro Rata among all Holders of Allowed Class 3 Claims. | General Unsecured Creditors representing $1,016,497 in trade claims are separately classified from the Undersecured Deficiency Claims of all Secured Creditors, including the Claims of Holders of Series 2009 Debentures if the Indenture Trustee loses the Lien Adversary, shall be unconditionally paid in full in 8 equal quarterly installments following the Effective Date. |

| | | |
|---|---|---|
| (*Plan Alternative 3(B)*) – Indenture Trustee Loses Lien Adversary)<br><br>Est. Amt.<br><br>$1,016,000 (Trade)<br><br>$3,046,217 (Interest-Class 2A)<br><br>$1,323,008 (Interest-Class 2B) | 1.   Holders of Class 3 Claims shall share Pro Rata in the following assets:  (i) the Operating Accounts Balances; (ii) the Arbitration Receivable; (iii) the Liquidating Trust Contribution; (iv) Causes of Action (including Avoidance Actions); and (v) $818,292.00 paid by Solsten Drilling to the Liquidating Trustee on or about the last Business Day of each of 40 successive calendar quarters (less any amounts required to be paid separately to Holders of Allowed Class 2D Claims if (A) a Final Order is entered against the Holders of Class 2A and Class 2B Claims in the Lien Adversary and (B) a Final Order is entered in favor of the Holders of Allowed Class 2D Claims in the Octane Adversary) (the "**Class 3 Alternative B Guaranteed Payment**"), with the first such payment commencing on the last day of the first full calendar quarter following the Effective Date.<br><br>To the extent that the Class 3 Alternative B Guaranteed Payments plus all other distributions to be made under Plan Alternative 3(B) exceed the Allowed Amount of such Class 3 Claims,[16] then further distributions shall be made on account of such Allowed Class 3 Claims as represents the payment of accrued interest on each Holder's full Allowed Class 3 Claim at 5% per annum commencing on the Petition Date through the date of the last distribution made by the Liquidating Trustee on the Allowed amount of such Holder's Class 3 Claim.<br><br>Payment of the Class 3 Alternative B Guaranteed Payment shall be further guaranteed by Solsten Funding. | General Unsecured Creditors representing $1,016,497 in trade claims are separately classified from the Undersecured Deficiency Claims of all Secured Creditors, including the Claims of Holders of Series 2009 Debentures if the Indenture Trustee loses the Lien Adversary, shall be unconditionally paid in full in 8 equal quarterly installments following the Effective Date. |
| Intercompany Claims | No Distributions. | Not a Specified Class. |
| Subordinated Claims | No Distributions. | Not a Specified Class. |

---

[16]   This provision for treatment of Allowed Class 3 Claims under Plan Alternative 3(B) was inadvertently omitted from the Trustee Plan filed with the Bankruptcy Court on July 22, 2011.  The first set of amendments to the Trustee Plan will include this provision.

The foregoing comparisons of key terms of the Trustee Plan and the Debtors' Plan as they relate to each Impaired Creditor Class highlights the starkly contrasting treatment afforded Creditor Classes under these Competing Plans and the superiority of the Trustee Plan in every material respect, including the following:

- Unlike the guaranteed payments provided under the Trustee Plan to Creditors according to their priorities, Secured Creditors under the Debtors' Plan are offered no certainty in recoveries. Instead, under the Debtors' Plan, principal and interest are required to be paid to Secured Creditors only from available "Free Cash." Because both the "Budget" and the operational profitability of the Reorganized Debtor will determine the amount of "Free Cash" that is generated, the amount that Creditors might receive under the Debtors' Plan is uncertain and speculative. Additionally, the Debtors' Plan is not subject to a clear payment default that would trigger these Holders' rights to foreclose upon their Collateral because they have no control over amounts the Reorganized Debtors will claim as expenditures that reduce available "Free Cash."

- Unlike the Trustee Plan, which provides the clearest indication that the value of the Debtors' assets will be maximized for the benefit of Creditors, the Debtors arbitrarily value the Debtors' Rigs at unreasonably low values of between $16 million and $21 million. In this way, the Debtors' Plan effectively seeks to wipe out (or transfer to Octane Funding, which will receive all the membership interests in the Reorganized Debtors) at least $10 million to $15 million in value that would be realized for the benefit of all Creditors according to their priorities if the Stalking Horse Bid alone is the Successful Bid (as defined in the Sales Procedures Order).

- The Debtors' Plan gerrymanders Classes by creating one potential consenting Class represented by approximately $1 million in trade-based Unsecured Claims. While the Bankruptcy Code allows for the possibility of classifying Claims of the same priority in separate Classes, the Debtors may not—as here—pay General Unsecured Claims of trade Creditors in full while Undersecured Deficiency Claims of their Secured Creditors receive nothing. Further, the Debtors' Plan unfairly discriminates between similarly situated Creditors.

- The Debtors' Plan provides no controls that can check the ability of Insiders to continue their spending practices, such as those described in the Indenture Trustee's Motion to Appoint a Trustee, attached as **Exhibit 6** hereto. The Indenture Trustee believes that the operational profitability of the business, from which the payments to Creditors will be funded under both Plans, will be significantly greater under the Trustee Plan than under the Debtor's Plan. The Indenture Trustee has confidence in the proposed Purchaser's financial management skills, which have been demonstrated over the past nearly 20 years of SolstenXP's existence. In contrast to the Debtors' Plan, the Trustee Plan and the Asset Purchase

Agreement contain a negative covenant providing that until all Guaranteed Payments have been paid or all Allowed Claims entitled to Guaranteed Payments have been purchased by Solsten Funding in the Dutch Auctions or extinguished, neither Solsten Drilling nor Solsten Funding shall, without the prior written consent of Indenture Trustee, pay or declare any Cash or other Distributions on any Equity Interests other than Permitted Solsten Drilling Distributions, the Permitted Solsten Funding Distributions, payments under the Solsten Post-Confirmation Loan Agreement, and the 3% Preferred Buyback Rights.

- Interest and principal payments to WSB and the Debenture Holders under the Debtors' Plan will come only from available "Free Cash," before which funds will be skimmed by the Reorganized Debtors at will to cover unrestrained litigation expenses, salaries of Insiders, expense allowances, and consulting and management fees, over $1 million in payments to junior trade Creditors under the Plan, and maintenance of a sizable $2 million slush fund "reserve" account. Conversely, the Guaranteed Payments payable to Creditors under the Trustee Plan must be paid timely and without fail or the Purchaser will be in default of its obligations under the Trustee Plan.

- "Free cash" in excess of $100,000 under the Debtors' Plan, instead of being used to make mandatory payments to Debenture Holders, can be diverted each quarter at the sole discretion of the Reorganized Debtors into the "Debenture Retirement Program," even though there is no obligation on the part of the Reorganized Debtors to retire outstanding Debentures with Cash available in that program. Conversely, under the Trustee Plan, use of "Excess Cash" in Dutch Auctions is mandatory up to 80% of the face amount of the Claim tendered.

- Under the Debtors' Plan, the new debentures proposed for the existing Debenture Holders strip Secured Creditors of their existing contractual rights to foreclose on their Collateral upon the occurrence of an event of default and even deny them the right to select an Indenture Trustee of their own choosing. Under the Trustee Plan, Lien and enforcement rights will be granted to the same extent as provided in the existing Debentures.

- The Debtors' Plan compels WSB and the Senior Series 2009A Debenture Holders (assuming the Indenture Trustee wins the Lien Adversary) to submit to a "process for agreed disposition of Collateral" in the event of default, including "engaging a mutually acceptable broker to sell Collateral within 120 days or transferring Collateral at a value to be determined by the Bankruptcy Court." This provision fails to provide these Secured Creditors with the "indubitable equivalent" of their Claims, cannot be confirmed, improperly vests Post-Confirmation jurisdiction in the Bankruptcy Court, and portends significant future litigation over valuation of Collateral to be sold. Conversely, under the Trustee Plan,

Lien enforcement rights under the Trustee Plan will be granted to the same extent as provided in the existing Debentures.

- The Debtors' Plan "gifts" to Octane Funding all membership interests in the Reorganized Debtors despite contributing no new value in exchange. Octane Funding's release and waiver of its   $4.1 million Claim is insufficient as a matter of law to satisfy the "new value" exception to the absolute priority rule and does not constitute a "contribution" of "new value" to the Debtors.  Indeed, in light of the amount offered by the Proposed Purchaser in the Stalking Horse Bid, Octane Funding could flip its new membership interests in the Reorganized Debtors the day after the Debtors' Plan were to become effective and earn for itself a $10 million to $15 million profit (representing the difference between the $16 million to $21 million value attributed to the Debtors' assets under the Debtors' Plan and the Guaranteed Payments of approximately $38 million over 10 years represented by the Stalking Horse Bid).

- The "best interests" test cannot be satisfied under the Debtors' Plan, as demonstrated by the existence of the Stalking Horse Bid alone.  Under the Trustee Plan, however, the Proposed Purchaser already has offered to pay a value for the Rigs and other purchased assets for a value in excess of the amount that Hadco, the Debtors' valuation expert, has opined represents the "fair market value" of those assets.

- Under the Debtors' Plan, Insiders are improperly released from potential Causes of Action by the Estate and third parties for no consideration.  No such releases are provided to Insiders in the Trustee Plan.

- The Debtors' Plan denies Creditors holding Undersecured Deficiency Claims voting and distribution rights.  Conversely, the Trustee Plan affords Holders of Undersecured Deficiency Claims voting and distribution rights that fairly account for the relative priorities of such Claims.

- The Debtors' Plan fails to provide Secured Creditors with sufficient interest rate risk premiums in a likely cram down scenario.

The Indenture Trustee believes that given these manifest deficiencies, the Debtors' Plan, is plainly unconfirmable as a matter of law.  The Indenture Trustee, therefore, urges Creditors entitled to vote on the Competing Plans to vote to accept the Trustee Plan and to reject the Debtors' Plan.

## IV.   VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS

### A.      The Disclosure Statement Order

By order dated _____, 2011 (the "**Disclosure Statement Order**") a copy of which is annexed hereto as **Exhibit 2**, the Bankruptcy Court approved the Trustee Disclosure Statement, in accordance with § 1125 of the Bankruptcy Code, as containing "adequate information" to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtors to make an informed judgment as to whether to accept or reject the Trustee Plan.  The Bankruptcy Court authorized use of this approved Disclosure Statement to solicit votes on the Trustee Plan.

The Disclosure Statement Order also establishes the approved procedures for soliciting votes on the Trustee Plan (the "**Solicitation Procedures**") and the following important dates and deadlines:

- the deadline for filing objections to Confirmation of the Trustee Plan (_____, 2011);

- the date for determining that Holders of Claims may vote on the Trustee Plan (_____, 2011) (the "**Record Date**");

- the deadline for voting on the Trustee Plan (_____, 2011) (the "**Voting Deadline**"); and

- the date on which a final hearing on confirmation of the Trustee Plan will be held (_____, 2011) (the "**Confirmation Hearing**").

**APPROVAL OF THE TRUSTEE DISCLOSURE STATEMENT AND ENTRY OF THE DISCLOSURE STATEMENT ORDER, HOWEVER, DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE TRUSTEE PLAN.**

**ADDITIONAL COPIES OF THE TRUSTEE PLAN, THE TRUSTEE DISCLOSURE STATEMENT, BALLOTS, OR ANY EXHIBITS TO SUCH DOCUMENTS MAY BE OBTAINED BY REQUESTING COPIES THEREOF FROM (I) BMC GROUP, AT THE ADDRESSES AND/OR TELEPHONE NUMBERS BELOW, OR (II) BY REQUESTING COPIES THEREOF FROM THE INDENTURE TRUSTEE'S COUNSEL AT THE TELEPHONE NUMBERS OR E-MAIL ADDRESSES SET FORTH ON THE COVER PAGE OF THE TRUSTEE DISCLOSURE STATEMENT.**

No solicitation of votes may be made unless, at the time of or before such solicitation, there is transmitted to such Holder the Trustee Plan (or a summary thereof) and the Trustee Disclosure Statement, which has been approved by the Bankruptcy Court as containing "adequate information" (as defined in § 1125(a)(1) of the Bankruptcy Code) that would enable a hypothetical Holder of Claims in each voting Class to make an informed judgment about the Trustee Plan.

### B.      Manner of Voting

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims that are (i) "impaired" by the Indenture Trustee and (ii) entitled to receive a distribution under the Trustee

Plan are entitled to vote on the Trustee Plan. If you fall within a Class entitled to vote to accept or reject the Trustee Plan, then accompanying the Trustee Disclosure Statement should be the Ballot for casting your vote(s) on the Trustee Plan and a pre-addressed envelope for the return of the Ballot(s).

**BALLOTS FOR ACCEPTANCE OR REJECTION OF THE TRUSTEE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES ENTITLED TO VOTE ON THE TRUSTEE PLAN. IF YOU ARE ENTITLED TO VOTE AND YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT, OR LOST YOUR BALLOT, PLEASE CALL BMC GROUP, INC., THE SOLICITATION AND VOTING AGENT FOR THE COMPETING PLANS, AT 1-888-909-0100. IN VOTING FOR OR AGAINST THE TRUSTEE PLAN, PLEASE USE ONLY THE BALLOT (OR BALLOTS) SENT TO YOU WITH THE TRUSTEE DISCLOSURE STATEMENT. IF A CREDITOR HAS AN ALLOWED CLAIM IN MORE THAN ONE CLASS, SUCH CREDITOR MAY VOTE MULTIPLE BALLOTS.**

After carefully reviewing the Trustee Disclosure Statement and the exhibits attached hereto, please indicate your vote with respect to the Trustee Plan on the enclosed Ballot and return it in the envelope provided. Votes cannot be transmitted via email, orally or by facsimile, except in the case of a master ballot submitted by a Master Ballot Agent. Accordingly, you are urged to return your signed and completed ballot, by hand delivery, overnight delivery or regular U.S. mail, promptly, so that it is received by the Debtors' solicitation agent on or before the Voting Deadline at the applicable following address:

**BY UNITED STATES MAIL:**

**O&G LEASING LLC VOTING AGENT
BMC GROUP, INC.
P.O. BOX 3020
CHANHASSEN, MN 55317**

**BY OVERNIGHT COURIER OR
PERSONAL DELIVERY**

**O&G LEASING LLC VOTING AGENT
BMC GROUP, INC.
18750 LAKE DRIVE EAST
CHANHASSEN, MN 55317**

**IN ORDER TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED BY 5:00 P.M. (CENTRAL TIME) ON _____, 2011 (THE "VOTING DEADLINE"). ANY EXECUTED BALLOTS THAT ARE TIMELY RECEIVED BUT WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE TRUSTEE PLAN SHALL NOT BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE TRUSTEE PLAN.**

## C.    Creditors Entitled to Vote on the Trustee Plan

Subject to the provisions of the Disclosure Statement Order and express provisions of the Trustee Plan that may provide otherwise, any Holder of a Claim against any Debtor as of the Petition Date that has not been Disallowed by Order of the Bankruptcy Court and is not otherwise a Disputed Claim, is entitled to vote to accept or reject the Trustee Plan if (i) such Claim or Interest is Impaired under the Trustee Plan and is not of a Class that is deemed to have accepted or rejected the Trustee Plan pursuant to §§ 1126(f) and 1126(g) of the Bankruptcy Code and (ii) either (A) such Holder's Claim has been Scheduled by the Debtors (and not as disputed, contingent or unliquidated) or (B) such Holder has filed a Proof of Claim on or before the applicable Bar Dates.

28

Under Bankruptcy Code § 1124, a Class of Claims is Impaired under the Trustee Plan unless, with respect to each Claim of such Class, the Trustee Plan:  (1) leaves unaltered the legal, equitable, and contractual rights of the Holder of such Claim; or (2) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim to demand or receive accelerated payment of such Claim after the occurrence of a default — (a) cures any such default that occurred before or after the commencement of the Cases, other than a default of a kind specified in Bankruptcy Code section 365(b)(2), (b) reinstates the maturity of such Claim as it existed before the default, (c) compensates the Holder of such Claim for damages incurred as a result of any reasonable reliance on such contractual provision or applicable law, and (d) does not otherwise alter the legal, equitable, or contractual rights to which such Claim entitles the holder of such Claim.

Unless otherwise permitted in the Trustee Plan, the Holder of any Disputed Claim is not entitled to vote with respect to such Disputed Claim unless the Bankruptcy Court, upon application made by such Holder pursuant to Bankruptcy Rule 3018(a) and in accordance with the approved solicitation procedures set forth in the Disclosure Statement Order, temporarily allows such Disputed Claim for the limited purpose of voting to accept or reject the Trustee Plan. Any such application must be heard and determined by the Bankruptcy Court on or before ten (10) days prior to the Voting Deadline.  A vote on the Trustee Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

For Holders of any Disputed Claim, the Debtors will cause to be distributed by United States mail, first-class postage prepaid, personal service or overnight delivery a Solicitation Package, which contains a Ballot, and such person or entity will be provided with notice that its entire Claim has been allowed temporarily for voting purposes only (and not for purposes of allowance or distribution).

## D.      General Procedures for Solicitation and Voting

Pursuant to Bankruptcy Rule 3017(d) and as directed in the Disclosure Statement Order, on or before _____, 2011 (the "**Solicitation Mailing Date**"), BMC Group, the solicitation and voting agent for the Competing Plans, will transmit packages (the "**Solicitation Packages**") to all parties entitled to receive them pursuant to and in accordance with the Solicitation Procedures described in the Disclosure Statement Order.  Pursuant to Bankruptcy Rule 3003(c)(2), no Solicitation Packages will be distributed to Holders of Claims that (a) are not Scheduled or are Scheduled at zero, in an unknown amount, or as disputed, contingent, or unliquidated and (b) who failed to timely file a Proof of Claim.  Holders of these Claims shall not be entitled to vote or receive distributions under the Trustee Plan, unless otherwise Ordered by the Bankruptcy Court.

*1.*       ***Ballot Tabulation Procedures***

For purposes of voting on the Plan, the amount and classification of a Claim and the procedures that will be used to tabulate acceptances and rejections of the Plan shall be exclusively as follows:

(a)      If no Proof of Claim has been timely Filed, the voted amount of a Claim shall be equal to the amount listed for the particular Claim in the Schedules to the extent such Claim is not listed as contingent, unliquidated, or disputed, and the Claim shall be placed in the appropriate Class, based on the Debtor's records, and consistent with the Schedules and the Claims registry of the Clerk of the Bankruptcy Court (the "Clerk");

(b)      If a Proof of Claim has been timely filed, and has not been objected to before the expiration of the Voting Deadline, the voted amount of that Claim shall be as specified in the Proof of Claim filed with the Clerk;

(c)      Subject to subparagraph (d) below, a Claim that is the subject of an objection filed before the Voting Deadline shall be disallowed for voting purposes;

(d)      If a Claim has been estimated or otherwise Allowed for voting purposes by Order of the Bankruptcy Court, the voted amount and classification shall be that set by the Bankruptcy Court;

(e)      If Holder of a Claim or its authorized representative did not use the Ballot form provided by the Indenture Trustee, such vote will not be counted;

(f)      If the Ballot is not received by the Voting Agent on or before the Voting Deadline at office of the Voting Agent in Chanhassen, Minnesota, the Ballot will not be counted;

(g)      If the Ballot is not signed by the Claimholder or its authorized representative the Ballot will not be counted;

(h)      If the individual or institution casting the Ballot (whether directly or as a representative) was not the Holder of a Claim on the Record Date (as that term is defined below), the Ballot will not be counted;

(i)      If the Holder of a Claim or its authorized representative did not check one of the boxes indicating acceptance or

30

rejection of the Plan, or checked both such boxes, the Ballot will not be counted; and

(j)  Whenever a Holder of a Claim submits more than one Ballot voting the same Claim(s) before the applicable deadline for submission of Ballots, except as otherwise directed by the Bankruptcy Court after notice and a hearing, the last such Ballot shall be deemed to reflect the voter's intent and shall supersede any prior Ballots.

## 2.  *Execution of Ballots by Representatives*

If a Ballot is signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations, or others acting in a fiduciary or representative capacity, such persons must indicate their capacity when signing and, at the Indenture Trustee's request, must submit proper evidence satisfactory to the Indenture Trustee of their authority to so act.

## 3.  *Waivers of Defects and Other Irregularities Regarding Ballots*

Unless otherwise directed by the Bankruptcy Court, all questions concerning the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots  will initially be determined by the Indenture Trustee and subject to review by the Bankruptcy Court whose determination will be final and binding. The Voting Agent and Indenture Trustee reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Voting Agent or Indenture Trustee (or their respective counsel), be unlawful.  The Indenture Trustee further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot, which waiver shall not be deemed to have any effect on any other Ballot. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Indenture Trustee or the Bankruptcy Court determines.  Neither the Indenture Trustee nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liability for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until any irregularities have been cured or waived.  Ballots previously furnished, and as to which any irregularities have not subsequently been cured or waived, will be invalidated.

## 4.  *Withdrawal of Ballots and Revocation*

Any holder of a Claim in an impaired Class who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time before the Voting Deadline.  To be valid, a notice of withdrawal must: (i) contain the description of the Claims to which it relates and

the aggregate principal amount, represented by such Claims; (ii) be signed by the Holder of the Claim in the same manner as the Ballot; and (iii) be received by the Voting Agent in a timely manner at the addresses set forth in Chanhassen, Minnesota.  The Indenture Trustee expressly reserves the absolute right to contest the validity of any such withdrawals of Ballots.  Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballot that is not received in a timely manner will not be effective to withdraw a previously furnished Ballot. Any Holder of a Claim who has previously submitted a properly completed Ballot before the Voting Deadline may revoke such Ballot and change its vote by submitting to the Voting Agent before the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

**E.**   **Confirmation of the Trustee Plan**

The Trustee Plan cannot be Consummated unless it is confirmed by the Bankruptcy Court.  Confirmation of the Trustee Plan requires that, among other things, either (i) each Class of Claims that is Impaired by the Trustee Plan and entitled to vote has voted to accept the Trustee Plan by the requisite majority, or (ii) the Trustee Plan is determined by the Bankruptcy Court to be fair and equitable, as defined by the Bankruptcy Code, with respect to Classes of Claims or Equity Interests that have rejected (or are deemed to have rejected) the Trustee Plan. The Bankruptcy Code also requires that the Confirmation of the Trustee Plan be in the "best interests" of all Holders of Claims and Equity Interests and "feasible" in that it is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or the successor to the Debtors, other than as provided in the Trustee Plan.

As explained below, the Indenture Trustee believes that the Trustee Plan meets the Confirmation requirements of the Bankruptcy Code.

*1.*   *The Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing on confirmation of a plan of reorganization. Pursuant to the Disclosure Statement Order, the hearing on Confirmation of the Trustee Plan will be held on _____, **2011, at [\_\_:\_\_], Central Time,** before the Honorable Edward Ellington in Courtroom 4D of the United States Courthouse for the Southern District of Mississippi in Jackson, Mississippi (the "**Confirmation Hearing**").  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Trustee Plan.  Any objection to Confirmation of the Trustee Plan must be made in writing, conform to the Bankruptcy Rules and Local Bankruptcy Rules, set forth the name of the objector, the nature and amount of the Claim or Equity Interest held or asserted by the objector against the Debtors' Estates or property, the basis for the objection and the specific grounds therefor.

ANY OBJECTION, TOGETHER WITH PROOF OF SERVICE THEREOF, MUST BE FILED WITH THE CLERK OF COURT BY 5:00 P.M. CENTRAL TIME ON _____, 2011 (THE "OBJECTION DEADLINE"), AND SERVED ON PERSONS IN THE MANNER SET FORTH IN THE DISCLOSURE STATEMENT ORDER.

OBJECTIONS TO CONFIRMATION OF THE TRUSTEE PLAN ARE GOVERNED BY BANKRUPTCY RULE 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY AND PROPERLY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## 2.      *Requirements for Confirmation of the Plan*

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of Bankruptcy Code section 1129 have been satisfied, in which event the Bankruptcy Court shall enter an Order Confirming the Trustee Plan. For the Trustee Plan to be confirmed, Bankruptcy Code section 1129 requires that:

(a)      The Trustee Plan complies with the applicable provisions of the Bankruptcy Code;

(b)      The Indenture Trustee has complied with the applicable provisions of the Bankruptcy Code;

(c)      The Trustee Plan has been proposed in good faith and not by any means forbidden by law;

(d)      Any payment or distribution made or promised by the Indenture Trustee or by a Person issuing securities or acquiring property under the Trustee Plan, for services or for costs and expenses in connection with the case, or in connection with Trustee Plan and incident to the Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

(e)      The Indenture Trustee has disclosed, to the extent known, the identity and affiliation of any individual proposed to serve, after Confirmation of the Trustee Plan, as a director, officer, member, agent, or voting trustee of the Liquidating Trust, the Liquidating Trust Oversight Committee, and any successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such Person is consistent with the interests of Creditors and Equity Interest Holders and with public policy, and the Indenture Trustee has, to the extent known, disclosed the identity of any Insider that will be employed or retained by the Purchaser or the Liquidating Trust and the nature of any compensation for such Insider;

(f)     Any government regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtors has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval;

(g)     With respect to each Impaired Class or Claims of Equity Interests, either each holder of a Claim or Equity Interest of the Class has accepted the Trustee Plan, or will receive or retain under the Trustee Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Trustee Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.  If Bankruptcy Code section 1111(b)(2) applies to the Claims of such Class, each Holder of a Claim of that Class will receive or retain under the Plan on account of that Claim property of a value, as of the Effective Date, that is not less than the value of that Holder's interest in the Estate's interest in the property that secures such Claim;

(h)     Each Class of Claims or Equity Interests has either accepted the Trustee Plan or is not impaired under the Trustee Plan;

(i)     Except to the extent that the Holder of a particular Administrative Claim has agreed to a different treatment of its Claim, the Plan provides that Allowed Administrative Claims shall be paid in full on the Effective Date or the date such Claim is Allowed;

(j)     If a Class of Claims or Equity Interests is Impaired under the Trustee Plan, at least one such Class of Claims or Equity Interests has accepted the Trustee Plan, determined without including any acceptance of the Trustee Plan by any Insider;

(k)     Confirmation of the Trustee Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan; and

(l)     All fees payable under Section 1930 of Title 28, as determined by the Court at the hearing on confirmation of the Trustee Plan, have been paid or the Trustee Plan provides for the payment of all such fees on the Effective Date of the Plan.

The Indenture Trustee believes that the Trustee Plan satisfies all of the statutory requirements of the Bankruptcy Code for Confirmation and that the Trustee Plan was proposed in good faith.  The Indenture Trustee believes it has

complied, or will have complied, with all the requirements of the Bankruptcy Code governing Confirmation of the Plan.

As stated above, the Indenture Trustee believes that the Debtors' Plan fails to satisfy all of these statutory requirements of the Bankruptcy Code for Confirmation.

### 3.    *Acceptances Necessary to Confirm the Plan*

For the Trustee Plan to be accepted and thereafter confirmed, it must be accepted by at least one (1) class of Claims that is Impaired by the Trustee Plan. Under 11 U.S.C. § 1126, an Impaired Class of Claims is deemed to have accepted the Trustee Plan if votes representing at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Allowed Claims that have cast votes have accepted the Trustee Plan. Votes designated by the Bankruptcy Court under 11 U.S.C. § 1126(f) as not having been cast, solicited, or procured in good faith or in accordance with the Bankruptcy Code's applicable provisions will not be counted. Even if all Classes of Claims accept the Plan, the Bankruptcy Court may refuse to confirm the Plan.

If a Class of Claims or Equity Interests has been Impaired by the Trustee Plan, that Impaired Class must accept the Trustee Plan or, in the absence of such acceptance, the Bankruptcy Court must independently determine that the Trustee Plan provides to each Holder of a Claim of such Class a recovery which has a value, as of the Effective Date, at least equal to the value of the distribution which such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

The Holders of Claims in Class 1 are not entitled to vote on the Trustee Plan. Such Holders will receive 100% of their Allowed Claim amount and are deemed to have accepted the Trustee Plan.

Holders of Claims in Classes 2A, 2B, 2C, 2D, and 3 (the "**Voting Classes**") are Impaired under, and the Holders of such Claims are entitled to vote on, the Trustee Plan and, therefore, must accept the Trustee Plan in order for it to be confirmed without application of the "fair and equitable test," described below, to such Class. As stated above, a Class of Claims will have accepted the Trustee Plan if the Trustee Plan is accepted by at least two-thirds (2/3) in dollar amount and a majority in number of the Claims of such Class (other than any Claims of creditors designated under § 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Trustee Plan.

The Holders of Claims and Equity Interests in Classes 4, 5, and 6 are not entitled to vote on the Trustee Plan. Such Holders will receive no distribution under the Trustee Plan and are conclusively deemed to reject the Trustee Plan.

### 4.    *Cramdown*

In the event that any impaired Class of Claims does not accept the Trustee Plan, the Bankruptcy Court may still confirm the Trustee Plan at the request of the Indenture Trustee if, as to each Impaired Class that has not accepted the Trustee Plan, the Trustee Plan "does not discriminate unfairly" and is "fair and equitable." The Trustee Plan does not discriminate unfairly within the meaning of the Bankruptcy Code if no Class receives more than it is legally entitled to receive for its Claims or Equity Interests. "Fair and equitable" has different meanings for holders of Secured and Unsecured Claims and Equity Interests.  With respect to a Secured Claim, "fair and equitable" means either:

> (i)      the Impaired Secured Creditor retains the Liens, whether the property subject to such Liens is retained by the Debtors or transferred to another Person, to the extent of its Allowed Claim and receives deferred Cash payments totaling at least the Allowed amount of its Claims with a present value as of the Effective Date at least equal to the value of such Creditor's interest in the property securing its Liens;

> (ii)     property subject to the Lien of the Impaired Secured Creditor is sold free and clear of that Lien, with that Lien attaching to the proceeds of sale, and such Lien proceeds must be treated in accordance with clauses (i) and (iii) hereof; or

> (iii)    the Impaired Secured Creditor realizes the "indubitable equivalent" of its Claim under the Trustee Plan.

With respect to an Unsecured Claim, "fair and equitable" means either (i) each Impaired Creditor receives or retains property of a value, as of the Effective Date of the Trustee Plan, equal to the amount of its Allowed Claim or (ii) the Holders of Claims and Equity Interests that are junior to the Claims of the dissenting Class will not receive any property under the Trustee Plan.

With respect to Equity Interests, "fair and equitable" means either (i) each Impaired Equity Interest receives or retains, on account of that Equity Interest, property of a value, as of the Effective Date, equal to the greatest of the Allowed amount of any fixed liquidation preference to which the Holder is entitled, any fixed redemption price to which the Holder is entitled, or the value of the Equity Interest; or (ii) the Holder of any Equity Interest that is junior to the Equity Interest of that Class will not receive or retain under the Trustee Plan, on account of that junior Equity Interest, any property.

In the event at least one Class of Impaired Claims rejects or is deemed to have rejected the Trustee Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Trustee Plan is fair and equitable and does not discriminate unfairly against any rejecting Impaired Class of Claims.

The Indenture Trustee believes that the Trustee Plan does not discriminate unfairly and is fair and equitable with respect to each Impaired Class of Claims and Equity Interests.  It believes that the Trustee Plan represents the best option available to maximize the return to all Creditors.  Further, under the Trustee Plan, no inferior class of Creditors or Equity Interest Holders will receive or retain anything unless the Allowed Claims of all superior classes are paid in full.

**5.       _Feasibility_**

The Bankruptcy Code requires that confirmation of a Trustee Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or the successor to the Debtors' Business, other than as provided in the Trustee Plan.  The Trustee believes that the Purchaser will be able to make all payments and perform all obligations as required by the Asset Purchase Agreement, and so there is no reasonable basis for believing that Confirmation of the Trustee Plan is likely to be followed by the liquidation or the need for further financial reorganization which is not provided for therein in respect of the Liquidating Trust.

The Proposed Purchaser has developed financial projections (the "**Solsten Projections**") that demonstrate its ability to meet its obligations under the Trustee Plan while maintaining sufficient liquidity and capital resources to conduct its business.  Unlike the Debtors' projections in the Debtors' Disclosure Statement, there is only one version of the Solsten Projections since, as noted above, Guaranteed Payments from Solsten Drilling payable under the Asset Purchase Agreement remain the same regardless of the adjudication of the Lien Adversary or the Octane Adversary.

The Solsten Projections are set forth at **Exhibit 4** to the Trustee Disclosure Statement and should be read in conjunction with the assumptions, qualifications, and notes thereto. The Solsten Projections were prepared by the Proposed Purchaser in good faith based upon assumptions believed to be reasonable.  **THE PROPOSED PURCHASER HAS PREPARED THE PROJECTIONS BASED UPON THE INFORMATION MADE AVAILABLE TO IT AND THE PROPOSED PURCHASER TAKES NO RESPONSIBILITY AND MAKES NO REPRESENTATIONS CONCERNING THE INFORMATION PROVIDED TO IT USED IN THE PREPARATION OF THE PROJECTIONS.**  Most of the assumptions about the operations of the Business after the assumed Effective Date that are utilized in the Solsten Projections were based, in part, on economic, competitive, and general business conditions prevailing at the time.  As of the date the Bankruptcy Court approved the Trustee Disclosure Statement such conditions have not materially changed, but any future changes in these conditions may materially impact the ability of the Purchaser to achieve the Solsten Projections (though they would have to be very significant to impact the ability of the Proposed Purchaser to be unable to make Guaranteed Payments due under the terms of the Asset Purchase Agreement).

The Solsten Projections and the assumptions, qualifications, and notes thereto are "forward-looking statements." Generally, these statements relate to business plans, anticipated strategies, and anticipated capital financing needed and estimated costs and expenses required to perform thereunder. Forward-looking statements are subject to risks, uncertainties, and assumptions. Actual results may differ materially from those in the Solsten Projections as a result of these risks and uncertainties. These forward-looking statements are made only as of the date hereof, and the Indenture Trustee and the Proposed Purchaser undertake no obligation to update or revise the forward-looking statements, whether as a result of new information, future events, or otherwise.

Although the Indenture Trustee, in consultation with its advisors, believes that the expectations reflected in the forward-looking statements are reasonable, there can be no assurances that such expectations will materialize or prove to be accurate. Solsten Drilling's operations and the industry and market conditions in which it will operate are subject to a number of uncertainties, risks and other influences, many of which are outside its control and cannot be predicted with any degree of accuracy. In light of the significant uncertainties inherent in the forward-looking statements made in the Solsten Projections, the inclusion of such statements should not be regarded as a representation by the Indenture Trustee, the Proposed Purchaser, or any other Person that the results reflected in the Solsten Projections will be achieved.

**6.      *"Best Interests" Test***

To obtain confirmation of the Trustee Plan, the Indenture Trustee must show under Bankruptcy Code section 1129(a)(7) that each Holder of an Impaired Claim or Interest has accepted the Trustee Plan, or that each Holder will receive or retain under the Trustee Plan on account of the Holder's Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors' assets were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date. This test is commonly known as the "**best interests**" test.

The Debtors, together with their advisors, have prepared a liquidation analysis that is contained in **Exhibit 5 to the Debtors' Disclosure Statement** (the "**Liquidation Analysis**"). The Liquidation Analysis outlines potential recoveries to Creditors in the event the Debtors were liquidated in a hypothetical Chapter 7 case. Proceeds distributed in the Liquidation Analysis are presumed to be distributed in accordance with § 726 of the Bankruptcy Code in the following priority: (i) Claims of Secured Creditors to the extent of the value of their Collateral; (ii) costs, fees and expenses of liquidation, as well as any other administrative expenses; (iii) Claims arising prior to commencement of the hypothetical Chapter 7 case, but which have priority status under the Bankruptcy Code; and (iv) General Unsecured Claims.

Notably, even if the Debtors had used Hadco's "fair market value" valuation of $28,329,000 as the benchmark for its Liquidation Analysis, the Trustee Plan would satisfy the "best interests" test of Section 1129(a)(7)(A)(ii) because the value of the Stalking Horse Bid exceeds the "fair market value" placed on the Debtors' assets by Hadco.  Clearly, then, the Trustee Plan satisfies the "best interests" test of Bankruptcy Code section 1129(a)(7).

## V.   HISTORY OF THE DEBTORS; SIGNIFICANT EVENTS IN THE CASES

Sections III and IV of the Debtors' Disclosure Statement sets forth background information to the Debtors, events leading to the filing of the Cases, and significant events in the Cases.  THE INDENTURE TRUSTEE DOES NOT ADOPT THESE STATEMENTS AND NOTHING IN THE TRUSTEE DISCLOSURE STATEMENT SHOULD BE CONSTRUED AS ADMISSION OR AGREEMENT BY THE INDENTURE TRUSTEE WITH ANY OF THE STATEMENTS CONTAINED THEREIN.

The Indenture Trustee, unlike the Debtors, is not going to use the Trustee Disclosure Statement as a vehicle to make blanket statements or characterizations that are irrelevant to the critical issue of maximizing the value of the Debtors' assets in a strong market for oil and gas rigs.  The Trustee Plan seeks to maximize these values through a vibrant Auction conducted in accordance with the Sales Procedures Order attached hereto as **Exhibit 3**.

The Indenture Trustee, however, does note in reviewing the Debtors' historical narrative that the Debtors glaringly omit in Section III.C of the Debtors' Disclosure Statement that the restructuring proposal they advanced in April 2010, just a month before the bankruptcy filing, called for the Holders of the Series 2009 Debentures to reduce the principal amount of their Claims from $33.6 million to $11 million and to reduce their annual interest rate from a blended rate of 11.7% to a flat rate of 7.5%.  *See* **Exhibit 7** (April 2010 "Offer to Bondholders") at p. 16.

The Indenture Trustee presented the Debtors' offer to the owners of the Debentures, who rejected it immediately.  The Trustee further notes that any "derogatory comments" leveled at the Debtors' proposal were well-deserved.  *Compare,* Section III.C of Debtors' Disclosure Statement at p. 14 ("The Company's initial proposals were never met with counter-proposals or meaningful discussion, other than derogatory comments.").  The Indenture Trustee subsequently moved for appointment of a receiver and the Debtors filed their chapter 11 petitions for relief soon thereafter.

In the course of discovery during the Cases, the Indenture Trustee learned more about the manner in which the Debtors and their Insiders had managed their Business.  The Indenture Trustee, believing that the Debtors had mismanaged their Business, had engaged in self-dealing, and had lavishly compensated themselves both before and after the Petition Date, filed a motion on January 19, 2011 seeking the appointment of a chapter 11 trustee or examiner.  A copy of this motion is attached as **Exhibit 6** to the Trustee Disclosure Statement.  Thus far, this motion has been held in abeyance.

Most frustrating for the Indenture Trustee and its constituents, however, is that despite the dramatic improvement in market conditions in the past 15 months.  Even with the Debtors' operating by their own admission at 100% utilization, the Debtors remain unwilling to honor the

commitments they undertook to the Holders of Series 2009 Debentures.  Instead, through their proposed reorganization plan, the Debtors' Insiders hope to effectively transfer the assets and Business of the Debtors to Octane Funding, an Insider.  As the Indenture Trustee sees it, instead of working with their Creditors during the temporary downturn of early 2010 to restructure and refinance the Debtors' secured obligations owing under the Debentures, the Debtors' Insiders decided to adopt a posture—foretold in their April 2010 presentation—that the alternative to not acceding to the patently unacceptable proposed "haircut" would be a "[b]ankruptcy that will be costly and contested and will likely last 12 – 15 months minimum causing delays in payment during the case."  *See* **Exhibit 6** at p.4.

Simply put, the hallmark of the Debtors' chapter 11 Cases has not been to maximize the recovery to Creditors in light of their restoring rig utilization to peak historic levels.  Indeed, their offering memorandum in connection with the issuance of the Series 2009 Debentures projected such utilization.  Rather, the hallmark of these Cases has been the Debtors' Insiders' continued self-dealing and their attempting to leverage the reorganization process for their own benefit in hopes that, through the guise of the Debtors' Plan, they can claim for themselves the substantial value inherent in the Debtors' assets that legitimately belongs first to their Creditors.

The fundamental purpose of the Trustee Plan, then, is to realize for the benefit of Creditors the value of the Debtors' assets and Business through the sale of substantially all the Debtors' assets in a 363 Sale through an Auction that is conducted in accordance with the approved Bid Procedures set forth in the Sales Procedures Order attached hereto as **Exhibit 3**. The Trustee Plan kick-starts this process through submission of the Solsten Drilling's Stalking Horse Bid, which itself provides vastly superior recoveries to Creditors in the Debtors' Plan (other than Insider Creditors and the Debtors' gerrymandered Classes).

The Indenture Trustee, therefore, urges all Creditors entitled to vote on the Competing Plans to vote to accept the Trustee Plan and to reject the Debtors' Plan, which seeks to appropriate the values of these assets for the benefit of Insiders.

## VI.   SUMMARY OF THE TRUSTEE PLAN

The following summary and the other descriptions of the Trustee Plan in the Trustee Disclosure Statement are qualified in their entirety by reference to the provisions of the Trustee Plan and its exhibits, a copy of which is attached hereto as **Exhibit 1**.  Each Holder of a Claim or Equity Interest is urged to carefully review the terms of the Trustee Plan.  In the event of any inconsistency between the provisions of the Trustee Plan and the summary contained in the Trustee Disclosure Statement, the terms of the Trustee Plan shall control.

The lynchpin of the Trustee Plan is the proposed sale of the Debtors' assets and business to the highest and best Qualified Bid pursuant to the approved Bidding Procedures.  The Indenture Trustee has negotiated and entered into an Asset Purchase Agreement with wholly-owned subsidiaries of SolstenXP, an experienced and successful full service upstream oil and gas services company, but this is bid is subject to higher and better offers as detailed in the proposed Bidding Procedures and Sales Procedures Order attached hereto as **Exhibit 3**.  The Trustee Plan also (i) divides Claims and Equity Interests into separate Classes, (ii) specifies the recoveries to each Class under the Trustee Plan, and (iii) contains other provisions relating to the sale and

confirmation the Trustee Plan. "Claims" and "Equity Interests" are classified in the Trustee Plan, rather "Creditors" and "shareholders," because such entities may hold Claims or Equity Interests in more than one Class.

A chapter 11 plan of reorganization may specify that certain Classes of Claims or Equity Interests are either to be paid in full when the Plan becomes effective or are to remain unchanged by the treatment prescribed in the Trustee Plan. Such Classes are referred to as "Unimpaired," and because of such favorable treatment, the Holders in such Classes are deemed to accept the plan or reorganization and are not entitled to vote. Accordingly, it is not necessary to solicit votes from the Holders of Claims or Equity Interests in such Classes. A chapter 11 plan may also specify that certain Classes will not receive any distribution of property or retain any Claim against the Debtors or their successors. Such Classes are deemed not to accept the plan of reorganization and, therefore, need not be solicited to vote to accept or reject the plan.

## A.    The Debtors' Assets

According to the Debtors, as of May 31, 2011, the Debtors' assets primarily consisted of (i) five (5) drilling rigs and related drilling equipment (the "**Rigs**"); (ii) Cash and current accounts receivable; (iii) current drilling contracts; and (iv) rolling stock and equipment. The Debtors hold various Causes of Action, identified on their Schedules, and other Causes of Action that they believe hold value, including the following: a receivable from Zenergy (in litigation pending in U.S. District Court for Southern District of Mississippi); and the Arbitration Receivable due from Odyssey Petroleum Corp. (US), recoveries of which are expected to be in excess of $1 million.

The Trustee Plan calls for the Rigs, drilling contracts, rolling stock, equipment, accounts receivable, and other assets associated with the Debtors' Business to be transferred to the successful Purchaser at the Auction. The Trustee Plan further provides that assets not sold to the Purchaser will become the property of the Post-Confirmation Liquidating Trust that will be established for the benefit of all Holders of Allowed Claims entitled to receive distributions under the Plan from the Liquidating Trustee. The primary assets of the Liquidating Trust will be the Causes of Action, Cash remaining in the Debtors' Operating Account Balances on the Effective Date after payment of Administrative Claims, Professional Fees, Cure Costs, Priority Unsecured Non-Tax Claims, and other Allowed Claims payable in full in Cash on the Effective Date, and the Arbitration Receivable.

The obvious bulk of the Debtors' assets values are concentrated in the Debtors' Rigs. The Debtors have advised that they engaged Hadco to provide valuation advices and opinions on the values of the Rigs and drilling equipment. The Indenture Trustee has been precluded from conducting an inspection of the Rigs for several months and so hopes the Debtors are correct in stating that all of the Rigs and drilling equipment appraised are currently in "good" condition. The Debtors have reported that Hadco has appraised the Debtors Rig and equipment as follows:

| Fair Market Value | Orderly Liquidation Value | Forced Liquidation Value |
| --- | --- | --- |
| $28,329,000 | $21,192,000 | $16,520,000 |

According to the Debtors, Hadco defines (A) "Fair Market Value" as the price, in cash or equivalent, that a buyer could reasonably be expected to pay and a seller could reasonably be expected to accept, if the property were exposed for sale on the open market for a reasonable period of time (at least one year), both buyer and seller being in possession of the pertinent facts and neither being under any compulsion to buy or sell, (B) "Orderly Liquidation Value" as the estimated proceeds that would result from sale of an asset, or group of assets, if sold individually and not as part of the enterprise of which they were originally a part, through an orderly sale process involving the owner preparing the asset and promoting and advertising the sale over a reasonable period of time (six months to one year) with the owner not being under the pressure of a deadline to sell, and (C) "Forced Liquidation Value" as the estimated proceeds that would result from sale of an asset, or group of assets, if sold individually and not as part of the enterprise of which they were originally a part, typically at auction sales, sold "as is, where is" and without warranties of any kind, under compulsion to sell/time pressures (less than six months), and net of sale commissions, advertising, mobilization/assembly and preparation costs.

The starkest contrast between the Debtors' Plan and the Trustee Plan lies in the different assumptions regarding the value of the Rigs and drilling equipment and the value that should be distributed to Creditors. The Debtors contend that the law only requires that Creditors receive the assets' "replacement value" of these assets as of the effective date of a reorganization plan. "Replacement value," they believe, represents the "hypothetical cost or amount that a debtor would incur to replace the asset." *Compare* Debtors' Disclosure Statement at p. 25. According to the Debtors, the "replacement value" they are required to provide Creditors through the Debtors' Plan ranges somewhere "between the Orderly Liquidation Value of $21,192,000 and the Forced Liquidation Value of $16,520,000."

The Indenture Trustee strongly disagrees with the Debtors' narrow interpretation of their fiduciary duties to Creditors and of the law itself and believes that Creditors entitled to vote on the Competing Plans will be far better served by supporting the Trustee Plan, which calls for the Rigs and other assets associated with the Debtors' Business to be sold at Auction to the highest and best offer submitted by a Qualified Bidder in accordance with the Sales Procedures Order attached hereto as **Exhibit 3**. Thus far, with no apparent marketing of the Debtors' assets by the Debtors' and only limited marketing by the Indenture Trustee and its financial advisor, a Stalking Horse Bid has been secured by the Indenture Trustee at no less than approximately $31 million, which is somewhere between 50% and 100% higher than the "replacement value" being offered Creditors under the Debtors' Plan.

**SET FORTH BELOW IS A COMPREHENSIVE SUMMARY OF THE TRUSTEE PLAN. AS NOTED ABOVE, THIS SUMMARY OF THE TRUSTEE PLAN IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE TRUSTEE PLAN ITSELF BY EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE TRUSTEE PLAN. RATHER, THIS SUMMARY IS INTENDED ONLY TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTIONS OF THE TRUSTEE PLAN IN THE TRUSTEE DISCLOSURE STATEMENT ARE SUMMARIES ONLY AND YOU ARE CAUTIONED TO REVIEW THE TRUSTEE PLAN, THE PLAN SUPPLEMENT, AND ANY RELATED EXHIBITS, SCHEDULES, OR ATTACHMENTS FOR A FULL UNDERSTANDING OF THE TRUSTEE PLAN'S PROVISIONS. THE TRUSTEE DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE TRUSTEE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE TERMS**

AND PROVISIONS OF THE TRUSTEE PLAN AND THE TRUSTEE DISCLOSURE STATEMENT, THEN
THE TERMS AND PROVISIONS OF THE TRUSTEE PLAN SHALL CONTROL.

### B.    Classification of Claims and Equity Interests

The following table designates the classes of Claims against and Equity Interests in the
Debtors and specifies which of those classes are Impaired or Unimpaired by the Plan and entitled
to vote to accept or reject the Plan in accordance with Section 1126 of the Bankruptcy Code or
deemed to reject the Plan.

SUMMARY OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

| Class | Nature of Claims Within Class | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Priority Unsecured Non-Tax Claims (both Debtors) | Unimpaired | No (deemed to accept) |
| 2 | Secured Claims (Consisting of Five Subclasses: 2A, 2B, 2C, 2D, 2E) | Impaired | Yes |
| 3 | General Unsecured Claims (both Debtors) | Impaired | Yes |
| 4 | Intercompany Unsecured Claims (both Debtors) | Impaired | No (deemed to reject) |
| 5 | Subordinated Claims (both Debtors) | Impaired | No (deemed to reject) |
| 6 | Equity Interests (both Debtors) | Impaired | No (deemed to reject) |

### C.    Treatment of Unclassified Claims

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims
(including Professional Fees) and Priority Unsecured Tax Claims are not classified under the
Plan.  The treatment of these unclassified Claims is set forth in this Article III

#### 1.    *Administrative Claims*

Each Holder of an Allowed Administrative Expense Claim shall receive
Cash in an amount equal to such Allowed Administrative Expense Claim on the
later of the Effective Date and the date such Administrative Expense Claim
becomes an Allowed Administrative Expense Claim, or as soon thereafter as is
practicable.   Allowed Administrative Expense Claims representing liabilities
incurred in the ordinary course of business by the Debtor in Possession shall be
paid in full on the Effective Date, first from the Operating Accounts Balances and
second, up to $500,000, from the Solsten Drilling Contribution.    Allowed
Administrative Expense Claims representing the Break-Up Fee to Solsten Drilling
on account of its Stalking Horse Bid in the event of any Alternative Transaction
(as defined in the Bidding Procedures), shall be paid in full on the Effective Date
from the Operating Accounts Balances.

43

All allowed Administrative Claims that are incurred by the Debtors in the ordinary course of business shall be paid on the later of (i) the Effective Date, (ii) when due or (iii) the date on which there exists a Final Order requiring payment. As of May 31, 2011, the Debtors claim to have accrued and unpaid post-petition liabilities totaling $1,867,371, which includes unpaid Professional Fees.

**2.     *United States Trustee Fees***

The Liquidating Trustee will pay on the Effective Date all fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) that become due prior to the Effective Date. Furthermore, the Liquidating Trustee shall timely pay to the United States Trustee, any and all Post-Confirmation quarterly fees as required by 28 U.S.C. § 1930(a)(6) until such time as this case is converted, dismissed or closed by the Bankruptcy Court. Additionally, the Liquidating Trustee shall submit to the United States Trustee post confirmation quarterly operating reports in the format prescribed by the United States Trustee until such time as this case is converted, dismissed or closed by the Court. At this time, the Debtors are current on these fees owed to the United States Trustee.

**3.     *Professional Fees***

The Debtors have Administrative Claims for accrued but unpaid Professional fees and expenses, which Claim amounts will increase for all fees and expenses incurred through the Effective Date. Professionals in the case have been paid interim compensation and reimbursement of expenses pursuant to the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals [*Dkt #129*] throughout the Cases, therefore any Administrative Claims from the Debtors' Professionals will be comprised largely of fees and expenses that are incurred close to Confirmation.

The Trustee Plan provides that Professionals for the Debtors and the Indenture Trustee who seek an award by the Bankruptcy Court of compensation for services rendered and reimbursement of expenses incurred through and including the Confirmation Date under Sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file within forty-five (45) days from the date the Confirmation Order is entered their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred; and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the Final Order relating to or Allowing any such Administrative Expense Claim as of the Effective Date. Payments on account of Professional Fees shall be paid first from the Operating Accounts Balances and second, up to $500,000, from the Solsten Drilling Contribution. The aggregate amount of fees and expenses sought herein by Professionals for the Indenture Trustee shall be net of all funds in the Post-Petition Escrow Account as of the Effective Date.

44

### 4.      *Allowed Unsecured and Priority Unsecured Tax Claims*

Holder of an Allowed Secured Tax Claim or an Allowed Priority Unsecured Tax Claim shall receive from the Liquidating Trustee deferred cash payments over a period that extends no longer than five (5) years after the Petition Date (the "**Tax Payment End Date**"), in an aggregate amount equal to the amount of such Allowed Claim, plus interest following the Effective Date on the unpaid portion thereof at a rate of four percent (4%) per annum.  The payment of each such Allowed Secured Tax Claim or Allowed Priority Unsecured Tax Claim shall be made in equal quarterly installments through the Tax Payment End Date, with the first installment due on the latest of (i) the first Business Day following the end of the first full fiscal quarter following the Effective Date, (ii) the first Business Day following the end of the first full fiscal quarter following the date on which an Order Allowing such Tax Claim becomes a Final Order, and (iii) such other time or times as may be agreed with the Holder of such Allowed Claim.  Each installment shall include simple interest on the unpaid balance of the Allowed Secured Tax Claim or Allowed Priority Unsecured Tax Claim, without penalty of any kind.  In exchange for the treatment provided herein, all Liens securing an Allowed Secured Tax Claim shall be deemed discharged and released as of the Effective Date.

According to the Debtors' Schedules, various Tax Claims exist.  The Debtors also assert that the "Claims Docket" that the Clerk of the Bankruptcy Court maintains for these Cases shows filed Tax Claims in the amount of $24,615 that as of May 31, 2011, remains unpaid.  Additionally, the Debtors state that they were notified by the Mississippi State Tax Commission in May, 2011 of its intent to perform a sales tax audit.  The Debtors state that the audit was performed and concluded in early June, 2011, after which the Debtors were advised that PDC would be assessed unpaid sales taxes from years 2008 through the Petition Date of $211,344, plus $46,056 in penalties and interest, giving rise to an aggregate tax liability of at least of $257,400.  The Debtors have not disputed this amount, nor have they indicated whether they are current during the Postpetition period.

### 5.      *Allowed Priority Unsecured Non-Tax Claims*

Other than Tax Claims, the Debtors are unaware of any Priority Claims.  In the event such Claims are determined to exist, each Holder of an Allowed Priority Unsecured Non-Tax Claim will receive Cash from the Liquidating Trustee in an amount equal to such Allowed Priority Unsecured Non-Tax Claim on the later of the Effective Date and the date such Allowed Priority Unsecured Non-Tax Claim becomes an Allowed Priority Unsecured Non-Tax Claim, or as soon thereafter as is practicable.

### D.    **Treatment of Classified Claims and Equity Interests**

### 1.      *Class 2A – Allowed Claims of Holders of Senior Series 2009A Debentures*

Class 2A is comprised of the Allowed Claims of the Holders of Senior Series 2009A Debentures against both Debtors.  Claims in Class 2A are Impaired under the Plan.

The treatment of the Holders of Class 2A Claims depends upon the outcome of the Lien Adversary.  Subject to Section 6.4 of the Trustee Plan, if a Final Order is entered in that adversary proceeding in favor of the Holders of Class 2A Claims, then the Holders of Class 2A Claims will be treated as Holders of Allowed Secured Claims entitled to payment under Plan Alternative 2A-(A).  Conversely, subject to Section 6.4 of the Trustee Plan, if a Final Order is entered in that adversary proceeding against the Holders of Class 2A Claims, then the Holders of Allowed Class 2A Claims will be treated as Holders of Allowed Unsecured Claims entitled to payment under Plan Alternative 2A-(B).   The treatment of Holders of Allowed Class 2A Claims under Plan Alternative 2A-(A) and Plan Alternative 2A-(B) is as follows:

(a)     *Plan Alternative 2A-(A)*

- In accordance with the terms of the New Indenture, and as part of the purchase price, Solsten Drilling shall pay to the Indenture Trustee for benefit of the Holders of Allowed Class 2A Claims an amount equal to $25,955,000 (representing the principal amount arising under the Series 2009A Debenture).

- Holders of Allowed Class 2A Claims shall be given a lien on the Purchased Assets to secure the $25,955,000 in principal amount according to the same priorities and to the same extent as existed as of the Effective Date.

- Following the Effective Date, interest shall accrue on the unpaid balance of the New Indenture to Class 2A Claims at a rate of 5% per annum.

- The Purchaser shall pay down the amount due under the Series 2011A Debentures, plus interest accruing thereon after the Effective Date, by paying the Indenture Trustee, for distribution to Holders of the Series 2011A Debentures, after deduction of reasonable Indenture Trustee Claims not reimbursed by the Liquidating Trustee, their Pro Rata share of $818,292.00 (the "Class 2A Alternative A Guaranteed Payment") on or about the last Business Day of each of 40 successive calendar quarters, with the first such payment commencing on the last day of the first full calendar quarter following the Effective Date.  The payments hereunder represent payments according to a mortgage amortization schedule.

46

- Upon completion of the Class 2A Alternative A Guaranteed Payment, the liabilities of the Purchaser to the Holders of Allowed Class 2A Claims under the New Indenture and the Series 2011A Debentures shall be deemed extinguished and all liens and security interests arising thereunder shall be deemed released.

- Payment of the Class 2A Alternative A Guaranteed Payment shall be further guaranteed by Solsten Funding.

- Solsten Funding shall conduct a Dutch Auction to purchase Allowed Class 2A Claims no less than once in each calendar year using Excess Cash and, in the first Dutch Auction only, the Solsten Funding Contribution; provided however, that in no event will Solsten Funding be required to purchase such Allowed Class 2A Claims at an amount greater than 80% of their Face Amount. All purchased Allowed Class 2A Claims shall hold a lien against all Purchased Assets on a pro rata basis with all remaining Allowed Class 2A Claims.

- The amounts of the Allowed Claims of Holders of Senior Series 2009A Debentures in excess of the principal amount of their Claims shall be treated as Unsecured Claims under Class 3 of the Plan.

(b)      _Plan Alternative 2A-(B)_

The entire Allowed Class 2A Claim, including accrued and unpaid interest thereon through the Petition Date plus attorneys' fees and other permitted charges, shall be treated as an Allowed Class 3 Claim and Holders of such Allowed Class 2A Claims shall receive their Pro Rata share of the distributions provided in the Plan to Holders of Allowed Class 3 Claims under Plan Alternative 3(B). In this event, Class 2A Claim holders shall have no lien rights.

(c)      _Disposition of Post-Petition Escrow Account_

All funds in the Post-Petition Escrow Account shall be released on the Effective Date to the Indenture Trustee and shall be applied and distributed by the Indenture Trustee in the following manner:   first, to pay all outstanding unpaid invoices for postpetition services rendered and expenses incurred by its attorneys, consultants, and professionals in connection with the

47

Cases and the Lien Adversary; second, to reimburse itself for all invoices paid at any time prior to the Effective Date for services rendered and expenses incurred by its attorneys, consultants, and professionals in connection with the Cases, the Lien Adversary, or the Debtors; third, to reimburse itself for all costs incurred by it in connection with the Cases, the Lien Adversary, or the Debtors; fourth, to be held by it and distributed in such manner as it deems appropriate under the Indenture.

2.    ***Class 2B – Allowed Claims of Holders of Series 2009B Debentures***

Class 2B is comprised of the Allowed Claims of the Holders of Series 2009B Debentures against both Debtors. Claims in Class 2B are Impaired under the Plan. The treatment of the Holders of Class 2B Claims does not depend upon the outcome of the Lien Adversary. The treatment of Holders of Allowed Class 2B Claims is as follows:

- The Purchaser shall issue to Holders of Allowed Class 2B Claims under the Series 2009B Debentures one (1) 3% Preferred Interest for each one dollar ($1.00) of principal amount of Allowed Class 2B Claims, all subject to the 3% Preferred Buyback Rights.

- The rights of Holders of Allowed Class 2B Claims under the Trust Indenture shall be entirely extinguished.

- Accrued interest and other permitted charges under the Indenture payable to Holders of Allowed Class 2B Claims shall be treated as Allowed Class 3 Claims and shall share Pro Rata in distributions provided in the Plan to Holders of Allowed Class 3 Claims under Plan Alternative 3(A) or Plan Alternative 3(B), as the case may be.

3.    ***Class 2C – Allowed Secured Claims and Certain Allowed Unsecured Claims of Washington State Bank***

Class 2C is comprised of the Allowed Secured Claims of WSB against O&G and the Allowed Unsecured Claim of WSB against PDC represented by PDC's guarantee of Washington Sate Bank's Allowed Secured Claim against O&G. Claims in Class 2C are Impaired under the Plan. The treatment of the Holders of Class 2C Claims shall be as follows:

- In accordance with the terms of the New WSB Note, Solsten Drilling shall pay Holders of Allowed Class 2C Claims an amount equal to $4,504,177 (representing the

principal amount owing to WSB as of the Petition Date), which is a portion of the Purchase Price.

▪ Following the Effective Date, interest shall accrue on the Allowed Class 2C Claim at a rate of 5% per annum.

▪ The Purchaser shall pay down the amount due under the New WSB Note, plus interest accruing thereon, by paying Holders of Allowed Class 2C Claims their Pro Rata share of $190,156 (the "Class 2C Guaranteed Payment") on or about the last Business Day of each of 28 successive calendar quarters, with the first such payment commencing on the last day of the first full calendar quarter following the Effective Date. The payments hereunder represent payments according to a mortgage amortization schedule.

▪ The Allowed Class 2C Claims shall be given a lien on the Purchased Assets according to the same priorities as existed as of the Effective Date to secure the New WSB Note in the principal amount of $4,504,177.

▪ Solsten Funding shall conduct a Dutch Auction to purchase Allowed Class 2C Claims no less than once in each calendar year using Excess Cash and, in the first Dutch Auction only, the Solsten Funding Contribution; provided however, that in no event will Solsten Funding be required to purchase such Allowed Class 2C Claims at an amount greater than 80% of their Face Amount. All purchased Allowed Class 2C Claims shall hold a lien against all Purchased Assets on a pro rata basis with all remaining Allowed Class 2C Claims.

▪ Upon completion of the Class 2C Guaranteed Payment, the liabilities of the Purchaser to the Holders of Allowed Class 2C Claims under the New WSB Note shall be deemed extinguished and all liens and security interests arising thereunder shall be deemed released.

▪ Payment of the Allowed Class 2C Claims under the New WSB Note shall be further guaranteed by Solsten Funding.

▪ Accrued interest and other permitted charges under the Indenture payable to Holders of Allowed Class 2C Claims shall be treated as Allowed Class 3 Claims and shall share Pro Rata in distributions provided in the Plan to Holders of Allowed Class 3 Claims under Plan

Alternative 3(A) or Plan Alternative 3(B), as the case
may be.

**4.      *Class 2D – Allowed Claims of Octane Funding***

Class 2D is comprised of the Allowed Claims of Octane Funding against
O&G.  Claims in Class 2D are Impaired under the Plan.  The treatment of the
Holders of Allowed Class 2D Claims depends upon the outcome of the Lien
Adversary and the Octane Adversary, as provided hereinafter:

(a)      <u>Plan Alternative 2D-(A)</u>

Subject to Section 6.4 of the Trustee Plan, if a Final Order
is entered in favor of the Holders of Class 2A and Class 2B Claims
in the Lien Adversary, or if a Final Order is entered against the
Holders of Allowed Class 2D Claims in the Octane Adversary,
then the Allowed Class 2D Claim shall be treated either as an
Allowed Class 3 Claim or an Allowed Class 5 Claim and Holders
of such Allowed Class 2D Claims shall receive their Pro Rata
share of the distributions provided in the Plan to Holders of
Allowed Class 3 Claims under Plan Alternative 3(A) or no
distributions as provided in the Plan to Holders of Allowed Class 5
Subordinated Claims

(b)      <u>Plan Alternative 2D-(B)</u>

Subject to Section 6.4 of the Trustee Plan, if a Final Order
is entered against the Holders of Class 2A and Class 2B Claims in
the Lien Adversary and a Final Order is entered in favor of the
Holders of Allowed Class 2D Claims in the Octane Adversary that
the Holders of Allowed Class 2D Claims hold Secured Claims that
are not Subordinated Claims, then the Allowed Class 2D Claim
shall be treated as follows:

▪ The Purchaser shall pay the entire amount of the
Allowed Class 2D Claim, plus interest accruing
thereon, by paying Holders of Allowed Class 2D
Claims their Pro Rata share of such amount as
represents $1/40^{th}$ of the amount of their Allowed
Class 2D plus accrued interest thereon (the "Class
2D Contingent Guaranteed Payment") on or about
the last Business Day of each of 40 successive full
calendar quarters following the date such Class 2D
Claims are Allowed.

- Following the Effective Date, interest shall accrue on the Allowed Class 2D Claim at the non-default contract rate.

- The Liens securing the Allowed Class 2D Claims shall remain in full force and effect following the Effective Date according to the same priorities as existed as of the Effective Date and according to the same terms and provisions of the existing loan documentation in respect of the enforcement of such Liens.

**5.      Class 2E –Other Secured Claims**

Class 2E is comprised of Allowed Secured Claims against the Debtors that are not included in any of Classes 2A through 2D of the Plan (excluding Allowed Secured Tax Claims).   Each Allowed Secured Claim in Class 2E will be considered to be in its own separate subclass within Class 2E, and each such subclass shall be deemed to be a separate Class for purposes of the Plan.  Claims in Class 2E are Impaired under the Plan.

In satisfaction of any Allowed Secured Claim of any Holder of a Class 2E Claim, such Holder shall receive on the Effective Date either: (i) the return of its Collateral in full satisfaction of its claim or (ii) such other treatment as may be agreed to in writing by such Holder and the Purchaser.

**6.      Class 3 – General Unsecured Claims**

Class 3 is comprised of the Allowed General Unsecured Claims of both Debtors that are not: (a) cured, paid, released, or waived pursuant to the Plan; (b) transferred to the Purchaser pursuant to the Asset Purchase Agreement; or (c) classified in any other Class of Claims.   Class 3 Claims include, without limitation, (i) Claims for goods sold and services rendered, (ii) Claims for monies lent, (iii) Claims based upon guarantees of performance or payment of the obligations or duties of any Person, (iv) Claims for contribution, reimbursement, or indemnity (excluding Claims for Indemnification Rights), (v) Claims for fines, penalties, or assessments, (vi) Claims for tort liability, (vii) Claims arising from the rejection of Executory Contracts and Unexpired Leases, (viii) Claims arising for environmental or bio-hazardous remediation, and (ix) the Allowed Claims of Holders of Class 2A, Class 2B, and Class 2C Claims in excess of the principal amount of their Claims (*e.g.,* accrued and unpaid interest and other permitted charges under 11 U.S.C. § 506(b).  Claims in Class 3 are Impaired under the Plan.

The treatment of the Holders of Class 3 Claims depends upon the outcome of the Lien Adversary and the Octane Adversary.  Subject to Section 6.4 of the Trustee Plan, if a Final Order is entered in favor of the Holders of Class 2A and Class 2B Claims in the Lien Adversary, then the Holders of Allowed Class 3

Claims will be treated in accordance with the provisions of Plan Alternative 3(A). Conversely, subject to Section 6.4 of the Trustee Plan, if a Final Order is entered against the Holders of Class 2A and Class 2B Claims in the Lien Adversary, then the Holders of Allowed Class 3 Claims will be treated in accordance with the provisions of Plan Alternative 3(B). The specified treatment of Holders of Allowed Class 3 Claims under Plan Alternative 3(A) and Plan Alternative 3(B) is as follows:

     (a)     *Plan Alternative 3(A)*

Subject to Section 6.4 of the Trustee Plan, if a Final Order is entered in favor of the Holders of Class 2A and Class 2B Claims in the Lien Adversary, Holders of Class 3 Claims represented by the accrued and unpaid interest on account of the Senior Series 2009A Debentures and the Series 2009B Debentures shall share Pro Rata in all Cash and other assets held by the Liquidating Trustee (after payment of Allowed Administrative Claims, Professional Fees, Cure Costs, and other Allowed Claims payable in full in Cash on the Effective Date) that represent Cash Collateral as of the Effective Date, including without limitation, Cash Collateral represented by (i) the Operating Accounts Balances; (ii) the Arbitration Receivable; (iii) the Liquidating Trust Contribution; and (iv) Causes of Action (including proceeds of Avoidance Actions). The remaining Cash and other assets held by the Liquidating Trustee that do not represent Cash Collateral as of the Effective Date shall be distributed Pro Rata among all Holders of Allowed Class 3 Claims.

     (b)     *Plan Alternative 3(B)*

- Holders of Class 3 Claims shall share Pro Rata in the following assets: (i) the Operating Accounts Balances; (ii) the Arbitration Receivable; (iii) the Liquidating Trust Contribution; (iv) Causes of Action (including Avoidance Actions); and (v) $818,292.00 paid by Solsten Drilling to the Liquidating Trustee on or about the last Business Day of each of 40 successive calendar quarters (less any amounts required to be paid separately to Holders of Allowed Class 2D Claims if (A) a Final Order is entered against the Holders of Class 2A and Class 2B Claims in the Lien Adversary and (B) a Final Order is entered in favor of the Holders of Allowed Class 2D Claims in the Octane Adversary) (the "Class 3 Alternative B Guaranteed Payment"), with the first such payment commencing on the last day of the first full calendar quarter following the Effective Date.

- ▪ Payment of the Class 3 Alternative B Guaranteed Payment shall be further guaranteed by Solsten Funding.

- • To the extent that the Class 3 Alternative B Guaranteed Payments plus all other distributions to be made under Plan Alternative 3(B) exceed the Allowed Amount of such Class 3 Claims, then further distributions shall be made on account of such Allowed Class 3 Claims as represents the payment of accrued interest on each Holder's full Allowed Class 3 Claim at 5% per annum commencing on the Petition Date through the date of the last distribution made by the Liquidating Trustee on the Allowed amount of such Holder's Class 3 Claim.

7.    *Class 4 – Intercompany Claims*

        Class 4 is comprised of all Intercompany Claims against the Debtors. Claims in Class 4 are Impaired under the Plan.  Holders of Allowed Class 4 Intercompany Claims will not receive any Distributions under the Plan.

8.    *Class 5 – Subordinated Claims*

        Class 5 is comprised of all Subordinated Claims against the Debtors. Claims in Class 5 are Impaired under the Plan.  Holders of Allowed Class 5 Subordinated Claims will not receive any Distributions under the Plan.

9.    *Class 6 – Equity Interests*

        Class 6 is comprised of all Equity Interests in the Debtors, including Claims arising under Bankruptcy Code section 510(b) and Claims based upon Indemnification Rights.  Holders of Allowed Class 6 Equity Interests will not receive any Distributions under the Plan.

## VII.    SALES PROCEDURES GOVERNING THE AUCTION AND 363 SALE

        The Indenture Trustee has proposed certain Sales Procedures to govern the sale of substantially all of the Purchased Assets.  The Indenture Trustee will seek the entry of an order (the "**Sales Procedures Order**") authorizing and directing the marketing of the Purchased Assets through the sales and procedures generally described below (the "**Sales Procedures**").  A copy of the Sales Procedures and Bidding Procedures is attached hereto as **Exhibit 8**.

### A.     The Stalking Horse Bid

The Indenture Trustee has negotiated an Asset Purchase Agreement with Solsten Drilling, the Proposed Purchaser, which contemplates a set of related transactions (collectively, the "**Sale Transaction**") for the sale of the Purchased Assets (as defined in the Asset Purchase Agreement) to the Purchaser, subject to Bankruptcy Court approval, for certain cash contributions (the "**Cash Contribution**") and other valuable consideration described in the Asset Purchase Agreement.

The Sales Procedures propose a mechanism by which the value of the Purchased Assets can be tested in the marketplace.  The proposed Sales Procedures provide for an opportunity for other interested parties become Qualified Bidders and thereby submit competing bids for all or substantially all of the Purchased Assets and to qualify and participate in the Auction.  The Sales Procedures set the proposed guidelines, deadlines, timelines and hearing dates, all of which will be established by the Bankruptcy Court.

### B.     The Break-Up Fee

In the event that at or prior to the Sale Hearing, another party presents a competing offer which constitutes a higher or better offer which is approved by the Bankruptcy Court as the successful bid, or in the event the Debtors' Plan is confirmed, or in the event that at the Auction a party presents a competing offer which constitutes a higher or better offer which is accepted by the Indenture Trustee (an "**Alternate Transaction**"), then upon sale of the Property to such party, Solsten Drilling shall be entitled to payment of a fee (the "**Break-Up Fee**") in an amount equal to Five Hundred Thousand Dollars ($500,000.00), which Break-Up Fee is intended to reimburse it for time, effort, and expenses incurred entering into and prosecuting this transaction, including but not limited to its due diligence, travel, out-of-pocket expenses, and professional fees and costs.  The Break-Up Fee and the return of Solsten Drilling's "**Earnest Money Deposit**" (as defined in the Asset Purchase Agreement) shall be Purchaser's sole remedy in the event of the consummation of an Alternative Transaction.  The Break-Up Fee shall be paid in Cash from the proceeds of and concurrent with the closing of the Alternative Transaction or as an Allowed Administrative Claim on the effective date of the Debtors' Plan in the event the Debtors' Plan is confirmed.

### C.     Important Dates for Potential Competing Bidders

The Sales Procedures provide for an opportunity for other interested parties to submit competing bids for all or substantially all of the Purchased Assets and to qualify and participate in the Auction.  The Indenture Trustee, in consultation with the Office of the United States Trustee, shall:

> a.     assist Potential Bidders (as defined in the Sales Procedures Order) in conducting their respective due diligence investigations and accept Bids (as defined in the Sales Procedures Order) until 5:00 p.m., Central Time, on _____ \_\_\_, 2011;[17]



---

[17]    The dates for all deadlines, auctions, and hearings will be set subsequently by Order of the Bankruptcy Court.

b.      negotiate with any Qualified Bidders (as defined in the Sales Procedures Order) in advance of the Sale Hearing to be conducted on _____ ___, 2011;[18]

c.      if there are Qualified Bidders for all or substantially all of the Purchased Assets in addition to the Purchaser, identify one bid (or group of bids) as the Lead Bid (as defined in the Sales Procedures Order) for presentation to the Bankruptcy Court and, if necessary, conduct an Auction among Qualified Bidders to be held on _____ ___, 2011 to identify the Successful Bid;[19] and

d.      seek authority to sell all or substantially all of the Purchased Assets to the Successful Bidder(s) (as defined below) at the Sale Hearing.

## D.      <u>Assets to Be Sold</u>

The Debtors seek to sell substantially all of the Debtors' tangible, intangible and operating assets, defined as the "**Purchased Assets**" in Section 2.1 of the Asset Purchase Agreement, including all of the assets of the Debtors described in their Schedules of Assets and Liabilities (as amended) [*Dkt. # 87, 251, 255*] and the Debtors' Disclosure Statement and other assets used in or necessary to the Debtors' drilling operations or related thereto (collectively, as defined in the Asset Purchase Agreement, the "**Purchased Assets**").

## E.      <u>The Bidding Process</u>

The Indenture Trustee shall: (a) coordinate the efforts of Potential Bidders (as defined in the Sales Procedures Order) in conducting their respective due diligence investigations regarding the Purchased Assets; (b) with the assistance of its financial advisor, S. Blake Murchison of R.M. Duncan Consulting (the "**Indenture Trustee's Financial Advisor**"),[20] determine whether any person or entity is a Qualified Bidder (as defined in the Sales Procedures Order); (c) receive and evaluate bids from Qualified Bidders; and (d) negotiate any Qualified Bids.  The foregoing activities are referred to, collectively, as the "**Bidding Process**."  Any person or entity who wishes to participate in the Bidding Process must meet the participation requirements for Potential Bidders below and must thereafter submit a Qualified Bid to become a Qualified Bidder.  Except as provided by applicable law or court order, neither the Indenture Trustee nor their representatives shall be obligated to furnish any information of any kind whatsoever

---

[18]   The Indenture Trustee will request that the Sale Hearing be conducted simultaneously and in conjunction with the Confirmation Hearing on the Chapter 11 Plans filed by the Debtors and the Indenture Trustee.

[19]   The Indenture Trustee will request that the Auction will be set on the business day immediately preceding the date of the Sale Hearing.

[20]   The Indenture Trustee reserves the right to retain an additional financial advisor or investment banker to assist in the marketing and sale of the Purchased Assets.  If and when any such financial advisor or investment banker is retained, it is to be included within the defined term "Indenture Trustee's Financial Advisor."

relating to the Purchased Assets to any person or entity who does not comply with the participation requirements below.

## F.    Participation Requirements

Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the Bidding Process, each interested person or entity (a "**Potential Bidder**") must deliver the following documents (the "**Participation Materials**") to the Indenture Trustee's Financial Advisor:

> a.    an executed confidentiality agreement in form and substance satisfactory to the Indenture Trustee; and

> b.    A statement demonstrating, to the satisfaction of the Indenture Trustee, a *bona fide* interest in purchasing the Purchased Assets, or a substantial portion thereof, from the Debtors' bankruptcy estates.

The Participation Materials must be transmitted by the Potential Bidder so as to be received by the Indenture Trustee's Financial Advisor no later than 5:00 p.m., Central Time, on _____ __, 2011.[21]

If the Indenture Trustee determines, in consultation with the Indenture Trustee's Financial Advisor, that a potential bidder has a bona fide interest in the Purchased Assets or a substantial portion thereof, then no later than two business days after the Indenture Trustee makes that determination and has received from a Potential Bidder all of the Participation Materials, the Debtors and/or the Indenture Trustee will deliver to the Potential Bidder: (a) a confidential memorandum containing information and financial data with respect to the Purchased Assets (the "**Confidential Memorandum**"); (b) an electronic copy of the Asset Purchase Agreement; and (c) access to confidential data concerning the Purchased Assets (the "**Data**").

## G.    Due Diligence

Until the Bid Deadline (as defined in the Sales Procedures Order), the Debtors will afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder and that are reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to Indenture Trustee's Financial Advisor, who, with the assistance of the Debtors' Financial Advisor, shall coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. If the Indenture Trustee's Financial Advisor determines that due diligence material requested by a Potential Bidder is reasonable and appropriate under the circumstances, but such material has not previously been provided to any other Potential Bidder, the Debtors' Financial Advisor shall make such materials available to the Potential Bidder and provide email notice of the availability of such materials to all Potential Bidders, as well as to the Indenture Trustee and the Debtors.

---

[21]    This date will be set by the Bankruptcy Court but the Indenture Trustee will request that this deadline be on or about October 31, 2011.

H.      **Bid Deadline and Bid Requirements**

A Potential Bidder that desires to make a bid shall deliver written and electronic copies of its bid to the Notice Parties so as to be received not later than 5:00 p.m., Central Time, on _____ ___, 2011 (the "**Bid Deadline**").[22]

To participate in the Auction, if any, a Qualified Bidder must deliver to the Indenture Trustee's Financial Advisor and to the Debtors' Financial Advisor a written offer, which must provide, at a minimum, the items noted below to be deemed a "**Qualified Bid**":

a.      The Potential Bidder offers to purchase the Purchased Assets, or a substantial portion thereof, from the Debtors' Estates at the purchase price and upon the terms and conditions set forth in an executed agreement in substantially the form of the Asset Purchase Agreement, which shall be executed by the Potential Bidder and submitted together with a black-lined copy showing any proposed changes, amendments and modifications to the Asset Purchase Agreement (the "**Marked Agreement**");

b.      The bid is not subject to any due diligence or financing contingency and is irrevocable until five business days following the closing of the Sale Transaction with the Successful Bidder (as defined in the Sales Procedures Order);

c.      The purchase price in such bid is a higher and better offer for the Purchased Assets, and such offer shall not be considered a higher or better offer unless such bid provides for net consideration to the Debtors' estates of at least $250,000 in cash in excess of the amount of the Cash Contribution as provided in the Purchased Agreement, and on the same or more favorable terms as provided in the Asset Purchase Agreement, plus the amount of the Break-Up Fee approved by the Bankruptcy Court (the "**Minimum Overbid Purchase Price**");

d.      The bid is received by the Bid Deadline;

e.      The bid does not entitle a bidder to any break-up fee, termination fee or similar type of payment or reimbursement; and

f.      The bid is accompanied by a list of any executory contracts or unexpired leases that are to be assumed and/or assigned under such bid and provide adequate assurance of future performance under any such executory contracts or unexpired leases to be assumed and/or assigned pursuant to such bid.

A Potential Bidder shall accompany its bid with: (a) written evidence of available cash, a commitment for financing or ability to obtain a satisfactory commitment if selected as the Successful Bidder or the Backup Bidder (as defined in the Sales Procedures Order) and such other evidence of ability to consummate the Sale Transaction as the Debtors may reasonably

---

[22]    This date will be set by the Bankruptcy Court, but the Indenture Trustee will request that the Bid Deadline be seven days before the date of the Sale Hearing.

request; (b) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed; and (c) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtors in their analysis of issues arising with respect to any applicable antitrust laws or other aspects of the bid.

No later than the Bid Deadline, a Potential Bidder must transfer to Jim F. Spencer, Esq., Watkins & Eager, Suite 300, The Emporium Building, 400 East Capitol Street, Jackson, Mississippi 39201, attorney for the Indenture Trustee (the "**Deposit Agent**") a cash deposit (the "**Good Faith Deposit**") equal to 10% of the purchase price set forth in the Marked Agreement, to be held in the trust account of the Deposit Agent. The Good Faith Deposit must be made by certified check or wire transfer and will be held by the Deposit Agent in accordance with the terms of the Escrow Agreement to be provided with the Asset Purchase Agreement.

A bid received from a Potential Bidder will be considered a "**Qualified Bid**" if (a) it meets the above requirements or (b) after consultation with the Indenture Trustee's Financial Advisor, it is determined by the Indenture Trustee to be a Qualified Bid. Each Potential Bidder that submits a Qualified Bid will be considered a "**Qualified Bidder**." For purposes hereof, the Purchaser is a Qualified Bidder and the Asset Purchase Agreement executed by the Purchaser is a Qualified Bid.

## I.   <u>Determination of Lead Bid</u>

After consultation with the Indenture Trustee's Financial Advisor, the Indenture Trustee will review and evaluate each Qualified Bid on the basis of financial and contractual terms, including any benefit to the Debtors' Estates from any proposal to assume liabilities of the Debtors, and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale Transaction. A Qualified Bid will be valued based upon factors such as: (a) the purported amount of the Qualified Bid, including any benefit to the Debtors' Estates from any assumption of liabilities of the Debtors; (b) the fair value to be provided to the Debtors under the Qualified Bid; (c) the extent to which the Qualified Bid is entirely for Cash Consideration and the timing of such payments; (d) the ability to close the proposed Sale Transaction without delay and within the timeframes contemplated by the Asset Purchase Agreement; (e) the ability to obtain all necessary regulatory approvals, if any, for the proposed transaction; and (f) any other factors the Indenture Trustee's Financial Advisor may deem relevant. The Indenture Trustee's Financial Advisor also may negotiate with Qualified Bidders to clarify or enhance their bids (the "Bid Negotiation Process"). Any such clarifications or enhancements shall be promptly provided by the Indenture Trustee's Financial Advisor to the Notice Parties and, in the sole discretion of the Indenture Trustee's Financial Advisor, to the other Qualified Bidders.

After completing any Bid Negotiation Process, the Indenture Trustee, in its reasonable business judgment and after consultation with the Indenture Trustee's Financial Advisor, shall designate the highest and best of the Qualified Bids received (including any improved bids obtained from Qualified Bidders as part of the Bid Negotiation Process) as the best offer, considering all of the factors mentioned above (collectively, the "**Bid Determination Procedures**"). That offer shall be designated as the "**Lead Bid**" and the Qualified Bidder

making such bid, the "**Lead Bidder**." The Indenture Trustee also will identify the second best offer in accordance with the Bid Determination Procedures, which shall be designated as the "**Secondary Bid**" and the Qualified Bidder making such bid, the "**Secondary Bidder**." The Indenture Trustee shall notify all Qualified Bidders and other Notice Parties, prior to the Sale Hearing, of the designation of the Lead Bid and Secondary Bid, and the amount and other material terms of such bids. The Indenture Trustee shall file a notice of the designation of the Lead Bid and the Secondary Bid with the Court, including a copy of such bids, no later than 12:00 p.m., Central Time, on _____ ___, 2011.[23]

If no additional Qualified Bids are received by the Bid Deadline, then (a) no Lead Bid or Secondary Bid will be designated, (b) the Purchaser's Qualified Bid shall be designated as the Successful Bid consistent with Section XII below, and (c) the Indenture Trustee shall file a notice of the foregoing within two business days after the Bid Deadline.

## J.    The Potential Auction

If any additional Qualified Bids are received on or before the Bid Deadline, the Indenture Trustee shall identify the Lead Bid and Lead Bidder, and the Secondary Bid and Secondary Bidder, at the outset of the Auction. The Indenture Trustee shall offer other Qualified Bidders to state on the record whether they wish to enhance their bids to top the Lead Bid (a "Topping Bid"). If any other Qualified Bidder, including the Secondary Bidder, expresses an interest in bidding against the Lead Bid by submitting a Topping Bid, the Indenture Trustee shall conduct an auction (the "Auction") in which only Qualified Bidders may participate. If no other Qualified Bids are received in the Bid Process or if no Qualified Bidders express an interest in providing a Topping Bid, no Auction will be conducted. In each case, the designation of the Successful Bid and the Backup Bid (if any) will be made consistent with Section XII below.

Additional rules for the conduct of the Auction shall be determined by the Indenture Trustee in its business judgment, in consultation with the Indenture Trustee's Financial Advisor, based on the number and nature of the Qualified Bidders participating in the Auction and the terms and conditions contained in their Qualified Bids. These additional auction rules will be Filed with the Bankruptcy Court in the Cases at least one business day before the outset of the Auction.

If the Asset Purchase Agreement with the Purchaser is the only Qualified Bid submitted by the Bid Deadline, the Indenture Trustee will not hold an Auction but instead shall request at the Sale Hearing that the Court approve the Asset Purchase Agreement with the Purchaser.

## K.    The Successful Bid

At the conclusion of any Auction, the highest and best bid, as determined by the Indenture Trustee consistent with the Sales Procedures, shall be designated as the "**Successful Bid**" and the second highest and best bid as the "**Backup Bid**." If additional Qualified Bids are

---

[23]    This date will be set by the Bankruptcy Court, but the Indenture Trustee will request that the designation of the Lead Bid and the Secondary Bid be filed at least two business days prior to the Auction.

received but no Auction is conducted, the Lead Bid shall be designated as the Successful Bid and the Secondary Bid shall be designated as the Backup Bid. If no Qualified Bids are received other than the Asset Purchase Agreement, the Asset Purchase Agreement shall be designated as the Successful Bid, and there shall be no Auction and no Backup Bid. The bidder making the Successful Bid is referred to as the "**Successful Bidder**" and the bidder making any Backup Bid is referred to as the "**Backup Bidder**."

## L.      The Sale Hearing

The Successful Bid will be presented to the Bankruptcy Court for approval at the Sale Hearing. If no other Qualified Bid is received by the Indenture Trustee so that the Purchaser's original Asset Purchase Agreement is the Successful Bid, then the Indenture Trustee anticipates that it will seek entry of an Order at the Sale Hearing authorizing and approving the Sale Transaction, including the sale of the Purchased Assets to the Purchaser pursuant to the terms and conditions set forth in the Asset Purchase Agreement. If some other Qualified Bid is the Successful Bid, then the Indenture Trustee anticipates that it would seek the entry of an order, modified as necessary to reflect the terms of the Successful Bid, authorizing and approving the sale of the applicable Purchased Assets to the Successful Bidder and directing the Debtors to execute such documents as are necessary to effectuate the sale of the Purchased Assets to the Successful Bidder. The Sale Hearing may be adjourned or rescheduled by the Court without notice, other than by an announcement of such adjournment at the Sale Hearing.

Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on all matters relating to the proposed sale, and parties shall be prepared to present their evidence in support of or in opposition to the proposed sale at the Sale Hearing. As noted earlier, the Indenture Trustee will request the Bankruptcy Court to conduct the Sale Hearing simultaneous and in conjunction with the Confirmation Hearings on the Chapter 11 Plans of the Debtors and the Indenture Trustee.

## M.      The Backup Bid

If, for any reason, the Successful Bidder fails to consummate the purchase of the Purchased Assets within fourteen days after the Sale Order becomes final, the Backup Bid automatically will be deemed to be the highest and best bid and be treated as the Successful Bid. In the event the Successful Bidder does not close by the deadline set forth in the Sale Order, its deposit shall be forfeited and the Backup Bidder will become the Successful Bidder, and the Debtors shall be authorized and directed to effect the sale, assignment and transfer of the applicable Purchased Assets to the Backup Bidder (now Successful Bidder) as soon as is commercially reasonable without further order of the Bankruptcy Court as if such Backup Bidder were the Successful Bidder in accordance with Section VII.K above ("The Successful Bid").

## N.      "As Is, Where Is"

The Sale Transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, the Indenture Trustee, their agents or representatives, except to the extent expressly set forth in the Asset Purchase Agreement or

the Marked Agreement corresponding to the Successful Bid, as the case may be.  Except as otherwise provided in the Successful Bid or such other bid which may ultimately be consummated in the sale of the Purchased Assets or a substantial portion thereof, all of the Debtors' right, title and interest in and to the Purchased Assets shall be sold free and clear pursuant to 11 U.S.C. § 363(f) of all liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), encumbrances, rights, title, interests, remedies, restrictions, interests, liabilities, and contractual commitments of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity, including all rights, interests, or claims based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the effectiveness of the transfer of the Purchased Assets to the Purchaser or to be excused from accepting performance by the Purchaser or performing for the benefit of the Purchaser under any assumed contract or lease and all rights at law or in equity (collectively, "**Interests**"), all as may more specifically be set forth and defined in the Sale Order approving the Sale Transaction, with such Interests to attach to the proceeds of the sale in the same order and priority and to the same extend and validity as they existed with respect to the Purchased Assets.

## O.      Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders shall be held in escrow by the Deposit Agent and shall not become property of the Debtors' Estates absent further order of the Bankruptcy Court.  If a Successful Bidder and/or a Backup Bidder are chosen, the Good Faith Deposit of the Successful Bidder and the Backup Bidder will be retained by the Deposit Agent, notwithstanding the Bankruptcy Court's approval of the Sale Transaction, until the earlier of (a) the Closing of the Sale Transaction or (b) the termination of the applicable Asset Purchase Agreement and withdrawal of the Purchased Assets for sale by the Indenture Trustee, but in no event shall the Good Faith Deposit be held by the Deposit Agent for greater than 30 days following the conclusion of the Sale Hearing.   At the closing of the Sale Transaction contemplated by the Successful Bid, any Backup Bidder's Good Faith Deposit shall be returned to the Backup Bidder so that it is received within one (1) business day, and the Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit in accordance with the Successful Bid or to substitute the consideration called for by the applicable Asset Purchase Agreement and receive the return of the Good Faith Deposit.  All Good Faith Deposits of all Qualified Bidders who are not the Successful Bidder or the Backup Bidder will be returned the next business day following the conclusion of the Sale Hearing.

## VIII.   MEANS OF IMPLEMENTATION OF THE TRUSTEE PLAN

## A.      The 363 Sale

In advance of the Confirmation Hearing and in accordance with the Bidding Procedures approved in the Disclosure Statement Order, the Bankruptcy Court shall have conducted a 363 Sale hearing to consider approval of a sale of the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement and the Bidding Procedures.  The 363 Sale will be authorized by the Bankruptcy Court in the Transfer Order.

**B.**     **Corporate Action**

The entry of the Confirmation Order shall constitute an Order of the Bankruptcy Court authorizing (without the need for any further action by the Bankruptcy Court or any managers or members of the Debtors) the Liquidating Trustee and the Indenture Trustee to take all actions on behalf of the Debtors necessary or appropriate to complete, enter into, implement, and/or consummate the contracts, instruments, or other agreements or documents created in connection with the Plan or to be executed and delivered pursuant to the Plan before, on, or after the Effective Date, including, without limitation, actions required to consummate the obligations of the Debtors under the Asset Purchase Agreement.

**C.**     **Preservation of Avoidance Actions and Causes of Action**

As of the Effective Date, any Avoidance Actions pursuant to Sections 544, 547, 548 or 549 of the Bankruptcy Code and any Causes of Action of the Debtors, including without limitation those identified in the Plan Supplement and incorporated herein by reference, will be preserved for prosecution by, and transferred to, the Liquidating Trust.

As set forth in the Trustee's Motion for Appointment of a Chapter 11 Trustee [*Dkt. #331*], the Debtor's Insiders and their Affiliates engaged in extensive transactions with the Debtors, the economic benefits of which will be examined by the Liquidating Trustee after the Effective Date.  To the extent these transactions constituted fraudulent transfers under state or federal law, preferential transfers, voidable transactions under applicable state law, or breaches of those Insiders' fiduciary duties to the Debtors (or aiding and abetting such breaches), these Causes of Action are preserved by the Trustee Plan.

**D.**     **Sources of Payments**

The various sources of payments by which the Plan and Plan Obligations will be funded are:  (i) the Operating Accounts Balances; (ii) the Arbitration Receivable; (iii) the Liquidating Trust Contribution; (iv) Causes of Action (including Avoidance Actions); (v) the Guaranteed Payments; (vi) the Solsten Funding Guaranty; (vii) the Solsten Post-Confirmation Loan Agreement; (viii) the Dutch Auction; (ix) the Excess Cash generated by Solsten Drilling; (x) the Solsten Funding Contribution; and (xi) the Solsten Drilling Contribution.  Funds received by the Liquidating Trust shall be deposited by the Liquidating Trustee into the Liquidating Trust Distribution Accounts.  The sources, collectively, support the feasibility of the Plan.

**E.**     **Substantive Consolidation of the Debtors**

The Plan shall serve as a motion by the Indenture Trustee seeking entry of an Order of the Bankruptcy Court substantively consolidating all of the Estates into a single consolidated Estate for all purposes associated with Confirmation and Consummation.  If substantive consolidation of all of the Estates is ordered, then on and after the Effective Date, all remaining assets and liabilities not assumed by the Purchaser pursuant to the Asset Purchase Agreement and Transfer Order shall be treated as though they were merged into the Estate of O&G for all purposes associated with Confirmation and Consummation, and all guarantees by any Debtor of

the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor shall be treated as one collective obligation of the Debtors. Notwithstanding anything in the Plan or in the Confirmation Order to the contrary, the entry of the Confirmation Order ordering substantive consolidation of the Estates shall not have any effect upon the separate and distinct legal entities as they existed at the time of any prepetition transaction that is or may be the subject of any Cause of Action (including any Avoidance Action).

## F.    Negative Covenant Regarding Distributions

The Asset Purchase Agreement shall provide that until all Guaranteed Payments have been paid or all Allowed Claims entitled to Guaranteed Payments have been purchased by Solsten Funding in the Dutch Auctions or extinguished, neither Solsten Drilling nor Solsten Funding shall, without the prior written consent of Indenture Trustee, pay or declare any Cash or other Distributions on any Equity Interests other than Permitted Solsten Drilling Distributions, the Permitted Solsten Funding Distributions, payments under the Solsten Post-Confirmation Loan Agreement, and the 3% Preferred Buyback Rights.

# IX.   THE LIQUIDATING TRUST

## A.    Formation of Liquidating Trust

The Liquidating Trust shall be established on the Effective Date. The Liquidating Trustee shall be governed in all respects by the terms of the Liquidating Trust Agreement and the Plan. The Liquidating Trustee shall administer the Liquidating Trust, and its assets, and make distributions from the proceeds of the Liquidating Trust in accordance with the Plan. The Liquidating Trust shall be further authorized, empowered and directed as the representative of the Debtors' Estates to take all actions necessary to comply with the Plan and exercise and fulfill the duties and obligations arising thereunder, including all actions necessary to consummate the transactions contemplated by the Asset Purchase Agreement. Except as otherwise set forth in this Plan, all distributions to Holders of Allowed Claims shall be from the Liquidating Trust (except for distributions to Holders of Allowed Class 2A Claims under Plan Alternative A, which shall in all instances be made by the Indenture Trustee, and distributions, if any, to Allowed Claims in Classes 2C and 2D (under Plan Alternative A) that shall be made directly by the Purchaser). The Liquidating Trust shall be administered for the benefit of all Allowed Administrative Expense Claims (including Allowed Professional Fees), all Allowed Priority Unsecured Tax Claims, all Allowed Priority Unsecured Non-Tax Claims, and all Allowed Class 3 Claims (or Allowed Claims in other Classes that share Pro Rata in the distributions to Holders of Class 3 Claims under Plan Alternative B) (collectively, the "Liquidating Trust Beneficiaries") pursuant to the provisions of this Plan, the Liquidating Trust Agreement, and any Post-Confirmation Orders of the Bankruptcy Court necessary or appropriate to permit the Liquidating Trustee to implement or modify the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries.

B.      **The Liquidating Trustee**

1.      *Appointment of the Liquidating Trustee and LTOC*

The Liquidating Trustee and the LTOC shall be appointed by the Indenture Trustee and approved by the Bankruptcy Court in the Confirmation Order to serve as the "Liquidating Trustee" and the "Liquidating Trustee Oversight Committee," respectively, under this Plan. As of the Effective Date, the appointment of the Liquidating Trustee and the LTOC shall be effective, and the Liquidating Trustee shall be vested with full legal power, capacity and authority, and shall be directed, upon consultation with and approval by the LTOC, to administer, collect and liquidate the Debtors' remaining Assets that were not sold pursuant to the Asset Purchase Agreement and to implement the Plan, including the 363 Sale, the Confirmation Order, and the Transfer Order. The Liquidating Trustee and the members of the LTOC shall be designated in the Plan Supplement and approved by Bankruptcy Court.

2.      *Powers of the Liquidating Trustee*

The Liquidating Trustee shall be deemed to be a judicial substitute for the Debtors as the party-in-interest in the Bankruptcy Cases, under the Plan or in any judicial proceeding or appeal to which any Debtor is a party, and, consistent with section 1123(b)(3)(B) of the Bankruptcy Code, is appointed as the representative of the Estate for the retention and enforcement of any Claim or interest which arose prior to the Confirmation Date. On the Effective Date, the current officers, directors, and managers of the Debtors shall be deemed to have resigned and shall be fully discharged from their responsibilities and duties as officers, directors, and managers of the Debtors. In general, and subject to the protective provisions in the Plan, the Liquidating Trustee shall act for the Debtors and the Estate in a fiduciary capacity as applicable to a managing member of a limited liability corporation.

3.      *Authorization.*

The Liquidating Trustee shall be empowered and authorized, after consultation with and approval by the LTOC, to, among other things:

(1)      collect and liquidate the Debtors' remaining assets;

(2)      make the distributions required under the Plan;

(3)      retain and/or employ professionals;

(4)      exercise all powers and authority that may be exercised by any officer, director, manager, or Equity Interest Holder in the Debtors with like effect as if authorized, exercised and taken by unanimous consent of such

64

officers, directors, managers, or Equity Interest Holders (including, without limitation, dissolving the Debtors);

(5)    pursue objections to, and estimations and settlements of, Claims;

(6)    prosecute any Cause of Action of the Debtors' Estates, including Avoidance Actions;

(7)    calculate and implement all distributions to be made under this Plan to Creditors holding Allowed Claims;

(8)    market, sell, lease or otherwise dispose of or realize the value of all Assets;

(9)    file all required tax returns and pay taxes and all other obligations on behalf of the Debtor;

(10)    file required operating reports;

(11)    pay all Liquidating Trust Claims as the Liquidating Trustee deems appropriate in its sole discretion and without the necessity of Bankruptcy Court approval; and

(12)    take all other actions required under the Plan to complete the liquidation, dissolution and wind-up of the Debtors in accordance with applicable non-bankruptcy law and the Plan.

**4.    *Appointment as Disbursing Agent***

The Liquidating Trustee shall serve as the Disbursing Agent under the Plan. The Liquidating Trustee is also authorized and directed, after consultation with and approval by the LTOC, to review, object to, prosecute, negotiate, settle or otherwise compromise any Claims, pending causes of action, or other Avoidance Actions, in each case in accordance with Bankruptcy Rule 9019. The powers granted to the Liquidating Trustee shall be exercisable without further approval of the Court.

**5.    *Liquidation of Assets***

The Liquidating Trustee, after consultation with and approval by the LTOC and in a commercially reasonable manner, shall pursue recovery and liquidation of Assets retained by the Debtors under the Plan that are not sold pursuant to the Asset Purchase Agreement.

### 6.    *Compensation of the Liquidating Trustee and Professionals*

The Liquidating Trustee shall be compensated for the services rendered in accordance with a rate schedule submitted to and approved by the Bankruptcy Court in the Confirmation Order.  Similarly, any professionals retained by the Liquidating Trustee Post-Confirmation shall be compensated for the services rendered in accordance with a fee schedule approved in advance by the Liquidating Trustee, after consultation with and approval by the LTOC, without the necessity of Bankruptcy Court approval.

### 7.    *Maintenance of Reserves*

The Liquidating Trustee shall maintain, after consultation with and approval by the LTOC, appropriate reserves in its discretion to fund confirmation Allowed Administrative Expense Claims, Allowed Professional Fees, Allowed Indenture Trustee Claims, and Post-Confirmation administrative and operating expenses.

### 8.    *Execution of Documents*

The Liquidating Trustee, after consultation with and approval by the LTOC, may execute any and all documents and instruments necessary to effectuate the provisions of the Plan.

### 9.    *Replacement of Liquidating Trustee*

The Liquidating Trustee may be replaced (A) by the affirmative vote of greater than 80% of the dollar amount of Allowed Claims entitled to distributions under the Plan, (B) the unanimous vote of the LTOC and the written consent of the Indenture Trustee, or (C) upon application to the Bankruptcy Court by any interested party with the requisite standing, for "cause" under the standards of Bankruptcy Code section 1104(a)(1).

## C.    <u>Distributions on Account of Allowed Claims</u>

Distributions with respect to Allowed Claims shall be as soon as reasonably possible, given the responsibilities of liquidating the assets of the Debtors' Estates, pursing Avoidance Actions and Causes of Action where appropriate, examining claims, and the time and expense of making partial or interim distributions.  All Allowed Claims in a particular class held by a creditor shall be aggregated and treated as a single Claim.  Any creditor holding multiple Allowed Claims shall provide to the Liquidating Trustee a single address to which any distribution shall be sent.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**D.**     **Disposition of Certain Guaranteed Payments Received from
Purchaser in Advance of Entry of a Final Order in the Lien Adversary**

In advance of entry of a Final Order in the Lien Adversary, the Purchaser shall timely tender all Guaranteed Payments to the Liquidating Trustee and, except as provided hereinafter, the Liquidating Trustee shall deposit $818,292 in an interest-bearing escrow account acceptable to the Indenture Trustee; provided, however, that notwithstanding anything in the Plan or any other document related to the Plan to the contrary (including the Trustee Disclosure Statement, the Plan Supplement, the Liquidating Trust Agreement, and all Exhibits or schedules attached thereto), the Liquidating Trustee, after consultation with and obtaining the written authorization of the LTOC and the Indenture Trustee, shall be authorized if an Order is entered in favor of the Indenture Trustee in the Lien Adversary to make Distributions under Plan Alternative A to Holders of Allowed Claims in Class 2A, Class 2D, and Class 3 under Plan Alternative 3(A) or Plan Alternative 3(B) even if that Order shall not have become a Final Order.

**E.**     **No Interest**

Except as expressly stated in the Plan or otherwise allowed by Final Order of the Bankruptcy Court, no Holder of an Allowed Claim will be entitled to the accrual of Post-Petition Date interest or the payment of Post-Petition Date interest penalties, or late charges on account of such claim for any purpose.

**F.**     **Delivery of Distributions**

Except as otherwise provided herein, all distributions under the Plan shall be made by the Liquidating Trustee, after consultation with and approval by the LTOC.  Subject to Bankruptcy Rule 9010, all distributions to any Holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such Holder as set forth on the Bankruptcy Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, as applicable, unless the Liquidating Trustee has been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such Holder that contains an address for such Holder different than the address of such Holder as set forth on the Bankruptcy Schedules.   In the event that any distribution to any Holder is returned as undeliverable, the Liquidating Trustee shall use commercially reasonable efforts to determine the current address of such Holder, but no distribution to such Holder shall be made unless and until the Liquidating Trustee has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code at the expiration of one year following final distributions of Guaranteed Payments provided for under the Plan.  After such date, all unclaimed property or interest in property shall be distributed by the Liquidating Trustee to Solsten Drilling, and the Claim of any other Holder to such property or interest in property shall be discharged and forever barred.

## G.    Nominal Distributions

With respect to any distribution prior to the final distribution, if the holder of an Allowed Claim would receive less than $100, the Liquidating Trustee may elect not to distribute such lesser amount to such Holder, but may instead defer the distribution thereof until the cumulative amount to be distributed to such Holder is $100 or more.  No interest on any deferred amount shall be paid to such Holder.

## H.    Unclaimed Distributions

If any distribution is returned to the Liquidating Trustee as undeliverable, no further distributions shall be made to the Holder of the Allowed Claim on which such distribution was made unless and until the Liquidating Agent is notified in writing of such Holder's then-current address, and the Liquidating Trustee shall be under no obligation to attempt to find such Holder's address other than through a review of the docket and Filings in the Bankruptcy Cases.  Undeliverable distributions shall remain in the possession of the Liquidating Agent until such time as a distribution becomes deliverable or is deemed canceled (as hereinafter provided).  Any unclaimed distribution held by the Liquidating Trustee shall be accounted for separately, but the Liquidating Trustee shall be under no duty to invest any such unclaimed distribution in any manner.  Any holder of an Allowed Claim that does not present a claim for an undeliverable distribution within one year after the date upon which a distribution is first made available to such holder shall have its right to such distribution discharged and shall be forever barred from asserting any such Claim against any Person or property, including the Liquidating Trustee or Indenture Trustee.  All unclaimed or undistributed distributions shall, pursuant to Bankruptcy Code section 347, be donated to Mississippi Bankruptcy Conference, Inc., a 501(c)(3) charitable organization.

## X.  PROCEDURES FOR TREATING DISPUTED CLAIMS UNDER PLAN

## A.    Objections to Claims

The Indenture Trustee has not reviewed the filed Proofs of Claim or attempted to reconcile those Claims with the Debtors' books and records.  The Liquidating Trustee shall examine such Claims and, after consultation with and approval by the LTOC, will file any objections with the Bankruptcy Court to filed Proofs of Claim no later than 180 days after the Effective Date.  Unless otherwise provided in the Plan or the Confirmation Order, the Liquidating Trustee and the Indenture Trustee shall have the sole right to object to and contest the allowance of any Proofs of Claim filed in the Bankruptcy Cases.  The Bankruptcy Court shall determine the amount of any Disputed Claim, unless the Liquidating Trustee or the Indenture Trustee stipulates as to its amount, or compromise, settle or dismiss the objection to the Disputed Claim prior to the determination of the Bankruptcy Court.  No distributions shall be made under the Plan on account of any Disputed Claim unless and until such Disputed Claim is liquidated and becomes an Allowed Claim.

Except as to Claims that are Allowed under the Plan, the Liquidating Trustee and the Indenture Trustee shall have the exclusive authority to File objections to any Claim and to withdraw any objections to such Claims that they File.  The Liquidating Trustee, after

consultation with and approval by the LTOC, shall have the exclusive authority to settle, compromise, or litigate to judgment any objections to such Claims (i) if the Liquidating Trustee has the prior written consent of the Indenture Trustee, (ii) if the Liquidating Trustee has given detailed written notice of the proposed settlement, compromise, or litigation to the Indenture Trustee, who has not objected thereto within five (5) Business Days after receipt of such notice, or (iii) upon the Final Order of the Bankruptcy Court after the Indenture Trustee has had notice and opportunity to object.  All objections to Claims shall be Filed within 180 days after the Effective Date.

**B.**     **Disallowed Claims**

In the event the Liquidating Trustee or the Indenture Trustee has commenced a Cause of Action under Chapter 5 of the Bankruptcy Code against the Holder of a Claim, then such Claim shall be deemed Disallowed pursuant to Section 502(d) of the Bankruptcy Code.  Consequently, the Holders of such Claims may not vote to accept or reject the Plan until the Cause of Action against such Claimant has been settled or adjudicated by the Bankruptcy Court and any amounts due the Debtors have been received.

**C.**     **No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim is Disputed, at the Liquidating Trustee's option, no payment or distribution provided in the Plan shall be made on account of such Disputed Claim unless and until such Disputed Claim is resolved and becomes an Allowed Claim.

**D.**     **Estimation of Claims**

The Liquidating Trustee, after consultation with and approval by the LTOC, or the Indenture Trustee may request at any time that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.

## XI.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption or Rejection of Executory Contracts

The Bankruptcy Code empowers the Debtors to assume or reject their Executory Contracts and Unexpired Leases. All Executory Contracts and Unexpired Leases that existed between the Debtors and any person or entity will be deemed to be rejected by the Liquidating Trustee as of the Filing Date, except for any Executory Contract or Unexpired Lease that has been assumed by the Debtors and assigned to the Purchaser pursuant to the Asset Purchase Agreement and Transfer Order. The Confirmation Order shall constitute an Order of the Bankruptcy Court approving such rejections, pursuant to Bankruptcy Code section 365, as of the Petition Date.

### B.    Assumption and Assignment to Purchaser

The Bidding Procedures and Asset Purchase Agreement contemplate that certain Executory Contracts and Unexpired Leases will be assumed and assigned to the Purchaser. In accordance with the Bidding Procedures, the Indenture Trustee will File a list of such Executory Contracts and Unexpired Leases along with the proposed Cure Costs. Any party taking exception to the proposed Cure Costs shall, in accordance with the Bidding Procedures, File a detailed statement setting forth its reason and the Bankruptcy Court shall determine the proper amount of the Cure Costs at the Confirmation Hearing. The fixing of the Cure Costs shall constitute the Debtor's right to assign the Executory Contract or Unexpired Lease to the Purchaser under Bankruptcy Code sections 365(c) and (f). Failure to assert any Cure Costs different in amount from the applicable amount set forth on the List identifying the Cure Costs filed by the Indenture Trustee shall constitute consent to the assumption, assignment, and Cure Costs on the terms provided for in the Plan and the Asset Purchase Agreement, including acknowledgment that (i) the proposed assumption provides adequate assurance of future performance, (ii) the amount identified for Cure Costs is the amount necessary to compensate for any and all outstanding defaults under the respective Executory Contract or Unexpired Lease to be assumed, (iii) no other defaults exist under such Executory Contract or Unexpired Lease, and (iv) to the extent the list so Filed by the Indenture Trustee calls for assumption and assignment to the Purchaser of an Executory Contract or Unexpired Lease as modified, the party or parties thereto have no objection and irrevocably consent to the assumption and assignment that said Executory Contract or Unexpired Lease as so modified.

### C.    Payment of Cure Costs Related to Assumption
### of Executory Contracts and Unexpired Leases

All Cure Costs under each Executory Contract and Unexpired Lease to be assumed and assigned under the Plan and Asset Purchase Agreement shall be satisfied, pursuant to Bankruptcy Code section 365(b)(1), by payment of the Cure Costs in Cash within 30 days following the Effective Date. Cure Costs shall be paid first from the Operating Accounts Balances and second, up to $500,000, from the Solsten Drilling Contribution. In the event of a dispute regarding (i) the amount of any Cure Cost, (ii) the ability of the Purchaser to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed and assigned, or (iii) any other matter pertaining to assumption and assignment, the Cure Costs

required by Bankruptcy Code section 365(b)(1) shall be made following entry of a Final Order of the Bankruptcy Court resolving the dispute and approving assumption and assignment to the Purchaser.

**D.     Assumed Executory Contracts and Unexpired Leases**

Each Executory Contract and Unexpired Lease that is to be assumed and assigned to the Purchaser under the Asset Purchase Agreement and Transfer Order will include all amendments, modifications, supplements, restatement, or other agreement made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease.  Notwithstanding anything herein to the contrary, any time within sixty (60) days after the Closing Date, Purchaser may designate any Contract that would otherwise be an assigned contract as a contract to be excluded from the assets purchased by the Purchaser.  Any such designation by Purchaser shall eliminate any obligation of Purchaser in connection with any liabilities related to such contract.

**E.     Claim Based on Rejection of Executory Contracts and Unexpired Leases**

Proofs of Claim for damages arising out of the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court and served upon the attorneys for the Liquidating Trustee on or before thirty (30) days after the later of the Effective Date or the effective date of rejection.  Any proofs of Claim arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Debtor or the Liquidating Trust without the need for any objection by any Person or further notice to, or action, order, or approval of, the Bankruptcy Court.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified and treated as Class 3 General Unsecured Claims under the Plan; provided, however, that if the Holder of an Allowed Claim for rejection damages has an unavoidable security interest in any Collateral to secure obligations under such rejected Executory Contract or Unexpired Lease, the Allowed Claim for rejection damages shall be treated as an Other Secured Claim under Class 2E to the extent of the value of such Holder's interest in the Collateral, with the deficiency, if any, treated as a General Unsecured Claim.

**F.     Reservation of Rights**

Nothing contained in the Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was an Executory Contract or Unexpired Lease at the time or assumption and assignment to the Purchaser or rejection, the Indenture Trustee or the Liquidating Trustee shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## XII.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### A.    Condition Precedent to Effectiveness

The Effective Date will not occur and the Plan will not become effective unless and until the Confirmation Order and the Transfer Order shall have been entered and shall have become Final Orders.

### B.    Waiver of Condition Precedent

The condition precedent of the Plan may be waived, in whole or in part, by both the Indenture Trustee and the Purchaser, in their sole discretion.  Any such waiver may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

### C.    Satisfaction of Condition Precedent

Any actions required to be taken on the Effective Date will take place and will be deemed to have occurred simultaneously, and no such action will be deemed to have occurred prior to the taking of any other such action.  In the event that the condition precedent specified has not occurred or otherwise been waived, (i) the Confirmation Order and the Transfer Order will be vacated, (ii) the Debtors and all Holders of Claims and interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) the Debtors' obligations with respect to Claims and Equity Interests will remain unchanged and nothing contained in the Plan will constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## XIII.    EFFECT OF CONFIRMATION

### A.    Vesting of Assets

On the Effective Date, the Debtors, their Assets, properties and interests in property, and their operations will be released from the custody and jurisdiction of the Bankruptcy Court and, to the extent not sold pursuant to the 363 Sale or otherwise disposed of pursuant to the Plan or during the Bankruptcy Cases, will vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, charges and other interests.

### B.    Binding Effect

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan will bind any Holder of a Claim against, or Equity Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or interests including any Equity Interest of such Holder is Impaired under the Plan and whether or not such Holder is entitled to Distributions under the Plan.

72

## C.    __Discharge of Claims__

As provided by Section 1141(d)(3)(A) of the Bankruptcy Code, the Debtors are not discharged from any existing debts and Claims asserted against the Debtors that arose at any time prior to the Effective Date.

## D.    __Exculpation__

Notwithstanding anything in the Plan to the contrary, as of the Effective Date, neither the Purchaser, the Liquidating Trustee, the Indenture Trustee and their respective accountants, advisors, agents, representatives, employees, and attorneys (but, in each case, solely in their capacities as such) will have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Bankruptcy Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Bankruptcy Cases, the Plan, the Trustee Disclosure Statement or any contract, instrument, document or other agreement related thereto; provided, however, that the foregoing will not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.  The Plan does not provide for broad third-party releases, but rather, limited exculpation for acts during these Bankruptcy Cases.  The exculpation neither affects liability for prepetition actions nor absolves any parties from liability for gross negligence or willful misconduct.  The Indenture Trustee believes the exculpation provision contained in the Plan is appropriate and reasonable.

## E.    __Injunction or Stay__

Except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against the Debtors or Debtors in Possession will be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim against the Liquidating Trustee, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Liquidating Trustee with respect to such Claim, (iii) creating, perfecting or enforcing any encumbrance of any kind against any Liquidating Trustee or against the property or interests in property of any Liquidating Trustee with respect to such Claim, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to any Liquidating Trustee or against the property or interests in property of any Liquidating Trustee with respect to such Claim, and (v) pursuing any Claim released pursuant to the Plan.

## F.    __Exemption from Certain Transfer Taxes__

Pursuant to Section 1146(a) of the Bankruptcy Code, the transfer of the Purchased Assets to the Purchaser and the remaining Assets to the Liquidating Trustee on the Property Closing Date and any transfers from the Debtors to the Reorganized Debtors shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax,

stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Transfer Order and the Confirmation Order shall contain a provision directing the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### G.    Cancellation of Equity Interests/Dissolution of the Debtors

On the Effective Date, all existing Equity Interests shall, without further act or action by any party, be cancelled, annulled and extinguished, and any certificates representing such cancelled, annulled and extinguished Equity Interests shall be null and void. After the Effective Date at such time as the Liquidating Trustee determines appropriate, the Liquidating Trustee is authorized (i) to execute and file, or cause to be executed and filed, such articles or certificates of dissolution, and such other documents as are necessary to effect, complete or evidence its dissolution under the applicable laws of any state and (ii) to file any required, final federal, state and local tax returns, and to take such other action as shall be necessary or appropriate to effect a final determination of any amounts of federal, state or local taxes owed by the Debtors.

### H.    Removal of Officers, Directors, and Managers

On the Effective Date, any then-currently serving directors, officers, managers or other members of any governing body of the Debtors will be removed from any office, directorship, or any other position held by any such person with the Debtors and will be relieved of any further duties or obligations with respect to the Debtors.

### I.    Authority of Liquidating Trustee to Wind Up Affairs of the Debtors

The Liquidating Trustee will be authorized to execute, deliver, file and record such contracts, instruments, assignments, conveyances, bills of sale, releases, indentures, certificates and any other agreement or document and take such action reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, without the need for further action by the board of directors or other managing body of the Debtors or the Bankruptcy Court.

### J.    Tax Reporting Requirements

Each Holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

**K.**     **Expedited Tax Determination**

The Liquidating Trustee is authorized under the Plan to request an expedited determination of taxes under Section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

**L.**     **Substantial Consummation**

Upon completion of initial payments to the Creditors pursuant to the Plan, the Plan will be deemed substantially consummated under Sections 1101 and 1127(b) of the Bankruptcy Code.  Following substantial consummation, as determined by the Liquidating Trustee in its sole discretion upon motion to the Bankruptcy Court, an appropriate Order will be entered closing the Case.

**M.**     **Interpretations of Orders**

To the extent the Confirmation Order, the Transfer Order, or the Plan are inconsistent with the Trustee Disclosure Statement, or any other agreement entered into between or among the Debtors and any third party, the Plan controls over the Trustee Disclosure Statement, the Confirmation Order controls over the Plan, and the Transfer Order controls over the Confirmation Order.

**N.**     **Modification of the Plan**

Amendments or modifications of or to the Plan may be proposed in writing by the Indenture Trustee at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified satisfies the conditions of Sections 1122 and 1123 of the Bankruptcy Code and the Trustee Disclosure Statement complies with Section 1125 of the Bankruptcy Code.  The Plan may be altered, amended or modified at any time by the Indenture Trustee after the Confirmation Date and before substantial consummation, provided: (i) the Plan, as altered, amended or modified, satisfies the requirements of Sections 1122 and 1123 of the Bankruptcy Code; (ii) the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under Section 1129 of the Bankruptcy Code; and (iii) the circumstances warrant such alterations, amendments or modifications.  A Holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.  Prior to the Effective Date, the Indenture Trustee may make appropriate technical adjustments and modifications to the Plan without further Order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Claims.

**O.**     **Revocation or Withdrawal of the Plan**

The Indenture Trustee reserves the right to revoke or withdraw the Plan, in whole or in part, prior to the Confirmation Date.  If the Indenture Trustee revokes or withdraws the Plan in

whole prior to the Confirmation Date, then the Plan will be deemed null and void.  In such event, nothing in the Plan will constitute or be deemed a waiver or release of any Claim or Equity Interest by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

**P.      Substantial Consummation of the Plan**

Upon completion of initial payments to the Creditors pursuant to the Plan, the Plan will be deemed substantially consummated under Sections 1101 and 1127(b) of the Bankruptcy Code. Following substantial consummation, as determined by the Liquidating Trustee in its sole discretion upon motion to the Bankruptcy Court, an appropriate Order will be entered closing the Case.

**Q.      Severability of Plan Provisions**

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make such term or provision valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as the Plan may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

**R.      Post-Confirmation Jurisdiction**

Subsequent to the Confirmation Date (including after the Bankruptcy Cases have been closed), the Court shall retain jurisdiction to the maximum extent permitted by applicable law of all matters arising out of or related to the Bankruptcy Cases and the Plan.

## XIV.   EXEMPTION FROM SECURITIES LAWS

**A.      Applicability of Bankruptcy Code Sections 1125 and 1145 to Certain New Securities to Be Issued Under the Plan**

The protection afforded by Bankruptcy Code section 1125 with regard to the solicitation of acceptances or rejections of the Plan and with regard to the offer, issuance, sale, or purchase of the 3% Preferred Interests to be issued and distributed to Holders of Class 2B Claims shall apply to the Purchaser and its directors, members, managers, employees, attorneys, and agents. The entry of the Confirmation Order shall constitute the determination by the Bankruptcy Court that the Purchaser and its officers, directors, partners, employees, members, managers, attorneys, and agents shall have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code pursuant to Section 1125(e) and the federal securities laws.   Entry of the Confirmation Order also shall constitute an Order of the Bankruptcy Court that the exemption

from the requirements of Section 5 of the Securities Act and any state or local law requiring registration for the offer or sale of a security provided for in Bankruptcy Code section 1145 shall apply to the 3% Preferred Interests to be issued under the Plan.

## B.    Initial Issuance

Section 1145(a)(1) of the Bankruptcy Code generally exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state securities laws if three principal requirements are satisfied: (i) the securities are offered and sold under a plan of reorganization and are securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the Trustee Plan; (ii) the recipients of the securities must hold a claim against, or an interest in, the debtor or such affiliate; and (iii) the securities are issued entirely in exchange for the recipient's claims against or equity interests in the debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property.

The Indenture Trustee believes that the issuance and distributions of the 3% Preferred Interests under the Trustee Plan will satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

## C.    Subsequent Transfers

To the extent not otherwise prohibited, and subject to the terms of the Trustee Plan, the 3% Preferred Interests by Solsten Drilling under the Trustee Plan and covered by § 1145(a)(1) of the Bankruptcy Code may be resold by the Holders thereof without registration unless, as more fully described below, the Holder is an "underwriter" with respect to such securities, as such term is defined in § 1145(b)(1) of the Bankruptcy Code.  Generally, § 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who: (i) purchases a claim against, an interest in or a claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (ii) offers to sell securities offered under a plan for the holders of such securities; (iii) offers to buy such securities from the holders of such securities, if the offer to buy is: (A) with a view to distributing such securities; and (B) under an agreement made in connection with the plan, the consummation of the plan or with the offer or sale of securities under the plan; or (iv) is an "issuer" with respect to the securities, as the term "issuer" is used in section 2(a)(11) of the Securities Act.  Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer or any person under direct or indirect common control of the issuer.  Such a person is an "affiliate" of the issuer. "Control" (as such item is defined in rule 405 promulgated under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting of securities, by contract or otherwise.

To the extent that Persons who receive 3% Preferred Interests pursuant to the Trustee Plan are deemed to be "underwriters" as defined in § 1145(b) of the Bankruptcy Code, including as an "affiliate" of the issuer, resales by such Persons would not be exempted by § 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.

Consequently, an "underwriter" or "affiliate" may not resell the 3% Preferred Interests except in compliance with the registration requirements of the Securities Act.  In addition, any person who is an "underwriter" but not an "issuer," including an "affiliate," with respect to an offer and sale of securities is entitled to engage in exempt "ordinary trading transactions" within the meaning of § 1145(b) of the Bankruptcy Code.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the 3% Preferred Interests to be issued pursuant to the Trustee Plan would depend upon various facts and circumstances applicable to that person.  Accordingly, we express no view as to whether any particular Person receiving 3% Preferred Interests under the Trustee Plan would be an "underwriter" with respect to them.

GIVEN THE COMPLEX AND SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN "UNDERWRITER," THE INDENTURE TRUSTEE MAKES NO REPRESENTATION CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE 3% PREFERRED INTERESTS.  POTENTIAL RECIPIENTS OF THE 3% PREFERRED INTERESTS ARE ADVISED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY TRADE THE 3% PREFERRED INTERESTS WITHOUT TAKING ADDITIONAL ACTION TO ENSURE COMPLIANCE WITH THE SECURITIES ACT, THE EXCHANGE ACT, OR SIMILAR STATE AND FEDERAL LAWS.

### D.    Subsequent Transfers Under State Laws

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the 3% Preferred Interests.

THE INDENTURE TRUSTEE MAKES NO REPRESENTATION TO ANY OFFEREE OF ANY SECURITIES ISSUED UNDER OR IN CONNECTION WITH THE TRUSTEE PLAN REGARDING THE LEGALITY OF ANY INVESTMENT THEREIN BY SUCH OFFEREE UNDER APPROPRIATE LEGAL INVESTMENT OR SIMILAR LAWS OR REGULATIONS.

## XV.    CERTAIN TAX CONSEQUENCES OF THE TRUSTEE PLAN

### A.    Generally

The following discussion summarizes certain United States federal tax consequences of the implementation of the Trustee Plan believed to be applicable to the Debtor and to certain Holders of Claims. The following summary is based on Title 26 of the United States Code ("**Tax Code**"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the United States federal tax consequences described below.

The United States federal tax consequences of the Trustee Plan are complex and are subject to significant uncertainties because of (i) the complexity of the transactions contemplated

by the Trustee Plan; (ii) the uncertainty as to the tax consequences of events in prior years; (iii) the differences in the nature of the types of Claims and the taxpayer status, residence and methods of accounting of Holders of Claims; (iv) prior actions taken by Holders with respect to their Claims; and (v) the possibility that events or legislation subsequent to the date hereof could change the federal tax consequences of the transactions.  There may also be state, local or foreign tax issues that may affect particular Holders.  The Indenture Trustee has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Trustee Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary generally does not address foreign, state or local tax consequences of the Trustee Plan, nor does it address the United States federal income tax consequences of the Trustee Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations (including, without limitation, certain pension funds), persons holding a Claim as part of a constructive sale, straddle or other integrated transaction, and investors in pass-through entities).  If a partnership (or other entity taxed as a partnership) holds a Claim, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership.

Holders of Claims and Equity Interests are urged to consult their tax advisors respecting the individual tax consequences of the transactions contemplated under or in connection with the Trustee Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX TRUSTEE PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF UNITED STATES FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THE TRUSTEE DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE TRUSTEE PLAN BY THE INDENTURE TRUSTEE; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## B.      Material Tax Consequences to Holders of Claims and Equity Interests

The tax consequences of the implementation of the Trustee Plan to Holders of Claims and Equity Interests will depend in part on (i) whether the Holder's Claim constitutes a security for federal income tax purposes, (ii) whether the Holder reports income on the accrual or cash basis, (iii) whether the Holder receives consideration in more than one (1) tax year, (iv) whether the Holder is a resident of the United States, (v) whether the Holder is a corporation, partnership, or an individual, (vi) whether all the consideration received by the Holder is deemed to be received by that Holder as part of an integrated transaction or a step transaction, or (vii) whether the Holder is a Holder of some Equity Interest or other interest in the Debtor.

In general, if the Holder of a Claim receives interest on account of its Claim, such interest will constitute income under the Tax Code. In general, if an Interest Holder receives funds on account of such Interest, these funds will constitute a recovery of the Interest Holder's investment and any excess funds above the Holder's basis in the Interest will be a capital gain. Conversely, if the Holder does not recover the full amount of the basis in the Interest, such deficiency will be a capital loss.

**C.      Material Tax Consequences to the Debtor**

There are no known material tax consequences of the Trustee Plan to the Debtor.

## XVI.   CONCLUSION AND RECOMMENDATION

The Indenture Trustee believes that the Trustee Plan is in the best interests of all Holders of Impaired Claims entitled to vote on the Plan and strongly recommends that the Holders of Impaired Claims in the Voting Classes (Classes 2A, 2B, 2C, 2D, and 3 vote to accept the Trustee Plan and to evidence such acceptance by returning their Ballots so that they will be actually received by the Voting Agent before the Voting Deadline.

**Dated:  July 26, 2011**                        **Respectfully submitted,**

                                                 **FIRST SECURITY BANK, AS INDENTURE TRUSTEE**

                                                 **By:  _____/s/ Frank Faust_____**
                                                 **Its:    Authorized Representative**

**OF COUNSEL:**
**PAUL H. STEPHENSON, III (Miss. Bar # 7864)**
**JIM F. SPENCER, JR. (Miss. Bar # 7736)**
**C. JOYCE HALL (Miss. Bar # 2123)**
**WATKINS & EAGER PLLC**
**Post Office Box 650**
**Jackson, Mississippi 39205**
**The Emporium Building**
**400 East Capitol Street**
**Jackson, Mississippi 39201**
**Telephone: (601) 965-1900**
**Facsimile:  (601) 965-1901**
*pstephenson@watkinseager.com*
*jspencer@watkinseager.com*
*jhall@watkinseager.com*

**STEPHEN W. ROSENBLATT (Miss. Bar # 5676)**
**CHRISTOPHER R. MADDUX (Miss. Bar # 100501)**
BUTLER, SNOW, O'MARA, STEVENS & CANNADA PLLC
**Post Office Box 6010**
**Ridgeland, Mississippi 39158**
**Suite 1400**
**1020 Highland Colony Parkway**
**Ridgeland, Mississippi 39157**
**Telephone: (601) 985-4502**
**Facsimile:  (601)  985-4500**
*steve.rosenblatt@butlersnow.com*
*chris.maddux@butlersnow.com*


**STEVE JAKUBOWSKI (*ADM. PRO HAC VICE*)**
THE COLEMAN LAW FIRM
**77 West Wacker Drive, Suite 4800**
**Chicago, Illinois 60601**
**Telephone: (312) 606-8641**
**Facsimile:  (312) 444-1028**
*sjakubowski@colemanlawfirm.com*