consummation of the Contemplated Transactions and the Transaction Documents to which it is a party (in each case to the extent required by such Purchaser's Organizational Documents);

(c)    Certificates. With respect to the Purchaser, Certificates of Existence and Good Standing (or equivalent) issued by the jurisdiction of incorporation, formation, or organization of such Purchaser and dated within ten (10) days of the Closing Date;

(d)    Miscellaneous. Any and all other documents, instruments, or agreements contemplated by this Agreement or as are necessary or appropriate or reasonably requested by the Trustee to fully consummate the Contemplated Transactions, in each case in form and substance reasonably satisfactory to the Trustee, duly executed, and dated as of the Closing Date.

# ARTICLE IV
## EMPLOYEE MATTERS

4.1    Offers of Employment.  At any time prior to Closing, Purchaser shall be entitled, but not obligated, to make offers of employment to such of the Seller Employees as Purchaser shall determine and on such terms as Purchaser shall deem appropriate (each, an "Offer of Employment").  In the event Purchaser extends an Offer of Employment to a Seller Employee, and such Seller Employee accepts employment with Purchaser (each, a "Transferred Employee"), employment of such Transferred Employee by Purchaser shall be effective as of the Closing Date and shall be on the terms of the Offer of Employment applicable to such Transferred Employee, which shall include the continued at-will status of such Transferred Employee unless expressly stated otherwise.

4.2    COBRA Benefits.  Effective as of Closing and thereafter, Purchaser (or an Affiliate thereof) shall provide, or cause to be provided, under Purchaser's plans or otherwise, continuation health coverage with respect to Seller Employees (excluding Insiders and Affiliates) employed as of the Closing Date (and their eligible dependents) in accordance with COBRA; *provided, however*, that Sellers shall, at their sole expense, be solely responsible for providing any and all notices and/or elections required by COBRA, and by Sellers' agreements, policies, plans or practices.

4.3    Cooperation.

(a) To the extent that Purchaser hires any employees of any Seller, Seller shall cooperate with Purchaser and Purchaser's agents to provide Purchaser the adequate payroll tax records required by federal and state agencies necessary for Purchaser to optimize federal and state payroll tax law relating to transactions such as the Contemplated Transactions.  Sellers will provide Purchaser and their agents with (i) permission for Purchaser to file for transfers of experience of payroll tax accounts in states which require a signed release by the such Seller, (ii) the most recent Annual 940 Report (including Schedule A), and most recent

16

years "tax rate notices" received from individual state agencies, and (iii) copies of all quarterly wage detail reports filed with individual state agencies in the calendar year through the Closing Date.  If any Seller used an outside payroll tax administrator, then such Seller hereby grants Purchaser, as applicable, permission to have access to relevant successor-in-interest reports from the payroll vendor, such as state tax rate notices, state quarterly contribution reports, W2s and federal recap reports such as 940 and 941, and will provide Purchaser with a contact person at such payroll vendor.

(b) Seller shall not in any way interfere with Purchaser's opportunity to retain any Seller Employee.

4.4    <u>Miscellaneous</u>.  Notwithstanding any provision to the contrary in this Agreement, nothing expressed or implied in this Agreement shall confer upon any Seller Employee (including any Transferred Employee) any rights or remedies of any nature or kind whatsoever, including any right to employment or continued employment for any specified period by Purchaser thereof, or restrict in any way the right of Purchaser to terminate employment of any Transferred Employee.


## ARTICLE V
## <u>CONDITIONS PRECEDENT</u>

5.1    <u>Conditions Precedent to Obligation of Purchaser</u>. The obligations of Purchaser to consummate the Contemplated Transactions and take any other action required to be taken by it at the Closing or thereafter are subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Purchaser in whole or in part:

(a)    <u>Compliance with Obligations</u>.  Sellers must have performed and complied with all of their respective covenants and obligations required by this Agreement to be performed or complied with at or prior to the Closing in all material respects.

(b)    <u>Transfer Order</u>.  The Transfer Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Indenture Trustee and Purchaser and consistent in all material respects with the terms of this Agreement and the Plan of Reorganization, (i) approving this Agreement and the Contemplated Transactions, and (ii) finding that notice of the hearing concerning approval of the Contemplated Transactions was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances and that Purchaser is a "good faith" Purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code, and (iii) providing for the vesting of the Purchased Assets in the Purchaser, free and clear of all interests in such property, as provided in and to the maximum extent permitted by 11 U.S.C. §§ 363(b), (f).

(c)     <u>Confirmation Order</u>.  The Confirmation Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to Indenture Trustee and Purchaser and consistent in all material respects with the terms of this Agreement and the Plan of Reorganization.

(d)     <u>Consents</u>.  All third party Consents set forth in Schedule 5.1(d), after giving effect to the Transfer Order and the Confirmation order, shall have been received by Sellers and delivered to Purchaser, and such Consents shall be on terms reasonably acceptable to Purchaser and in full force and effect as of the Closing.

(e)     <u>Closing Deliveries</u>.  Sellers shall have delivered, or caused to be delivered, at the Closing each item described in Section 3.3.

(f)     <u>Inspections and Contingencies</u>.

(1)     Beginning on the Execution Date and ending forty-five (45) days after first being given access to the Sellers' rigs (the "Due Diligence Period"), plus any Permitted Exception under Section 5.1(f)(4) hereof, Purchaser and its agents, engineers, and consultants will have the right to inspect the Sellers' assets related to the Business, including without limitation: all rigs; all equipment; all spare parts and inventory; drawings and blueprints for all rigs and associated equipment; modification documents and related drawings for all rigs and associated equipment; engineering documents and reports; maintenance, repair, and inspection records for all rigs and associated equipment; schedules for ongoing maintenance, repair and inspections of all rigs and associated equipment; overhaul records and schedules for all engines and pumps; time logs for all engines and pumps; current lists of inventories and records establishing their purchase price and depreciated and appraised values; monthly expenses for each rig since January 2008; all contracts with current customers; all contracts with current vendors; all executory contracts and unassumed leases; and all master service agreements for customers and subcontractors; payroll records of current employees. Purchaser must give the Indenture Trustee and Sellers at least forty-eight (48) hours advance notice of any inspections, examinations, and other visits.

(2)     At any time during the Due Diligence Period, plus any Permitted Exception under Section 5.1(f)(4) hereof, Purchaser will have the sole right, exercisable in its sole and absolute discretion, to terminate this Agreement by delivering written notice to the Indenture Trustee of such termination prior to the expiration of the Due Diligence Period.

(3)     If Purchaser does not receive cooperation in from the Sellers in respect of its due diligence requests, Purchaser shall immediately notify the Indenture Trustee, who shall seek to cause Sellers (either voluntarily or through Order of the Bankruptcy Court) to provide Purchaser access to the Seller in order to be able to conduct its due diligence within the Due Diligence Period plus any Permitted Exception under Section 5.1(f)(4) hereof.

(4)     Purchaser shall have the right at its sole discretion, prior to the expiration of the Due Diligence Period, to extend the Due Diligence Period for a period of twenty (20) additional days (the "Permitted Extension") by giving written notice to Seller.

5.2     <u>Conditions Precedent to Obligations of Sellers</u>.   The obligation of Sellers to consummate the Contemplated Transactions and take any other action required to be taken by Sellers at the Closing or thereafter is subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which, except Section 5.2(d) may be waived by the Indenture Trustee in whole or in part:

(a)     <u>No Legal Proceedings</u>.   There shall be no Claim, Proceeding, or Order pending against Purchaser (excluding such by or at the direction of Sellers) by or before any Governmental Authority that would have the effect of or seek to challenge, restrain, prohibit, invalidate, interfere with, or collect Damages arising out of, the Contemplated Transactions.

(b)     <u>Closing Deliveries</u>. Purchaser shall have delivered, or caused to be delivered, at the Closing each item described in Section 3.4.

(c)     <u>Entry of Orders</u>. The Transfer Order and the Confirmation shall have been entered by the Bankruptcy Court, as required by Sections 5.1(b) and 5.1(c) hereof.

(d)     <u>Post-Confirmation Lending Agreement</u>.   SolstenXP, Inc., shall enter into the Solsten Post-Confirmation Loan Agreement with the Purchaser, in form and substance acceptable to the Indenture Trustee (whose approval shall not be unreasonably withheld) that shall provide up to $1.5 million to the Purchaser to support operations first and further shall, to the extent of line availability  assist the Purchaser  in making the Guaranteed Payments required hereunder.

## ARTICLE VI
## <u>TERMINATION</u>

6.1     <u>Termination of Agreement</u>. In addition to the Purchaser's right to terminate at any time during the Due Diligence Period or Extension Period at Purchaser's sole discretion, in which case the Purchaser is unconditionally entitled to return of its Deposit, the Parties may terminate this Agreement as provided below:

(a)     <u>Mutual Consent</u>.  Purchaser and Sellers may terminate this Agreement as to all Parties by mutual written consent at any time prior to the Closing by written instrument duly authorized by the respective parties.

(b)     <u>By Either Party</u>.  Sellers or Purchaser may terminate this Agreement by giving written notice to the other Party if (i) any court of competent jurisdiction or any other Governmental Authority in a suit instituted by a third party or a Governmental Authority shall have issued an Order or shall have taken any other action prior to the Closing permanently enjoining, restraining, or otherwise prohibiting the Contemplated Transactions or a material portion thereof, or (ii) the Bankruptcy Court enters an Order that materially alters, contravenes or violates this Agreement or denies approval of this Agreement or the Contemplated Transactions.

(c)     <u>Absence of Certain Changes</u>.  Purchaser shall have the right to terminate this Agreement within ten (10) days of learning that, following the conclusion of the Due Diligence Period, plus any Permitted Exception under Section 5.1(f)(4) hereof, there has been an event, occurrence or development which has had a Material Adverse Effect or there has been any damage, destruction or other casualty loss (whether or not covered by insurance) affecting any Purchased Assets which has had a Material Adverse Effect.

6.2     <u>Effect of Termination</u>.  If either Party terminates this Agreement pursuant to Section 6.1, all rights and obligations of the Parties under this Agreement shall terminate and the Indenture Trustee shall instruct its counsel to return to Purchaser any Earnest Money Deposit held by it; *provided, however*, that the rights and obligations of the Parties under this Section 6.2 (Effect of Termination), any provisions regarding the interpretation or enforcement of this Agreement, and Article VIII (Miscellaneous) will survive any such termination.

**ARTICLE VII**
**BANKRUPTCY MATTERS**

7.1     <u>Bankruptcy Actions</u>.  As established by the Bidding Procedures, this Agreement shall be subject to the consideration of higher and better offers, including offers for a Cash amount acceptable to the Indenture Trustee in its sole discretion submitted at an auction (the "Auction") to be conducted in accordance with the Bidding Procedures.  From the date hereof and until the date of the Auction, Sellers and the Indenture Trustee are permitted to cause their respective representatives to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person in connection with any sale or other disposition of the Purchased Assets.  In addition, Sellers and the Indenture Trustee shall have the right, responsibility, or obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Business and the Purchased Assets to prospective purchasers.  The Sellers' and the Indenture Trustee's obligations under this Agreement will be conditioned upon the Court entering the Transfer Order.  In conjunction with the approval of the Disclosure Statement to

solicit votes on the Plan of Reorganization, the Indenture Trustee will seek approval of the Bid Procedures and the Break-Up Fee.

7.2     Break-Up Fee.  In the event that at or prior to the Sale Hearing, another party presents a competing offer which constitutes a higher or better offer which is approved by the Bankruptcy Court as the successful bid, or in the event the Debtors' competing Chapter 11 Plan (the "Debtors' Plan") is confirmed, or in the event that at the Auction a party presents a competing offer which constitutes a higher or better offer which is accepted by the Indenture Trustee (an "Alternate Transaction"), then upon sale of the Property to such party, Purchaser shall be entitled to payment of a fee (the "Break-Up Fee") in an amount equal to Five Hundred Thousand Dollars ($500,000.00), which Break-Up Fee is intended to reimburse Purchaser for time, effort, and expenses incurred entering into and prosecuting this transaction, including but not limited to Purchaser's due diligence, travel, out-of-pocket expenses, and professional fees and costs.   The Break-Up Fee and the return of Purchaser's Earnest Money Deposit shall be Purchaser's sole remedy in the event of the consummation of an Alternative Transaction.  The Break-Up Fee shall be paid in Cash from the proceeds of and concurrent with the closing of the Alternative Transaction or as an Allowed Administrative Claim on the effective date of the Debtors' Plan in the event the Debtors' Plan is confirmed.

7.3     Negative Covenant Regarding Distributions.  Until all Guaranteed Payments have been paid or all Allowed Claims entitled to Guaranteed Payments have been purchased by Solsten Funding in the Dutch Auctions or extinguished through final payment, neither Solsten Drilling nor Solsten Funding shall, without the prior written consent of Indenture Trustee, pay or declare any Cash or other Distributions to Holders of any of their Equity Interests other than the Permitted Solsten Drilling Distributions, the Permitted Solsten Funding Distributions, payments under the Solsten Post-Confirmation Loan Agreement, and the 3% Preferred Buyback Rights.

## ARTICLE VIII
## MISCELLANEOUS

8.1     Waiver. Any term or provision of this Agreement may be waived in writing at any time by the Party which is entitled to the benefits thereof.  The failure of either Party at any time or times to require performance of any provision hereof shall in no manner affect such Party's right at a later time to enforce the same.  No waiver by any Party of a condition or of the breach of any term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of the breach of any other term, covenant, representation, or warranty of this Agreement.

8.2     Notices. All notices, requests, demands, Claims, Consents, or other communications required or authorized hereunder shall be in writing and shall be deemed to have been duly given by the applicable Party if personally delivered, sent by facsimile with receipt acknowledged, sent by a recognized commercial overnight delivery service which guarantees next Business Day delivery, sent by U.S. registered or certified mail return receipt requested and postage prepaid, or otherwise actually received (and confirmed to have been received) by the other Party at the address of the intended recipient set forth below:

If to Sellers:

[Insert Name / Address of Liquidating Trustee]

With copies to (which shall not constitute notice):

[Insert Name of Counsel to Liquidating Trustee]

If to Purchaser:

Duane Dudley
Solsten Drilling, LLC
310 K Street, Suite 700
Anchorage, Alaska  99501
(907) 264-6102 (phone)
(907) 264-6190 (fax)
Duane.Dudley@solstenxp.com

With copies to (which shall not constitute notice):

Michelle L. Boutin
JERMAIN DUNNAGAN & OWENS, P.C.
3000 A Street, Suite 300
Anchorage, Alaska  99503
(907) 563-8844 (phone)
(907) 563-7322 (fax)
mboutin@jdolaw.com

Either Party may change the address to which notices, requests, Claims, Consents, and other communications hereunder are to be delivered by giving the other Party prior written notice thereof in the manner herein set forth in this Section 8.2.

8.3    Further Assurances. Each of the Parties hereby agrees that after Closing it will execute and deliver such additional documents and will use commercially reasonable efforts to take or cause to be taken such further action as may be necessary or desirable, or as the other Party may reasonably request, to close and make effective the Contemplated Transactions. After the Closing, each Party, at the request of the other Party, and without additional consideration,

shall execute and deliver, from time to time, such additional documents of conveyance and transfer as may be necessary to accomplish the orderly transfer of the Purchased Assets and Business to Purchaser in the manner contemplated in this Agreement

8.4     Expenses. Except as otherwise expressly provided in this Agreement, each of the Parties shall pay all costs and expenses incurred or to be incurred by it and its advisors and representatives in connection with any negotiations respecting this Agreement and Contemplated Transactions, including preparation of documents, obtaining any necessary regulatory approvals, and the consummation of the other transactions contemplated hereby.

8.5     Successors and Assigns. This Agreement, and all rights and powers granted hereby, will bind and inure to the benefit of the Parties and their respective successors and permitted assigns.

8.6     Third Party Beneficiaries. This Agreement and any agreement contained, expressed, or implied herein, shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

8.7     Time of the Essence. Time is of the essence in the performance of all covenants and obligations under this Agreement.

8.8     Assignment. Neither this Agreement nor any Party's rights, interests, or liabilities hereunder may be assigned, transferred, conveyed, or pledged by operation of law or otherwise; provided, that Purchaser may transfer and assign prior to the Closing all or any portion of its rights and liabilities pursuant to this Agreement to an Affiliate thereof but (i) Purchaser shall not be relieved of their obligations hereunder as a result of such assignment, and (ii) to the extent any such assignment by Purchaser relates to the assignment by Sellers of an executory contract or unexpired Lease and occurs prior to the Closing such that, at the Closing, this Agreement will provide for Sellers' assignment of such executory contract or unexpired Lease to a Person other than Purchaser, such assignment by Sellers shall be subject to all applicable provisions of the Bankruptcy Code.

8.9     Governing Law; Venue. THIS AGREEMENT, THE TRANSACTION DOCUMENTS, AND THE LEGAL RELATIONS BETWEEN THE PARTIES WITH RESPECT TO THIS AGREEMENT, SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MISSISSIPPI WITHOUT REGARD TO RULES CONCERNING CONFLICTS OF LAWS.  Purchaser and Sellers agree that the Bankruptcy Court shall have exclusive jurisdiction over all disputes and other matters relating to (a) the interpretation and enforcement of this Agreement or any ancillary document executed pursuant hereto and (b) the Purchased Assets, and Purchaser expressly consents to and agrees not to contest such exclusive jurisdiction.  All Claims and Proceedings brought, arising out of, or related to the Contemplated Transactions shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such Claims and Proceedings. The Parties waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the bringing of any such Claim or Proceeding in such jurisdiction.

8.10   <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

8.11   <u>Entire Agreement; Amendment</u>. This Agreement (including any documents referred to in this Agreement) constitutes the entire agreement between the Parties with respect to the Contemplated Transactions and supersedes any prior understandings, negotiations, statements, discussions, correspondence, offers, agreements, or representations by the Parties, written or oral, relating in any way to the subject matter of this Agreement and the Contemplated Transactions.  No modification, amendment, or supplement of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties. Without limiting the generality of the preceding sentence, no conditions, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement will be binding unless hereafter made in writing and signed by the Party to be bound, and no modification will be effected by the acknowledgment or acceptance of documents containing terms or conditions at variance with or in addition to those set forth in this Agreement, except as otherwise specifically agreed to by the Parties in writing.

8.12   <u>Counterparts</u>. This Agreement may be executed by Purchaser and Sellers in one or more counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same instrument.  A facsimile transmission of a signed copy of this Agreement, shall be effective as a valid and binding agreement between the Parties for all purposes.

8.13   <u>Certain Limitations</u>. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT (OR ANY OTHER AGREEMENT RELATED HERETO) TO THE CONTRARY, IN NO EVENT SHALL ANY PARTY BE LIABLE (OR ENTITLED TO RECOVER) UNDER, OR IN RESPECT OF, THIS AGREEMENT FOR EXEMPLARY, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES.

[Signatures Follow]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date and year first above written.

**SOLSTENXP DRILLING, LLC**                    **FIRST SECURITY BANK, AS INDENTURE TRUSTEE**

BY: _Duane Dudley_                             BY: _Steve Jakubowski_

ITS: _CFO_                                     ITS: _Attorney & Authorized Signatory_


**SOLSTENXP VENTURE FUNDING, LLC**

BY: _Duane Dudley_

ITS: _CFO_


**O&G LEASING, LLC**                           **PERFORMANCE DRILLING COMPANY, LLC**

BY:_____                     BY:_____

ITS: Designated Representative                 ITS: Designated Representative

### SCHEDULE 1.1
### DEFINITIONS

Subject to Schedule 1.2 below, the following terms shall have the following definitions when used in the Agreement.  Capitalized terms used in this Agreement and not otherwise defined shall have the meaning set forth in the Plan of Reorganization:

"3% Preferred Interests" means those certain cumulative preferred interests in Solsten Drilling to be issued on the Effective Date to Holders of Allowed Class 2B Claims in the amount of one preferred interest for each $1.00 of principal amount of Allowed Class 2B Claim.  The form of designation of the 3% Preferred Interests is set forth at Schedule 1.1(a) hereof.  To the extent permitted by applicable law and this Plan, and as further provided in the form of designation attached hereto, a $0.03 annual cumulative dividend on each 3% Preferred Interest shall be owed, payable in arrears, to each Person holding 3% Preferred Interests of record on each anniversary following the Effective Date.  The form of designation will also provide that Solsten Drilling or Solsten Funding shall have (A) the right to purchase or redeem the 3% Preferred Interests in accordance with the 3% Preferred Interests Buyback Rights and (B) the right of first refusal in connection with any proposed transfer, assignment, or sale of beneficial ownership of the 3% Preferred Interests after the Effective Date to a Person that is not an Insider of such beneficial holder.

"3% Preferred Interests Buyback Rights" means the right, but not the obligation, of Solsten Drilling or Solsten Funding, to the extent permitted by applicable law, within 30 business days following the close of an annual Dutch Auction , to apply Excess Cash unused in the preceding Dutch Auction to redeem or purchase pursuant to the following formula the 3% Preferred Interests from any holder thereof who voluntarily offers to have a stated amount of its 3% Preferred Interests redeemed or purchased:

Solsten Drilling's Previous Fiscal Year EBITDA  (x)   4   (x)   0.15   (x)
(# of 3% Preferred Interests Offered / 7,610,000)  =   Purchase/Redemption Amt. Paid

By way of example, assuming an Effective Date of   12/31/2011, if (A) Solsten Drilling's EBITDA in its fiscal year ending 12/31/2012 is $5,000,000 and (B) Solsten Drilling or Solsten Funding accepts in its sole discretion the offer of such holder to have 1,000,000 in principal amount of its 3% Preferred Interests (plus accrued and unpaid dividends earned thereon) redeemed or purchased, then such the holder shall receive $394,736.84 in Cash (plus Cash at the stated formula rate for accrued and unpaid dividends earned thereon) in exchange for those 1,000,000 3% Preferred Interests (plus accrued and unpaid dividends earned thereon).

"Affiliate" means a Person that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with another Person.  As used in this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Aggregate Consideration" has the meaning set forth in Section 2.4.

"Agreement" has the meaning set forth in the Preamble.

"Allowed" has the meaning set forth in the Plan of Reorganization.

"Arbitration Receivable" means any and all Claims or rights of the Sellers against Odyssey Petroleum Corp. (US), a chapter 11 debtor, in the case captioned *In re Odyssey Petroleum Corp. (US)*, Case No. 10-01482-NPO, pending in the United States Bankruptcy Court for the Southern District of Mississippi.

"Assigned Contracts" has the meaning set forth in Section 2.1(b).

"Assigned Intangible Assets" has the meaning set forth in Section 2.1(k).

"Assigned Permits" has the meaning set forth in Section 2.1(j).

"Avoidance Actions" has the meaning set forth in the Plan of Reorganization

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court' has the meaning set forth in the Recitals.

"Bid Procedures" means those procedures established by Schedule 1.1(b) hereto and approved in the Disclosure Statement Order for conducting a 363 Sale of the Purchased Assets, including provision for payment of the Break-Up Fee.

"Books and Records" means the books, files, records, information, and data (including all Tax Returns and related workpapers and electronic data to the extent transferable) relating to the Purchased Assets and Business that are in the possession of Sellers, including data regarding all accounts receivable and accounts payable in such form as reasonably requested by Purchaser so that such data can be transferred to Purchasers' accounting system from Sellers' accounting system.

"Break-Up Fee" has the meaning set forth in Section 7.2.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks in Houston, Texas are authorized or required by Law to close.

"Cash Contribution" has the meaning set forth in Section 2.4.

"Claim" means any demand, claim (including, without limitation, as defined in Section 101(5) of the Bankruptcy Code), cause of action, suit, demand, judgment, complaint, notice of noncompliance or violation, or other assertion of Liability.

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"Code" means the Internal Revenue Code of 1986, as amended.

"Computer Software" has the meaning set forth in the definition of Intellectual Property.

"Confirmation Order" means the Plan of Reorganization filed by the Trustee that is confirmed by Order of the Bankruptcy Court.

"Consent" means any necessary ratification by, notification requirement to, filing or registration with, or consent, waiver, approval, permit, or other authorization from, a Governmental Authority or other third party.

"Contemplated Transactions" means all of the transactions contemplated by this Agreement, including: (a) the sale of the Purchased Assets to Purchasers as approved by the Transfer Order; (b) the execution and delivery of the Transaction Documents; (c) the performance by the Parties of their respective covenants and obligations under this Agreement; and (d) confirmation of the Plan of Reorganization.

"Contract" means any contract, agreement, lease, license, instrument, commitment, or other obligation or arrangement (whether written or oral), and any liability, cost, or expense of whatever kind or nature relating to the foregoing, that is binding on a Person or any part of its property under applicable Law.

"Cure Amounts" has the meaning set forth in Section 2.3.

"Damages" means any and all damages, losses, liabilities, payments, obligations, penalties, fines, assessments, charges, costs, Taxes, disbursements or expenses (including interest, awards, judgments, settlements, costs of redemption, fees, reasonable disbursements and expenses of attorneys, accountants and other professional advisors and of expert witnesses and costs of investigation and preparation of any kind or nature whatsoever) and court costs.

"D&O Claims" has the meaning set forth in Section 2.2(h).

"Due Diligence Period" means the 30 day period following the Execution Date

"Employee Benefit Plan" means any (a) employee welfare benefit plans or employee pension benefit plans as defined in sections 3(1) and 3(2) of ERISA, including plans that provide retirement income or results in deferrals of income by employees for periods extending to their terminations of employment or beyond, and plans that provides medical, surgical or hospital care benefits or benefits in the event of sickness, accident, disability, death or unemployment and (b) other employee benefit agreements or arrangements that are not ERISA plans, including any deferred compensation plans, incentive plans, bonus plans or arrangements, stock option plans, stock purchase plans, stock award plans, golden parachute agreements, severance pay plans, dependent care plans, cafeteria plans, employee assistance programs, scholarship programs,

retention incentive agreements, noncom petition agreements, vacation policies and, or other similar plans, agreement or arrangements that (i) are maintained by or required to be contributed to Sellers or any Affiliates thereof or with respect to which Sellers may have any Liability, (ii) have been approved by Sellers or any Affiliates thereof but are not yet effective for the benefit of Seller Employees or their beneficiaries, or (iii) that were previously maintained by Sellers or any Affiliates thereof and with respect to which Sellers or any Affiliates thereof may have any Liability, contingent or otherwise.

"Environmental, Health and Safety Laws" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Resource Conservation and Recovery Act of 1976, the Occupational Safety and Health Act of 1970, each as amended, together with all other laws, rules and regulations of federal, state, local and foreign governments (and all agencies thereof) and other requirements having the force or effect of law relating to or imposing liability or standards of conduct concerning pollution or protection of the environment, public health and safety, or employee health and safety, and all judgments, orders and decrees of federal, state, local and foreign governments (and all agencies thereof) having the force and effect of law issued or promulgated thereunder, and all related common law theories.

"Equipment" has the meaning set forth in Section 2.1(c).

"Equity Interest" means (a) with respect to a corporation, any and all shares of capital stock of such corporation, (b) with respect to a partnership, limited liability company, trust, or similar Person, any and all units, interests, or other partnership/limited liability company interests, and (c) any other direct or indirect equity ownership or participation in a Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Execution Date" means the date first referenced in the preamble to this Agreement.

"Excluded Assets" has the meaning set forth in Section 2.2(a).

"Excluded Contracts" has the meaning set forth in Section 2.2(b).

"Governmental Authority" means the United States and any foreign, state, county, city, or other political subdivision and any department, commission, ministry, board, bureau, agency, commission, officer, official, court, tribunal, arbitrator, board or bureau or other instrumentality thereof or any quasi-governmental or private body exercising any regulatory, administrative, taxing, importing, exporting, or other governmental or quasi-governmental function and any self-regulatory organization.

"Guaranteed Payments" means (I) payments required to be made to Holders of Allowed Class 2C Claims and (II) (A) the $818,292 in quarterly payments required to be tendered by the Purchaser to the Indenture Trustee for the benefit of Holders of Class 2A Claims under Plan Alternative A or (B) the $818,292 required to be tendered in quarterly payments tendered by the Purchaser the Liquidating Trustee for the benefit of Holders of Class 3 Claims under Plan Alternative B (less any amounts required to be paid separately to Holders of Allowed Class 2D Claims if (x) a Final Order is entered against the Holders of Class 2A and Class 2B Claims in the Pending Series 2009 Avoidance Adversary Proceeding and (y) a Final Order is entered in favor

of the Holders of Allowed Class 2D Claims in the Prospective Octane Funding Avoidance Adversary Proceeding), on or about the last Business Day of each of 40 successive calendar quarters commencing on the last day of the first full calendar quarter following the Effective Date.

"Intangible Personal Property" means proprietary rights, business names, business logos, slogans, processes, Intellectual Property, franchises, licenses, technology, computer software, source codes, operating rights, plans and specifications, third party guaranties and warranties, rights with respect to telephone and facsimile numbers and email addresses or listings, server code, data and content, and all other intangible rights and property, and any work product, knowledge, creative works, and other proprietary data related thereto.

"Intellectual Property" means all copyrights, patents, trademarks, trade names, service marks, mask works, domain names, email addresses, uniform resource locator addresses, trade dress, logos, slogans, symbols, corporate names, rights of publicity and privacy, inventions, design rights, drawings, trade secrets, customer and supplier lists, pricing and marketing plans, policies and strategies, methods of operation, royalties, secret processes, formulae, rights in know-how and all applications, registrations, renewals and other rights relating to the foregoing (whether or not any registration or filing has been made with respect thereto) used primarily in connection with the Business, including the Computer Software, Trademark Intellectual Property and the Website Intellectual Property.

"Intellectual Property" includes the following:

(i)   Sellers' software programs, tools, kits, and any content or related documentation or third party or open source code embedded therein, either locally stored on Sellers' computers or remotely accessed by Sellers, that is owned or made available to Sellers and is used in, held for use in, or is necessary for the operation of the Purchased Assets or Business or otherwise, and any upgrades, updates, releases, fixes, enhancements, or modifications thereto, and all written materials and specifications applicable thereto (collectively, the "Computer Software");

(ii)   the names "O&G Leasing" and "Performance Drilling" and the marks "O&G Leasing" and "Performance Drilling" and any other registered or unregistered trademarks, trade names, service marks, domain names, and email addresses, including the terms "O&G Leasing" and "Performance Drilling," used or held for use in the Business (collectively, the "Trademarks"), and any and all goodwill associated with the Business embodied in the Trademarks, and any and all rights of Sellers with respect to the Trademarks (collectively, the "Trademark Intellectual Property");

(iii)   Sellers' internet websites and any derivations thereof (collectively, the "Website") and all intellectual property rights that may exist or arise in connection with the Website, including all Underlying Technology (collectively, the "Website Intellectual Property"); and

(iv)   uniform resource locator addresses, trade dress, logos, slogans, symbols and corporate names.

"Knowledge," "Know," or "Knowing" means in the case of Sellers, the actual knowledge of the Seller Designees after reasonable inquiry but without independent investigation and, in the case of Purchasers, the actual knowledge of the Purchasers Designees after reasonable inquiry but without independent investigation.

"Law" means all applicable local, state, federal, tribal, and foreign laws (whether statutory or common) and rules, regulations, rules, tariffs and regulatory authorizations, codes (including the Code), and ordinances promulgated thereunder, as well as case law, judgments, orders, consent orders, or decrees.

"Lease" means any lease or sublease, including any amendments thereto, of any Purchased Asset.

"Liabilities" means any and all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, or determined or determinable, including those arising under any Law or Order of any Governmental Authority and those arising under any contract, agreement, arrangement, commitment or undertaking.

"Lien" means any charge against or interest in property to secure payment of a debt or performance of an obligation such as a Claim, debt, mortgage, indenture, hypothecation, encumbrance, Liability, lien, right of redemption, security interest, mechanic's or materialman's lien, judgment lien, assessment, special assessment, title defect, restriction, reservation, reversion, Contract, or right or interest of any third party, whether absolute or contingent, and the filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction.

"Material Adverse Effect" means any events, circumstances, development, change or effect that, individually or in the aggregate with all other events, circumstances, developments, changes and effects, has: (i) a material adverse effect on the Purchased Assets; provided, however, that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: any adverse change, event, development, or effect arising from or relating 'to (1) acts of war or terrorism occurring after the date hereof so long as the Purchased Assets are not disproportionately affected thereby; (2) any change arising from and related to the market in general in which Sellers operate the Purchased Assets, the United States economy as a whole, or the international economy; (3) changes in GAAP or (4) the Cases; or (ii) a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement.

"New Indenture" means the indenture to be executed between the Purchaser and the Indenture Trustee pursuant to which the Series 2011A Debentures will be issued to the Holders of Allowed Class 2A Claims under Plan Alternative A in accordance with Section 4.2 of the Plan and in such form as is set forth at Schedule 1.1(b) hereof, the terms of which shall be satisfactory to the Purchaser in its sole discretion.

"New WSB Loan" means the loan and security agreement to be executed between the Purchaser and Washington State Bank in accordance with Section 4.4 of the Plan and in such

form as is set forth at Schedule 1.1(c) hereof, the terms of which shall be satisfactory to the Purchaser in its sole discretion.

"Offer of Employment" has the meaning set forth in Section 4.1.

"Order" means any order, ruling, decision, verdict, decree, charge, award (including arbitration awards), judgment, injunction, directive or other similar determination or finding by, before, or under the supervision of any Governmental Authority, or any arbitrator, board of arbitration, or similar entity including any regulatory or administrative Proceeding.

"Organizational Documents" means the articles of incorporation, certificate of incorporation, charter, bylaws, articles or certificate of formation, regulations, operating or company agreement, certificate of limited partnership, partnership agreement, and all other similar documents, instruments or certificates executed, adopted, or filed in connection with the creation, formation, or organization of a Person, including any amendments thereto.

"Party" or "Parties" has the meaning as set forth in the Preamble.

"Permits" means all licenses, permits, concessions, franchises, certificates, consents, exemptions, approvals, variances, registrations, or authorizations of any Governmental Authority, necessary or desirable in connection with, related to, or associated with the Purchased Assets or the conduct of the Business.

"Permitted Encumbrances" means, with respect to the Purchased Assets, any of the following matters: (a) all easements, rights-of-way, and restrictive covenants affecting the Real Properties which individually or in the aggregate could not be reasonably expected to interfere with the operation of the Purchased Assets or Business by Purchasers; and (b) Liens that are excused or unenforceable from and after the Closing Date as a result of the filing of the Petitions or the applicability of the Bankruptcy Code.

"Person" means any individual, firm, association, incorporated or unincorporated organization, partnership, business, trust, estate, joint stock company, joint venture, club, syndicate, company; corporation, Governmental Authority, or other legal entity.

"Petition Date" means the date on which Sellers file the Petitions commencing the Bankruptcy Cases.

"Petitions" has the meaning set forth in the Recitals.

"Plan of Reorganization" means the plan of reorganization or liquidation to be filed by the Trustee in the Bankruptcy Court that is confirmed by Order of the Bankruptcy Court pursuant to the Confirmation Order.

"Plan Alternative A" means the treatment described in the Plan of Reorganization as Plan Alternative A.

"Plan Alternative B" means the treatment described in the Plan of Reorganization as Plan Alternative B.

"Proceeding" means any action, suit, hearing, investigation, audit, examination, arbitration, litigation, review or other proceeding, at law or in equity, before any Governmental Authority, including any regulatory or administrative proceeding.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchaser" and "Purchasers" has the meaning set forth in the Preamble.

"Retained Books and Records" has the meaning set forth in Section 2.2(e).

"Retained Liabilities" has the meaning set forth in Section 2.5.

"Rigs" has the meaning set forth in the Recitals.

"Seller" and "Sellers" have the meanings set forth in the Preamble.

"Seller Employees" mean all employees of Sellers and, for purposes of continuation coverage under COBRA, all former employees of Sellers who have elected to receive COBRA continuation coverage under a Seller group health plan.

"Series 2009 Debentures" means, collectively, the Senior Series 2009A Debentures and the Series 2009B Debentures.

"Senior Series 2009A Debentures" means the 10.50% Debentures, Senior Series 2009A issued by O&G Leasing, LLC, in the approximate amount of $25,955,000.

"Series 2009B Debentures" means the 16.00% Debentures, Series 2009B issued by O&G Leasing, LLC, in the approximate amount of $7,610,000.

"Tangible Personal Property" means furniture, fixtures, furnishings, racks, cabinets, hardware, tools, machinery, instruments, measuring and other devices, appliances, supplies, communications devices and systems, computers, servers, and other computer equipment, hardware and systems, electrical equipment and systems, construction, repair, and maintenance equipment, materials, spare parts, and any other items of tangible personal property.

"Tax" means any federal, state, local or foreign income tax, ad valorem tax, excise tax, sales tax, use tax, value added tax, alternative or add-on minimum tax, franchise tax, real or personal property tax, transfer tax, gross receipts tax, escheat or unclaimed property tax, or other tax, assessment, duty, fee, levy or other governmental charge of any kind whatsoever, together with and including any and all interest, fines, penalties, assessments and additions to tax resulting from, relating to, or incurred in connection with any such tax or any contest or dispute thereof.

"Tax Returns" means all returns, declarations, reports, statements and other documents required to be filed in any federal or state jurisdiction.

"Trademark Intellectual Property" has the meaning set forth above within the definition of Intellectual Property.

"Trademarks" has the meaning set forth above within the definition of Intellectual Property.

"Transferred Books and Records" has the meaning set forth in Section 2.1(l).

"Transaction Documents" means the agreements listed in Sections 3.3 and 3.4, and any other agreements or documents executed in connection with or as required under this Agreement.

"Transfer Order" means an Order issued by the Bankruptcy Court approving this Agreement and the Contemplated Transactions and the sale of the Purchased Assets to the Purchaser free and clear of all interests in such property, as provided in and to the maximum extent permitted by 11 U.S.C. §§ 363(b), (f).

"Transferred Employee" has the meaning set forth in Section 4.1.

"Transferred Rig Documents" means any and all class and flag documentation (originals and any existing copies); all existing drawings (hard and electronic); any third party survey or gauging reports; any manuals for foreign equipment that are in Sellers' possession; all shop and maintenance records, including for all well control and lifting/ hoisting equipment; Assigned Permits related thereto; and other documents primarily relating to Transferred Rigs.

"Transferred Rigs" has the meaning set forth in Section 2.1(a).

"Website" has the meaning set forth above within the definition of Intellectual Property.

"Website Intellectual Property" has the meaning set forth above within the definition of Intellectual Property.

"Underlying Technology" means any and all technical information, software, specifications, drawings, records, shared drive and other computer files, work product, works of authorship, or other creative works or ideas knowledge, know-how, trade-secrets, invention disclosures, or other data including works subject to copyright protection and mask works associated with Sellers' website or operation thereof, including related e-mail.

## SCHEDULE 1.1(a)
### FORM OF DESIGNATION OF 3%
### PREFERRED INTERESTS IN SOLSTEN DRILLING

**[Forthcoming]**

## SCHEDULE 1.1(b)
## FORM OF NEW INDENTURE FOR SERIES 2011A DEBENTURES

### [Forthcoming]

## **SCHEDULE 1.1(c)**
**FORM OF NEW WSB NOTE**


**[Forthcoming]**

## SCHEDULE 1.2
## INTERPRETATIONS

Unless expressly provided for elsewhere in this Agreement, this Agreement shall be interpreted in accordance with the following provisions:

(a)     All references herein to Articles, Sections, Exhibits and Schedules are to Articles and Sections of and Exhibits and Schedules attached to and forming part of this Agreement, unless the contrary is specifically stated;

(b)     The headings of the Articles, Sections and subsections of this Agreement and the headings contained in the Exhibits and Schedules hereto are inserted for convenience of reference only and shall not in any way define or affect the meaning, construction, or scope of any of the provisions hereof or thereof;

(c)     A defined term has its defined meaning throughout this Agreement and each Exhibit and Schedule to this Agreement, regardless of whether it appears before or after the place where it is defined;

(d)     In the event of any conflict between the main body of this Agreement and the Exhibits and Schedules hereto, the provisions of the main body of this Agreement shall prevail;

(e)     Except where specifically stated otherwise, any reference to any statute, regulation, rule, or agreement shall be a reference to the same as amended, supplemented or reenacted from time to time;

(f)     Whenever the words "include," "including," or "includes" appear in this Agreement, they shall be read as if followed by the words "without limitation" or words having similar import;

(g)     Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

**SCHEDULE 2.1(a)**
**TRANSFERRED RIGS**

The rigs commonly referred to by the Sellers as Rig 22, Rig 48, Rig 3, Rig 14, and Rig 28.

## SCHEDULE 2.1(b)
## ASSIGNED CONTRACTS


**[Forthcoming]**