# EXHIBIT 6

**Indenture Trustee's Motion to Appoint a Trustee or Examiner
(1/19/2011)**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# JACKSON DIVISION

| | |
|---|---|
| IN RE: O&G LEASING, LLC, ET AL., <br> **Debtors** | CHAPTER 11 CASE NO: 10-01851-EE <br> **Chapter 11** <br> **Jointly Administered** |

**FIRST SECURITY BANK AS TRUSTEE'S
MOTION TO APPOINT TRUSTEE OR EXAMINER
FOR DEBTORS, O&G LEASING, LLC AND
PERFORMANCE DRILLING COMPANY, LLC**

First Security Bank, as trustee ("FSB"), pursuant to 11 U.S.C. § 1104 respectfully moves for the appointment of a trustee or examiner for the debtors, O&G Leasing, LLC ("O&G") and Performance Drilling Company, LLC ("PDC"). In support, FSB would state as follows:

1. FSB is a secured creditor and party-in-interest in this proceeding.

2. O&G and PDC are Chapter 11 debtors by virtue of their voluntary petitions for relief filed on or about May 21, 2010. By Order dated May 27, 2010 (Dk #34), the Court consolidated the Chapter 11 proceedings of O&G and PDC for administrative purposes.

## I. BACKGROUND

3. Prior to the bankruptcy, O&G and PDC entered into a series of debenture financing transactions pursuant to which they financed the acquisition and/or construction of five (5) drilling rigs. Under their business plan, O&G would purchase/construct the rigs and lease them to PDC for operation. All of the revenue generated from the rigs was intended to be held by PDC but pledged to FSB to repay the debentures that were issued to finance the purchase/construction of the rigs.

4. The debtors acquired/constructed the rigs over a three year period beginning in 2006. With each rig, the Debtors issued a series of debentures. With each debenture issue, FSB served as

the trustee on the underlying trust indenture. A brief summary of the debenture financing transactions follows:

    a.    In 2006, PDC issued $5,100,000 Series 2006 A and $1,680,000 Series 2006 B Debentures ("2006 Debentures") for PDC's acquisition of Drilling Rig No. 1, which is now identified as Drilling Rig No. 22. FSB was the indenture trustee on the debentures. The 2006 Debentures were secured by a security agreement executed by PDC pursuant to which it granted FSB a security interest in Rig No. 22 along with the revenue from Rig No. 22. In 2006, FSB filed a UCC-1 to perfect its security interest in Rig No. 22 and the revenue. A copy of the UCC-1 is attached as Exhibit "A" and incorporated herein by reference. This UCC-1 remains effective.[1]

    b.    In 2007, O&G issued $5,800,000 Series 2007A and $1,515,000 Series 2007 B Debentures ("2007 Debentures") to acquire Rig No. 3. FSB was the indenture trustee on the debentures. The 2007 Debentures were secured by a security agreement executed by O&G and PDC pursuant to which they granted FSB a security interest in Rig No. 3 along with the revenue from Rig No. 3. In 2007, FSB filed a UCC-1 to perfect its security interest in Rig No. 3 and the revenue. A copy of the UCC-1 is attached hereto as Exhibit "B" and incorporated herein by reference. This UCC-1 remains effective.

    c.    In 2008, O&G issued $17,600,000 Series 2008 A and $4,440,000 Series B Debentures ("2008 A and B Debentures") to acquire Rig No. 28. FSB was the indenture trustee on the debentures. The 2008 A and B Debentures were secured by a security agreement executed by

---

[1] Pursuant to Mississippi Code Annotated § 75-9-515, a UCC financing statement remains effective until terminated. None of the UCC-1 financing statements attached as an exhibit to this motion have been terminated and all remain effective. *See In re: Bishop*, 52 B.R. 470 (N.D. Ala. 1985).

O&G and PDC pursuant to which they granted FSB a security interest in Rig Nos. 28 and 22, which had been transferred to O&G by PDC, along with the revenue from both Rig No. 28 and Rig No. 22. FSB filed a UCC-1 to perfect its security interest in Rig Nos. 28 and 22 and the revenue. A copy of the UCC-1 is attached hereto as Exhibit "C" and incorporated herein by reference. This UCC-1 remains effective.

    d.  Later in 2008, O&G issued $5,670,000 Series C and $2,500,000 Series D Debentures ("2008 C and D Debentures") to finance the acquisition of Rig No. 14 and fund closing costs of a Senior Loan from Washington State Bank secured by Rig No. 48 (formerly known as Rig No. 2). FSB was the indenture trustee on the debentures. The 2008 C and D Debentures were secured by a security agreement executed by O&G and PDC pursuant to which they granted FSB a security interest in Rig No. 14 and related assets, including the revenue from Rig No. 14 and a second lien on Rig No. 48 and its revenue. FSB filed a UCC-1 to perfect its security interest in Rig Nos. 14 and 48 and their revenue. A copy of the UCC-1 is attached hereto as Exhibit "D" and incorporated herein by reference. The UCC-1 remains effective.

    e.  In September of 2009, PDC and O&G exchanged the prior debentures for 2009 Series A debentures in the amount of $25,955,000 and 2009 Series B debentures in the amount of $7,610,000. In the express words of the Debtors, the 2009 debentures were issued "in order to induce the Debenture owners to exchange O&G's prior debentures [2007 Series A&B Debentures, 2008 Series A, B, C & D Debentures for 2009 A & B Debentures] for its 10.50% Debentures, Senior Series 2009A and its 16.00% Subordinate Debentures, Series 2009 B in the aggregate principal amount of $33,565,000 for the purpose of exchanging the Debentures for O&G's Prior Debentures (herein referred to as the "Exchange"), and thus simplify O&G's capital and debt structure and to

3

balance the cash flow from each of the Drilling Rigs." See Assignment of Drilling Contracts, Lease, Rents, Revenues and Pledge and Security Agreement attached hereto as Exhibit "E" and incorporated herein by reference. The security for the 2009 Debentures remained the same as security for the prior debentures.

5. Under the 2009 Debentures, the Debtors were required to make interest only payments beginning on March 15, 2010 and continuing until maturity. A true and correct copy of one of the 2009 Debentures is attached hereto as Exhibit "F" and incorporated herein by reference.

6. When the first interest payment on the 2009 Debentures came due on March 15, 2010, the Debtors failed to make the payment. This bankruptcy proceeding ensued.

## II. LEGAL AUTHORITY FOR APPOINTMENT OF TRUSTEE

7. Pursuant to § 1104(a)(1), the court shall order the appointment of a trustee for cause, including fraud, dishonesty, incompetence or gross mismanagement by current management, before or after the commencement of the case or for similar cause.

8. The cause grounds listed under § 1104(a)(1) are not exhaustive. Section 1104(a)(1) is intended to give the court wide latitude in determining whether the appointment of a trustee is necessary under the facts of each case. *In re: Marvel Entertainment Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1998). Acrimony between the debtor and its creditors is sufficient cause for appointment of a trustee. *Id. See also In re: Cajun Elec. Power Co-Op, Inc.*, 74 F.3d, 599, 600 (5th Cir. 1996) (adopting at rehearing the opinion of dissent in 69 F.3d at 751).

9. The Court also may appoint a trustee under § 1104(a)(2) if such appointment is in the best interest of the creditors. Under § 1104 (a)(2), the Court is not required to find cause. Instead, it must only determine that it is "in the interest of creditors and other interests of the estate to have

an independent third party assume control." *Taub v. Taub*, 210 U.S. Dist. Lexis 104805, at *17 (E.D.N.Y. August 30, 2010) *citing In re: V. Savino Oil and Heating Co.*, 99 B.R. 518, 527 n. 11 (Bankr. E.D. N.Y. 1989) ("In essence, . . . it seems that § 1104(a)(2) reflects the practical reality that a trustee is needed.")

### III. CAUSE GROUNDS FOR APPOINTMENT OF TRUSTEE/EXAMINER

10. Current management of Debtor is the same management that operated O&G and PDC on a pre-petition basis. Post-bankruptcy, management has continued its free spending practices that led to this case being filed only now it is doing so under the protection of the bankruptcy court. As shown below, management has numerous conflicting interests which cast doubt on its ability to manage the Debtors for the benefit of its creditors. These conflicts and continued mismanagement justify the appointment of an independent trustee.

    a. **Transactions with insiders of the Debtor.**

        **1. Dell Group Holdings, LLC**

11. The Debtors' post-petition management has continued with the pre-petition relationships with affiliated companies. The relationships benefit only insiders of the Debtors and not creditors of the estate.

12. Specifically, the Debtors are paying Dell Group Holdings, LLC ("Dell Group"), an entity controlled by Ben Turnage, who is also the managing member and CEO of the Debtors, $45,000 a month for "management fees."

13. According to Turnage, Dell Group is a "holding and investment company. It owns a number of different companies and provides management services to those companies and others

as well." Transcript of 2004 exam of Dell Group p. 41 Exhibit G.[2] Dell Group is the parent company of SAJAC O&G Investors, LLC ("SAJAC"). See Transcript p. 28. ("Well, Dell Group is the parent of SAJAC. . . ."). SAJAC is the 100% owner of the Debtors. SAJAC has pledged its ownership interest in the Debtors to secure the 2009 Debentures. See Membership Interest Pledge Agreement attached as Exhibit "H." [3]

14. There has been no independent examination of what the "management fee" actually represents or whether it is reasonable or necessary.

15. According to the 2004 examination of Dell Group, the management fee is paid to Dell Group for "management services" it provides to O&G and Performance Drilling. Transcript of Dell Group pp. 41 and 42. The amount of the "management fee" is determined by Ben Turnage. Transcript of Dell Group pp. 41 and 42. Turnage, who is also CEO of Debtors, is believed to be an employee of Dell Group. According to Turnage, he spends "about 50% - 60% of my time managing O&G." Transcript of Dell Group, Exhibit "G", p. 43. The CEO of the Debtors, who is believed to be an employee of another company that has a contract with the Debtor, has a conflict of interest in determining how much the Debtors should pay the company for which he works.

16. According to Mr. Turnage's 2004 testimony, approximately $25,000 a month of the "management fee" is allocated to his compensation. This specific amount is not disclosed in the Statement of Financial Affairs. The remainder is allocated to "accounting services" for employees

---

[2] The 2004 Transcript of Dell Group, SAJAC, Octane Funding and Octane Funding II is attached hereto as Exhibit "G." There is one transcript because Ben Turnage testified on behalf of all these entities.

[3] FSB has sued SAJAC to foreclose on the membership interest of the Debtors. Counsel for the Debtors, Young Williams P.A., also represents SAJAC in that litigation.

William Wicker, Eric Butler, Mr. Turnage's assistant, Beth Bosnoian, and rent. Transcript of Dell Group, Exhibit "G", pp. 47 - 49. This relationship is detrimental to the creditors because it increases the operating costs of the Debtors. Further, because management has a conflicting interest, it has no incentive to reduce any of these costs. The extent to which Dell Group employees Wicker and Butler actually provide accounting services to the Debtors is unknown. The Debtors' have a significant line item budget category for "general and administrative" payroll. These G&A employees are paid $41,526 per pay period or $646,040 as of December 24, 2010. According to Debtors' 2004 exam, there are several accounting employees within the G&A category, including the CFO of the Debtors, Jeff Goodwin, who is a CPA, and two bookkeeping employees located at the company's headquarters. Transcript of 2004 Examination of Debtors attached hereto as Exhibit "I", pp. 8, 107. Further, the Debtor retained Ken Lefoldt, CPA, to provide accounting services to it on a post-petition basis.

17. Dell Capital Partners LP ("Dell Capital"), also an affiliate of the Debtors, provides the office space where the Debtors' headquarters are located. Dell Capital leases the space on the 13th and 16th floors of Capital Towers in Jackson, Mississippi from Capital Towers Company, LLC ("CTC"). Dell Capital's managing partner is Turnage. According to the invoice from CTC, the annual rent paid for the CTC space is $64,186.50 a year. The invoice is attached hereto as Exhibit "J." Some portion of the "management fee" paid by the Debtors is paid through Dell Group to Dell Capital.

18. O&G is not the only Turnage related entity that occupies space in CTC. Dell Group is located there along with SAJAC, Octane Funding, LLC and Octane Funding II, LLC. It is unknown whether these entities pay any of the rent for the CTC space or if the portion of the

management fee paid to Dell Group pays all the rent. Again, a conflict of interest exists because management of all these companies is the same person and management has no incentive to reduce any of these expenditures since it benefits related entities.

### 2. SAJAC O&G Investors, Octane Funding and Octane Funding, II

19. The inter-company relationship between SAJAC, Dell Group and the Debtors also presents a conflict of interest situation with respect to the management of the Debtor. According to the 2004 examinations of SAJAC, Dell Group, Octane Funding and Octane Funding II,[4] all these entities are managed by Ben Turnage. Prior to the bankruptcy, these entities entered into an elaborate lending relationship whereby O&G borrowed $3,801,976.07 from SAJAC through Dell Group. Transcript of 2004 exam of SAJAC, Exhibit "G", pp. 20, 25. Within one year of this filing, these loans were paid off by a loan from Octane Funding and Octane Funding, II, both of whom who are also related entities. Transcript SAJAC, Exhibit "G", pp. 24 and 25.

20. In this Chapter 11 case, Octane Funding and Octane Funding II now claim a perfected security interest in all of the assets of O&G and PDC. Schedule D to O&G's Bankruptcy Schedules, attached hereto as Exhibit "K" and incorporated herein by reference. This security interest was allegedly perfected on March 3, 2010, well within the one year preference period for insider transactions. See UCC -1 Financing Statements attached hereto as Exhibit "L." This transfer was not disclosed in response to question number 10 of the Statement of Financial Affairs of O&G or PDC. The Debtors have not challenged any of these transactions.

### 3. Transactions with David Grumpy Farmer, Inc.

---

[4]Octane Funding and Octane Funding II are owned by family members of Turnage. Transcript of SAJAC, Exhibit "G", p. 24 ("Well, I'm the manager of all of those entities, and they are basically all - each owned by various family-related entities.").

21. The president of PDC is an individual named David "Grumpy" Farmer ("Farmer"). Farmer owns a company, David Grumpy Farmer, Inc. ("DGFI"). On a pre and post-petition basis, the Debtors have paid DGFI substantial sums on a monthly basis. Specifically, DGFI leases space to PDC in Brandon, Mississippi for $5,000 a month. The Debtors pay DGFI a "consulting fee" of $18,500 a month as compensation to Mr. Farmer, who is an employee of DGFI and not the Debtors. This specific compensation to Mr. Farmer is not disclosed in the Statement of Financial Affairs. Transcript of 2004 exam of DGFI, Exhibit "M", p. 14. The Debtors pay DGFI a monthly "lease payment" for vehicles and forklifts owned by DGFI and leased to the Debtors. Transcript of DGFI, Exhibit "M", p. 18.

22. Under the equipment lease arrangement, DGFI has purchased vehicles and forklifts which it financed 100% with a third party. DGFI leased those vehicles and forklifts to the Debtors. The lease payments paid by the Debtors on the vehicles equal the monthly payments due on the third party note plus an extra $100 per vehicle. Transcript of DGFI, Exhibit "M", p.18. DGFI charges the Debtors $100 per day for the use of its forklifts. Transcript of DGFI, Exhibit "M", pp. 19-21. This arrangement is not beneficial to the estate because once the financing contracts are paid, DGFI, who has put no money into the purchases, owns the vehicles and forklifts free and clear of liens instead of the Debtors. These transactions with DGFI further support the appointment of a trustee to manage the operations of the Debtors.

### 4. Post-Petition Purchases of Vehicles Without Court Approval

23. In November of 2010, the Debtors purchased two (2) brand new pick-up trucks without Court approval. Specifically, the Debtors paid cash for two (2) pick-up trucks that it supplied to two of its employees. The purchases totaled over $63,000. Not only were the purchases

9

not approved by the Court, but creditors only learned about these transactions when the Debtors' November operating reports were filed in December which disclosed payments to **Rogers Chevrolet Hummer**. See November operating report attached as Exhibit "N" and incorporated herein by reference. Counsel for the debtors confirmed via e-mail that these purchases occurred. These post-petition purchases further demonstrate the need for a trustee to manage the operations of the Debtors.

24. In summary, on a post-petition basis, according to the reports furnished by the Debtors for week ended December 24, 2010, the Debtors have paid $315,652 in management fees to Dell Group, $646,040 in general and administrative payroll, of which $129,500 (7x $18,500) went to DGFI's management fee. Further, the Debtors have paid approximately $110,000 in truck leases and $64,700 in forklift leases to DGFI and purchased new vehicles without Court approval for $63,000. Accordingly, insiders of the Debtors have received nearly $1,000,000, since the case was filed, while creditors have received nothing. Current management has not demonstrated a desire to curtail this spending and indeed have every incentive not to do so because of its conflicts of interest. If a trustee is not appointed, there may be nothing left to reorganize.

  b. **Acrimonious Relationship with Creditors**

25. As noted above, acrimony between the debtors-in-possession and creditors constitutes cause grounds for the appointment of a trustee. This is particularly true where management has a conflict of interest in relation to its management of the company. *In re: Marvel*, 140 F.3d at 473 (" Having found that this unhealthy conflict of interest was manifest in the 'deep seeded conflict and animosity' between the . . . debtor and the Lenders . . . the district court did not depart from the proper exercise of discretion when it determined sufficient cause existed under §

1104(a)(1) to appoint a neutral trustee to facilitate reorganization").

26. The Debtors' relationship with FSB has been nothing short of the deep seeded animosity described in *Marvel*. The Debtors have fought FSB at every step of the way in this proceeding. The Debtors would not agree to 2004 examinations without Court intervention. The Debtors have filed an adversary proceeding against FSB to determine the extent and validity of its liens even though FSB has filed five UCC-1 Financing Statements perfecting its security interest in all the rigs, which have never been terminated.

27. The Debtors filed a motion pursuant to FRBP 2019 to require FSB to do something that the Debtors <u>knew</u> could not be done; name <u>all</u> of the owners of the beneficial interests in the debentures. When FSB objected, the debtors accused FSB and its attorneys of misleading the Court. This motion only wasted the Court's time and assets of the estate that could be used to pay creditors.

28. In the adversary proceeding against FSB, the Debtors are engaging in litigation tactics that will only delay the outcome of the adversary proceeding. The Court need only review the Debtors' answers to requests for admissions where the denials are almost laughable to see this is true.[5] Even if the Debtors are successful in their litigation, they still must pay the debenture holders' unsecured claims in full under the absolute priority rule. Rather than address these issues, the Debtors filed a <u>second</u> motion to extend the exclusivity period to file a plan in part on the basis that this adversary proceeding is unresolved.

29. The Debtors' motion to set aside order and for protective order, docket No. 319,

---

[5] The Debtors have denied that the filed documents, obtained from the Mississippi Secretary of State, are true and correct copies, have denied that the UCC terminations have not been filed ("Plaintiffs admit only that Plaintiffs have not filed a termination of UCC-1 Financing Statement No. 20060203516G but deny all remaining allegations.") and denied that the previous debentures were even secured by a security interest in each rig.

further demonstrates that the Debtor would rather fight with FSB than try to reorganize. That pleading is full of condescending and unsupported statements about FSB that prove a trustee is needed.[6]

30. The Debtors' scorched earth approach toward FSB demonstrates that they have no intention of attempting to propose any realistic plan of reorganization that benefits its main creditor. This conduct coupled with the fact that the Debtors' management has an inherit conflict of interest supports the appointment of a trustee. Without a trustee, the Debtors' continued acrimonious relationship with its main creditor will only cause further loss to the estate as professional fees and expenses will continue to mount.

      c.     **Mismanagement of Revenue from Active Contracts that Expire in April of 2011**

31. According to the Debtors, either four or five of the rigs, the revenue of which is pledged as security for the debentures, are actively working and producing significant monthly revenue. For the thirty-one week period ending December 24, 2010, rig revenue was $12,800,000.

32. The most lucrative contract is a long-term contract with Petrohawl on Rig No. 28. This contract produces approximately $25,000 per day in net revenue. Transcript of 2004 Examination of Debtors, Exhibit "I", pp. 70 and 71. This contract expires in April of 2011.

33. As noted in paragraph 24 above, the Debtors have paid out nearly one million dollars ($1,000,000) to insiders during that thirty-one week post-petition period. Further, they have paid their professionals over $400,000 and paid a "reorganization expert" $23,000 a month to assist with their restructuring plans. Yet, no plan has been forthcoming.

---

[6]Curiously, the only one complaining about FSB's actions are the Debtors, not any of the debenture holders.

12

34. Because the Debtors' most profitable contract expires in April, the immediate appointment of a Trustee is necessary to manage the revenue produced by the rigs in a manner that benefits the creditors. The failure to do so will be detrimental to all of the creditors in this case in that significantly more in management fees and insider payments will be paid between now and the end of the Petrohawl contract in April of 2011.

35. A "Debtor-in-Possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization." *Petit v. New England Mortgage Services, Inc.*, 182 B.R. 64, 69 (D. Me. 1995). This fiduciary duty includes a "duty to protect and conserve property in its possession for the benefit of creditors." *In re: Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D. N.Y. 1990). Because of the conflicts of interest, mismanagement and acrimony referenced above, creditors have no confidence the Debtors can fulfil these fiduciary obligations. Accordingly, a trustee is appropriate.

### IV. APPOINTMENT OF A TRUSTEE IS IN THE BEST INTEREST OF THE CREDITORS AND THE ESTATE

36. Even if the Court finds that cause grounds do not exist under § 1104 (a)(1), sufficient grounds exist under § 1104(a)(2) to appoint a trustee for the benefit of all creditors. Appointment of a Chapter 11 Trustee pursuant to § 1104 (a)(2) is not punishment nor does it imply a finding of fault. Appointing a Chapter 11 trustee pursuant to § 1104 (a)(2) is an acknowledgment that it is simply in the best interest of the creditors and the estate to appoint a trustee. Because of the factors stated above, even if those grounds are not sufficient cause under § 1104 (a)(1) to appoint a trustee, they are sufficient grounds to demonstrate that the appointment of a trustee is in the best interest of all creditors of the estate.

37. In the alternative, if the Court determines that there are not sufficient grounds to appoint a trustee, FSB respectfully requests that the Court appoint an examiner to investigate the activities of the Debtors. An examiner is necessary in light of the numerous connected transactions referenced above.

WHEREFORE, PREMISES CONSIDERED, First Security Bank, as trustee, respectfully requests that the Court enter an order appointing a trustee or examiner as requested in its motion.

Dated this 19th day of January, 2011.

> Respectfully submitted,
>
> **FIRST SECURITY BANK, AS TRUSTEE**
>
> By: **/s/ Jim F. Spencer, Jr.**
>       **Jim F. Spencer, Jr.**

**OF COUNSEL:**
**PAUL H. STEPHENSON, III (MSB# 7864)**
**JIM F. SPENCER, JR.(MSB# 7736)**
**C. JOYCE HALL (MSB# 2123)**
**WATKINS & EAGER PLLC**
**Post Office Box 650**
**Jackson, Mississippi 39205**
**The Emporium Building**
**400 East Capitol Street**
**Jackson, Mississippi 39201**
**Telephone: (601) 965-1900**
**Facsimile:  (601) 965-1901**
*pstephenson@watkinseager.com*
*jspencer@watkinseager.com*
*jhall@watkinseager.com*